UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CYNTHIA HILL, GAIL WILLIAMS,
DENISE INMAN, VICKIE GORDON,
ROLANDO LOPEZ, TAURA PATE, ELLEN
ENNIS, and ANDREA HOLLY individually
and on behalf of a class of all others similarly
situated;

Plaintiffs,

-against-

THE CITY OF NEW YORK, MICHAEL R.
BLOOMBERG, as Mayor of the City of New
York, RAYMOND KELLY, as Police
Commissioner, RICHARD F. NAPOLITANO,
CHARLES F. DOWD, MICHAEL V. POLITO,
LJUBOMIR BELUSIC, FRANCIS KELLY,
DONALD CHURCH, DAVID
LICHTENSTEIN, LOCAL 1549, DISTRICT
COUNCIL 37, AFSCME, AFL-CIO; and JOHN
and JANE DOES 1-20 (said names being
fictitious, the persons intended being those who
aided and abetted the unlawful conduct of the
named Defendants),

Defendants.

------------------------------------------------------------X

Docket No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiffs, by their attorneys, **MADUEGBUNA COOPER LLP**, complaining

of the defendants, alleges, upon information and belief, as follows:

## NATURE OF THIS ACTION

1.     Plaintiffs bring this action on behalf of themselves and those similarly

situated to secure protection of and to redress deprivation of rights, privileges and

immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981"), the New York Human Rights Law as contained in New York State Executive Law, § 296 *et seq.* ("NYHRL"), New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107 *et seq.* ("NYCHRL"), providing for injunctive relief and other relief against discrimination on the basis of race, gender, creed, national origin, and disability; the First Amendment to the United States Constitution and 42 U.S.C. § 1983, providing for redress of deprivation of rights under color of law; and 42 U.S.C. § 1988, providing for the protection of all persons in their civil rights.

2.    This is also a class action brought pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* (the "FMLA") to correct willful employment practices, policies and procedures that have denied benefits guaranteed by the FMLA, and/or discriminated against eligible employees who sought to exercise their FMLA rights.

3.    Relief is also sought pursuant to the New York State Public Employees' Fair Employment Act of 1967, New York Civil Service Law ¶ 200 *et seq.* (the "Taylor Law") and the New York City Collective Bargaining Law ("NYCCBL"), New York City Administrative Code § 12-306(b)(1) and (3), based on violations of the duty of fair representation owed to Plaintiffs and the class they

represent.

4.      This action also seeks remedy, pursuant to the New York State Taylor Law, for breach of contract for violations of the Collective Bargaining Agreement ("CBA") (**Exhibit A** hereto) between Plaintiffs' union, defendant LOCAL 1549, DISTRICT COUNCIL 37, AFSCME, AFL-CIO ("DC 37") and defendant CITY OF NEW YORK ("City"), the terms of the so-ordered Settlement Agreement between Operator Plaintiffs and the City in the matter entitled Rodriguez et al. v. The City of New York, No. 1:06-cv-3049 (BMC), 2006 WL 2023949 (E.D.N.Y. June 20, 2006) (the "FMLA Class Action") (**Exhibit B** hereto – Stipulation of Settlement, and Order Approving Stipulation of Settlement, No. 06-cv-3049, Dockets # 55 and 77), and to enforce the terms of the arbitration decision dated August 2, 2008, City of New York v. Local 1549, Nos. 2008-402689, 402 689-08, 2008 WL 6626210 (N.Y. Sup. Aug. 2, 2008), rendered in favor of defendant DC 37 against the City (the "August 2008 Arbitration Decision") (**Exhibit C** hereto).

5.      This action is also brought pursuant to New York State Labor Law, § 162 *et seq.*, and other pertinent sections and provisions of New York State and New York City Law entitling employees to required meal breaks and entitling Plaintiffs to earned sick time.

6.      Plaintiffs seek appropriate class-wide injunctive and declaratory relief, monetary damages for the harm caused by the willful and discriminatory conduct of

defendants, and other appropriate legal and equitable relief as may be necessary.

## PROCEDURAL REQUIREMENTS

7.    Prior to commencement of this action, Plaintiff served a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502 (c).

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 2617(a)(2).

9.    Plaintiffs' requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.    Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all State and City law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

11.    Venue is proper in the United States District Court for the Eastern District of New York because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

### Plaintiffs

12.    Plaintiffs are a class of predominantly female African-American and Hispanic individuals currently or previously employed by the City as civilians in the Communications Section of the Police Department of the City of New York ("NYPD" or "Police Department").

13.    Plaintiffs work in Civil Service titles of Police Communications Technician ("PCT") and Supervisor Police Communication Technician ("SPCT") (collectively "Plaintiffs or "Operators"), answering the public's emergency calls received through the City's 911 response system and dispatching police radio calls.

14.    Plaintiffs work in communication centers set up by the City's Police Department at One Police Plaza in Manhattan and at 11 MetroTech Center in Brooklyn.

15.    There are approximately 1,300 PCTs and 91 SPCTs currently employed by the City's Police Department at both communications centers.

16.    The SPCTs, under general supervision, supervise and direct the activities of the PCTs.

17.    SPCTs do not have any role in promulgating the policies and procedures of the City's Police Department. However, SPCTs have the responsibility of enforcing these policies against PCTs and face disciplinary action

- 5 -

if they do not. Nonetheless, SPCTs do not have the authority to cancel FMLA leave, sick time, meal breaks, or impose mandatory overtime upon PCTs.

18. The duties and responsibilities of the PCTs and SPCTs are overseen and managed by civilian Principal Police Communication Technicians ("PPCT"), who except for defendant Francis Kelly, are mostly female and minorities.

19. All PPCTs 1 and PPCTs 2 are under the immediate supervision and control of defendant Francis Kelly, as well as under the general supervision of Police Department Captains, who are mostly white Caucasians, and uniformed and armed members of the City's Police Department.

### Named Plaintiffs

20. Plaintiff Cynthia Hill ("Hill") is an African-American woman who lives in the City of New York, Borough of Queens.

21. Since December 17, 1984 Hill has been employed by the City, first as a PCT and now as an SPCT.

22. Hill currently holds the civil service title of SPCT at 11 MetroTech Center in Brooklyn, New York.

23. At all times relevant to this lawsuit, Hill has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

24. Plaintiff Gail Williams ("Williams") is an African-American woman

who lives in the City of New York, Borough of the Bronx.

25.     Williams has been employed by the City since 1980 and with the City's Police Department since 1992.

26.     Williams currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York, having assumed that title since 1992.

27.     At all times relevant to this lawsuit, Williams has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

28.     Plaintiff Denise Inman ("Inman") is an African-American woman who lives in the City of New York, Borough of Brooklyn.

29.     Since February 23, 2001, Inman has been employed by the City.

30.     Inman currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

31.     At all times relevant to this lawsuit, Inman has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

32.     Plaintiff Vickie Gordon ("Gordon") is an African-American woman who lives in the City of New York, Borough of Brooklyn.

33.     Since March 2000, Gordon has been employed by the City.

34.     Gordon currently holds the Civil Service title of PCT at 11 MetroTech

Center in Brooklyn, New York.

35.   At all times relevant to this lawsuit, Gordon has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

36.   Plaintiff Rolando Lopez ("Lopez") is a Hispanic male, of Puerto Rican ancestry, who lives in the City of New York, Borough of Bronx.

37.   Since September 1992, Lopez has been employed by the City.

38.   Lopez currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York, and has worked as a PCT for more than 20 years.

39.   At all times relevant to this lawsuit, Lopez has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

40.   Plaintiff Taura Pate ("Pate") is an African-American woman who lives in the City of New York, Borough of Queens.

41.   Since July 2000, Pate has been employed by the City.

42.   Pate currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

43.   At all times relevant to this lawsuit, Pate has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

44.     Plaintiff Ellen Ennis ("Ennis") is an African-American woman who lives in the City of New York, Borough of the Bronx.

45.     Since March 1984, Ennis has been employed by the City.

46.     Ennis currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

47.     At all times relevant to this lawsuit, Ennis has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

48.     Plaintiff Andrea Holly ("Holly") is an African-American woman who lives in the City of New York, Borough of Brooklyn.

49.     Since April 1989, Holly has been employed by the City.

50.     Holly currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

51.     At all times relevant to this lawsuit, Ennis has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

## Defendants

52.     Defendant City is a municipal agency existing by virtue of the laws of the State of New York.

53.     Defendant City is an employer covered by the FMLA, 29 U.S.C. § 2611(4)(iii).

54.     Defendant Michael R. Bloomberg ("Bloomberg"), a white male, is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the City's Police Department known as the New York City Police Department ("NYPD").

55.     Defendant Bloomberg is sued in his official capacity.

56.     NYPD is an agency of the City and is therefore a public agency and a municipal employer covered by the Taylor Law.

57.     Defendant Raymond Kelly ("Commissioner Kelly"), a white male, is and was, at all times relevant herein, the Commissioner of the NYPD.

58.     Commissioner Kelly is and was responsible for developing and implementing the policies, practice and/or customs of the NYPD.

59.     Commissioner Kelly is also responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the individual defendants named herein.

60. Commissioner Kelly is sued in his official capacity.

61. Defendant Richard F. Napolitano ("Napolitano"), a white male, is and was, at all times relevant, Inspector and Deputy Inspector in charge of the Communications Section of the NYPD.

62. Upon information and belief, Napolitano is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within the Communication Section, including the Plaintiffs.

63. Defendant Napolitano is sued in his official and individual capacity.

64. Defendant Charles F. Dowd ("Dowd"), a white male, is and was, at all times relevant, a Chief in the Communications Section of the NYPD.

65. Upon information and belief, defendant Dowd is responsible for developing and implementing personnel policies and procedures affecting the terms and conditions of employment of employees within the Communication Section, including the Plaintiffs.

66. Defendant Dowd is also responsible for imposing and enforcing disciplinary measures against Plaintiffs.

67. Defendant Dowd is sued in his official and individual capacity.

68. Defendant Michael V. Polito ("Polito"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

69.     Upon information and belief, defendant Polito is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators.

70.     Defendant Polito is sued in his official and individual capacity.

71.     Defendant Ljubomir Belusic ("Belusic"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

72.     Upon information and belief, defendant Belusic is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators.

73.     Defendant Belusic is sued in his official and individual capacity.

74.     Defendant Francis Kelly, a white male, is and was, at all times relevant, a PPCT and Platoon Commander in the Communications Section of the NYPD.

75.     Upon information and belief, defendant Francis Kelly is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators, and fellow PPCT 1 and PPCT 2s who are mostly female and minorities.

76.     Defendant Francis Kelly is sued in his official and individual capacity.

77.     Defendant Donald Church ("Church"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

78.     Upon information and belief, defendant Church is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated Operators.

79.     Defendant Church is sued in his official and individual capacity.

80.     Defendant David Lichtenstein ("Lichtenstein"), a white male, is and was, at all times relevant, the Deputy Chief Surgeon in the Medical Division of the Police Department.

81.     Upon information and belief, defendant Lichtenstein was responsible for conducting examinations to determine if Plaintiffs and similarly situated operators were medically fit for duty under Section 72 of the New York Civil Service Law.

82.     Defendant Lichtenstein is sued in his official and individual capacity.

83.     Defendants City, Bloomberg, Commissioner Kelly, Napolitano, Dowd, Polito, Belusic, Francis Kelly, Church, and Lichtenstein, are collectively referred to as the municipal defendants.

84.     Defendant DC 37 is a recognized representative under the Taylor Law, has continuously been and is now an unincorporated association of employees in which they participate and which deals with employers concerning terms and conditions of employment, including, but not limited to, grievances, labor disputes, wages, rates of pay, hours and seniority.

- 13 -

85.    DC 37 now is, and at all times mentioned was, a labor organization representing municipal employees as recognized under the Taylor Law.

86.    DC 37 is the bargaining representative for, and has entered into a collective bargaining agreement ("CBA") with the City (**Exhibit A**) concerning the terms and conditions of employment of Plaintiffs and other employees of the Police Department of the City, which agreement was in force during the relevant period alleged herein.

87.    The CBA was entered into by defendants for the benefit of the employees of the Communications Section of the NYPD, and plaintiffs, as members of the Communications Section, are accordingly entitled to the benefit of the agreement and to enforce the provisions thereof.

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons consisting of all minority persons working under the Civil Service titles of PCT and SPCT who currently work or have worked for the NYPD Communications Section, within three years preceding the filing of this complaint.

89.    All said persons, including named Plaintiffs, are referred to herein as the "Class." The Class members are readily ascertainable. The number and identity

of the Class members are determinable from the records of Defendant City and the EEO Office of the City's Police Department. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under said F.R.C.P. 23.

90.     The proposed Class is so numerous that joinder of all members is impracticable and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of the Class is unknown, upon information and belief, at least two hundred (200) persons would choose to join the Class.

91.     Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each Class member in separate actions. All the Class members were subjected to the municipal defendants' discriminatory conduct, employment practices and policies, breach of contract and interference with their FMLA and sick leave rights. Additionally, since the Class members are all union members, like Plaintiffs, each suffered from DC 37's breach of the duty of fair representation towards them.

92.     Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class.

93.     Plaintiffs are represented by attorneys who are experienced and

competent in civil rights and employment litigation. Plaintiffs' Counsel has the resources, expertise and experience to prosecute this action. Plaintiffs' Counsel knows of no conflicts among members of the class or between the attorneys and members of the class.

94.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy. This is particularly true in a pattern or practice discrimination claim where individual class members lack the financial resources to vigorously prosecute a lawsuit against the municipal Defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions entail. Moreover, due to the invidious nature of discriminatory employment practices, the ability to properly demonstrate a pattern or practice of disparate treatment requires a class action when brought as a private suit.

95.   Due to the nature of civil rights claims against high-ranking police officials and municipal employers, current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Class action provide class members who are not named in the complaint a degree of anonymity which allows for the vindication of their rights while eliminating or reducing these risks.

96.   There are questions of law and fact common to the Class which

- 16 -

predominate over any questions affecting only individual class members, including:

a.  whether Defendants subjected Plaintiffs and the Rule 23 Class to a pattern or practice of disparate treatment as their employer due to their race in altering the terms and conditions of their employment;

b.  whether Defendants interfered with the FMLA rights of the Plaintiffs and the Rule 23 Class in frustrating the ability to request FMLA and retaliating against those who took FMLA leave;

c.  whether Defendants breached the CBA by canceling all sick leave and subjected those who attempted to use sick leave to intimidation, threat of imminent harm and harassment;

d.  whether Defendants breached the CBA by declaring an on-going emergency and requiring excessive double-shifts back-to-back;

e.  whether Defendants breached the CBA by not giving mandatory overtime and double-shift orders in advance and in writing;

f.     whether Defendant DC 37 breached its duty of fair representation by not enforcing terms of the CBA, past Arbitration decisions, such as the August 2008 Arbitration Decision or the prior settlement agreement with respect to the FMLA Class Action; and,

g.     whether Defendants violated federal and state labor laws by denying Plaintiffs and the Rule 23 Class meal breaks and/or accurate compensation for mandatory work imposed during said meal breaks.

97.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

## FACTS COMMON TO ALL INDIVIDUAL AND CLASS CLAIMS

98.    Plaintiffs work in a demanding high-stress environment where every call counts, and can be the difference, literally, between life and death. Plaintiffs are responsible not only to ensure that 911 emergency calls are expeditiously and appropriately dispatched to the correct source but also to dispatch all NYPD police radio calls for back-up, shots fired and other distress calls. In particular, PCTs are responsible for answering and directing the 911 calls so that the appropriate Police, Fire or emergency resources can be dispatched. As a result, both the safety of the

public and the immediate safety of NYPD officers in the field rely on the Operators' skill and precision in taking and directing calls.

99.     Plaintiffs are dedicated and professional civilian employees of the Police Department who, day in and day out, serve the City of New York and its citizens in times of danger and tragedy, including during the terror attacks of September 11 and the recent Super Storm Sandy that caused widespread damage and fatalities within the City. Plaintiffs therefore sit at the crossroad of all emergency relief in the City.

100.    PCTs and SPCTs cover three (3) primary tours: 11:00PM to 7:00AM, 7:00AM to 3:00PM, and 3:00PM to 11:00PM. PCTs are assigned to squads, five (5) of which report for each tour. The squads work in platoons supervised by a uniformed armed NYPD Platoon Commander, who is typically a non-minority.

101.    A typical Operator works a 35-hour work week. Between in or about May 2013 and July 2013 the NYPD started requiring Operators to work mandatory double shifts of eight (8) hours each, three times per week. Since July 2013, the NYPD has required Operators to work two twelve (12) hour tours per week as a minimum amount of overtime with continued uncertainty as to the required length of each tour.

102.    Frequently, since May 29, 2013, and pursuant to policies instituted by the Police Department and practices instituted and enforced by Plaintiffs' non-minority supervisors, including the individual municipal defendants, Operators are relieved

- 19 -

from duty at 11:00 P.M. after working a mandatory double-shift and expected to return for their next shift the same day at 7:00 A.M. with an average of two-hours commuting. This schedule threatens not only the health of individual Operators but all those who depend on the City's 911 emergency response system.

103.   Since May 2013, Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez, were relieved from duty at 3:00 P.M. after working a mandatory double-shift and are expected to return for their next shift the same day at 11:00 P.M with an average of two-hours commuting, or worked a similar or equivalent tour with varying start times.

104.   Since May 2013, Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez, have been required by the City and the Police Department to work mandatory double shifts of 8 hours each three times per week. Currently these plaintiffs are required to work, at a minimum, two twelve-hour shifts each week with additional overtime and additional tours as required. On occasion, the midnight squad will work until 11:00A.M., and be required to return to work at 7:00 P.M. the same day.

105.   Beginning in 2012, the City and NYPD, through the individual municipal defendants, have frequently and arbitrarily cancelled the use of sick leave accrued by Plaintiffs under the CBA, intimidated those Plaintiffs attempting to use sick leave, and retaliated against those of them who use or attempt to use their contractually and

legally entitled FMLA or sick leave.

106.   Since May 2013, the City and NYPD, through the individual municipal defendants, have retaliated against, or threatened future retaliation against, Plaintiffs Gordon, Inman, Holly, Lopez, Hill, Pate and Ennis for using or attempting to use their contractually and legally entitled FMLA or sick leave.

107.   Since May 2013, the City and NYPD, through the individual municipal defendants, have arbitrarily cancelled the use of sick leave accrued by Plaintiffs Williams, Gordon, Inman, Hill, Pate, Ennis, Holly and Lopez.

108.   From May 2013 and continuing, the City and its Police Department has implemented formal and informal policies that interfere with Plaintiff's rights to FMLA leave, and municipal defendants by their conduct, practices and policies have retaliated against those Operators who use FMLA leave.

109.   Since May 2013, the City and NYPD, through the individual municipal defendants, have arbitrarily imposed additional mandatory overtime on all Operators including Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez.

110.   The City and its Police Department, acting through the individual municipal defendants currently maintains a policy that discourages, intimidates and retaliates against those Operators who seek reasonable accommodations under the State and Federal law, including the NYHRL, NYCHRL and the Americans with Disabilities Act ("ADA").

111.   Since May 2013, Plaintiffs who report sick or seek to exercise their FMLA rights are subjected to immediate reprisals, cancellation of sick calls, delay or denial of FMLA applications, and imposition of additional mandatory overtime on all Operators.

112.   Presently, the City and its Police Department require the Operators to clock out from their shifts and then wait to sign out before leaving. At times, the sign-out sheets are willfully held and hidden from the Operators by their supervisors who have been instructed to take the sheets to different rooms to impede Plaintiffs' and Operators' ability to sign out. This practice by defendants and others acting in concert with them violates the rights of Plaintiffs and the Operators, and compels them to continue working without pay.

113.   Presently, the City and the Police Department require Operators to answer and dispatch calls during their meal breaks when call volumes spike in violation of rights under the CBA and New York State Law in that defendants and those acting in concert with them have forced and continues to force Plaintiffs and Operators to sit and work for up to 3 hours in violation of video display terminal ("VDT") health protection rights under the CBA (see **Exhibit A** at 50), citywide rules as well as state and local laws.

114.   Since May 2013, the City and its Police Department, through the individual municipal defendants, have required Plaintiffs, Williams, Gordon, Inman,

Pate, Ennis, Holly and Lopez, to answer and dispatch calls during their meal breaks in violation of law.

115.   Since May 2013, the municipal defendants have therefore been willfully violating the civil rights of the Plaintiff as well as several provisions of the CBA between the City and DC 37 together with August 2008 Arbitration Decision and the settlement agreement regarding the FMLA rights of Plaintiffs approved by this Court (Hon. Brian Cogan, U.S.D.J.), on December 19, 2009 (the "December 2009 Settlement Agreement").

116.   Since July 8, 2013, Defendant DC 37 has irrationally and discriminatorily ignored the appalling working conditions of the Operators and has failed and refused to enforce the provisions of the CBA, the terms of past Arbitration decisions, and the December 2009 Settlement Agreement while continuously promising and affirming to the Operators that they were addressing the issue with the City and NYPD.

117.   All of the above employment policies, practices and conduct of the municipal defendants, and the inaction of DC 37 are evidence of the intentional discrimination against the predominantly minority and female Plaintiffs, for which monetary compensation and injunctive relief is sought.

### Defendants' Violation of Sick Leave Policy and CBA

118.   The CBA between the City and DC 37 provides the Operators with an allotment of 12 paid sick leave days and 3 family sick days that they may use when

they or a family member are ill.

119.   Upon information and belief, since on or around 1999, the NYPD has been arbitrarily restricting Operational floor personnel sick leave.

120.   In or around 2006, DC 37 filed a grievance against the City and NYPD before the Board of Collective Bargaining on behalf of Plaintiff Hill and Toni Reid for violating its duty to bargain by unilaterally changing its procedures for requiring documentation of certain categories of sick leave.

121.   By a decision dated December 4, 2006, the Board of Collective Bargaining, found that the City and NYPD's actions constituted a change in sick leave procedures regarding documentation required for the use of leave time for FMLA-qualifying health conditions and that the City failed to bargain to the point of agreement with the Union before unilaterally imposing the changes, in violation of New York City Collective Bargaining Law ("NYCCBL") § 12-306(a)(1) and (4).

122.   Following the City's refusal to comply with the decision dated December 4, 2006, in or around 2007, DC 37 filed for Arbitration.

123.   By a decision dated August 2, 2008, the Board of Collective Bargaining concluded that the City violated the CBA by issuing blanket cancellation of sick leave. See **Exhibit C**.

124.   According to the decision:

- 24 -

"The citywide agreement and related regulations and rules all grant the NYPD the discretion to approve sick leave requests based on its satisfaction with the proof of disability submitted by its employees. There is no provision in the contract, rule or regulation, however, that authorizes an agency to deny sick or injured employees the right to request sick leave. On the occasions that the City suspended sick leave, it was not exercising discretion to approve or disapprove the leave. It was instead denying its employees the contractual right to request it." Id. at 6-7.

125.   In light of the above findings, the arbitrator concluded that "the Union has met its burden of demonstrating that the City violated the sick leave provisions of the citywide agreement and related rules and regulations" and, among other things, directed that the City "[c]ease and desist from canceling sick leave." Id. at 7.

126.   Neither the City nor the Police Department appealed or otherwise challenged the August 2008 Arbitration Decision.

127.   Despite the August 2008 Arbitration Decision, since May 2013, the City and NYPD acting through the individual defendants have continued to cancel sick leave of Plaintiffs, as aforesaid.

128.   In or around May 2013, the NYPD began suspending sick leave on a regular basis for the Operators.

129.   Between May and August 2013, sick leave was consistently cancelled every Wednesday and reinstated every Monday for Operators.

130.   In particular, sick leave was cancelled from June 26, 2013 to July 4, 2013 for 10 consecutive days.

131.   From May 2013, if a PCT or SPCT attempts to use an accrued sick leave day when being sick would cause them to miss mandatory overtime, that employee is automatically marked absent without leave ("AWOL") by NYPD's Communication Section command. When the Operator returns to work an AWOL notice is given to them.

132.   Since May 2013 and continuing, an Operator who tries to use sick leave when the City and NYPD declared that it is canceled are denoted as "attempted sick" which is a status the NYPD made up specifically and only for 911 Operators.

133.   At all relevant and material times, and since May 2013, although department rules state in the NYPD Civilian Handbook that no doctor's note is required for an absence of less than 3 days, the NYPD is requiring this for operational PCTs and SPCTs.

134.   Since May 2013, Day Tour Captains at the Communications Centers have been specifically positioned at the sick desk where they intentionally challenge any Operator that wishes to use his or her sick leave.

135.   Also, since May 2013, Defendants City and NYPD, acting thorough the individual defendants, threaten to change tours and squads of Operators that

take sick leave. For instance, PCTs have had their day tours changed to midnight tours because they failed or refused to complete mandatory overtime.

136.   Moreover, since May 2013, Operators who attempt to use or appeal sick day requests have had their files marked "not a team player," or comments to that effect, in evaluations.

137.   At different times between May 2013 and the present, Plaintiffs have been threatened with discipline when they requested to take sick leave.

138.   From May 2013 and continuing, the City and NYPD have released directives instructing performance evaluators to refer to Operators who use sick days as "not a team player," or comments to that effect.

### Use of Derogatory Remarks and Comments towards Operators

139.   In or around June 2013, while in the clerical area of the Communication Section, and noticing that only a few Operators were reporting for duty, Defendant Polito exclaimed, in sum and substance, in reference to the largely African-American and Hispanic Operators, "Don't they know they are hiring at Pathmark?!!"

140.   Similarly, in or around July 4, 2013, Defendant Polito stated, while in the Platoon Commander's office, at the Metro Tech Center, in sum and substance, that "you people are useless" in reference to a group of largely minority female Operators, including Plaintiff Hill, who was within earshot of his comments, and

another PCT, who was removed to the hospital with high blood pressure.

## Use of Threats and Compulsion of Operators to Perform Overtime

141.   On or about July 7, 2013, defendant Church, while armed, threatened Operators that had already worked four consecutive 16-hour days at the Metro Tech communications center that if they did not work a fifth, he would take three days of vacation away from them.

142.   Additionally, on that day (July 7, 2013) Church also made intimidating remarks regarding his unquestionable authority to grant relief from duty.

143.   Church who was wearing his holstered NYPD issued weapon at the time, on July 7, 2013, also gave the Operators who had already worked four consecutive 16-hour days at the Metro Tech Communications Center five seconds to comply, and warned them that "if you don't return to your positions by the time I count to five I'm going to take three [vacation] days from each of you."

144.   Plaintiff Pate was present when Church made the threat on July 7, 2013, and was one of the Operators who had had already worked four consecutive 16-hour days.

145.   On or about July 23, 2013, NYPD, through defendant Francis Kelly, instituted a policy whereby a list is compiled and reviewed to determine which Operators missed involuntary overtime so that those Operators will be forced to

make up the missed overtime on one of their regular days off.

146.   Pursuant to this July 2013 policy, any Operator who missed mandatory "held-over" overtime due to FMLA leave was given a written order to perform mandatory overtime the very next day.

147.   At all material times, defendant DC 37 was aware of the City and Police Department's cancelation of Plaintiffs' sick leave and violation of the August 2008 Arbitration Decision, as well as the above unlawful acts of the individual municipal defendants towards the Operators. Yet DC 37 did nothing to protect Plaintiffs, enforce the terms of the decision or challenge the actions of the municipal defendants while representing to the Operators in July and August 2013 that they were addressing the issue with the City and NYPD.

**Defendants Willfully Holding the Operators at Work Uncompensated**

148.   Defendants willfully prevent the Operators from leaving work after they have clocked out from their shifts resulting in unpaid wages.

149.   Since May 2013, the NYPD has been requiring the Operators to first clock out from their shifts and then wait to sign out with a supervisor before leaving work. This time spent waiting to sign out is not compensated.

150.   Operators who do not sign out face disciplinary action.

151.   At times, the sign out sheet is willfully hidden from the Operators to prevent them from leaving work in a timely manner after their shifts and after they

have clocked out.

152.   Communication Division management have instructed lower level managers, SPCTs, to leave the room with the sheet and walk around in the building to evade and delay sign out.

### Defendants' Violation of FMLA Policies

153.   On June 26, 2006, Operators, with Plaintiff Hill, as one of the named Plaintiff, commenced the FMLA Class Action, against defendants City, Mayor Bloomberg and Commissioner Kelly, in this Court, "to correct various willful employment practices, policies and procedures that have denied benefits guaranteed by the FMLA, and/or discriminated against eligible employees who sought to exercise their FMLA rights."

154.   On January 24, 2008, this Court (Hon. Brain Cogan, U.S.D.J.) certified the class.

155.   A Settlement Agreement was reached on June 11, 2009, and so-ordered by Judge Cogan on December 10, 2009. See **Exhibit B**.

156.   The terms of the so-ordered agreement, *inter alia*, provided that the NYPD would not cancel or delay FMLA leave for the Operators, would exclude FMLA leave as a consideration in performance reviews and follow FMLA anti-retaliation provisions. Id.

157.   Since May 2013, Defendant City through NYPD have implemented

retaliatory measures and engaged in intimidating practices against Operators seeking to exercise their rights under FMLA.

158. Plaintiff Ennis has been the target of such retaliatory measures and intimidation.

159. In or around April 2013, the Police Department through Defendant Belusic released a list of Operators with a "high absentee rate" who are no longer allowed to work voluntary overtime regardless of whether the Operators were absent due to qualified FMLA leave.

160. In his April 2013 communication, Defendant Belusic informed operators that the Disciplinary Unit will only accept FMLA calls that are placed thirty (30) minutes prior to the time when the employee is requesting to leave. If the Operator calls more than thirty (30) minutes before the time, the FMLA request will be denied and the Operator will be told to call back.

161. As of May 2013, any Operator who proceeds on qualified FMLA leave and as a result fails to perform mandatory overtime, upon return to duty is automatically required to perform mandatory overtime, even if that Operator's squad is not scheduled to work overtime, or face disciplinary charges.

162. At different times between May 2013 and the present, Plaintiff Ennis has been required to perform automatic overtime when she returned from FMLA leave even when her squad is not scheduled for overtime.

163. In an attempt to discourage and interfere with Plaintiffs' FMLA leave requests, by a memorandum dated March 23, 2013, Defendant Napolitano directed that Operators requesting FMLA leave to call the Disciplinary Unit's new FMLA-dedicated telephone number, instead of the "Platoon Commander's Office" and consolidated the FMLA unit into the Disciplinary Unit.

164. This unilateral change in the procedure for requesting FMLA leave by Plaintiffs allows the NYPD to keep a strict watch over FMLA leave usage by Plaintiffs and has turned a civil right into a disciplinary issue.

165. On or about July 24, 2013, the City and NYPD, through defendant Napolitano, changed the name of the "Disciplinary Unit" to the "Compliance Unit" in an attempt to obscure their interference and retaliation with Plaintiffs' FMLA rights by making it more difficult for Operators to take FMLA leave.

166. On or about September 30, 2013, Arnold S. Wechsler, the NYPD Deputy Commissioner of Personnel, issued a memorandum noting that an "FMLA Compliance Unit" was created that would be located at One Police Plaza to reduce FMLA abuse among the Operators.

167. Upon information and belief, no other civilian or non-civilian NYPD unit has been forced to undergo the above FMLA policies that now exist in the Communications Section and are imposed only on the predominantly minority Operators.

**Violation of Plaintiffs' Rights to Reasonable Accommodation**

168.   Since June or July 2013, the City and NYPD has instituted a policy of automatically requiring all Operators who request a reasonable accommodation to undergo a medical examination pursuant to Section 72 of the New York Civil Service Law, where Operators are automatically declared unfit for duty by physicians employed by the Police Department, such as defendant Lichtenstein, without conducting actual examinations or properly reviewing the Operator's personnel file. They have also been threatened with unpaid leave.

169.   Since in or about May 2013, Defendant City and its Police Department is responding to requests for reasonable accommodations by Plaintiffs in a racially discriminatory manner and imposing regulations unlike other NYPD of civilian units.

**The Effect of Defendants' Conduct on the Health of Operators**

170.   As aforesaid, since May 2013, Operators are forced to work their regular 35-hour work week shifts plus three extra mandatory overtime double shifts each week of 8 hours. In addition, since July 2013, the NYPD now requires two twelve-hour tours per week as a minimum amount of overtime with continued uncertainty as to the required length of each tour.

171.   The mandatory non-stop double shifts imposed by the municipal

defendants on Plaintiffs are causing illness and fatigue in addition to the high-stress job of being an Operator.

172. Since May 2013, and as has been widely reported in the media, a number of Operators have collapsed from exhaustion while dispatching calls and were removed from the MetroTech Center by paramedics.

173. On or around the weekend of September 21, 2013, Plaintiff Andrea Holly was removed from the Metro Tech call center by paramedics.

174. The Operators are routinely prevented from taking even short meal breaks and are provided with inadequate bathroom facilities.

### Defendants' Abuse of Civil Service Law, Section 72 Examination

175. As of May 2013, when Operators present a reasonable request from their private doctors seeking to limit the hours of overtime performed each day, the NYPD will automatically, as part of an informal policy, send the Operators for Section 72 examination and impose blanket denials of reasonable accommodation requests.

176. In such circumstances, the Operators are sent to an NYPD Physician, such as defendant Lichtenstein and despite not being examined or asked sufficient questions to determine their medical condition, are declared unfit for duty pursuant to Section 72 of the Civil Service Law, and either threatened with unpaid leave or given undesirable secretarial work.

- 34 -

177.    The above practice by defendants is designed to deter Operators from seeking reasonable accommodation which limits the hours of overtime.

178.    Since May 2013, defendant Lichtenstein has conducted several of these section 72 examinations wherein he does not actually examine the Operator before declaring them unfit for duty and informing them that the NYPD expects unlimited overtime performance.

179.    Since June 2013, Defendant City and NYPD is declaring Operators unfit for duty despite the fact that the City claims it is facing a staffing shortage with respect to Operators.

180.    Upon information and belief, other civilian units not manned by Plaintiffs are not targeted for and subjected to medical examinations by NYPD physicians, such as defendant Lichtenstein.

181.    Since May 2013, Operators have been pressured by the municipal defendants to have their private doctors renounce and change their request for reasonable accommodation letter, so that the Section 72 determination will be reversed and the Operator will be reinstated to active duty.

182.    For example, prior to July 3, 2013, Plaintiff Gordon submitted a reasonable request from her doctor to limit overtime each day. In response, Plaintiff Gordon was automatically directed by defendant Napolitano to appear for a Section 72 examination by defendant Lichtenstein and subsequently her

reasonable accommodation request was summarily denied and she was relieved of active duty as a Call taker and Radio Dispatcher.

183. During the examination, Plaintiff Gordon was not examined or even asked any questions by defendant Lichtenstein. Yet, defendant Lichtenstein declared Plaintiff Gordon unfit for duty under Section 72 of the Civil Service Law.

184. As a result of the conduct, policies and practices of the municipal defendants, in or about July 2013, Plaintiff Gordon was denied reasonable accommodation in the form of a four-hour exemption, despite the fact that it was medically supported with a note by her private physician, and her request would not have posed undue hardship on the City.

185. Similarly, prior to June 28, 2013, Plaintiff Ennis was denied reasonable accommodation in the form of a four-hour exemption, despite the fact that it was medically supported with a note from her private physician.

186. Also, on July 5, 2013, Plaintiff Inman was denied reasonable accommodation in circumstances similar to Plaintiff Gordon's.

187. Since May 2013, DC 37 and their agents, including attorneys for DC 37 assigned to represent Operators during Section 72 proceedings have also pressured Operators to withdraw their physician supported reasonable accommodation requests.

188. Subsequent to the denial of their requests for reasonable

- 36 -

accommodation, in July 2013, Plaintiffs Gordon and Inman were pressured by defendant DC 37 and their agents, including attorneys for DC 37, to withdraw their requests for reasonable accommodation.

### Disparate Treatment of Operators within NYPD's Disciplinary System

189.   Upon information and belief, the City and NYPD, with the tacit support and direct involvement and participation of the individual municipal defendants, subjects the Operators to disparate treatment based on their race when applying formal and informal disciplinary proceedings and policies.

190.   NYPD disciplinary policies are often vague, unwritten and ad hoc variations of written policies that prevent Operators from knowing what the actual rules or policies are, and this practice is carried out intentionally to coerce and manipulate the Operators from asserting their federal and state rights as well as their rights under the city-wide CBA.

191.   The City and NYPD have a long history of a pattern or practice of disparate treatment when applying disciplinary measures and punishments against African-American and Hispanic civilian and non-civilian employees of the department.

192.   Since at least 2011 and continuing, any disciplinary write up against an Operator initiated from any source outside of the Communications Section of the Police Department is automatically considered substantiated by the NYPD

captains and are thus not adjudicated or defensible by the Operator.

193.   Since at least 2011 and continuing, African-American and Hispanic Operators receive a disproportionally high number of Command Disciplines ("CDs") for minor infractions which are substantiated and then used as basis to deny them seniority, and for rejecting their requests for more favorable work schedules.

194.   At all relevant times, Captains in the Communications Section of the Police Department have ordered the issuance of a Report of Violation against a targeted Operator only to then adjudicate the violations themselves.

195.   At all relevant times, Operators have been disciplined under the NYPD Patrol Guide but most Operators have never seen or read the guide.

196.   At all relevant times, NYPD will send detectives to the home of Operators to investigate alleged infractions and get signatures for disciplinary actions only a few days before the expiration of the 18-month statute of limitations for adjudication of formal disciplinary actions against Operators.

197.   The aforesaid conduct of the municipal defendants towards Plaintiffs and the Operators as regards the application of disciplinary measures and punishments was willful and was based on considerations of race and color.

## DC 37 Failure to Protect Operator Union Members

198.   Since July 2013, DC 37 has failed to take any meaningful action to

challenge the deplorable working conditions of the Operators and the discriminatory and retaliatory treatment they face.

199. Plaintiff has complained to no avail to the City and the Union about their deplorable working conditions and the discriminatory and retaliatory treatment they face at the hands of the municipal defendants.

200. In or about July 2013, Plaintiffs complained to no avail to the Union about their deplorable working conditions and the discriminatory and retaliatory treatment they face at the hands of the municipal defendants.

201. Plaintiffs' July 2013 complaints were met with unfulfilled promises by the Union of an intention to address the situation sometime in the future, which to date the Union has failed to do.

202. Upon information and belief, the conduct of the Union with respect to Plaintiffs' complaints and requests were perfunctory, spurious, carried on in bad faith, and deliberately designed to give Plaintiffs the false impression that sincere efforts were being made by the Union to resolve and address their concerns about the terms and conditions of his employment.

203. The conduct of the Union towards the Plaintiffs was willful and unlawful and was based on considerations of race and color.

204. At all material times and continuing, defendant Union has failed in its duty to fairly and zealously represent Plaintiff in that it failed to file a grievance or

take Plaintiffs' highly meritorious claims and their employers' multiple violations of the law and the terms of the CBA and the August 2008 Arbitration Decision, and the 2009 Settlement Agreement.

205.   The failure of the Union in its duty to fairly and zealously represent Plaintiffs is unlawful and in violation of Plaintiffs' rights under the law.

206.   The Union's failure has impaired the ability of the Plaintiffs and class members to exhaust their administrative remedies under the CBA, and prevented any meaningful relief from being provided through the grievance process.

207.   Since the Union has not taken steps to protect Plaintiffs' rights, Plaintiffs have been compelled to retain private counsel to commence this lawsuit.

**Plaintiffs' Complaints to the Public and their Working Conditions**

208.   Since May 2013, members of the class have repeatedly and publicly complained about and explained the implications of their deplorable working conditions for public safety in public forums such as rallies.

209.   Since May 2013, there have been several Press reports of Plaintiffs' public exposure about not only Plaintiffs' working conditions, but the effects of their forced and mandatory overtime shifts on public safety compounded by what has been described as "a bulky new 911 computer-aided dispatch system that workers say has resulted in thousands of lost calls and delays."

210.   Plaintiffs' reports to and discussions with the Press about the public

safety implications of the 911 dispatch system since May 2013 were not made pursuant to their official duties as Operators.

211.   Shortly after members of the class raised awareness in public forums, and such activities were reported in news media in May 2013, the municipal defendants developed and implemented additional unlawful employment policies and practices and instituted disciplinary measures against Plaintiffs, as outlined above, which were designed to deter Plaintiffs and Class members from further speaking and complaining to the public, about their working conditions.

212.   Defendants' retaliatory conduct, as aforesaid, violated and continues to violate Plaintiffs' First Amendment rights.

### Defendants' Actions Continue and Warrant Injunctive and other Reliefs

213.   Defendants' actions were unlawful and in violation of Plaintiff's rights under several amendments to the United States Constitution as well as Federal laws such as Section 1981, and State and local laws, such as the New York City Human Rights Law, New York State Human Rights Law and New York Labor Law.

214.   As a proximate result of defendants' conduct towards Plaintiffs, Plaintiffs have suffered and continues to suffer monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

215.   As a further proximate result of Defendants' actions, Plaintiffs have

suffered and continue to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as, other incidental and consequential damages and expenses.

216.   The conduct of the individual defendants are outrageous and malicious; were intended to injure Plaintiff, and was carried out with reckless indifference to Plaintiffs' protected civil rights, thereby entitling him to punitive damages.

217.   Plaintiffs have no complete, plain, clear or adequate remedy at law.

218.   Defendants must be restrained from further retaliation and discrimination against Plaintiffs and directed to cease and desist from their unlawful acts against Plaintiffs.

219.   The acts of the defendants against Plaintiffs continue.

220.   Plaintiffs believe that the defendants' unlawful acts against them will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST CAUSE OF ACTION
### (Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981)

221.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

222.   Defendants subjected Plaintiffs to differential terms and conditions of employment because of their race.

223.   These differential terms and conditions of employment include, but

are not limited to:

    a.  canceling sick leave and retaliating against and physically intimidating those who sought to use sick leave;

    b.  interfering with FMLA leave and retaliating against those Operators who sought to use and did use FMLA leave;

    c.  implementing abusive and continuous double-shift tours of duty back-to-back while maintaining dangerously low-staffing levels;

    d.  implementing and enforcing a blanket policy of denying ADA reasonable accommodation requests and using Section 72 fitness-for-duty examinations as retaliation for Operators who sought accommodations due to serious and on-going medical conditions;

    e.  applying and implementing arbitrary and harassing disciplinary measures against Operators;

    f.  violating the CBA, past arbitration and settlement agreements; and

    g.  denying meal breaks and adequate rest periods.

224.  All the foregoing actions were taken by the Defendants in order to deprive Plaintiffs of employment and other contractual opportunities on account of their race.

225.  Because of the willful and deliberate actions of the Defendants, and as a proximate cause thereof, Plaintiffs have been and continues to be denied their

rights to equal employment opportunity in violation of Section 1981.

226.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Sex, Race and Color Discrimination in Violation of NYHRL)

227.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

228.   By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of sex, their race and color, Defendants violated the New York State Human Rights Law.

229.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Sex, Race and Color Discrimination in Violation of NYCHRL)

230.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

231.   By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of their sex, race and color, Defendants violated New York City Human Rights Law.

232.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (First Amendment Violation)

233.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

234.   By developing and implementing unlawful employment policies and practices designed to deter Plaintiffs and Class members from further speaking and complaining about their working conditions to the public and in public forums, Defendants violated and continue to violate Plaintiffs' First Amendment rights.

235.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Pursuant to FMLA 29 U.S.C. § 2601, *et seq.*)

236.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

237.   As a direct and proximate result of defendants' policies, procedures and practices alleged herein, the rights of employees are being interfered with and denied in violation of the FMLA.

238.   Defendants have (1) created policies to frustrate and make it more difficult for Operators to seek FMLA leave in violation of past settlement agreements; (2) created policies to directly retaliate against Operators who take qualified FMLA to seek treatment or care for their ill family members by requiring

- 45 -

involuntary overtime upon their return and requiring them to report for duty on their regular days off in order to disrupt their schedules; and (3) treated those who seek FMLA leave as delinquents and scofflaws who must be disciplined and thus requiring FMLA request to be made directly to the Disciplinary Unit.

239.   Plaintiffs are entitled to declaratory judgment, declaring that the employment policies, practices and procedures adopted and implemented by defendants apply to and govern employee requests for intermittent FMLA leave as alleged herein, are unlawful and in violation of the FMLA.

240.   Unless injunctive relief is granted, Plaintiffs and class members who are otherwise eligible for FMLA rights, benefits and protections will be irreparably harmed by defendants' continued refusal to comply with their statutory obligations.

## SIXTH CAUSE OF ACTION
### (Breach of Contract pursuant to Section 200 *et seq.* of the New York State Civil Service Law, Public Employees' Fair Employment Act)

241.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

242.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under the CBA by reason of the scheduling of excessive and dangerous involuntary double-shifts, canceling sick leave, violating VDT health protection rights, and failing to provide proper notice of overtime.

243.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (New York State Labor Law Violation pursuant to § 162)

244.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

245.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under New York Labor Law to have the required meal breaks.

## EIGHTH CAUSE OF ACTION
### (Defendant DC 37 Breach of the Duty of Fair Representation)

246.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

247.   Defendant DC 37 acted irrationally, discriminatorily and in bad faith in not taking any meaningful steps to protect the rights of minority union members working as Operators and failing to enforce past arbitration decisions and settlement agreements.

248.   By failing in its duty to fairly and zealously represent Plaintiffs, DC 37 violated and continues to violate Plaintiffs' rights contrary to Section 200 *et seq.* of the New York State Civil Service Law, Public Employees' Fair

Employment Act and New York City Administrative Code ¶ 12-306(b)(1) and (3).

249.   By reason of the foregoing, plaintiffs have suffered loss and damage in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Defendant DC 37 pursuant to 42 U.S.C. § 1981)

250.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

251.   Defendant DC 37 subjected Plaintiffs to differential terms and conditions of representation because of their race.

252.   All the foregoing actions were taken by the Defendants DC 37 in order to deprive Plaintiffs of their contractual opportunities under the CBA.

253.   Because of the willful and deliberate actions of the Defendants DC 37, as a proximate cause thereof, Plaintiffs have been and continue to be denied their rights to equal enforcement of contracts under the CBA in violation of Section 1981.

254.   By reason of the foregoing, plaintiffs have suffered loss and damage in an amount to be determined at trial.

## PUNITIVE DAMAGES

255.   By reason of the wanton, unrepentant, reckless and egregious conduct of the individual defendants herein-above alleged, Plaintiffs claim punitive

damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the named Plaintiffs and other members of the class they

seek to represent pray that the Court:

a) Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b) Issue an order for the following preliminary injunctive relief:

    I.   Enjoining the NYPD from interfering with and retaliating against those Operators requesting FMLA leave;

    II.   Enjoining the NYPD from canceling sick leave under the CBA and intimidating and retaliating against those Operators who seek and do use sick days;

    III.   Enjoining the NYPD from intentionally holding Operators after they have clocked out and forcing them to remain at work uncompensated after their shifts;

    IV.   Enjoining the NYPD's pattern or practice of discriminatory disciplinary measures against the Operators;

    V.   Enjoining the NYPD's pattern or practice of discriminatory and abusive scheduling of involuntary and dangerous double-shifts consecutively;

c) Impanel a jury to hear Plaintiffs' claims;

d) Issue a class-wide judgment declaring that the NYPD's pattern or practice of disparate treatment of the Operators is unlawful in that it violates § 1981 and the laws of New York State and New York City;

- 49 -

e) Award compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

f) Award all Plaintiffs, including the members of the Class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

g) Award all Plaintiffs, including members of the Class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

h) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:      November 4, 2013
            New York, New York

Respectfully Submitted,

SAMUEL O. MADUEGBUNA (6084)
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiffs
110 Wall Street, 11th Floor
New York, New York 10005
(212) 232-0155

TO:   **DEFENDANTS**

      THE CITY OF NEW YORK
      c/o Corporation Counsel
      Law Department
      100 Church Street
      New York, New York 10007

      MICHAEL R. BLOOMBERG,
      City Hall
      New York, New York 10007

- 50 -

RAYMOND KELLY,
New York City Police Department
One Police Plaza
New York, New York 10007

RICHARD F. NAPOLITANO,
New York City Police Department
One Police Plaza
New York, New York 10007

CHARLES F. DOWD,
New York City Police Department
One Police Plaza
New York, New York 10007

MICHAEL V. POLITO,
New York City Police Department
One Police Plaza
New York, New York 10007

LJUBOMIR BELUSIC,
New York City Police Department
11 MetroTech Center
Brooklyn, New York 11201

FRANCIS KELLY,
New York City Police Department
One Police Plaza
New York, New York 10007

DONALD CHURCH,
New York City Police Department
One Police Plaza
New York, New York 10007

DAVID LICHTENSTEIN,
New York City Police Department
One Police Plaza
New York, New York 10007

- 51 -

LOCAL 1549, DISTRICT COUNCIL 37, AFSCME, AFL-CIO
125 Barclay Street
New York, New York 10007

**MADUEGBUNA COOPER LLP**
110 Wall Street, 11th Floor, New York, New York 10005
(212) 232 - 0155

# EXHIBIT A



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, N.Y. 10006
http://nyclink.org/html/olr/

**JAMES F. HANLEY**
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

TO:        HEADS OF CONCERNED CITY DEPARTMENTS AND AGENCIES

FROM:     JAMES F. HANLEY, COMMISSIONER

SUBJECT:  EXECUTED CONTRACT: CITYWIDE AGREEMENT

TERM:     JANUARY 1, 1995 THROUGH JUNE 30, 2001


        Attached for your information and guidance is a copy of the executed contract entered into by the Commissioner of Labor Relations on behalf of the City of New York and District Council 37 on behalf of the incumbents of positions listed in Article I of said contract.

        The contract incorporates terms of an agreement reached through collective bargaining negotiations and related procedures.

DATED:     May 19, 2000


OFFICE OF LABOR RELATIONS
REGISTRATION

OFFICIAL                    CONTRACT

NO:                              DATE:
00001                      May 19, 2000

# 1995 - 2001 CITYWIDE AGREEMENT

## CONTENTS:

ARTICLE I - UNION RECOGNITION ON CITYWIDE MATTERS .................................................. 1

ARTICLE II - WORK WEEK................................................................................................ 3

ARTICLE III - SHIFT DIFFERENTIAL AND HOLIDAY PREMIUM ............................................ 3

ARTICLE IV - OVERTIME ................................................................................................. 5

ARTICLE V - TIME AND LEAVE ....................................................................................... 10

ARTICLE VI - TIME AND LEAVE VARIATIONS.................................................................... 23

ARTICLE VII - HEALTH INSURANCE ................................................................................ 25

ARTICLE VIII - CAR ALLOWANCES................................................................................. 26

ARTICLE IX - PERSONNEL AND PAY PRACTICES ............................................................ 27

ARTICLE X - EVALUATIONS AND PERSONNEL FOLDERS ................................................ 33

ARTICLE XI - CIVIL SERVICE, CAREER DEVELOPMENT.................................................... 34

ARTICLE XII - UNION RIGHTS ....................................................................................... 35

ARTICLE XIII - WELFARE FUNDS ................................................................................... 37

ARTICLE XIV - OCCUPATIONAL SAFETY AND HEALTH .................................................... 41

ARTICLE XV - ADJUSTMENT OF DISPUTES .................................................................... 42

ARTICLE XVI - DISCIPLINARY PROCEDURE FOR PROVISIONAL EMPLOYEES ................... 45

ARTICLE XVII - JOB SECURITY ..................................................................................... 46

ARTICLE XVIII - VDT OPERATORS ................................................................................. 50

ARTICLE XIX - NO STRIKE............................................................................................. 52

ARTICLE XX - FINANCIAL EMERGENCY ACT.................................................................. 52

ARTICLE XXI - RESOLUTION ......................................................................................... 52

ARTICLE XXII - SAVINGS CLAUSE ................................................................................. 52

APPENDIX A ............................................................................................................... 54

APPENDIX B ............................................................................................................... 85

APPENDIX C ............................................................................................................... 86

APPENDIX D ............................................................................................................... 89

APPENDIX E ............................................................................................................... 90

APPENDIX F................................................................................................................ 91

APPENDIX G ............................................................................................................... 93

00001

# 1995 - 2001 CITYWIDE AGREEMENT

**COLLECTIVE BARGAINING AGREEMENT** entered into this _____ day of _____ by and between the City of New York and related public employers pursuant to and limited to their respective elections or statutory requirement to be covered by the New York City Collective Bargaining Law ("NYCCBL") and their respective authorizations to the City to bargain on their behalf and the New York City Health and Hospitals Corporation (hereinafter referred to jointly as the "Employer"), and District Council 37, AFSCME, AFL-CIO (the "Union"), for the period from January 1, 1995 – June 30, 2001.

## WITNESSETH:

**WHEREAS,** the parties hereto have entered into collective bargaining and desire to reduce the results thereof to writing,

**NOW, THEREFORE,** it is mutually agreed as follows:

## ARTICLE I - UNION RECOGNITION ON CITYWIDE MATTERS

### Section 1.

The Employer recognizes the Union as the sole and exclusive collective bargaining representative on citywide matters which must be uniform for the following employees:

i.   Mayoral agency employees subject to the Career and Salary Plan.

ii.  Employees of the Health and Hospitals Corporation with the exception of Group 11 employees and interns and residents.

iii. Employees of the Off-Track Betting Corporation and the New York City Housing Authority pursuant and limited to the extent of their respective elections to be covered by the NYCCBL.

iv.  Employees of the Comptroller, the District Attorneys, the Borough Presidents, and the Public Administrators, who are subject to the Career and Salary Plan, pursuant and limited to the terms of their respective elections to be covered by the NYCCBL, and any museum, library, zoological garden or similar cultural institution for employees whose salary is paid in whole from the City Treasury, pursuant and limited to the election of said cultural institution to be covered by this Agreement.

### Section 2. Exclusions

a.   Prevailing rate employees are excluded from the coverage of this Agreement.

b.   Managerial, confidential, exempt civil service employees, and other employees ineligible for collective bargaining are excluded from the coverage of this Agreement.

### Section 3.

The Employer recognizes the Union as the sole and exclusive collective bargaining representative for employees included in the New York City Employees' Retirement System on pension matters which must be uniform for all such employees pursuant to Section 1173-4.3(a)(5) of the NYCCBL. In the event that the current prohibition against bargaining for retirement benefits is discontinued, the parties agree to reopen negotiations on this matter.

00001

## Section 4.

For the purposes of this Agreement, the term "employee" shall mean a full-time per annum worker, unless otherwise specifically indicated herein.

## Section 5.

Effective January 1, 2000, and each April 1st, July 1st, October 1st, or January 1st thereafter, any per diem employee who has worked the appropriate number of hours in the normal full-time week established for such per annum title as listed in Appendix A of this Citywide Agreement for at least eighteen (18) continuous months immediately preceding the beginning of said quarter, and who continues to meet the above-stated conditions without a break in service of more than 31 days, shall be deemed to be an "employee" under Article I, Section 4 of the Citywide Agreement, subject to the conditions listed below.

a.   The following sections of the Citywide Agreement shall not be applicable: Article V, Sections 18 (summer hours) and 19 (per diem accrual leave rates); and Article VI, Section 8 (summer hours).

b.   Seniority for eligibility for benefits pursuant to this Section 5 shall be computed from the date 18 months prior to the date such employee becomes covered by this Section 5.

c.   These provisions shall not apply to employees hired pursuant to Rule 5.6 of the Personnel Rules and Regulations of the City of New York.

d.   Notwithstanding the provisions of this Section 5, an employee, who at the time of appointment to a title is assigned to regularly work the normal full-time work week established for such per annum title as listed in Appendix A must continue to work such on a full-time basis for at least 2 years without a break in service of more than 31 days, to be covered by Article XVI (Disciplinary Procedure For Provisional Employees), subject to the conditions listed below.

    i.   The employee must have been serving provisionally in such competitive class position on a full-time per annum or full-time per diem basis.

    ii.   Prior provisional service followed by permanent service may not be aggregated with current provisional service (*e.g.* prior provisional service as a temporary or seasonal "step-up" followed by permanent service may not be counted towards meeting the service requirement in an employee's current provisional position)

e.   For the purposes of this Section 5, Article IX, Section 24 and Article XVI the following unpaid time in excess of 31 days will not be deemed a break in service or be counted as service:

    i.   for maternity/childcare leave;

    ii.   for military leave;

    iii.   jury duty;

    iv.   for union business pursuant to Executive Order 75;

    v.   while pending workers' compensation determination;

    vi.   while on workers' compensation option 2;

    vii.   due to illness or exhaustion of paid sick leave; and

    viii.   due to family illness.

00001

# ARTICLE II - WORK WEEK

### Section 1.

The normal work week for employees in each of the titles covered by this Agreement shall be listed in the attached Appendix A. If a title covered by this Agreement is inadvertently omitted from the attached list, the number of hours in the normal work week for employees in such title shall be determined by the parties in accordance with the number of hours being worked by a majority of employees in the affected title and added to Appendix A. The hours in the normal work week for employees in any newly established title which is created during the term of this Agreement and is covered by this Agreement shall be determined by the Employer and added to Appendix A.

### Section 2.

Wherever practicable, the normal work week shall consist of five (5) consecutive working days separated by two (2) consecutive days off. This shall not, however, constitute a bar to the investigation and implementation by the Employer with the Union's participation and consent of flexible work weeks, flexible work days or other alternative work schedule(s).

## ARTICLE III - SHIFT DIFFERENTIAL AND HOLIDAY PREMIUM

This Article is applicable to all employees except those in classes of positions certified by the Board of Certification in Decision No. 50-73 [Doctors Council] and subsequent amendments to said certification.

### Section 1.

a.   There shall be a shift differential of ten percent (10%) for all employees covered by this Agreement for all scheduled hours worked between 6 P.M. and 8 A.M. with more than one hour of work between 6 P.M. and 8 A.M. This provision shall not apply to employees in the titles of Houseparent and Senior Houseparent.

   i.   For all employees *newly* hired after July 14, 1996, this provision shall apply to scheduled hours of work between **8:00 P.M.** and 8:00 A.M.

   ii.   For employees covered by Unit Agreements that expire March 31, 2000, subsection 1(a)(i) shall be in effect from July 15, 1996 to March 31, 2000.

   iii.   For employees covered by Unit Agreements that expire December 31, 1999, subsection 1(a)(i) shall be in effect from July 15, 1996 to December 31, 1999.

b.   An employee working overtime shall only receive a shift differential if the employee is receiving straight time cash compensation. In such cases the shift differential shall be calculated separately from the overtime compensation. In all other cases, the employee shall receive only the compensatory time or premium overtime pay provided for in Article IV.

00001

**Section 2.**

a.  If an employee is required to work on any of the holidays listed in Section 9 of Article V. the employee shall receive a fifty percent (50%) cash premium for all hours worked on the holiday and shall, in addition, receive compensatory time off at the employee's regular rate of pay. Compensatory time off earned pursuant to this Section may be scheduled by the agency either prior to or after the day on which the holiday falls.

b.  If the holiday designated pursuant to this Agreement falls on a Saturday or a Sunday the following provisions shall apply:

    i.  The fifty percent (50%) cash premium and compensatory time off at the employee's regular rate of pay shall be paid to all employees who work on the actual holiday only.

    ii.  Employees required to work on the Friday or Monday day of observance designated pursuant to Article V, Section 9 shall receive compensatory time only.

    iii.  For an employee scheduled to work on both the Saturday or Sunday holiday and the day designated for observance the following shall apply:

        (1)  If the employee is required to work on only one of such days, the employee shall be deemed to have received compensatory time off and shall receive the fifty percent (50%) cash premium only when required to work on the actual holiday.

        (2)  If the employee is required to work on both such days, the employee shall receive the fifty percent (50%) cash premium and compensatory time off at the employee's regular rate of pay only for all hours worked on the actual holiday.

c.  i.  If an employee is required to work on a holiday which falls on the employee's scheduled day off, the employee may choose whether such holiday work is to be compensated by the fifty percent (50%) cash premium and compensatory time off provided for above, or if the employee is otherwise eligible, by the overtime provisions of Article IV.

    ii.  An employee shall not receive for the same hours of work both (1) overtime pay and (2) the fifty percent (50%) cash premium and compensatory time off.

    iii.  Regardless of whether the holiday falls on a regular working day or on a scheduled day off, if the number of hours worked on such holiday exceeds the employee's normal daily tour of duty, all hours of work in excess of such normal daily tour of duty shall be covered by the provisions of Article IV.

d.  Shifts which begin at 11 P.M. or later on the day before the holiday shall be deemed to have been worked entirely on the holiday, and shifts which begin at 11 P.M. or later on the holiday shall be deemed not to have been worked on the holiday.

00001

e.  As an alternative to the methods of compensation provided in subsections 2(a), 2(b), and 2(c), an employee may elect in writing to receive compensation either entirely in cash or entirely in compensatory time for any such holiday worked. Such election shall be subject to the approval of the agency head, executive director of a hospital, or the Chief of Personnel in the Police Department, or their designee whose decision shall be final. In no case shall the compensation under this provision exceed or be less than the value of the compensation provided under subsections 2(a), 2(b), or 2(c).

## Section 3.

a.  An employee may receive both a shift differential and holiday premium pay for the same hours of work, but in such cases each shall be computed separately according to subsection 3(b), below.

b.  Shift differentials and holiday premium pay shall in all cases be computed on the individual employee's hourly rate of pay as determined in Section 6 of Article IV.

## Section 4.

Part-time per annum, hourly, per diem, per session and seasonal employees shall be covered by the terms of this Article.

# ARTICLE IV - OVERTIME

In the event of any inconsistency between this Article and standards imposed by Federal or State Law, the Federal or State Law shall take precedence unless such Federal or State Law authorizes such inconsistency.

## Section 1.

For purpose of the overtime provisions of this Agreement, all time during which an employee is in full pay status, whether or not such time is actually worked, shall be counted in computing the number of hours worked during the week. However, where the Fair Labor Standards Act ("FLSA") provides for more beneficial compensation than the overtime provisions of this Agreement such benefits shall be calculated on the basis of time actually worked.

## Section 2.

a.  "Authorized voluntary overtime" and "authorized voluntary standby time" shall be defined as overtime or standby time for work authorized by the agency head or the agency head's designee, which the employee is free to accept or decline.

b.  "Ordered involuntary overtime" and "ordered involuntary standby time" shall be defined as overtime or standby time which the employee is directed in writing to work and which the employee is therefore required to work. Such overtime or standby time may only be authorized by the agency head or a representative of the agency head who is delegated such authority in writing.

00001

## Section 3.

a.   Ordered involuntary overtime which results in an employee working in excess of forty (40) hours in any calendar week shall be compensated in cash at time and one half (1-1/2 times).

b.   For those employees whose normal work week is less than forty (40) hours, any such ordered involuntary overtime worked between the maximum of that work week and forty (40) hours in any calendar week, shall be compensated in cash at straight time (1x). For employees granted a shortened work day under Section 18 of Article V, compensatory time for work performed between thirty (30) and thirty-five (35) hours a week when such shortened schedule is in effect shall be granted at the rate of straight time (1 time), but such work shall not be considered overtime.

c.   Upon the written approval of an employee's request by the agency head or designee, an employee who works ordered involuntary overtime shall have the option of being compensated in time off at the applicable rates provided in Sections 3(a) and 3(b) provided that the exercise of such option does not violate the provisions of ("FLSA").

d.   There shall be no rescheduling of days off and/or tours of duty to avoid the payment of overtime compensation. Any work performed on a scheduled day off shall be covered by this Article.

e.   Employees who are paid in cash or who are compensated in time at the rate of time and one-half (1½X) for overtime pursuant to subsection c of this Section or the Fair Labor Standards Act may not credit such time for meal allowance.

## Section 4.

a.   Authorized voluntary overtime which results in any employee working in excess of the employee's normal work week in any calendar week shall be compensated in time off at the rate of straight time (1x).

b.   For employees covered by the provisions of FLSA, voluntary overtime actually worked in excess of forty hours in a calendar week shall be compensated at the rate of time and one-half (1½x) in time provided that the total unliquidated compensatory hours credited to an employee pursuant to this provision may not exceed 240 hours. If an employee has reached the 240 hour maximum accrual for FLSA compensatory time, all subsequent overtime earned under this provision must be compensated in cash at time and one-half (1½x).

## Section 5.

a.   No credit shall be recorded for unauthorized overtime. Credit for all authorized overtime beyond the normal work week shall accrue in units of one-quarter (¼) hour to the nearest one-quarter (¼) hour and, except for an employee covered by the provisions of FLSA who has actually worked in excess of forty hours in said calendar week, only after one (1) hour. Effective July 15, 1996, credit for all authorized overtime, beyond the normal work week, shall accrue in units of **one-half (½) hour** to the nearest **one-half (½) hour.**

00001

i.      For employees covered by Unit Agreements that expire March 31, 2000, subsection 5(a)(i) shall be in effect from July 15, 1996 to March 31, 2000.

ii.     For employees covered by Unit Agreements that expire December 31, 1999, subsection 5(a)(i) shall be in effect from July 15, 1996 to December 31, 1999.

## Section 6.

The hourly rate of pay shall be determined by taking the below indicated fractional part of the affected employee's annual regular salary:

a.     For employees whose basic work week is thirty-five (35) hours:

$$\frac{1}{1827} \quad \text{or} \quad \frac{1}{261 \times 7}$$

b.     For employees whose basic work week is thirty-seven and one-half (37½) hours:

$$\frac{1}{1957.5} \quad \text{or} \quad \frac{1}{261 \times 7.5}$$

c.     For employees whose basic work week is forty (40) hours:

$$\frac{1}{2088} \quad \text{or} \quad \frac{1}{261 \times 8}$$

d.     For employees in the titles of Houseparent or Senior Houseparent, the hourly basic rate shall be calculated by multiplying the "basic annual rate (excluding overtime)" set forth in the Social Services and Related Titles Agreement by:

$$\frac{1}{3132} \quad \text{or} \quad \frac{1}{261 \times 12}$$

For all hours in excess of 40 hours per week, such employees shall be compensated at the rate of time and one-half (1½X) of the hourly basic rate.

e.     Payment shall be computed and paid on a basis of quarter hour units actually worked beyond the normal scheduled work week, provided at least one (1) full hour is compensable in a calendar week (unless such employee is covered by the provisions of the FLSA and has actually worked in excess of forty hours in said calendar week). "Annual regular salary" shall in addition to all payments included in an employees basic salary include all educational, assignment, and longevity differentials, and, when mandated to be included by FLSA, such other additions to gross that are regularly part of an employee's salary.

## Section 7. Overtime Cap

a.     These overtime provisions, including recall and standby provisions, shall apply to all covered employees including those working more than half-time, and with permanent, provisional or temporary status, whose annual gross salary including overtime, all differentials and premium pay is not in excess of the amount set forth in subsections 7(d) and 7(e) for eligibility for cash compensated overtime (the "cap").

00001

b. When an employee's annual gross salary including overtime, all differentials and premium pay is higher than the cap, compensatory time at the rate of straight time shall be credited for authorized overtime except as may be proscribed by FLSA. The gross salary shall be computed on an annual calendar year basis and for the purposes of this Section shall mean basic annual salary plus any monies earned.

c. Employees who are not covered by FLSA whose annual gross salary including overtime, all differentials and premium pay is in excess of the cap shall be required to submit periodic time reports at intervals of not less than one week, but shall not be required to follow daily time clock or sign-in procedures. Employees covered by the overtime provisions of FLSA shall be required to follow daily time clock or sign-in procedures. The periodic time report shall be in such form as is required by the Agency.

d. Effective January 1, 1995, the cap shall be **$45,805.**

e. Effective November 28, 1999, the cap shall be increased to **$54,549.** Thereafter, unless otherwise agreed by the parties, the cap amount shall be adjusted by future collective bargaining increases. Each time the cap is adjusted, an interpretive memorandum or similar document shall be issued setting forth the new amount.

## Section 8.

a. Effective as indicated below employees who work authorized overtime, except as set forth in Section 3(e) of this Article, shall be entitled to the following meal allowances:

|  | Effective 1/1/1995 | Effective 11/26/99 |
|---|---|---|
| For two continuous hours of overtime | $ 7.50 | $ 8.25 |
| For five continuous hours of overtime | $ 8.00 | $ 8.75 |
| For seven continuous hours of overtime | $10.00 | $10.75 |
| For ten continuous hours of overtime | $11.00 | $11.75 |
| For fifteen continuous hours of overtime | $12.00 | $12.75 |

b. Time off for meals shall not be computed as overtime. However, such time off shall not affect the continuity requirement for the above meal allowances.

## Section 9.

Employees recalled from home for authorized ordered involuntary overtime work, shall be guaranteed overtime payment in cash for at least four (4) hours, if eligible for cash payment under Section 7 of this Article. When an employee voluntarily responds to a request to come from home for voluntary authorized overtime work, such overtime shall be compensated in time off on an hour-for-hour basis but with minimum compensatory time of four (4) hours.

a. Effective July 15, 1996, for all employees who are recalled from home for authorized ordered involuntary overtime work, the minimum guaranteed cash overtime payment shall be **two (2) hours.**

b. For employees covered by Unit Agreements that expire March 31, 2000, subsection 9(a) shall be in effect from July 15, 1996 to March 31, 2000.

c. For employees covered by Unit Agreements that expire December 31, 1999, subsection 9(a) shall be in effect from July 15, 1996 to December 31, 1999.

**00001**

**Section 10.**

a.      Compensatory time off for voluntary overtime work as authorized in this Article shall be scheduled at the discretion of the agency head but the agency head shall not schedule its use without the consent of the employee within the thirty (30) calendar days following its earning. However, all compensatory time off must be taken by the affected employee within the four (4) months following its earning. Except for the time described in subsection 10b(ii) below, any such compensatory time not so used by the employee's choice shall be added to the employee's sick leave balance. If the agency head calls upon an employee not to take the compensatory time off or any part thereof within the four (4) months, that portion shall be carried over until such time as it can be liquidated. This subsection shall not apply to compensatory time accrued pursuant to FLSA.

b.      For employees covered by the Fair Labor Standards Act, accrued compensatory time usage shall be charged in the following manner and order:

  i.      First, Pre-FLSA Compensatory Time Bank

  ii.     Second, Post-April 14, 1986 FLSA Compensatory Time Bank

  iii.    Third, Post-April 14, 1986 non-FLSA Compensatory Time Bank

c.      If compensatory time off is charged to an employee's Post-April 14, 1986 FLSA Compensatory Time Bank and as a result the employee will not be able to take his/her accrued Post-April 14, 1986 non-FLSA compensatory time within the four (4) month period provided in subsection 10(a) above, the period of time in which the equivalent amount of time in the Post-April 14, 1986 non-FLSA Compensatory Time Bank which must be taken shall be extended in writing by the agency head an additional four months.

**Section 11.**

a.      Employees who volunteer to stand by in their homes, as authorized by competent authority, shall receive compensatory time credit on the basis of one-half (1/2) hour for each hour of standby time.

b.      Employees who are required, ordered and/or scheduled on an involuntary basis to stand by in their homes subject to recall, as authorized by the agency head or the agency head's designated representative shall receive overtime payment in cash for such time on the basis of one-half (1/2) hour paid overtime for each hour of standby time. Employees who reside on the work premises or are in post-graduate training status shall not be included in this provision.

**Section 12.**

Employees who are required to carry communication devices (or "beepers") shall not be restricted in their ability to travel. Notwithstanding the above, they may be required to call in or may make other mutually agreeable accommodations with the agency.

00001

## Section 13.

The Employer and the Union may agree to apply a variation of the overtime provisions of this Agreement.

## Section 14.

Except in an emergency situation, when authorized and ordered by an agency head, a Hospital Executive Director or a designated representative, no employee shall be required to actually work more than two (2) consecutive normal work shifts in any twenty-four (24) hour period nor shall said employee be required to work more than two (2) consecutive work shifts for more than two (2) consecutive weeks.

# ARTICLE V - TIME AND LEAVE

## Section 1.

a.  All provisions of the Resolution approved by the Board of Estimate on June 5, 1956 on "Leave Regulations for Employees Who Are Under the Career and Salary Plan" (hereinafter "Leave Regulations") and amendments, and official interpretations relating thereto, in effect on the effective date of this Agreement and amendments which may be required to reflect the provisions of this Agreement shall apply to all employees covered by the Agreement.

Interpretations shall be defined as those rulings issued by the Commissioner of Citywide Administrative Services pursuant to Section 6.6 of the Leave Regulations and which are printed in the official Leave Regulations.

This Section shall not circumscribe the authority of the Commissioner of Citywide Administrative Services to issue new interpretations subsequent to the effective date of this Agreement. Such new interpretations shall be subject to the grievance and arbitration provisions of this Agreement.

b.  The annual leave allowance for Employees in a title or an agency covered by the Leave Regulations shall accrue as follows: *

| Work Week | Years of Service | Monthly Accrual | Allowance |
|-----------|------------------|-----------------|-----------|
|    | Beginning of 15th year | 27:00 hours | 324:00 hours |
|    | Beginning with 8 year | 25:00 hours | 300:00 hours |
| 60 | Beginning with 5 year | 20:00 hours | 240:00 hours |
|    | First Year | 15:00 hours | 180:00 hours |
|    | Beginning of 15th year | 18:00 hours | 216:00 hours |
|    | Beginning with 8 year | 16:40 hours | 200:00 hours |
| 40 | Beginning with 5 year | 13:20 hours | 160:00 hours |
|    | First Year | 10:00 hours | 120:00 hours |
|    | Beginning of 15th year | 16:53 hours | 202:30 hours |
|    | Beginning with 8 year | 15:38 hours | 187:30 hours |
| 37½ | Beginning with 5 year | 12:30 hours | 150:00 hours |
|    | First Year | 9:23 hours | 112:30 hours |
|    | Beginning of 15th year | 15:45 hours | 189:00 hours |
|    | Beginning with 8 year | 14:35 hours | 175:00 hours |
| 35 | Beginning with 5 year | 11:40 hours | 140:00 hours |
|    | First Year | 8:45 hours | 105:00 hours |

---

* Refer to prior Citywide Agreement for accrual rate in effect prior to July 1, 1991.   0 0 0 0 1

## Section 2.

a.  Employee requests for annual leave made pursuant to agency policy or collective bargaining agreement, shall be in writing on a form supplied by the agency. Approval or disapproval of the request shall be made on the same form by a supervisor authorized to do so by the agency.

Decisions on requests for annual leave or for leave with pay shall be made within seven (7) working days of submission except for requests which cannot be approved at the local level or requests for leave during the summer peak vacation period or other such periods for which the Employer has established and promulgated a schedule for submission and decision of leave requests. Once a leave request has been approved, the approval may not be rescinded except in writing by the agency head, Executive Director of a Hospital or Chief of Personnel in the Police Department.

If any agency head, Executive Director of a Hospital, or Chief of Personnel in the Police Department calls upon an employee to forego the employee's requested annual leave or any part thereof in any year, it must be in writing and that portion shall be carried over until such time as it can be liquidated.

b.  In order to allow employees to make advanced plans, decisions on requests for annual leave in amounts of at least 5 consecutive work days or tours falling during an agency's designated summer peak vacation period shall be made not less than thirty (30) days prior to the scheduled commencement of said peak vacation period. Such requests must be made no later than forty-five (45) days or tours prior to the commencement of the summer peak vacation period or by the designated submission date for such requests, whichever is earlier. The summer peak vacation period shall be the period designated by an Agency as such, provided such period does not commence prior to Memorial Day Weekend or extend past September 30th. Nothing contained herein shall preclude employees from making annual leave requests in accordance with the other provisions of this Agreement.

c.  Where an employee has an entitlement to accrued annual leave and/or compensatory time, and the City's fiscal condition requires employees who are terminated, laid off or who choose to retire in lieu of layoff, be removed from the payroll on or before a specific date because of budgetary considerations, the Employer shall provide the monetary value of accumulated and unused annual leave and/or compensatory time allowances standing to the employee's credit in a lump sum. Such payments shall be in accordance with the provisions of Executive Order 30, dated June 24, 1975, and the FLSA.

## Section 3.

a.  Approved sick leave and annual leave may be used in units of one (1) hour. Any employee who has completed four (4) months of service may be permitted to take approved annual leave as it accrues.

b.  Except as provided below, employees shall be credited with one day of sick leave per month. Approved sick leave may be used as it accrues. This section shall not alter the provisions of any existing unit agreement which contains a more beneficial procedure.

0 0 0 0 1

i.   For all employees *newly* hired after July 14, 1996, a maximum sick leave accrual of eleven (11) days per annum for the first three (3) years of service shall apply.

ii.  For employees covered by Unit Agreements that expire March 31, 2000, subsection 3(a)(i) shall be in effect from July 15, 1996 to March 31, 2000.

iii. For employees covered by Unit Agreements that expire December 31, 1999, subsection 3(a)(i) shall be in effect from July 15, 1996 to December 31, 1999.

c.   It shall be the policy of the employer to allow employees to use during their current leave year the amount of annual leave accruable during that year, provided they have sufficient available leave balances.   This provision shall be subject to the leave regulations referenced in Section 1 of this Article V and the needs of the agency. Exceptions to this policy shall be on a reasonable and case-by-case basis.

## Section 4.

By June 1st of each year all employees shall be given an annual statement of all leave balances as of the preceding April 30th (sick leave, annual leave, compensatory time, holiday leave credits).

## Section 5.

a.   i.   Except as provided in Section 5(a)(ii), sick leave shall be used only for personal illness of the employee.  Approval of sick leave in accordance with the Leave Regulations is discretionary with the agency and proof of disability must be provided by the employee, satisfactory to the agency within five (5) working days of the employee's return to work. However, the employer may request proof of disability when an employee has been on sick leave for five or more consecutive working days.  Such proof satisfactory to the agency must be submitted within five working days of such request.

    ii.  (1)  Notwithstanding the provisions of Section 5(a)(i), Employees may use one day per year from their sick leave balances for the care of ill family members.

        (2)  Effective July 15, 1996, employees may use two (2) days per year from their sick leave balances for the care of ill family members.

        (3)  Approval of such leave is discretionary with the agency and proof of disability must be provided by the employee satisfactory to the agency within five (5) working days of the employee's return to work.

        (4)  The provisions of Article V, Section 5(a)(ii) shall apply to part-time per annum, hourly, per diem, per session and seasonal employees who work at least one half the regular hours of full time employees in the same title and who have worked for at least one month on a regular basis and accrue sick leave pursuant to Article V, Section 19(b).

00001

    (5)    The use of sick leave for care of ill family members shall be limited to a maximum of one-sixth (1/6) of the amount of sick leave hours accruable by an eligible employee during the current leave year or one-sixth (1/6) of the sick leave hours accruable by a full time employee in the same title during a leave year, whichever is less. Approved usage of sick leave for care of ill family members may be charged in units of one (1) hour.

    (6)    Family member shall be defined as: spouse; natural, foster or step parent; child, brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 *et seq.*

b.    The provisions of Section 5(a) above notwithstanding, the agency may waive the requirement for proof of disability unless:

    i.    An employee requests sick leave for more than three (3) consecutive work days; or

    ii.    An employee uses undocumented sick leave more than five (5) times in a "sick leave period." Employees hired during a "sick leave period" shall be subject to the terms of this subsection commencing with the next complete "sick leave period"; or

    iii.    An employee uses undocumented sick leave more than four (4) times in a "sick leave period" on a day immediately preceding or following a holiday or a scheduled day off. Employees hired during a "sick leave period" shall be subject to the terms of this subsection commencing with the next complete "sick leave period."

c.    For the purposes of Sections 5(b)(ii) and 5(b)(iii) above, the calendar year shall be divided into two (2), six (6) month "sick leave periods." They shall be: (1) January 1 to June 30, inclusive; and (2) July 1 to December 31, inclusive. An employee who exceeds the allowable number of undocumented absences in any "sick leave period" pursuant to Sections 5(b)(ii) and 5(b)(iii) above shall thereafter, commencing with the next "sick leave period," be required to submit medical documentation, satisfactory to the agency head, before further sick leave may be approved. The requirement for such documentation shall continue in effect until the employee has worked a complete "sick leave period" without being on sick leave more than two (2) times.

d.    For the purposes of this Section 5 "one time" shall mean the consecutive use of one-half (½) or more work days for sick leave. Sick leave taken in units of less than one-half (½) work day shall be counted as "one time" on sick leave when the cumulative total of such sick leave amounts to one-half (½) day.

0 0 0 0 1

e.    The provisions of Section 5(b) above notwithstanding, the agency shall have the discretion to waive the medical documentation required pursuant to Sections 5(b)(ii), 5(b)(iii) and 5(c), for employees who have completed their third year of employment and thereafter have a current sick leave balance commensurate with the number of years of employment as follows:

| | | | |
|---|---|---|---|
| 3 years | 21 days | 7 years | 49 days |
| 4 years | 28 days | 8 years | 56 days |
| 5 years | 35 days | 9 years | 63 days |
| 6 years | 42 days | 10 years or more | 70 days |

f.    It is not the intent of Sections 5(b) and 5(e) for an agency to regularly require proof of disability under normal circumstances.

g.    Any employee who anticipates a series of three (3) or more medical appointments, which will require a repeated use of sick leave in units of one day or less shall submit medical documentation indicating the nature of the condition and the anticipated schedule of treatment.  Sick leave taken pursuant to said schedule of treatment shall be deemed documented.

h.    The medical documentation required by this Section shall be from a health practitioner licensed by the state in which she/he practices to diagnose and certify illness or disability. When an employee has been recommended for relief from duty by a medical practitioner acting in behalf of the Employer's Health Service, the time granted shall be considered documented sick leave for the day of the relief from duty only, unless otherwise specified by the Employer's practitioner.

## Section 6.

The number of sick leave allowance days permitted to accumulate shall be unlimited.

## Section 7.

a.    An employee's annual leave shall be changed to sick leave during a period of verified hospitalization.  When an employee is seriously disabled but not hospitalized while on annual leave, after the employee submits proof of such disability which is satisfactory to agency head, such leave time may be charged to sick leave and not to annual leave at the employee's option.

b.    Employees on approved sick leave who have exhausted their sick leave balances shall be placed on annual leave unless otherwise requested in writing for the duration of that absence, subject to continued proof of disability satisfactory to the agency.

## Section 8.

Employees who are on agency approved work-study paid leave of absence shall not have annual leave credits deducted unless they actually request and take such annual leave, provided that annual leave accruals do not exceed the maximum permitted in this Agreement.

00001

## Section 9.

a. The regular holidays with pay shall be as follows:

| | |
|---|---|
| New Year's Day | January 1st |
| Martin Luther King, Jr. Day | Third Monday in January |
| Lincoln's Birthday * | February 12th |
| Washington's Birthday | Third Monday in February |
| Memorial Day | Last Monday in May |
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Columbus Day | Second Monday in October |
| Veterans' Day | November 11th (or other date established by NYS Legislature) |
| Election Day | First Tuesday following the First Monday in November |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |

\* See Section 9(c)

b. When a holiday falls on a Saturday, it shall be observed on the preceding Friday. When a holiday falls on a Sunday, it shall be observed on the following Monday. However, when an agency head deems it necessary to keep facilities open on both Monday and Friday, employees may be scheduled to take time off on either the Monday or Friday. When either the holiday, or the day designated for observance, occurs on an employee's scheduled day off and the employee does not work on such day, the employee shall be entitled to one compensatory day off in lieu of the holiday.

c. Effective January 1, 1997, an Employee shall be entitled to one floating holiday in each calendar year during which the employee is in active pay status with the Employer prior to Lincoln's Birthday of such calendar year, subject to the following conditions:

    i. The floating holiday shall be taken at the employee's discretion, subject to the needs of the employing agency. Employees must request to use their floating holiday in writing at least 30 days in advance on a form supplied by the agency. Approval or disapproval of the request shall be made on the same form by a supervisor authorized to do so by the agency. Decisions shall be made within ten (10) working days of submission.

    ii. Employees wishing to use their floating holiday to observe Lincoln's Birthday shall file such requests prior to January 15. Approval shall not be unreasonably denied. For the purposes of this subsection, the day of observance for employees of Mayoral agencies assigned to Board of Education facilities shall be on the day set by the Board.

    iii. Once a floating holiday request has been approved, the approval may not be rescinded except in writing by the agency head, Executive Director of a Hospital or Chief of Personnel in the Police Department. If an employee is required to work on a floating holiday once the request for it has been approved, the employee shall receive a fifty percent (50%) cash premium for all regularly scheduled hours worked on the floating holiday and shall, in addition, receive compensatory time off at the employee's regular rate of pay.

00001

    iv.    The floating holiday must be used in the calendar year in which it is earned and may not be carried over to a succeeding year or cashed out upon separation of service. If the agency head calls upon an employee not to take the floating holiday by the end of the calendar year, the floating holiday shall be carried over to the following calendar year only.

    v.    For employees assigned to perform work at facilities which are normally closed on Lincoln's Birthday, such as, but not limited to, State Courts or Department of Sanitation garages, Lincoln's Birthday shall continue to be observed as an official holiday and the floating holiday provisions set forth in this subsection c, shall not apply.

## Section 10. Line of Duty Injury Due to Assault

Upon the determination by the head of an agency that an employee has been physically disabled because of an assault arising out of and in the course of the employee's employment, the agency head will grant the injured employee a leave of absence with pay not to exceed eighteen (18) months. No such leave with pay shall be granted unless the Worker's Compensation Division of the Law Department advises the head of the agency in writing that the employee's injury has been accepted by the Division as compensable under the Worker's Compensation Law, or if such injury is not accepted by the Division as compensable under such law, unless the Worker's Compensation Board determines that such injury is compensable under such law.

If a permanent employee who has five (5) years or more of service does not have sufficient leave credit to cover the employee's absence pending a determination by the Worker's Compensation Division of the Law Department, the agency head shall advance the employee up to forty-five (45) calendar days of paid leave. In the event the Worker's Compensation Division of the Law Department does not accept the injury as compensable under the law or the Worker's Compensation Board determines that such injury is not compensable under such law, the employee shall reimburse the City for the paid leave advance.

If an employee is granted a leave of absence with pay pursuant to this Section, the employee shall receive the difference between the employee's weekly salary and the employee's compensation rate without charge against annual leave or sick leave. The employee shall, as a condition of receiving benefits under this Section, execute an assignment of the proceeds of any judgment or settlement in any third party action arising from such injury, in the amount of the pay received pursuant to this Section and medical disbursements, if any, made by the Employer, but not to exceed the amount of such proceeds. Such assignment shall be in the form prescribed by the Corporation Counsel. The injured employee shall undergo such medical examinations as are requested by the Worker's Compensation Division of the Law Department and the employee's agency, and when found fit for duty by the Worker's Compensation Board shall return to the employee's employment.

No benefits shall be paid while an employee is suspended pending disciplinary action, or if an employee is subsequently found culpable of having commenced the assault or unnecessarily continuing the assault.

00001

Benefits provided under this Section shall be in addition to but not concurrent with benefits provided under Section 7.0 and 7.1 of the Career and Salary Plan Leave Regulations.

## Section 11. Line of Duty Injury Other than Assault

For employees who do not come under the provisions of Section 10 of this Article but who are injured in the course of employment, upon determination by the head of an agency that an employee has been physically disabled because of an injury arising out of and in the course of the employee's employment, through no fault of the employee, the agency head will grant the injured employee an extended sick leave with pay not to exceed three (3) months after all the employee's sick leave and annual leave balances have been exhausted. This additional leave must be taken immediately following the exhaustion of such balances. No such leave with pay shall be granted unless the Worker's Compensation Division of the Law Department advises the agency head in writing that the employee's injury has been accepted by the Division as compensable under the Worker's Compensation Law, or if such injury is not accepted by the Division as compensable under such law, unless the Worker's Compensation Board determines that such injury is compensable under such law. If an employee is granted extended sick leave with pay pursuant to this Section, the employee shall receive the difference between the employee's weekly salary and the employee's compensation rate for the period of time granted The employee shall, as a condition of receiving benefits under this Section, execute an assignment of the proceeds of any judgment or settlement in any third party action arising from such injury, in the amount of the pay and medical disbursements received pursuant to this Section, but not to exceed the amount of such proceeds. Such assignment shall be in the form prescribed by the Corporation Counsel. The injured employee shall undergo such medical examinations as are requested by the Worker's Compensation Division of the Law Department and the employee's agency, and when found fit for duty by the Worker's Compensation Board shall return to the employee's employment.

Benefits provided under this Section shall be in addition to but not concurrent with benefits provided under Sections 7.0 and 7.1 of the Career and Salary Plan Leave Regulations.

### Section 12.

Within forty-five (45) days of the receipt by the Worker's Compensation Division of the Law Department of a claim for Worker's Compensation, the City shall notify the claimant of the approval or disapproval of the claim.

Failure to notify the employee within the forty-five (45) day time limit may be grieved at Step III of the grievance procedure without resort to previous steps.

### Section 13.

Pursuant to Executive Order No. 34, dated March 26, 1971, "Regulations Governing Cash Payments for Accrued Annual Leave and Accrued Compensatory Time on Death of an Employee while in the City's Employ," if an employee dies while in the Employer's employ, the employee's beneficiary or if no beneficiary is designated, then the employee's estate, shall receive payment in cash for the following:

00001

a.    All unused accrued annual leave to a maximum of fifty-four (54) days credit.

b.    All unused accrued compensatory time earned subsequent to March 15, 1968 and retained pursuant to this Agreement, verifiable by official agency records, to a maximum of two hundred (200) hours.

### Section 14.

If an employee dies during the term of this Agreement because of an injury arising out of and in the course of the employee's employment through no fault of the employee, and in the proper performance of the employee's duties, a payment of twenty-five thousand dollars ($25,000) will be made from funds other than those of the Retirement System in addition to any other payment which may be made as a result of such death.  Such payment shall be made to the same beneficiary designated for the purposes of Section 13 of this Article, or if no beneficiary is so designated, payment shall be made to the employee's estate.

### Section 15.

If while in covered employment under the terms of this Agreement an employee dies, the Employer shall notify the beneficiary designated by the employee in the personnel folder as to what benefits may be available for the employee and as to where claims may be initiated for such benefits.  If no beneficiary is designated, the public administrator of the county in which the employee last resided shall be notified.

The employing agency shall promptly notify the appropriate retirement system and request it communicate with the beneficiary designated in the system's records.

### Section 16.

a.    Every employee is obligated to report for work as scheduled.

b.    Except for the employees described in subsection c below, there shall be a grace period of five minutes at the beginning of the work shift.  When an employee's lateness extends beyond the five-minute grace period, the full period of time between the scheduled reporting time and the actual reporting time shall be charged against such employee (e.g. an employee whose starting time is 9:00 a.m. who reports to work at 9:05 a.m. would not be "late," but such an employee with such a starting time who reports to work at 9:06 a.m. would be charged with six (6) minutes of lateness).

c.    The following employees shall not be entitled to the five-minute grace period described in subsection b above:

   i.    Emergency personnel, including, but not limited to, Fire Alarm Dispatchers, Police Communication Technicians, Emergency Medical Services Specialists. The City shall furnish the Union with a full list of such positions.

   ii.    Employees whose positions require, in the event of late reporting for work, that another be held over from a previous shift or be called in to substitute for the late employee, at premium rates of pay.

   iii.    Employees subject to flexible work schedules.

00001

d.      Lateness beyond the five-minute grace period shall be classified as "excused" or "not excused" and excused lateness shall not be charged against the employee.  Lateness found by the agency head or the individual designated by the agency head to have been caused by unforeseen public transportation delays or other circumstances which arise after an employee leaves for work which cannot be anticipated (e.g. elevator breakdowns or private transportation breakdowns) which are beyond the ability of the tardy employee to control shall be excused.  Such findings shall be reasonably made; and the tardy employee may be required to furnish proof satisfactory to the agency head of the cause of the lateness.  A request for excusal shall not be unreasonably denied.  A refusal to excuse a lateness may be appealed to the Commissioner of Labor Relations whose decision shall be final.

e.      Deduction for unexcused lateness shall be made on a minute for minute basis from any compensatory time standing to an employee's credit and then, if there is no such credited time, from the employee's annual leave balances.

f.      The City reserves the right and power appropriately and for just cause to discipline or to discharge an employee for excessive lateness.

g.      Contractual provisions or agency policies regarding lateness, grace or excusal periods or lateness penalties inconsistent with the uniform lateness policy set forth in this Section shall be superseded by this Section 16.

h.      Latenesses caused by a verified major failure of public transportation, such as a widespread or total power failure of significant duration or other catastrophe of similar severity, shall be excused.

i.      Each agency will prepare contingency plans for operation during a major failure of public transportation which would cause disabled employees, as defined in the Americans with Disabilities Act, great difficulty in reaching their regular work location.  Such plans will include, where practicable and productive, provisions assigning disabled employees to report to agency locations closer to their homes.  Such plans shall also include provisions for excusal by the agency head of absences on an individual basis for disabled employees.  Decisions of the agency head with respect to absences under such plans shall not be subject to the grievance procedure.

**Section 17.**

a.      Effective January 1, 1975, the terminal leave provision for all employees except as provided in subsections b. and c., below shall be as follows:

Terminal leave with pay shall be granted prior to final separation to employees who have completed at least ten (10) years of service on the basis of one (1) day of terminal leave for each two (2) days of accumulated sick leave up to a maximum of one hundred-twenty (120) days of terminal leave.  Such leave shall be computed on the basis of work days rather than calendar days.

00001

b.      Any employee who as of January 1, 1975 had a minimum of fifteen (15) years of service as of said date may elect to receive upon retirement a terminal leave of one (1) calendar month for every ten (10) years of service pro-rated for a fractional part thereof in lieu of any other terminal leave. However, any sick leave taken by such employees subsequent to July 1, 1974 in excess of an average annual usage of six (6) days per year shall be deducted from the number of days of terminal leave to which the employee would otherwise be entitled at the time of retirement, if the employee chooses to receive terminal leave under this subsection.

c.      In the case where an employee has exhausted all or most of the employee's accrued sick leave due to a major illness, the agency head, in the agency head's discretion, may apply two and one-fifth (2 1/5) work days for each year of paid service as the basis for computing terminal leave in lieu of any other terminal leave. An employee's request for the application of this subsection shall not be unreasonably denied. The denial of an employee's request may be appealed solely to the Commissioner of Labor Relations.

d.      Where an employee has an entitlement to terminal leave and the City's fiscal situation requires that employees who are terminated, laid off or retired be removed from the payroll on or before a specific date, because of budgetary considerations, the Employer shall provide a monetary lump sum payment for terminal leave in accordance with the provisions of Executive Order 31, dated June 24, 1975.

## Section 18.

a.      Shortened workday schedules or heat days in lieu thereof for employees who have traditionally enjoyed shortened workday schedules or heat days in lieu thereof shall begin on July 1 and terminate on Labor Day. Employees who are entitled to receive heat days in lieu of shortened workdays shall receive three (3) such days.

b.      Shortened workday schedules and heat days in lieu thereof shall be abolished for employees who work in air-conditioned facilities and for outdoor and field employees. However, outdoor and field employees who traditionally enjoyed such benefits and who are required to return to an office location before the end of the workday shall be entitled to the same summer schedules enjoyed by office employees at such location on such day.

c.      Outdoor and field employees include, but are not limited to, law enforcement personnel, Traffic Enforcement Agents, Traffic Device Maintainers, Motor Vehicle Operators, Inspectors, Engineers, Assessors, Appraisers, Investigators, Quality Control Specialists and Public Health Nurses. Homemakers and employees in equivalent titles, who are assigned to work in clients' homes which are not air-conditioned and who traditionally enjoyed shortened workday schedules or heat days in lieu thereof, shall continue to be so entitled.

d.      No shortened workday schedules or heat days in lieu thereof, shall be granted to any employee until the employee has completed one year of service.



e.    Employees who work shortened workday schedules as described in this Section are entitled to the meal allowances set forth in Section 8 of Article IV, provided that such employees work a minimum of three (3) hours beyond the shortened workday schedule. An employee who qualifies for a meal allowance pursuant to this subsection shall not count the first hour worked after the shortened workday schedule in computing the amount of the meal allowance to which the employee is entitled.

### Section 19.

a.    Part-time per annum, hourly, per diem, per session and seasonal employees who work at least one half the regular hours of full time employees in the same title and who have worked for at least one month on a regular basis shall accrue leave credits as set forth below: *

| Years of Service | Accrual |
|---|---|
| At the beginning of the 1st year | 1 hour for 15 hours worked (154 hours maximum) |
| At the beginning of the 5th year | 1 hour for 11 hours worked (210 hours maximum) |

b.    Sick leave: One (1) hour of sick leave for every twenty (20) hours actually worked with no maximum accrual.

   i.    For all employees *newly* hired after July 14, 1996, shall accrue at the rate of 1 hour of sick leave for each 22 hours actually worked for the first three (3) years of service.

   ii.   For employees covered by Unit Agreements that expire March 31, 2000, subsection 19(b)(i) shall be in effect from July 15, 1996 to March 31, 2000.

   iii.  For employees covered by Unit Agreements that expire December 31, 1999, subsection 19(b)(i) shall be in effect from July 15, 1996 to December 31, 1999.

c.    If no full-time equivalent title exists then the minimum number of hours required in order to receive leave credits pursuant to this Section shall be based on the nature of employment as follows:

   White Collar Employment   -   17 1/2 hours per week
   Blue Collar Employment    -   20 hours per week

### Section 20.

a.    A child care leave of absence without pay shall be granted to any employee (male or female) who becomes the parent of a child up to four years of age (or whose domestic partner registered pursuant to the New York City Administrative Code Section 3-240 et seq.) becomes the parent of a child up to four years of age), either by birth or by adoption, for a period of up to forty-eight (48) months. The use of this maximum allowance will be limited to one instance only. All other child care leaves of an employee shall be limited to a thirty-six (36) month maximum.

---

* Refer to prior Citywide Agreement for accrual rate in effect prior to July 1, 1991.

0 0 0 0 1

b.   Prior to the commencement of child care leave, an employee shall be continued in pay status for a period of time equal to all of the employee's unused accrued annual leave and compensatory time (including FLSA compensatory time).

c.   Employees, who initially elect to take less than the forty-eight (48) month maximum period of leave or the thirty-six (36) months, may elect to extend such leave by up to two extensions, each extension to be a minimum of six (6) months. However, in no case may the initial leave period plus the one or two extensions total more than forty-eight (48) months or thirty-six (36) months.

d.   This provision shall not diminish the right of the Agency Head or the Personnel Director, as set forth in Rule 5.1 of the Leave Regulations, to grant a further leave of absence without pay for child care purposes.

### Section 21.

a.   Bereavement leave shall be granted for the death of an employee's spouse; "domestic partner," as defined in the New York Administrative Code Section 1-112(21); natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; or other relative residing in the household.

b.   Effective November 26, 1999, bereavement leave shall be granted for the death of a grandchild.

c.   When a death in an employee's family occurs while the employee is on annual or sick leave, such time as is excusable for death in the family shall not be charged to annual or sick leave.

### Section 22.

Individual employee grievants shall be granted leave with pay for such time as is necessary to testify at arbitration hearings.

Leave with pay shall be granted to three (3) employees who are named grievants in a group arbitration proceeding for such time as is necessary for them to testify at their group arbitration hearings.

Leave with pay for such time as is necessary to testify at their hearings shall be granted to employees who, after final adjudication of proceedings under Section 210 paragraph 2(h) of the Civil Service Law, are determined not to have been in violation of Section 210.

### Section 23.

If at any time during the period of this Agreement the parties agree that it is impracticable to recruit for certain titles covered by this Agreement, the employer with the agreement of the Union may apply a variation of the provisions contained in Article V and Article VI of this Agreement for those titles.

00001

## ARTICLE VI - TIME AND LEAVE VARIATIONS

This Article shall apply only to employees who work other than a regularly scheduled standard work week consisting of five (5) seven (7) hour, seven and one-half (7½) hour or eight (8) hour days.

### Section 1.

A "holiday leave bank" shall be established for each employee covered under this Article. The bank shall be credited with holiday leave time equal to one-fifth (1/5) the number of hours in the respective employee's work week as each holiday occurs.

No employee shall receive credit for more than twelve (12) holidays per annum.

### Section 2.

a.     When an employee does not work on one of the regular holidays, a number of hours equal to the number of hours in the employee's regularly scheduled work day shall be subtracted from the employee's "holiday leave bank."

b.     An employee who works on any of the regular holidays shall be compensated in accordance with Section 3 of this Article or the overtime provisions of this Agreement whichever is applicable.

c.     When either the holiday or the day designated for observance occurs on an employee's scheduled day off and the employee does not work on such day, the employee shall accrue credits pursuant to Section 1 of this Article, but no credits shall be deducted from the employee's "holiday leave bank."

### Section 3.

a.     If an employee is required to work on any of the holidays listed in Article V, Section 9 of this Agreement, the employee shall receive a fifty percent (50%) cash premium for all hours worked on the holiday, and there shall be no deduction from the employee's "holiday leave bank."

b.     If a holiday falls on a Saturday or Sunday, the fifty percent (50%) cash premium shall apply only to those employees who are required to work on the Saturday or Sunday holiday. Employees required to work on the Monday or Friday designated by the Employer for holiday observance shall not have any time charged against their "holiday leave bank" as a result of the Saturday or Sunday holiday, but shall not receive premium pay.

c.     With respect to an employee who is scheduled to work on both the Saturday or Sunday holiday and the day designated for observance: (1) if the employee is required to work on only one of such days, the employee's "holiday leave bank" shall be charged the equivalent of one day. Such employee shall receive the fifty percent (50%) cash premium when required to work on Saturday or Sunday; or (2) if the employee is required to work on both such days, the employee shall receive the fifty percent (50%) cash premium for all hours worked on the Saturday or Sunday holiday without any charge to the employee's "holiday leave bank."

00001

d. However, if the employee is required to work on a holiday which falls on the employee's scheduled day off, the employee may choose whether such holiday work is to be compensated by the fifty percent (50%) cash premium without charge to the employee's leave bank, or, if otherwise eligible, by the overtime provisions of Article IV.

e. An employee shall not receive for the same hours of work both (1) overtime pay and (2) the fifty percent (50%) cash premium without charge to the employee's "holiday leave bank." However, regardless of whether the holiday falls on a regular working day or on a scheduled day off, if the number of hours worked on such holiday exceeds the employee's normal daily tour of duty, all hours of work in excess of such normal daily tour of duty shall be covered by the overtime provisions of Article IV.

f. Shifts which begin at 11 P.M. or later on the day before the holiday shall be deemed to have been worked entirely on the holiday, and shifts which begin at 11 P.M. or later on the holiday shall be deemed not to have been worked on the holiday.

## Section 4.

An employee may be advanced holiday leave credits consistent with the maximums set forth in Section 1 of this Article. Any resulting negative leave balance shall be charged against subsequent holiday accruals. If as of May 1 of any year an employee's "holiday leave bank" has a negative balance, said balance shall be charged against the employee's annual leave.

## Section 5.

The "Annual Leave Allowance" shall accrue on an hourly basis. The rate of accrual shall be based on the number of hours in the work week and the number of years of service of the respective employee as follows: *

| Work Week | Years of Service | Allowance | Monthly Accrual |
|-----------|------------------|-----------|-----------------|
| 60 | Beginning of 15th year | 324:00 hours | 27:00 hours |
| | Beginning of 8th year | 300:00 hours | 25:00 hours |
| | Beginning of 5th year | 240:00 hours | 20:00 hours |
| | First Year | 180:00 hours | 15:00 hours |
| 40 | Beginning of 15th year | 216:00 hours | 18:00 hours |
| | Beginning of 8th year | 200:00 hours | 16:40 hours |
| | Beginning of 5th year | 160:00 hours | 13:20 hours |
| | First Year | 120:00 hours | 10:00 hours |
| 37½ | Beginning of 15th year | 202:30 hours | 16:53 hours |
| | Beginning of 8th year | 187:30 hours | 15:38 hours |
| | Beginning of 5th year | 150:00 hours | 12:30 hours |
| | First Year | 112:30 hours | 9:23 hours |
| 35 | Beginning of 15th year | 189:00 hours | 15:45 hours |
| | Beginning of 8th year | 175:00 hours | 14:35 hours |
| | Beginning of 5th year | 140:00 hours | 11:40 hours |
| | First Year | 105:00 hours | 8:45 hours |

---

* Refer to prior Citywide Agreement for accrual rate in effect prior to July 1, 1991.

0 0 0 0 1

## Section 6.

The "Sick Leave Allowance" shall accrue on an hourly basis. The monthly accrual of sick leave shall be equal to one-fifth the number of hours in the respective employee's work week.

a. For all employees *newly* hired after July 14, 1996, the monthly accrual of sick leave shall be equal to 11/60[th]s of the number of hours in the respective employee's work week .for the first three (3) years of service.

b. For employees covered by Unit Agreements that expire March 31, 2000, subsection 6(a) shall be in effect from July 15, 1996 to March 31, 2000.

c. For employees covered by Unit Agreements that expire December 31, 1999, subsection 6(a) shall be in effect from July 15, 1996 to December 31, 1999.

## Section 7.

Where, for record keeping purposes, daily leave balances are converted to hourly leave balances, such conversion shall be based on one-fifth (1/5) the number of hours in the respective employee's regular work week for each day of leave credited to the employee's leave balance, pro-rated for fractional days.

## Section 8.

a. Employees who are otherwise entitled to receive heat days pursuant to Article V, Section 18 of this Agreement shall receive compensatory time for said heat days. The number of hours credited for each heat day shall be equal to one-fifth (1/5) the number of hours in the respective employee's work week.

b. Employees who are otherwise entitled to a shortened workday schedule pursuant to Article V, Section 18 of this Agreement shall be credited with five (5) hours of compensatory time, in lieu of any shortened workday schedule, for each week actually worked while shortened schedules are in effect.

# ARTICLE VII - HEALTH INSURANCE

## Section 1.

The Labor-Management Health Insurance Policy Committee, with representation from the Municipal Labor Committee and from the Employer, for the purpose of consultation on policy only shall be continued.

## Section 2.

a. Retirees shall continue to have the option of changing their previous choice of Health Plans. This option shall be:

    i. a one-time choice;

    ii. exercisable only after one year of retirement; and

    iii. exercisable at any time without regard to contract periods.

00001

Such changes to a new plan shall be effectuated as soon as practicable but no later than the first day of the month three months after the month in which the application has been received by the New York City Employee Health Benefits Program.

b.   Effective with the reopener period for health insurance subsequent to January 1, 1980 and every two years thereafter, retirees shall have the option of changing their previous choice of health plans. This option shall be exercised in accordance with procedures established by the Employer. The Union will assume the responsibility of informing retirees of this option.

### Section 3.

If an employee has filed for any disability retirement and, prior to the approval of the application makes direct payment pursuant to the Comprehensive Omnibus Budget Reconciliation Act ("COBRA") to prevent discontinuation of the basic health insurance coverage, upon approval of the disability application the Employer shall request the basic health insurance carrier to reimburse the employee in the amount of the direct premiums paid by the employee which premiums were also paid by the Employer. The Employer shall upon request provide the employee with a letter to the carrier indicating the effective dates of coverage under the New York City Employee Health Benefits Program.

### Section 4.

If an employee is laid off, on leave, or disabled, and has City contributions for basic health insurance discontinued, the Union may make direct COBRA payments on behalf of such employee to the New York City Employee Health Benefits Program carriers at 102 percent of the group rate for such coverage for a maximum period of thirty-six (36) months from the date of discontinuance.

### Section 5.

The Commissioner of Labor Relations and the Commissioner of Citywide Administrative Services will recommend to the New York City Employee Health Benefits Program that retirees be permitted to add dependents to such retirees' coverage under the New York City Employee Health Benefits Program on the same terms and conditions as active employees.

### Section 6.

At the present time, the Employer is providing certain electronic data processing tapes and other relevant information necessary for the administration of certain supplemental health and welfare plans. The cost of supplying such tapes and information will be borne by the entity requesting same.

## ARTICLE VIII - CAR ALLOWANCES

### Section 1.

Employees who are receiving a per diem allowance in lieu of a mileage allowance for authorized and actual use of their own cars may elect reimbursement on a standard mileage basis. Such election shall be irrevocable.

00001

## Section 2.

Effective as of the dates set forth below, compensation to employees for authorized and required use of their own cars shall be at the indicated rate. There shall be a minimum guarantee of thirty (30) miles for each day of authorized and actual use. Said mileage allowance is not to include payment for the distance traveled from the employee's home to the first work location in a given day or from the last work location to the employee's home unless the employee is authorized and required to carry special equipment or materials which cannot feasibly be transported via mass transit.

| | |
|---|---|
| Effective January 1, 1995 | 25¢ per mile |
| Effective November 26, 1999 | 28¢ per mile |

# ARTICLE IX - PERSONNEL AND PAY PRACTICES

## Section 1.

All regular paychecks of City employees shall be itemized to include overtime, additional wage benefits (including back pay), and differentials.

## Section 2.

Upon transfer of a permanent employee from one agency covered by the sick leave and annual leave provisions of this Agreement to another agency so covered, or appointment of any employee to another agency so covered from an eligible list promulgated by the Commissioner of Citywide Administrative Services immediately following continuous City service, all sick leave and annual leave balances shall be transferred with the employee.

## Section 3.

a.     When a transfer is accomplished with the consent of the employee, all compensatory time due for overtime worked shall be granted to the employee prior to the effective date of the transfer except where:

    i.     the receiving agency agrees in writing to accept the transfer of these accrued compensatory time balances in whole or in part to its records,

    ii.     or the employee requests in writing that these accrued compensatory time balances be converted to sick leave credits as of the date of the transfer.

Initiation of action to liquidate this compensatory time shall be the responsibility of the transferring employee.

b.     When an employee is subjected to a functional or involuntary transfer, all the employee's accrued compensatory time balances shall be transferred to the records of the receiving agency.

c.     When a current employee is appointed to another City agency from a list promulgated by the New York City Department of Citywide Administrative Services, all compensatory time shall be transferred to the records of the appointing agency.

00001

Section 4.

a.    The Employer shall furnish identification cards to all employees who have served continuously for six (6) months.

b.    Each employee who is a member of the New York City Employee's Retirement System (NYCERS) as of the effective date of this Agreement shall receive a Tax-Pension Identification Card showing the name, withholding tax number, pension number, pension plan, and the date the last membership in the System began.  Employees joining the NYCERS during the life of this Agreement shall be given a Tax-Pension Identification Card when the employing agency is notified by the System of the date membership was granted the pension number assigned.  In the discretion of an agency head, the identification card required by subsection 4(a) above may be combined with the Tax-Pension Identification Card.

c.    Lost cards shall be reported immediately and replaced at cost to the employee.  Upon separation from service, an employee shall not receive the employee's final paycheck until the employee has returned the identification card issued, or has submitted an appropriate affidavit of loss.

Section 5.

Any employee who is promoted or who is affected by an individual change in title or rate of compensation of an adverse nature shall be notified in writing no later than two (2) weeks after the effective date of such promotion, change in title, or rate of compensation.  Present agency agreements on this subject shall not be affected by this Section.

Section 6.

Consistent with, and subject to security requirements, paychecks shall be released on the preceding day as soon as possible after 3:00 P.M. for all employees who would not normally receive their paychecks during their working hours on the scheduled payday.

Section 7.

Agencies shall be authorized to establish and maintain imprest funds for the reimbursement to employees of all necessary carfare, telephone, automobile and meal expenses and such other types of expenses as the Comptroller may approve.  The funds shall be administered in accordance with the rules and regulations of the Comptroller.  Authorized carfare and telephone expenses shall be reimbursed within one month of submission of an appropriate claim for reimbursement.

Section 8.

a.    In the event of an overpayment to an employee which is agreed by both parties to be erroneous, the employer shall not make wage deductions for recoupment purposes in amounts greater than: 10% if the employee's gross pay is under $17,500, 15% if the employee's gross pay is $17,500 or over and under $32,500, and 25% if the employee's gross pay is $32,500 or more. In the event the employee disputes the alleged erroneous overpayment, the employee or the union, except as provided in Section 8(b), may appeal to the Office of Labor Relations ("OLR") within 20 days of a notice by the employer of

00001

its intent to recoup the overpayment and no deduction for recoupment shall be made until OLR renders a decision, which decision shall be final. Nothing contained above shall preclude the parties or affected individuals from exercising any rights they may have under law.

b.    In the event of a dispute by an employee of the Health and Hospitals Corporation ("HHC") concerning an alleged erroneous overpayment, the employee shall send notice of the appeal to both OLR and HHC's Office of the Vice President for Human Resources within 20 days of the notice by HHC of its intent to recoup said overpayment.

HHC will attempt within 21 days to resolve the dispute and execute a stipulation of settlement. Copies of any such stipulation of settlement shall be sent to the employee, the Union, and the OLR. If after 21 days the dispute remains unresolved or upon notification by HHC that no resolution can be reached, the OLR shall render a decision pursuant to Section 8(a).

c.    Any recoupment shall be limited to the period up to six years prior to the commencement of such proceedings for recoupment.

d.    In lieu of wage deductions for recoupment purposes, the Employer may, with the consent of the employee, make deductions from the employee's annual leave or compensatory leave banks.

## Section 9.

Any employee who is required to take a medical examination to determine if the employee is physically capable of performing the employee's full duties, and who is found not to be so capable, shall, as far as practicable, be assigned to in-title and related duties in the same title during the period of the employee's disability. If a suitable position is not available, the Employer shall offer the employee any available opportunity to transfer to another title for which the employee may qualify by the change of title procedure followed by the New York City Department of Citywide Administrative Services pursuant to Rule 6.1.1 of the Personnel Rules and Regulations of the City of New York or by noncompetitive examination offered pursuant to Rule 6.1.9 of the Personnel Rules and Regulations of the City of New York.

If such an employee has ten (10) years or more of retirement system membership service and is considered permanently unable to perform all the duties of the employee's title and no suitable in-title position is available, the employee shall be referred to the New York City Employee's Retirement System and recommended for ordinary disability retirement.

## Section 10.

a.    Interest on wage increases shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days after execution of the applicable agreement or one hundred-twenty (120) days after the effective date of the increase, whichever is later, to the date of actual payment.

00001.

b.      Interest on shift differentials, holiday and overtime pay, shall accrue at the rate of three percent (3%) per annum from one hundred twenty (120) days following their earning or one hundred twenty (120) days after the execution of this Agreement, whichever is later. to the date of actual payment.

c.      Interest accrued under subsections 10(a) or 10(b) shall be payable only if the amount of interest due to an individual employee exceeds five dollars ($5.00).

## Section 11.

The Employer shall make every reasonable effort to provide adequate notice of employee salary garnishments.

## Section 12.

No employee shall receive a lower basic salary rate following promotion than the basic salary rate received preceding the promotion.

## Section 13.

The Employer shall not withhold entire paychecks when an employee has no leave balance to cover absences without pay, due to illness, up to a maximum of five (5) days, provided the affected employee has five (5) years of service as a member of the New York City Employee's Retirement System.   Appropriate deductions shall be made in a subsequent paycheck. Employees with a negative leave balance shall not be covered by this Section.

## Section 14.

For the purposes of this Agreement employees in all classes of positions not yet classified by the appropriate competent body shall be presumptively covered by the terms of this Agreement pending final classification of the affected class of positions.

## Section 15.

The Employer shall provide a copy of this Agreement to all covered agencies.

## Section 16.

Employees who purchase meals served in any facility run by the Employer shall pay fifty percent (50%) of the then total direct costs of such meals.

## Section 17.

The Employer shall distribute material describing pension benefits and provisions under the Coordinated-Escalator Retirement Plan (CO-ESC Plan) to all newly hired employees at the time of appointment by the employing Agency.

## Section 18.

a.      If an employee's paycheck is lost by the Employer, the Employer shall secure a handwritten replacement check for the employee within three (3) working days after receipt of an affidavit by the employee stating that he/she has not received the lost check or any proceeds from it.

00001

b.  If the paycheck of an employee who is already on payroll is withheld as the result of an error which is solely the fault of the Employer, the Employer shall make payment in (4) four working days except when the large effort of paying retroactive monies is involved.

## Section 19.

When a permanent employee is summoned to an interview which may lead to a disciplinary action and which is conducted by someone outside the normal supervisory chain of command, the following procedure shall apply:

a.  Employees who are summoned to the appropriate office of their agency shall be notified, whenever feasible, in writing at least two (2) work days in advance of the day on which the interview or hearing is to be held, and a statement of the reason for the summons shall be attached, except where an emergency is present or where considerations of confidentiality are involved.

b.  Whenever such an employee is summoned for an interview or hearing for the record which may lead to disciplinary action, the employee shall be entitled to be accompanied by a Union representative or a lawyer, and the employee shall be informed of this right. Upon the request of the employee and at the discretion of the Inspector General, the Inspector General may agree to the employee being accompanied by a lawyer and a Union representative. Such permission shall not be unreasonably denied. If a statement is taken, the employee shall be entitled to a copy.

c.  Wherever possible, such hearings and interviews shall be held in physical surroundings which are conducive to privacy and confidentiality.

d.  This Section shall not alter the provisions of any existing unit Agreement which contains a more beneficial procedure.

## Section 20.

a.  Upon the conclusion of an investigation conducted pursuant to Executive Order 16, dated July 26, 1978, the summoned employee shall be entitled, upon request, to a copy of any sworn statement the employee has given to an Inspector General or the Inspector General's designee or representative.

b.  Upon the conclusion of an investigation conducted pursuant to Executive Order 16, dated July 26, 1978, an employee who has been notified that he or she has been the subject of said investigation, shall, upon the employee's request, be advised of its disposition.

## Section 21.

Certified Unions shall be provided with a copy of the applicable personnel rules, regulations, policies and procedures as distributed by the agency.

## Section 22.

At the time of the final approval of an agreement, the Employer shall notify NYCERS of an adjustment in compensation to be included in retirement benefits.

0 0 0 0 1

## Section 23.

Employees who have retired or left employment for other reasons shall be paid negotiated increases, premium pay, shift differential, overtime, and any other monies due them as soon as possible.

## Section 24.  Full-time Per Diem Employees

The Alternative Career and Salary Pay Plan shall be amended to permit employees appointed on a  full-time per diem basis to receive their  base salary (including salary increment schedules) and/or additions-to-gross payments in the same manner as a full-time per annum employee, subject to the conditions listed below:

a.  In order to qualify, a per diem employee must, at the time of appointment, be assigned to regularly work the normal full-time work week established for such per annum title as listed in Appendix A of the Citywide Agreement ("full-time basis") and *must* continue to regularly work the normal full-time work week established for such per annum title.

b.  For the purpose of salary increment schedules or additions-to-gross payments based on active service (including: experience differentials, longevity differentials, longevity increments, recurring increment payments and service increments), the qualifying service for these provisions shall commence with the original date of appointment on a full-time basis, provided the employee has no break in service * of more than 31 days.  Employees with a break in service shall be deemed newly hired and only service subsequent to such break shall be credited.

c.  Except as may otherwise be provided by an agreement applicable to the employee's title, assignment differen  ais, certification differentials, educational differentials, license differentials, uniform  allowances and uniform maintenance allowances shall be paid from the original date of appointment on a full-time basis.

d.  For purposes of calculating the seniority of employees appointed prior to December 5, 1999, the seniority date shall be deemed their original date of appointment on a full-time basis.  However, no benefits granted in this Section 24 are payable prior to December 5, 1999.

e.  These provisions shall only apply to an employee hired on a temporary basis pursuant to Rule 5.4 of the Personnel Rules and Regulations of the City of New York if such employee has worked the normal full-time work week established for the per annum title for one full year (52 weeks) without a break in service* of more than 31 days, and continues to regularly work such normal full-time work without a break in service of more than 31 days.

f.  These provisions shall take effect December 5, 1999.

---

*  See Article I, Section 5(e).

$00001$

## Section 25. Notice of Major Renovations

Effective November 26, 1999, Agencies shall give the Union notice two weeks in advance of the commencement of any major renovation (i.e., funded through the Capital Budget) of an agency facility

## Section 26. Functional Transfers

a.    For the purposes of Article XVI (Disciplinary Procedure for Provisional Employees), time served immediately prior to a functional transfer of a provisional employee in the employee's former agency shall count as time served in the employee's new agency.

b.    For the purposes of Article XVII (Job Security), time served immediately prior to a functional transfer of a non-competitive or labor class employee in the employee's former agency shall count as time served in the employee's new agency.

## Section 27. Metrocards

As soon as administratively feasible, the City with the Union's participation shall implement procedures enabling employees to purchase Metrocards through pre-tax payroll deductions.

## Section 28. Conflict of Interest Board Submissions

When permitted by law, the Employer may withhold the final paycheck of an employee who is required by law to file a report with the Conflict of Interest Board upon the termination of employment until the employee has submitted such report.

# ARTICLE X - EVALUATIONS AND PERSONNEL FOLDERS

## Section 1.

An employee shall be required to accept a copy of any evaluatory statement of the employee's work performance or conduct prepared during the term of this Agreement if such statement is to be placed in the employee's permanent personnel folder whether at the central office of the agency or in another work location. Prior to being given a copy of such evaluatory statement, the employee must sign a form which shall indicate only that the employee was given a copy of the evaluatory statement but that the employee does not necessarily agree with its contents. The employee shall have the right to answer any such evaluatory statement filed and the answer shall be attached to the file copy. Any evaluatory statement with respect to the employee's work performance or conduct, a copy of which is not given to the employee, may not be used in any subsequent disciplinary actions against the employee. At the time disciplinary action is commenced, the Employer shall review the employee's personnel folder and remove any of the herein-described material which has not been seen by the employee.

An employee shall be permitted to view the employee's personnel folder once a year and when an adverse personnel action is initiated against the employee by the Employer. The viewing shall be in the presence of a designee of the Employer and held at such time and place as the Employer may prescribe.

00.00.1

## Section 2.

If an employee finds in the employee's personnel folder any material relating to the employee's work performance or conduct in addition to evaluatory statements prepared after July 1, 1967 (or the date the agency came under the provisions of the Citywide Agreement, whichever is later), the employee shall have the right to answer any such material filed and the answer shall be attached to the file copy.

# ARTICLE XI - CIVIL SERVICE, CAREER DEVELOPMENT

## Section 1.

When vacancies in promotional titles covered by this Agreement are authorized to be filled by the appropriate body and the agency with such vacancies decides to fill them, a notice of such vacancies shall be posted in all relevant areas of the agency involved at least five (5) working days prior to filling except when such vacancies are to be filled on an emergency basis. Present agency agreements on this subject shall not be affected by this Section.

## Section 2.

a.   The duly certified union representative shall be given a copy of proposed changes in job specifications for any title certified to such union for its perusal at least seven (7) working days in advance of the final approval of such changes.

b.   Notice of final revisions shall be distributed to all affected agencies and shall be posted in appropriate areas for thirty (30) days.

## Section 3.

The Employer's contribution to all existing and any newly negotiated Training Fund agreements may be applied, by the agreement of the parties, to a mutually agreed upon Training Trust Fund for the purpose of establishing and administering a plan to provide opportunities for training and education for covered employees beyond those provided by the Department of Citywide Administrative Services. The Training Trust Fund shall plan, administer, and coordinate all training programs to be financed by the Training Fund. Such training programs shall be designed to increase the effectiveness and efficiency of employees covered by the agreement and to prepare such persons for advancement and upgrading.

The Training Trust Funds and training programs shall be subject to fiscal audit by the Comptroller of the City of New York and to prior approval and performance audit by the Department of Citywide Administrative Services.

All factual data necessary to evaluate the programs shall be furnished to the Department of Citywide Administrative Services by the Training Trust Fund. The Department of Citywide Administrative Services shall respond within thirty (30) days stating its objection, if any, to the proposed program.

00.00.1.

### Section 4.

After promotion, if an employee is returned to his/her former title in accordance with existing Personnel Rules and Regulations of the City of New York, the employee may request of the Employer a conference to discuss the basis for the employee's return to the former title.  The Employer's decision is neither arbitrable nor reviewable under the Civil Service Law or the Rules and Regulations of the Health and Hospitals Corporation.

### Section 5.

An employee on a promotion list who is on a leave of absence without pay shall be notified prior to promotions being made past the employee's list number at the last address of record on file with the City Department of Citywide Administrative Services or the Office of Personnel Management of the Health and Hospitals Corporation.

### Section 6.

Time served by an employee in a higher assignment level of the employee's permanent title shall count towards the lock-in of the employee's salary at a lower level of that title.

### Section 7.

The hiring agency or Department of Citywide Administrative Services, as applicable, shall notify all eligibles at least one week in advance of scheduled hiring or promotional pools or interviews from civil service lists.

## ARTICLE XII - UNION RIGHTS

### Section 1.

a.     Where orientation kits are supplied to new employees, unions certified to represent such employees shall be permitted to have included in the kits union literature, provided such literature is first approved for such purpose by the Office of Labor Relations.

b.     The Employer shall distribute to all newly hired employees information regarding their union administered health and security benefits, including the name and address of the fund that administers said benefits, provided such fund supplies the Employer the requisite information printed in sufficient quantities.

c.     The Employer shall distribute information regarding the New York City Employee Health Benefits Program and enrollment forms to eligible employees prior to the completion of thirty (30) days of employment.

### Section 2.

Each certified union shall have reasonable access to its dues check-off authorization cards in the custody of the Employer.

0 0 0 0 1

## Section 3.

When an employee transfers from one agency to another, but remains in the same bargaining unit, the employee shall continue to be covered by the same dues check-off authorization card and not be required to sign another authorization card. The agency where the employee was formerly employed shall transfer the check-off authorization card to the employee's new agency.

The Employer will issue an appropriate administrative instruction to all agencies to insure compliance with this Section.

## Section 4.

When an employee is promoted or reclassified to another title certified to the same union as the employee's former title, the dues check-off shall continue uninterrupted. The Employer will issue an appropriate administrative instruction to all agencies to insure compliance with this Section.

## Section 5.

When an employee returns from an approved leave of absence without pay, is reappointed or temporarily appointed to a preferred list to the same agency in the same title or in another title represented by the same certified union, any dues check-off authorization in effect prior to the approved leave or the layoff shall be reactivated. The Employer will issue an appropriate administrative instruction to all agencies to insure compliance with this Section.

## Section 6.

The Employer shall furnish to a certified union, once a year between March 15 and July 1, a listing of employees by Job Title Code, home address when available, Social Security Number and Department Code Number, as of December 31st of the preceding year. This information shall be furnished to a certified union through the Municipal Labor Committee.

## Section 7.

a.    District Council 37 or any other certified union represented by D.C. 37 for the purposes of this Agreement which elects to participate in a separate segregated fund established pursuant to applicable law, including Title 2 USC, Section 441b, to receive contributions to be used for the support of candidates for federal office shall have the exclusive right in conformance with applicable law to the checkoff for such political purposes in a manner as described in a supplemental agreement hereby incorporated by reference into this Agreement.

b.    Any eligible employee covered by this Agreement may voluntarily authorize in writing the deduction of such contributions from the employee's wages for such purpose in an authorization form acceptable to the employer which bears the signature of the employee.

c.    A copy of the Summary Annual Report to the Federal Elections Commission ("FEC") of each fund shall be submitted by the appropriate participating union to the Comptroller and OLR at the time of its submission to the FEC.

00001

# ARTICLE XIII - WELFARE FUNDS

## Section 1.

a.    Welfare fund contributions shall remain uniform for those employees whose respective certified unions have elected to receive the uniform contributions provided by this Article.  Upon the execution of an election, welfare fund contributions shall be made uniform for those employees whose respective certified unions have not heretofore elected the uniform contributions.  Under such election, welfare fund contributions shall be permanently reserved for citywide bargaining. This shall not, however, preclude the right of any certified union to bargain for welfare fund coverage for groups of employees not now included in welfare fund agreements.

b.    Effective January 1, 1979, District Council 37 or any of its affiliated locals or any other certified union which elects to be covered by this Section, shall be entitled to receive such separate contributions as may be provided in this Agreement for welfare, training and legal services benefits, as a single contribution.  This contribution shall be paid by the Employer into a trusted administrative Benefits Fund Trust and shall be held by the trustees of that fund for the exclusive purpose of providing, through other funds, welfare, training and legal service benefits for the employees so covered as well as any other benefits as the Employer and the certified union may agree upon.  Such administrative Benefits Fund Trust contribution by the Employer shall be subject to a separate agreement between the Employer and the union.  Such agreement shall include among its provisions that the Employer shall continue to have the right to review and approve the distribution of funds to and the level of benefits provided by the individual funds. The individual funds shall also continue to be subject to a separate agreement between the Employer and the union.

In those instances where the contributions for welfare, training and legal service benefits derive from more than one unit agreement and those unit agreements are not uniform as to each other with respect to the aforesaid contributions, the Employer shall have no obligation to comply with the immediately above paragraph unless and until each particular unit agreement contains a provision agreeing to waive the relevant contribution provided for in the unit agreement in question.

## Section 2. Full-Time Employees:

a.    For those full-time employees who are in a welfare fund whose certified union has elected the uniform contribution rates pursuant to Section 1 of this Article XIII, the Employer shall contribute in the pro-rata annual amounts set forth below, effective the dates indicated below, per full-time employee for remittance to the Welfare Fund, subject to a signed separate trusted fund agreement between the Employer and the Union.

| Effective Date: | Amount: |
|---|---|
| July 1, 1995 | $1,125 [1] |
| July 1, 1996 | $1,125 |
| March 1, 1998 [2] | $1,200 |
| June 1, 1999 [3] | $1,275 |

---

1.  The contribution paid to each applicable welfare fund on behalf of full-time per annum employees shall be reduced by a one-time amount of one hundred dollars ($100) for each such full-time per annum employee who was eligible for welfare fund benefits on July 1, 1995.

2.  For employees covered by Unit Agreements with a commencement date of January 1, 1995 the effective date shall be December 1, 1997.

3.  For employees covered by Unit Agreements with a commencement date of January 1, 1995 the effective date shall be March 1, 1999.

00.001.

b.    Effective July 31, 1999, the Employer shall make a one hundred dollar ($100) one-time payment to each Welfare Fund on behalf of each full-time per annum employee who, pursuant to Section 2(a), is receiving benefits on July 31, 1999.

### Section 3.

a.    For each part-time per annum, hourly, per diem, per session and seasonal employee who is covered by a welfare fund whose certified union has elected the uniform contribution rates pursuant to Article XIII, Section 1 of the Citywide Agreement, and who works on a regular basis at least one half the regular hours of full-time employees in the same title [1] and who is not otherwise eligible for a welfare fund contribution in said employee's behalf, the Employer shall contribute in the pro-rata annual amounts set forth below, effective the dates indicated below, per employee for remittance to the Welfare Fund, subject to a signed separate trusted fund agreement between the Employer and the Union.

| Effective Date: | Amount: |
|---|---|
| July 1, 1995 | $642.86 [1] |
| July 1, 1996 | $642.86 |
| March 1, 1998 [2] | $685.71 |
| June 1, 1999 [3] | $728.57 |

1. The contribution paid to each applicable welfare fund on behalf of part-time per annum, hourly, per diem, per session and seasonal employees shall be reduced by a one-time amount of $57.14 for each such part-time per annum, hourly, per diem, per session and seasonal employee who was eligible for welfare fund benefits on July 1, 1995.

2. For employees covered by Unit Agreements with a commencement date of January 1, 1995 the effective date shall be December 1, 1997.

3. For employees covered by Unit Agreements with a commencement date of January 1, 1995 the effective date shall be March 1, 1999.

b.    Effective July 31, 1999, the Employer shall make a fifty-seven dollar and fourteen cents ($57.14) one-time payment to each Welfare Fund on behalf of each part-time per annum, hourly, per diem, per session and seasonal employee who, pursuant to Section 3(a), is receiving benefits on July 31, 1999.

c.    If no full time equivalent title exists, then the minimum number of hours required to be eligible to receive a contribution pursuant to this Section shall be based on the nature of employment as follows:

| White Collar Employment | 17 1/2 hours per week |
|---|---|
| Blue Collar Employment | 20 hours per week |

### Section 4.

a.    For employees separated from service subsequent to June 30, 1970 who were in a welfare fund subject to the provisions of the above Sections 2 and 3 at the time of such separation, the Employer shall, subject to a signed separate agreement between the Employer and the Union, contribute to the Welfare Fund on the same contributory basis as incumbent employees.

00001

b.    The per annum contribution rates paid on behalf of employees separated from service to a welfare fund which covers such employees and the one-time lump sum payment (for such employees who are receiving benefits on July 31, 1999) shall be adjusted in the same manner as the per annum contribution rates for other employees are adjusted pursuant to Sections 2 and 3.

c.    Contributions shall be made only for such time as said individuals remain primary beneficiaries of the New York City Employee Health Benefits Program and are entitled to benefits paid for by the Employer through such Program or are retirees of the New York City Employee's Retirement System who have completed at least five (5) years of full-time service with the City.

### Section 5.

For those employees who are covered by any other welfare fund and whose certified union elects the uniform contributions provided in this Article, the Employer shall make an equal contribution for remittance to such welfare fund subject to a separate agreement between the Employer and such Union.

### Section 6.

a.    District Council 37 and certified unions which elect to be covered by the uniform contributions provided for in this Article shall make every reasonable effort to publicize and disseminate to all employees covered under their respective welfare funds, whether members of the Union or not, full and complete information concerning the provisions thereof, including but not limited to, the following matters:

    i.     benefits provided and eligibility requirements

    ii.    procedures including the filing of applications, and

    iii.   where and when information may be obtained concerning such benefits.

b.    District Council 37 and the other certified unions which elect to be covered by this Article shall furnish information and applications readily and expeditiously to all covered employees on an equal basis.

### Section 7.

District Council 37 or a certified union which elects to be covered by this Article may allow the welfare fund to utilize an amount not to exceed ten dollars ($10) per employee per year from welfare fund contributions to help defray the costs of health insurance and pension counseling for such employees.

### Section 8.

a.    When a title not previously covered by any welfare fund becomes certified to a union, welfare fund payments shall be made to the appropriate union welfare fund pursuant to the terms of this Article effective the January 1st or July 1st next following the date of petition for certification.

b.    When a title or titles previously covered by the same welfare fund are reclassified, broadbanded, or consolidated into new title(s), welfare fund payments shall continue to be made to said welfare fund pursuant to the terms of this Article pending the final decision of the Board of Certification as to the bargaining status of the new title(s).

c.    When there is a certification dispute involving a title not previously covered by any welfare fund or titles previously covered by different welfare funds which have been reclassified, broadbanded, or consolidated into new title(s), such title(s) shall be covered by the Management Benefits Fund pending the final decision of the Board of Certification as to the bargaining status of the title(s).

d.    When a title has been covered by the Management Benefits Fund or a different union welfare fund prior to becoming certified to a union, welfare fund payments shall be made to the appropriate union welfare fund pursuant to the terms of this Article effective the first day of the month sixty (60) days subsequent to the date of actual certification.

## Section 9.

District Council 37 or a certified union which elects to be covered by this Article may, pursuant to a separate agreement between the Employer and the certified union, utilize a portion of its welfare fund contributions to provide prepaid legal services for employees.

## Section 10.

a.    Training trust funds and welfare funds shall be audited by a certified public accountant to be selected by the trustees of such fund and at the expense of the respective fund. The results of such audits shall be submitted promptly to the Comptroller of the City of New York and such funds shall be subject to further audit by the Comptroller.

b.    In lieu of the annual report to the Comptroller required by the separate welfare fund agreement between the Employer and the certified union, the welfare fund may submit a copy of its ERISA filing.

## Section 11.

Where an employee is suspended without pay for disciplinary reasons and is subsequently restored to full pay status as of the effective date of the suspension, the Employer shall make any necessary contributions to the welfare fund covering such employee to permit said employee to receive full welfare fund and New York City Employee Health Benefits Program Insurance coverage for the period of the suspension.

## Section 12.

The Unions have agreed to provide welfare fund benefits to domestic partners of covered employees in the same manner as those benefits are provided to spouses of married covered employees.

00001

# ARTICLE XIV - OCCUPATIONAL SAFETY AND HEALTH

## Section 1.

The Employer shall establish a Citywide Occupational Safety and Health Committee, the members of which shall be appointed by the Mayor and shall include union representation. The Director of the Citywide Office on Safety and Health shall serve, *ex officio*, as Chairperson of this Committee.

The Citywide Occupational Safety and Health Committee shall recommend citywide employee safety and health policy to the Mayor and shall assume the duties and responsibilities of the Occupational Safety and Health Planning Task Force created by Mayor's Executive Order No. 58, dated May 6, 1976, and shall also assume the citywide safety responsibilities of the City Director of Personnel contained in Mayor's Executive Order No. 109, dated August 28, 1969. In addition, this Committee shall act as the City's liaison with Federal and State Agencies, in efforts to obtain grants to finance City employee safety and health programs and shall perform any additional tasks assigned by the Mayor.

## Section 2.

a.    Adequate, clean, structurally safe and sanitary working facilities shall be provided for all employees.

b.    Motor vehicles and power equipment which are in compliance with minimum standards of applicable law shall be provided to employees who are required to use such devices.

c.    Where necessary, first aid chests, adequately marked and stocked, shall be provided by the Employer in sufficient quantity for the number of employees likely to need them and such chests shall be reasonably accessible to the employees.

d.    A Labor Management Health and Safety Committee shall be established in each agency. Each committee shall be composed of not less than three nor more than five labor representatives designated by the Union and not more than an equivalent number of management representatives designated by the agency. The appropriate number of such representatives shall be determined jointly. If agreement on the number cannot be reached such number shall be determined by the Commissioner of Labor Relations.

The Committee shall meet at least quarterly and shall meet at the written request of the labor or the management representatives for the purpose of discussing health and safety problems in the agency and making recommendations for their resolution to the agency head. The written request for such a meeting shall indicate the specific condition for which the meeting is called.

In addition to the above described committee, sub-committees may be established on an ad hoc basis upon agreement of the parties.

e.    The sole remedy for alleged violations of this Section shall be a grievance pursuant to Article XV of this Agreement. Any employee who withholds services as a means of redressing or otherwise protesting alleged violations of this Section shall be docked pay for any unauthorized non-performance of work and may be subject to any appropriate disciplinary action.

0 0 0 0 1.

f.   In construing this Section, an arbitrator shall initially have the power only to decide whether the subject facilities meet the standards of subsection (a) of this Section 2 but may not affirmatively direct how the Employer should comply with this Section. If the arbitrator determines that the Employer is in violation of this Section, the Employer shall take appropriate steps to remedy the violation. If in the opinion of the Union the Employer does not achieve compliance within a reasonable period of time, the Union may reassert its claim to the arbitrator. Upon such second submission, if the arbitrator finds that the Employer has had a reasonable time to comply with the terms of this Section and has failed to do so, then and only then, the arbitrator may order the Employer to follow a particular course of action which will effectuate compliance with the terms of this Section. However, such remedy shall not exceed appropriations available in the current budget allocation for the involved agency for such purposes.

g.   In any enclosed facility where employees are assigned to work, the Employer shall make reasonable efforts to provide for the personal security of employees while they are working.

h.   When the Employer becomes aware of a safety hazard which the Employer considers an imminent physical danger to employees at a worksite, the Employer shall remove the employees from the affected area.

i.   The Employer shall provide to the Municipal Labor Committee a copy of the results of environmental testing by the City of a City worksite and statistics resulting from special medical testing of employees.

## ARTICLE XV - ADJUSTMENT OF DISPUTES

Section 1.

The term "grievance" shall mean a dispute concerning the application or interpretation of the terms of this Agreement.

Section 2.

The grievance procedure shall be as follows:

STEP I     The employee and/or the Union shall present the grievance in writing to the person designated by the agency head for such purpose, not later than one hundred twenty (120) days after the date on which the grievance arose. The employee may also request an appointment to discuss the grievance. The person designated to hear the grievance shall take any steps necessary to a proper disposition of the grievance and shall reply in writing by the end of the third work day, following the date of submission.

STEP II    An appeal from an unsatisfactory determination at STEP I shall be presented in writing to the agency head or the agency head's designated representative, who shall not be the same person designated in STEP I. The appeal must be made within five (5) working days of the receipt of the Step I determination. The agency head or the agency head's designated representative if any, shall meet with the employee and/or the Union for review of the grievance and shall issue a written determination by the end of the tenth work day following the date on which the appeal was filed.

00001.

STEP III     An appeal from an unsatisfactory determination at STEP II shall be presented by the employee and/or the Union to the Commissioner of Labor Relations in writing, within ten (10) working days of the receipt of the STEP II determination. Copies of such appeals shall be sent to the agency head. The Commissioner of Labor Relations, or the Commissioner's designee shall review all such appeals from STEP II determinations and shall make and issue a written determination within fifteen (15) working days following the date on which the appeal was filed.

STEP IV     An appeal from an unsatisfactory determination at STEP III may be brought solely by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) working days of receipt of the STEP III determination. In addition, the Employer shall have the right to bring directly to arbitration any dispute between the parties concerning any matter defined herein as a "grievance." The Employer shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining. A copy of the notice requesting impartial arbitration shall be forwarded to the opposing party. The arbitration shall be conducted in accordance with the Title 61 of the Rules of the City Of New York (formerly referred to as the Consolidated Rules of the Office of Collective Bargaining). The costs and fees of such arbitration shall be borne equally by the Union and the Employer.

A transcript of all arbitration hearings shall be taken unless the taking of a transcript is waived by both parties. The cost of one copy of the transcript for each party and for the arbitrator shall be borne equally by the parties.

Both the Employer and the Union will request the arbitrator to make every reasonable effort to issue the decision within thirty (30) days. The arbitrator's decision, order or award shall be limited to the application and interpretation of this Agreement, and the arbitrator shall not add to, subtract from or modify this Agreement. The arbitrator's award shall be final and binding and enforceable in any appropriate tribunal in accordance with Article 75 of the Civil Practice Law and Rules. An arbitrator may provide for and direct such relief as the arbitrator deems necessary and proper, subject to the limitations set forth above and any applicable limitations of law.

## Section 3.

As a condition to the right of a Union to invoke impartial arbitration set forth in this Article, the employee or employees and the Union shall be required to file with the Director of the Office of Collective Bargaining a written waiver of the right, if any, of the employee or employees and the Union to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitrator's award.

## Section 4.

Any grievance of a general nature affecting a large group of employees and which concerns the claimed misinterpretation, inequitable application, violation or failure to comply with the provisions of this Agreement shall be filed at the option of the Union at STEP III of the grievance procedure, without resort to previous steps.

## Section 5.

If a decision satisfactory to the Union at any level of the grievance procedure is not implemented within a reasonable time, the Union may re-institute the original grievance at STEP III of the grievance procedure; or if a satisfactory STEP III determination has not been so implemented, the Union may institute a grievance concerning such failure to implement at Step IV of the grievance procedure.

## Section 6.

If the Employer exceeds any time limit prescribed at any step in the grievance procedure, the grievant and/or the Union may invoke the next step of the procedure, except, however, that only the Union may invoke impartial arbitration under STEP IV.

0 0 0 0 1.

### Section 7.

The Employer shall notify the Union in writing of all grievances filed by employees, all grievance hearings, and all determinations. The Union or a public employee organization which has been designated by the Union to represent the grievant or grievants shall have the right to have a representative present at any grievance hearing and shall be given forty-eight (48) hours' notice of all grievance hearings.

### Section 8.

Each of the steps in the grievance procedure, as well as time limits prescribed at each step of this grievance procedure, may be waived by mutual agreement of the parties.

### Section 9.

The grievance and arbitration procedure contained in this agreement shall be the exclusive remedy for the resolution of disputes defined as "grievances" herein. This shall not be interpreted to preclude either party from enforcing the arbitrator's award in court. This Section shall not be construed in any manner to limit the statutory rights and obligations of the Employer under Article XIV of the Civil Service Law.

### Section 10. FLSA Dispute Procedure

a.   Any dispute, controversy or claim concerning or arising out of the application or interpretation of the Fair Labor Standards Act ("FLSA Controversy") shall be submitted by a claimant in accordance with this section.

b.   Any FLSA Controversy must be presented in writing and in the form prescribed by the FLSA Panel no later than sixty days after the date on which such FLSA Controversy arose.

c.   i.   Any FLSA Controversy arising out of a claimed wrongful computation of benefits shall be submitted by an employee in writing to the applicable agency head or designee for review and resolution. A copy shall also be submitted to the Office of Labor Relations and to the Union. The agency shall have thirty days to resolve the matter and issue a written decision; such period may be extended by mutual agreement of the parties.

    ii.   If the matter is not satisfactorily resolved at the agency level, the claimant may, within two weeks after receipt of the agency determination, appeal the matter to the FLSA Panel in writing.

d.   The FLSA Panel shall consist of a representative designated by the Municipal Labor Committee and a representative designated by the Commissioner of the Office of Labor Relations of the City of New York. The FLSA Panel shall establish appropriate forms and procedures to promptly review and resolve all FLSA Controversies submitted to it.

e.   Any FLSA Controversy arising out of the classification of a position or group of positions as exempt or non-exempt from the FLSA shall be submitted by an employee in writing to the FLSA Panel.

A copy of any FLSA Controversy concerning a HHC title which is submitted to the FLSA Panel pursuant to this Section 10(e) shall be forwarded immediately by the Panel to the HHC's Office of Vice President for Human Resources. If the Panel deems it necessary to the proper resolution of said FLSA Controversy, it shall consult with HHC prior to issuance of its determination.

0 0 0 0 1

The Panel shall take any steps necessary for a proper disposition of any FLSA Controversy and shall issue a written determination within sixty days following the date of submission thereof. The FLSA Panel's time may be extended by mutual agreement of the parties. The decision of the Panel shall be final.

f.     Notwithstanding the provisions of this Section 10, the submission of a dispute by an employee under this procedure shall not constitute a waiver of the employee's rights under the FLSA.

## Section 11. VDT Operators Dispute Procedure

For purposes of this Section 11, the term "grievance" shall mean a dispute concerning the application or misinterpretation of Article XVIII. Employees may at any time informally discuss with their supervisors a matter which may become a dispute. If the results of such a discussion are unsatisfactory, the Union may present the grievance at STEP 1.

STEP 1     The Union shall present the grievance in the form of a memorandum to the person designated for such purpose by the Commissioner of Labor Relations no later than 120 days after the date on which the dispute arose except a dispute concerning employees of the Health and Hospitals Corporation shall be filed directly at STEP 1(a) of this dispute procedure. The Commissioner of Labor Relations or the Commissioner's designee shall investigate the grievance and shall issue a determination within thirty (30) work days of the receipt of the grievance, except, a determination involving a dispute arising pursuant to subsections 5(f) and 5(g) of Article XVIII or an appeal from STEP 1(a) shall be issued within fifteen (15) work days following the date of its receipt.

   STEP 1(a)     Health and Hospitals Corporation Only:

         The Union shall present the grievance in the form of a memorandum to the person designated for such purpose by the New York City Health and Hospitals Corporation's Vice President for Human Resources no later than 120 days after the date on which the dispute arose. The Vice President for Human Resources or the Vice President's designee shall investigate the grievance and shall issue a determination within thirty (30) work days of the receipt of the grievance. An appeal from an unsatisfactory determination at STEP 1(a) shall be presented in writing to the Commissioner of Labor Relations or the Commissioner's designee within ten (10) work days of the receipt of the STEP 1(a) determination.

STEP 2     An appeal from an unsatisfactory determination at STEP 1 may be brought by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) work days of receipt of the STEP 1 determination. In addition, the Employer shall have the right to bring directly to arbitration any dispute between the parties concerning any matter defined herein as a "grievance". The Employer shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining. A copy of the notice requesting impartial arbitration shall be forwarded to the opposing party. The arbitration shall be conducted in accordance with the Consolidated Rules of the Office of Collective Bargaining. The costs and fees of such arbitration shall be borne equally by the Union and the Employer.

      Both the Employer and the Union will request the arbitrator to make every reasonable effort to issue the decision within thirty (30) days. The arbitrator's decision, order or award (if any) shall be limited to the application and interpretation of the Article XVIII and the arbitrator shall not add to, subtract from or modify said Article. The arbitrator's award shall be final and binding and enforceable in any appropriate tribunal in accordance with Article 75 of the Civil Practice Law and Rules. The arbitrator may provide for and direct such relief as the arbitrator deems necessary and proper, subject to the limitations set forth above and any applicable limitations of law.

Each of the steps in the dispute procedure, as well as the time limits prescribed at each step of this dispute procedure, may be waived by mutual agreement of the parties.

0 0 0 0 1

## ARTICLE XVI - DISCIPLINARY PROCEDURE FOR PROVISIONAL EMPLOYEES

When a claimed wrongful disciplinary action has been taken against a provisional employee who has served for two years * in the same or similar title or related occupational group in the same agency, the following procedure shall govern upon service of written charges of incompetency or misconduct:

STEP A
Following the service of written charges, a conference with such employee shall be held with respect to such charges by the person designated by the agency head to review a grievance at STEP I of the Grievance Procedure set forth in Article XV of this Agreement. The employee may be represented at such conference by a representative of the Union. The person designated by the agency head to review the charges shall take any steps necessary to a proper disposition of the charges and shall issue a determination in writing by the end of the fifth day following the date of the conference.

STEP B(i)
If the employee is not satisfied with the determination at STEP A above, then the employee may choose to proceed in accordance with the Grievance Procedure set forth in Article XV of this Agreement through STEP III. The Union, with the consent of the employee, shall have the right to proceed to binding arbitration pursuant to STEP IV of such Grievance Procedure. The period of an employee's suspension without pay pending hearing and determination of charges shall not exceed thirty (30) days.

STEP B(ii)
An appeal from the determination of STEP A above shall be made to the agency head or designated representative. The appeal must be made in writing within five (5) work days of the receipt of the determination. The agency head or designated representative shall meet with the employee and the Union for review of the grievance and shall issue a determination to the employee and the Union by the end of the tenth work day following the day on which the appeal was filed. The agency head or designated representative shall have the power to impose the discipline, if any, decided upon, up to and including termination of the accused employee's employment. In the event of such termination or suspension without pay totaling more than thirty (30) days, the Union with the consent of the grievant may elect to skip STEP C of this Section and proceed directly to STEP D.

STEP C
If the grievant is not satisfied with the determination of the agency head or designated representative the grievant or the Union may appeal to the Commissioner of Labor Relations in writing within ten (10) days of the determination of the agency head or designated representative. The Commissioner of Labor Relations shall issue a written reply to the grievant and the Union within fifteen (15) work days.

STEP D
If the grievant is not satisfied with the determination of the Commissioner of Labor Relations, the Union with the consent of the grievant may proceed to arbitration pursuant to the procedures set forth in STEP IV of the Grievance Procedure set forth in Article XV of this Agreement.

## ARTICLE XVII - JOB SECURITY

### Section 1. General Layoff Provisions

Where layoffs are scheduled affecting full-time employees in competitive class, non-competitive class, and labor classes the following procedures shall be used:

---

* See Article I, Section 5(e).

a.  Notice shall be provided by the Office of Labor Relations to the appropriate union(s) not less than thirty (30) days before the effective dates of projected layoffs. Such notification(s) shall apply to all proposed layoffs and shall include a summary by layoff unit of the number of affected positions by title (including title code number and civil service status) and shall also include in addition to the above information the name, social security number, city start date, and title start date of each affected employee.

It is understood by the parties that such notice is considered to be preliminary and is subject to change during the 30 days notice period. However, if new title(s) which were not part of the original notice are added to the proposed layoff notice or the number of employees in title(s) contained in the original notice is increased beyond the number in the original notice, an additional 30 days notice will be given to the affected union(s) covering solely such additional title(s) or numbers, except, such additional 30 days notice shall not apply to employees displaced by the "bumping" provisions mandated by the Civil Service Law or by appointments from special transfer, preferred, or other civil service lists. The parties may waive such additional notice by mutual consent.

b.  Within such 30-day period designated representatives of the Employer will meet and confer with the designated representatives of the appropriate union with the objective of considering feasible alternatives to all or part of such scheduled layoffs, including but not limited to:

i.  the transfer of employees to other agencies with retraining, if necessary, consistent with Civil Service law but without regard to the Civil Service title,

ii.  the use of Federal and State funds whenever possible to retain or re-employ employees scheduled for layoff,

iii.  the elimination or reduction of the amount of work contracted out to independent contractors, and

iv.  encouragement of early retirement and the expediting of the processing of retirement applications.

c.  After meeting and conferring with the designated representatives of the appropriate union, the Employer shall have the right, when necessary, to transfer any employee, in lieu of layoff, from one agency to another provided such transfer is within title (and the employee meets all the legal requirements of the new position) and is being made without loss in pay, benefits, or seniority to the affected employee. The following procedure shall govern:

i.  Volunteers in order of title seniority.

ii.  Non-volunteers in order of title seniority among those who would otherwise have to be laid off in the agency from which the transfer is being made.

00.00.1

## Section 2. Competitive Class Preferred Lists

a.   When a layoff occurs, the Employer shall provide to the appropriate bargaining representative a list of permanent competitive class employees who are on a preferred list with the original date of appointment utilized for the purpose of such layoff.

b.   A laid off employee who is returned to service in the employee's former title or in a comparable title from a competitive class preferred list, shall receive the basic salary rate that would have been received by the employee had the employee never been laid off, up to a maximum of two (2) years of general salary increases.

## Section 3. Non-Competitive Class and Labor Class Layoff Procedures

a.   If budgetary restrictions, consolidations or abolition of functions or other curtailment of activities result in the abolition of non-competitive class or labor class positions, the suspension among the incumbents in the same class of positions shall be made in inverse order of their original appointment to the agency in the subject class of positions.

b.   The date of original appointment shall be the first date of appointment followed by continuous service up to the time of the abolition or reduction of positions.

c.   An employee who had been terminated from the subject class of positions and who was reappointed in the affected class of positions within one year thereafter shall for the purposes of this Section be deemed to have continuous service.

d.   A period of an authorized leave of absence without pay or any period during which an employee is suspended from the employee's position pursuant to this Section shall not constitute an interruption of continuous service for the purposes of this Section.

e.   In the case of non-competitive or labor class employees, the Employer may determine the layoff unit (agency, unit of appropriation, department, bureau, division, or other clearly identifiable subdivision). In such case, layoff shall be made from among incumbents in the same class of positions in each such layoff unit.

f.   If the Employer designates a subdivision smaller than a unit of appropriation, department, bureau, or division as a non-competitive layoff unit or smaller than a unit of appropriation as a labor class layoff unit, the affected union may appeal such designation within 3 days of the receipt of the layoff notice to Commissioner of Citywide Administrative Services who will issue a final and binding determination within 3 days of the receipt of such appeal.

g.   Employees in affected titles in the layoff unit shall be laid off in the following order:

    i.   All employees in probationary status in the same title. Among them, layoff shall be in inverse order to date of original appointment.

    ii.   All employees who have satisfactorily completed their probationary periods in the same title. Among them, layoff shall be in inverse order to date of original appointment.

0 0 0 0 1

### Section 4. Non-Competitive Class and Labor Class Recall Procedures

a. In the event of layoff the Employer shall place the names of affected non-competitive or labor class employees on a recall list.

b.   i.   The Employer shall certify such recall list for filling non-competitive vacancies in the same class of positions in the unit of appropriation from which the suspensions were made, and for labor class vacancies in the same class of positions in the agency from which the suspensions were made, and for which the Commissioner of Citywide Administrative Services determines they qualify. The parties may waive the terms contained in this paragraph by mutual consent.

  ii.   Effective November 26, 1999, the following subsection shall supercede subsection 4(b)(i):

For filling non-competitive vacancies in the same class of positions from which the layoffs were made and for which the Commissioner of Citywide Administrative Services determines such laid off employees are qualified, the Employer shall certify such recall list to the agency from which the layoffs were made. For filling labor class vacancies in the same class of positions from which the layoffs were made, the Employer shall certify such recall list on a citywide basis. The parties may waive the terms contained in this paragraph by mutual consent.

c. Persons on the recall list shall be called for reinstatement in the order of their original date of appointment and upon the occurrence of a vacancy in an appropriate position in the recall unit shall be certified in seniority order. The eligibility for reinstatement of a person on such recall list shall not continue for a period longer than four years from the date of separation.

d. No person suspended or demoted prior to completing his/her probationary term shall be certified for reinstatement until the exhaustion of all other eligibles on the recall list and shall be required to complete his/her probationary term upon reinstatement.

e. Failure or refusal to accept reinstatement from recall lists to vacancies in the same class of positions shall be deemed relinquishment of eligibility and the employee's name shall be removed from the list.

f. A person reinstated from a recall list to his/her former class of positions shall receive at least the same salary he/she was receiving at the time of suspension.

g. Notwithstanding any other provisions of this Section, the Employer may, to the extent permissible by law, disqualify for reinstatement and remove from a recall list the name of any eligible who is physically or mentally disabled for the performance of the duties of the position for which such list is established, or who has been guilty of such misconduct as would result in dismissal.

### Section 4. Applicability

These procedures shall not apply in those agencies where layoff procedures already exist unless specifically agreed to by the Union and affected agencies.

00.00.11

## ARTICLE XVIII - VD  OPERATORS

### Section 1. Applicability:

Except as otherwise specifically indicated in this Article XVIII, the terms "employee" and "employees shall mean only a full-time worker who regularly and for continuous periods of time operate VDT terminals 20 hours or more per week.

### Section 2. Alternative Work Break:

Employees covered by this Article shall not be required to *continuously* operate a VDT terminal for more than two (2) consecutive hours without an assignment to alternative work of a visually less demanding nature for a period of not less than fifteen (15) minutes. Meal periods and any previously established rest periods shall count towards meeting the requirement for alternative work, but this provision shall not be construed as providing any additional non-work break time. The provisions of this Section shall also apply to part time employees subject to the terms of the Citywide Agreement who regularly and for continuous periods of time operate VDT terminals 20 hours or more per week.

### Section 3. Alternative Work:

a.    Upon submission of proof satisfactory to the agency head or the agency head's designee that an employee covered by this Article is physically incapable from operating a VDT terminal due to injury, disability, or pregnancy, the Employer shall make every effort to assign such employee to appropriate, alternative duties in the same title for the period of such disability, provided that such temporary assignments shall not be required to exceed one year. If a suitable position is not available, the Employer shall offer the employee any available opportunity to transfer to another title for which the employee may qualify by the change of title procedure followed by the New York City Department of Citywide Administrative Services pursuant to Rule 6.1.1. of the Personnel Rules and Regulations of the City of New York or by non-competitive examination offered pursuant to Rule 6.1.9. of the Personnel Rules and Regulations of the City of New York or Rule 4.1.8 of the Health and Hospitals Corporation Personnel Rules and Regulations.

b.    If such an employee has ten (10) or more years of retirement system membership service and is considered permanently unable to perform all the duties of the employee's title and no suitable in-title position is available, the employee shall be referred to the New York City Employee's Retirement System and recommended for ordinary disability retirement.

### Section 4. Training:

The Citywide Office of Occupational Safety and Health, and the Union shall jointly develop a module on VDT operational safety for inclusion in agency orientational training programs. In the Health and Hospitals Corporation, such training module shall be developed by Human Resources (in conjunction with the Corporate Office of Occupational and Environmental Health Services) and the Union. Such training module shall also be offered to current employees as part of any regular Right to Know Training given in the normal course of business. The provisions of this Section 4 shall apply to all employees subject to the terms of the Citywide Agreement regardless of the number of hours of employment.

0 0 0 0 1

## Section 5. VDT and Related Equipment:

a.   A standing VDT Sub-Committee of the Citywide Occupational Safety and Health Committee instituted pursuant to Article XIV, Section 1 of this Agreement, shall be established with joint Employer and Union membership. Such sub-committee shall study, issue, and periodically review procurement and ergonomic standards for VDT's and ancillary furniture and equipment. The joint sub-committee's initial report and recommendations shall be issued within three months of the execution of this Agreement. A separate labor-management committee shall be established in the Health and Hospitals Corporation for such purposes.

b.   Procurement and ergonomic standards shall be implemented by Mayoral directive. In the Health and Hospitals Corporation such standards shall be implemented in accordance with existing procedures. Agencies and facilities of the Health and Hospitals Corporation shall purchase new equipment and ancillary furniture and equipment in compliance with the then current Mayoral directive or Health and Hospital Corporation procedure.

c.   Agencies shall advise the Union of the installation and proposed utilization of new VDT equipment, and shall make service logs available on a reasonable basis to qualified, authorized Union personnel.

d.   Employees may at any time informally discuss alleged violation(s) of this Section with their supervisors. The Union may also seek to resolve any alleged violation(s) of this Section through the agency Labor Management Health and Safety Committees.

e.   If a complaint alleging violation(s) of this Section cannot be resolved pursuant to sub-section 5(d), such complaint may be filed by the Union in writing with the Director of the Citywide Office of Occupational Safety and Health or the Director's designee, or, in the Health and Hospitals Corporation, the Director of Occupational Health and Environmental Services or the Director's designee, who will investigate such alleged violation(s) and issue a determination within forty-five (45) days of the receipt of the complaint.   Upon determination by the Director or the Director's designee that violation(s) has occurred, the affected agency or agencies shall be notified of the nature of the violation(s) and directed to take steps to correct the violation(s) within sixty (60) days. A complaint pursuant to the sub-section must be brought within sixty (60) days of the initial occurrence of the alleged violation(s).

f.   A dispute concerning a determination by the Director of the Office of Citywide Occupational Health and Safety or the Director's designee, or, in the Health and Hospitals Corporation, the Director of Occupational Health and Environmental Services or the Director's designee may be appealed by the Union in writing to the Commissioner of Labor Relations within ten (10) work days of its issuance for resolution pursuant to Article XV, Section 11 of this Agreement.

g.   A complaint concerning failure by an agency or agencies to comply with a determination issued by the Director of the Office of Citywide Occupational Health and Safety or the Director's designee, or, in the Health and Hospitals Corporation, the Director of Occupational Health and Environmental Services or the Director's designee may be filed with the Commissioner of Labor Relations within ten (10) working days of the expiration of the time limits set forth in sub-section 5(e) for resolution pursuant to Article XV, Section 11 of this Agreement.                                                     0 0·0 0·1

h.   The provisions of this Section 5 shall apply to all employees subject to the terms of the Citywide Agreement regardless of the number of hours of employment.

## Section 6. Eye Examinations and Corrective Lenses:

a.   The parties shall form a joint sub-committee to develop a program related to the provision of eye examinations and corrective lenses for VDT operators. It is understood that said sub-committee shall be charged with developing a program which will operate in the most cost efficient manner possible.

b.   The guidelines under which the sub-committee shall study the issues are:

   i.   The provision of a base line examination with a follow-up examination every second year.

   ii.  The provision of corrective lenses if necessary due to the operation of a VDT terminal.

   iii. Establishment of a cap on the costs of providing the examinations and lenses.

   iv.  Allowance by the Employer to covered employees of up to two (2) hours of time to take the baseline examination and follow-up examinations.

## ARTICLE XIX - NO STRIKE

The terms of the no strike provisions contained in separate collective bargaining agreements covering employees also covered under this Agreement are deemed fully incorporated at length herein.

## ARTICLE XX - FINANCIAL EMERGENCY ACT

The provisions of this Agreement are subject to applicable provisions of law, including the New York State Financial Emergency Act for the City of New York, as amended.

## ARTICLE XXI - RESOLUTION

This Agreement shall constitute and be deemed a complete adjustment and settlement of all demands and items presented, and as to all of such demands and items there shall be no further collective bargaining for effectiveness during the period of time from January 1, 1995 to June 30, 2001. Nor, during the foregoing period of time, shall the Union engage in any activity for the enactment of any law, the effect of which would increase the monetary cost to the Employer beyond the benefits granted under this Agreement.

## ARTICLE XXII - SAVINGS CLAUSE

In the event that any provision of this Agreement is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions of this Agreement.

00001

WHEREFORE, we have hereunto set our hands and seals this _19ᵗʰ_ day _May_ of 2000.

**FOR THE CITY OF NEW YORK:**

BY _James F. Hanley_
James F. Hanley
Commissioner of Labor Relations

**FOR THE NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION:**

BY _____
Pamela S. Silverblatt
Senior Assistant Vice President
Human Resources & Workforce Development

**FOR DISTRICT COUNCIL 37
AFSCME, AFL-CIO:**

BY _____
Lee Saunders
Administrator

**APPROVED AS TO FORM**

BY _____
Jeffery D. Friedlander
Acting Corporation Counsel

## DATE CERTIFIED TO THE FINANCIAL CONTROL BOARD:_____

**UNIT:**   Citywide

**TERM:**   January 1, 1995 – June 30, 2001

| OFFICE OF LABOR RELATIONS |
| :---: |
| REGISTRATION |
| OFFICIAL                 CONTRACT |
| |
| NO:                      DATE: |
| 0 0 0 0 1          May 19, 2000 |

53

00001

# APPENDIX A

## Citywide Title Code Numbers

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Account Clerk | 10105 | 35 |
| Accountant | 40510 | 35 |
| Actuary | 40710 | 35 |
| Actuarial Specialist Level I | 40731 | 35 |
| Addiction Specialist | 56070 | 35 |
| Addiction Specialist (Methadone) | 56071 | 35 |
| Administrative Assistant | 10125 | 35 |
| Administrative Assistant (EDP) | 11023 | 35 |
| Administrative Assistant (Secretarial) | 10122 | 35 |
| Administrative Assistant (Campaign Finance Board) | 06603 | 35 |
| Administrative Associate | 10130 | 35 |
| Administrator of Youth Services | 51452 | 35 |
| Administrator of Youth Services (Research) | 51450 | 35 |
| After School Program Specialist (Youth Board) | 52602 | 35 |
| Agency Attorney | 30087 | 35 |
| Agency Attorney Interne | 30086 | 35 |
| Air Pollution Control Engineer | 20610 | 35 |
| Air Pollution Control Engineering Intern | 20602 | 35 |
| Air Pollution Control Engineering Trainee | 20604 | 35 |
| Air Pollution Inspector | 31315 | 35 |
| Alcoholism Counselor | 95437 | 35 |
| Ambulance Technician | 53057 | 37.5 |
| Analyst (Campaign Finance Board) | 06601 | 35 |
| Appraiser (Real Estate) | 40410 | 35 |
| Appraiser Trainee (Real Estate) | 40401 | 35 |
| Apprentice Inspector (Boilers) | 35001 | 40 |
| Apprentice Inspector (Cement Test) | 35002 | 40 |
| Apprentice Inspector (Construction) | 35003 | 40 |
| Apprentice Inspector (Electrical) | 35004 | 40 |
| Apprentice Inspector (Elevator) | 35005 | 40 |
| Apprentice Inspector (Heating and Ventilation) | 35006 | 40 |
| Apprentice Inspector (Highways and Sewers) | 35007 | 40 |
| Apprentice Inspector (Hoists and Rigging) | 35008 | 40 |
| Apprentice Inspector (Housing) | 35009 | 40 |
| Apprentice Inspector (Steel Construction) | 35010 | 40 |
| Apprentice Rehabilitation Specialist (Buildings) | 35141 | 40 |
| Architect | 21215 | 35 |
| Architect (Materials Research and Specifications) | 21216 | 35 |
| Architectural Intern | 21205 | 35 |
| Architectural Specialist | 06106 | 35 |
| Area Services Coordinator | 22557 | 35 |
| Arts Program Analyst | 60904 | 35 |
| Arts Programs Specialist | 60495 | 35 |
| Asbestos Handler | 31313 | 40 |
| Asbestos Handler Supervisor | 31314 | 40 |
| Asbestos Hazard Investigator | 31312 | 35 |
| Assessor | 40210 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Assistant Accountant | 40505 | 35 |
| Assistant Actuary | 40705 | 35 |
| Assistant Administrator of Youth Services | 51448 | 35 |
| Assistant Air Pollution Control Engineer | 20605 | 35 |
| Assistant Architect | 21210 | 35 |
| Assistant Area Services Coordinator | 22556 | 35 |
| Assistant Attorney | 30110 | 35 |
| Assistant Attorney (Taxes) | 30091 | 35 |
| Assistant Bio-Medical Equipment Technician | 21561 | 35 |
| Assistant Bridge Operator | 91105 | 40 |
| Assistant Bridge Operator Trainee | 91101 | 40 |
| Assistant Building Custodian | 80605 | 40 |
| Assistant Chemical Engineer | 20510 | 35 |
| Assistant Chemist | 21810 | 35 |
| Assistant Chemist (Toxicology) | 21811 | 35 |
| Assistant City Assessor | 40201 | 35 |
| Assistant City Assessor Trainee | 40200 | 35 |
| Assistant City Highway Repairer | 90692 | 40 |
| Assistant Civil Engineer | 20210 | 35 |
| Assistant Community Liaison Worker | 56092 | 35 |
| Assistant Coordinating Manager | 10236 | 35 |
| Assistant Coordinator of Highway Transport Studies | 22360 | 35 |
| Assistant Director of Bureau of Public Health Education | 51175 | 35 |
| Assistant Director of Rehabilitation | 60385 | 35 |
| Assistant Director of Technical Services (Air Pollution Control) | 20612 | 35 |
| Assistant Director of Technical Services (EI-SS) | 20603 | 35 |
| Assistant Economist | 40905 | 35 |
| Assistant Electrical Engineer | 20310 | 35 |
| Assistant Engineer (Accounting) | 20710 | 35 |
| Assistant Engineering Technician | 20112 | 35 |
| Assistant Geologist | 21910 | 35 |
| Assistant Health Facilities Planner | 22081 | 35 |
| Assistant Highway Transportation Specialist | 22305 | 35 |
| Assistant Institutional Teacher (DJJ) | 60370 | 35 |
| Assistant Landscape Architect | 21310 | 35 |
| Assistant Laundry Supervisor | 80810 | 40 |
| Assistant Maintenance Supervisor | 80682 | 35 |
| Assistant Mechanical Engineer | 20410 | 35 |
| Assistant Media Services Technician | 90621 | 35 |
| Assistant Physicist | 22010 | 35 |
| Assistant Physicist (Electronics) | 22011 | 35 |
| Assistant Physicist (Isotopes) | 22012 | 35 |
| Assistant Physicist (Radiation) | 22013 | 35 |
| Assistant Plan Examiner (Buildings) | 22405 | 35 |
| Assistant Planner | 22110 | 35 |
| Assistant Planning & Operations Officer (CD) | 22112 | 35 |
| Assistant Principal Custodial Supervisor | 80560 | 40 |
| Assistant Printing Press Operator | 92122 | 40 |
| Assistant Printing Press Operator | 92122 | 40 |
| Assistant Program Specialist (DOC) | 60947 | 35 |
| Assistant Project Coordinator | 22420 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Assistant Project Development Coordinator | 22515 | 35 |
| Assistant Project Services Specialist | 22516 | 35 |
| Assistant Public Health Adviser (CDC) | 51190 | 35 |
| Assistant Purchasing Agent | 12120 | 35 |
| Assistant Real Estate Repairer | 81706 | 35 |
| Assistant Real Estate Repairer (DCAS) | 82021 | 35 |
| Assistant Retirement Benefits Examiner | 40491 | 35 |
| Assistant Scientist (Radiation Control) | 21511 | 35 |
| Assistant Signal Circuit Engineer | 20311 | 35 |
| Assistant Space Analyst | 80181 | 35 |
| Assistant Statistician | 40605 | 35 |
| Assistant Stock Handler | 12207 | 35 |
| Assistant Superintendent of Bridge House | 52276 | 35 |
| Assistant Superintendent of Construction and Repairs | 91355 | 35 |
| Assistant Superintendent of Welfare Shelters | 52275 | 35 |
| Assistant Supervising Real Estate Manager | 80136 | 35 |
| Assistant Supervisor of Electrical Installations | 34208 | 35 |
| Assistant Supervisor of Mechanical Installations | 34209 | 35 |
| Assistant Supervisor of Youth Services | 51442 | 35 |
| Assistant Supervisor of Youth Services (Research) | 51440 | 35 |
| Assistant Surveyor | 21010 | 35 |
| Assistant Surveyor Trainee | 21005 | 35 |
| Assistant Systems Analyst (Finance) | 12646 | 35 |
| Assistant Urban Designer | 22092 | 35 |
| Assistant Workers' Compensation Benefits Examiner | 40481 | 35 |
| Assistant Youth Services Specialist | 51436 | 35 |
| Associate Accountant | 40517 | 35 |
| Associate Arts Programs Analyst | 60491 | 35 |
| Associate Arts Programs Specialist | 60496 | 35 |
| Associate Attorney | 30126 | 35 |
| Associate Attorney (Taxes) | 30097 | 35 |
| Associate Bookkeeper | 40527 | 35 |
| Associate Business Promotion Coordinator | 60861 | 35 |
| Associate Chemist | 21822 | 35 |
| Associate City Planner | 22123 | 35 |
| Associate Contract Specialist | 40562 | 35 |
| Associate Correctional Counselor | 51274 | 35 |
| Associate Engineering Technician | 20118 | 35 |
| Associate Fingerprint Technician | 71141 | 35 |
| Associate Fire Protection Inspector | 31662 | 35 |
| Associate Fraud Investigator | 31118 | 35 |
| Associate Graphic Artist | 91416 | 35 |
| Associate Housing Development Specialist | 22508 | 35 |
| Associate Human Rights Specialist | 55038 | 35 |
| Associate Inspector (Boilers) | 31640 | 40 |
| Associate Inspector (Construction) | 31642 | 40 |
| Associate Inspector (DCA) | 33996 | 35 |
| Associate Inspector (Electrical) | 31643 | 40 |
| Associate Inspector (Elevator) | 31644 | 40 |
| Associate Inspector (Highways and Sewers) | 31645 | 40 |
| Associate Inspector (Hoists and Rigging) | 31647 | 40 |

0 0 0 0 1.

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Associate Inspector (Housing) | 31675 | 40 |
| Associate Inspector (Low Pressure Boilers) | 31676 | 40 |
| Associate Inspector (Plastering) | 31648 | 40 |
| Associate Inspector (Plumbing) | 31649 | 40 |
| Associate Inspector (Steel Construction) | 31650 | 40 |
| Associate Investigator | 31121 | 35 |
| Associate Juvenile Counselor | 52300 | 35 |
| Associate Laboratory Microbiologist | 21514 | 35 |
| Associate Landmarks Preservationist | 92238 | 35 |
| Associate Management Auditor | 40503 | 35 |
| Associate Market Agent | 33973 | 35 |
| Associate Mortgage Analyst | 40551 | 35 |
| Associate Operations Communications Specialist | 20272 | 35 |
| Associate Parking Control Specialist | 41122 | 40 |
| Associate Personnel Investigator | 31122 | 35 |
| Associate Program Officer (DFTA) | 51455 | 35 |
| Associate Project Manager | 22427 | 35 |
| Associate Public Health Epidemiologist | 51183 | 35 |
| Associate Public Health Sanitarian | 31220 | 40 |
| Associate Public Information Specialist | 60816 | 35 |
| Associate Public Records Officer | 60217 | 35 |
| Associate Quality Assurance Specialist | 34190 | 35 |
| Associate Quality Assurance Specialist (Foods) | 34192 | 35 |
| Associate Quality Assurance Specialist (Fuel) | 34193 | 35 |
| Associate Quality Assurance Specialist (Lumber) | 34194 | 35 |
| Associate Quality Assurance Specialist (Metals) | 34195 | 35 |
| Associate Quality Assurance Specialist (Pupil Transportation) | 34196 | 35 |
| Associate Quality Assurance Specialist (Building Repairs) | 34191 | 35 |
| Associate Quality Assurance Specialist (Textiles) | 34197 | 35 |
| Associate Real Property Manager | 80122 | 35 |
| Associate Rehabilitation Specialist (HPD) | 31685 | 40 |
| Associate Reporter/Stenographer (DA) | 10213 | 35 |
| Associate Retirement Benefits Examiner | 40493 | 35 |
| Associate Sanitation Enforcement Agent | 71682 | 40 |
| Associate Space Analyst | 80183 | 35 |
| Associate Special Officer (Aqueduct Patrol) | 70502 | 40 |
| Associate Staff Analyst [1] | 12627 | 35 |
| Associate Supervisor of School Security | 60821 | 40 |
| Associate Tax Auditor | 40522 | 35 |
| Associate Taxi and Limousine Inspector | 35143 | 40 |
| Associate Traffic Enforcement Agent | 71652 | 40 |
| Associate Urban Designer | 22124 | 35 |
| Associate Urban Park Ranger | 60422 | 40 |
| Associate Water Use Inspector | 34620 | 35 |
| Associate Word Processor | 10303 | 35 |
| Associate Workers' Compensation Benefits Examiner | 40483 | 35 |
| Attendant | 81710 | 40 |
| Attorney | 30115 | 35 |
| Attorney (Law Librarian) | 30113 | 35 |
| Attorney (Taxes) | 30092 | 35 |
| Attorney at Law | 30085 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Attorney Trainee | 30101 | 35 |
| Audio-Visual Aide Technician | 90613 | 35 |
| Audiologist | 51238 | 35 |
| Audiologist (DOH) | 51237 | 35 |
| Auditor of Accounts | 40810 | 35 |
| Auditor of Printing | 12135 | 35 |
| Auto Body Worker | 92501 | 40 |
| Automotive Service Worker | 92508 | 40 |
| Automotive Specialist | 20130 | 35 |
| Baker | 90211 | 35 |
| Bio-Medical Equipment Technician | 21562 | 35 |
| Bio-Medical Equipment Technician Trainee | 21560 | 35 |
| Blasting Inspector | 31815 | 35 |
| Blueprinter | 11110 | 35 |
| Bookbinder | 92105 | 35 |
| Bookbinder's Seamstress | 92106 | 35 |
| Bookkeeper | 40526 | 35 |
| Bookeeping Machine Operator | 11505 | 35 |
| Bridge Operator | 91110 | 40 |
| Bridge Operator-in-Charge | 91135 | 40 |
| Building Custodian | 80610 | 40 |
| Business Promotion Coordinator | 60860 | 35 |
| Buyer (Drugs, Chemical & Scientific Equipment) | 12127 | 35 |
| Buyer (Electrical Equipment) | 12126 | 35 |
| Buyer (Foods) | 12128 | 35 |
| Buyer (Hardware, Tools, & Metal) | 12129 | 35 |
| Buyer (Instructional Material ) | 12130 | 35 |
| Buyer (Paper & Paper Products) | 12131 | 35 |
| Buyer (Printing) | 12132 | 35 |
| Buyer (School & Office Furniture) | 12133 | 35 |
| Buyer (& Approved Specialties) | 12135 | 35 |
| Cartographer (C.D.) | 71411 | 35 |
| Case Aide | 52291 | 35 |
| Case Management Nurse (Correction) | 06240 | 35 |
| Case Management Nurse (Fire Department) | 50959 | 35 |
| Case Management Nurse (Police Department) | 50958 | 35 |
| Case Management Nurse (Sanitation) | 09968 | 35 |
| Caseworker | 52304 | 35 |
| Caseworker Trainee | 52301 | 35 |
| Cashier | 10605 | 35 |
| Chemical Engineer | 20515 | 35 |
| Chemical Engineering Intern | 20503 | 35 |
| Chemical, Biological & Radiological Officer (C.D.) | 71435 | 35 |
| Chemist | 21815 | 35 |
| Chemist (Biochemistry) | 21816 | 35 |
| Chemist (Clinical Chemistry) | 21820 | 35 |
| Chemist (Food & Water) | 21821 | 35 |
| Chemist (Narcotic Analysis) | 21819 | 35 |
| Chemist (Sanitary) | 21817 | 35 |
| Chemist (Toxicology) | 21818 | 35 |
| Chemist Trainee | 21801 | 35 |

0 0 0 0 1

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Chief Clerk | 01190 | 35 |
| Chief Dietician | 50370 | 35 |
| Chief Dockmaster | 81665 | 40 |
| Chief Law Stenographer | 10221 | 35 |
| Chief Marine Engineer (DC) | 91524 | 35 |
| Chief Office Assistant | 10118 | 35 |
| Chief Psychologist | 52170 | 35 |
| Chief of Resources Management (CD) | 71477 | 35 |
| Chief Supervisor of Mechanical Installations | 34265 | 35 |
| Child Protective Specialist | 52366 | 35 |
| Child Protective Specialist Supervisor | 52367 | 35 |
| Child Welfare Specialist | 52369 | 35 |
| Child Welfare Specialist Supervisor | 52370 | 35 |
| Children's Counselor | 51510 | 35 |
| City Assessor | 40202 | 35 |
| City Attendant | 90647 | 40 |
| City Custodial Assistant | 90644 | 40 |
| City Debris Remover | 90699 | 40 |
| City Elevator Operator | 90648 | 40 |
| City Park Worker | 90641 | 40 |
| City Parking Meter Service Worker | 90642 | 40 |
| City Pest Control Aide | 90643 | 35 |
| City Planner | 22122 | 35 |
| City Planning Technician | 22121 | 35 |
| City Research Scientist | 21744 | 35 |
| City Security Aide | 90650 | 40 |
| City Tax Auditor | 40523 | 35 |
| Civil Engineer | 20215 | 35 |
| Civil Engineer (Building Construction) | 20216 | 35 |
| Civil Engineer (Highway Traffic) | 20217 | 35 |
| Civil Engineer (Sanitary) | 20218 | 35 |
| Civil Engineer (Structural) | 20219 | 35 |
| Civil Engineer (Water Supply) | 20220 | 35 |
| Civil Engineering Drafter | 20205 | 35 |
| Civil Engineering Intern | 20202 | 35 |
| Civil Engineering Trainee | 20201 | 35 |
| Claim Specialist | 30726 | 35 |
| Clerical Aide | 10250 | 35 |
| Clerical Associate | 10251 | 35 |
| Clerk | 10106 | 35 |
| Clerk (Community Action Activities) | 10133 | 35 |
| Clerk (Income Maintenance) | 10098 | 35 |
| Clinician | 52810 | 35 |
| Commissary Manager | 54910 | 35 |
| Community Assistant [2] | 56056 | 40 |
| Community Associate | 56057 | 35 |
| Community Coordinator | 56058 | 35 |
| Community Liaison Trainee | 56091 | 35 |
| Community Liaison Worker | 56093 | 35 |
| Community Organization Specialist (Urban Renewal) | 22116 | 35 |
| Community Planning Board Coordinator | 22117 | 35 |

0 0 0 0 1

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Compliance Agent (Sanitation) | 05260 | 35 |
| Computer Aide | 13620 | 35 |
| Computer Associate (Operations) | 13621 | 35 |
| Computer Associate (Software) | 13631 | 35 |
| Computer Associate (Technical Support) | 13611 | 35 |
| Computer Facilities Maintainer (FISA) | 91603 | 40 |
| Computer Operator | 13511 | 35 |
| Computer Programmer | 13530 | 35 |
| Computer Programmer Analyst | 13651 | 35 |
| Computer Programmer Analyst Trainee | 13650 | 35 |
| Computer Service Technician | 13615 | 35 |
| Computer Specialist (Applications Programming) | 13662 | 35 |
| Computer Specialist (Data Base Administration) | 13681 | 35 |
| Computer Specialist (Operations) | 13622 | 35 |
| Computer Specialist (Software) | 13632 | 35 |
| Computer Specialist (Software) | 13632 | 35 |
| Computer Specialist (Systems Specialist) | 13672 | 35 |
| Confidential Secretary (Kings County D.A.) | 12804 | 35 |
| Construction Project Manager | 34202 | 35 |
| Construction Project Manager Intern | 34201 | 35 |
| Consultant (Day Camp) | 51614 | 35 |
| Consultant (Early Childhood Education) | 51611 | 35 |
| Consultant (Mental Health Standards and Services) | 51000 | 35 |
| Consultant (Public Health Social Work) | 51613 | 35 |
| Consultant Public Health Nurse | 51020 | 35 |
| Consultant Public Health Nurse (Child Health) | 51015 | 35 |
| Consultant Public Health Nurse (Communicable Diseases) | 51014 | 35 |
| Consultant Public Health Nurse (Hospital Services) | 51017 | 35 |
| Consultant Public Health Nurse (Mental Hygiene) | 51012 | 35 |
| Consultant Public Health Nurse (Nursing Education) | 51021 | 35 |
| Consultant Public Health Nurse (Rehabilitation) | 51018 | 35 |
| Consumer Affairs Inspector | 33991 | 35 |
| Continuity Writer | 60612 | 35 |
| Contracting Agent | 06627 | 35 |
| Contract Reviewer (Office of Labor Services) | 40563 | 35 |
| Contract Specialist | 40561 | 35 |
| Cook [3] | 90210 | 40 |
| Correction Administrative Aide | 70400 | 35 |
| Correctional Counselor | 51273 | 35 |
| Counselor (Addiction Treatment) | 51214 | 35 |
| Crew Chief (Pest Control) | 90501 | 35 |
| Criminalist | 06728 | 35 |
| Curator of Jumel Mansion | 81709 | 35 |
| Custodial Assistant | 82015 | 40 |
| Custodial Assistant (JDC) | 82018 | 40 |
| Custodial Supervisor | 80510 | 40 |
| Custodial Supervisor (JDC) | 80515 | 40 |
| Custodian | 80609 | 40 |
| Day Care Eligibility Worker | 52305 | 35 |
| Debris Remover | 81902 | 40 |
| Decedent Property Agent | 10142 | 35 |

00.00.1.

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Decedent Property Agent (Queens Co.) | 06665 | 35 |
| Demolition Inspector | 32415 | 35 |
| Dental Assistant | 50101 | 35 |
| Dental Hygienist | 50102 | 35 |
| Dentist | 50210 | 35 |
| Department Librarian | 60210 | 35 |
| Department Library Aide | 60101 | 35 |
| Department Principal Librarian | 60265 | 35 |
| Department Senior Librarian | 60235 | 35 |
| Department Supervising Librarian | 60260 | 35 |
| Deputy Director of Motor Equipment Maintenance (Sanitation) | 95251 | 40 |
| Deputy Sheriff Level I | 30305 | 40 |
| Deputy Sheriff Level II | 30310 | 40 |
| Dietary Aide [3] | 81801 | 40 |
| Dietary Aide (DOC) | 05256 | 40 |
| Dietitian | 50310 | 35 |
| Director of Intersection Traffic Control | 22347 | 35 |
| Director of Puppetry | 60416 | 35 |
| Director (Television) | 60666 | 35 |
| District Supervising Public Health Nurse | 51065 | 35 |
| Dockmaster (Rule XI) | 81610 | 40 |
| Economist | 40910 | 35 |
| Editorial Assistant | 12303 | 35 |
| Electrical Engineer | 20315 | 35 |
| Electrical Engineer (Electronics) | 20316 | 35 |
| Electrical Engineer (Radio) | 20317 | 35 |
| Electrical Engineer (Radio and Television) | 20320 | 35 |
| Electrical Engineer (Railroad Signals) | 20318 | 35 |
| Electrical Engineering Drafter | 20305 | 35 |
| Electrical Engineering Intern | 20302 | 35 |
| Electrical Engineering Trainee | 20301 | 35 |
| Electrocardiograph Technician | 51512 | 35 |
| Electroencephalograph Technician | 51513 | 35 |
| Elevator Operator | 80910 | 40 |
| Elevator Starter | 80935 | 40 |
| Eligibility Specialist | 10104 | 35 |
| Emergency Medical Specialist-EMT | 53053 | 37.5 |
| Emergency Medical Specialist-Paramedic | 53054 | 37.5 |
| Emergency Medical Specialist Trainee | 53052 | 37.5 |
| Engineer (Accounting) | 20715 | 35 |
| Engineer (College Equipment & Specs) | 20815 | 35 |
| Engineer - Assessor (Gas) | 20915 | 35 |
| Engineer - Assessor (Railroad) | 20916 | 35 |
| Engineer - Assessor (Structural) | 20917 | 35 |
| Engineer - Assessor (Telephone) | 20918 | 35 |
| Engineer - Assessor (Utility) | 20919 | 35 |
| Engineering Aide | 20101 | 35 |
| Engineering Specialist | 06019 | 35 |
| Engineering Technician | 20113 | 35 |
| Engineering Technician | 20114 | 35 |
| Engineering Technician | 20115 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Engineering Technician Trainee | 20111 | 35 |
| Engineering Work Study Trainee | 20100 | 35 |
| Environmental Control Technician | 90971 | 35 |
| Environmental Health Technician | 51380 | 35 |
| Estimator (Electrical) | 20121 | 35 |
| Estimator (General Construction) | 20122 | 35 |
| Estimator (Mechanical) | 20123 | 35 |
| Evidence and Property Control Specialist | 71022 | 35 |
| Exterminator | 90510 | 35 |
| Family Preservationist (Juvenile Justice) | 51595 | 35 |
| Field Investigation Specialist (LD) | 06426 | 35 |
| Film Editor | 90312 | 35 |
| Film Manager | 90313 | 35 |
| Fingerprint Technician | 71110 | 35 |
| Fingerprint Technician Trainee | 71105 | 35 |
| Fire Alarm Dispatcher | 71010 | 40 |
| Fire Prevention Inspector | 31615 | 35 |
| Fire Protection Inspector | 31661 | 35 |
| Fitness Instructor | 51225 | 35 |
| Food Service Administrator (DC) | 06593 | 35 |
| Food Service Manager | 05058 | 35 |
| Food Service Supervisor | 90238 | 35 |
| Forensic Analyst (OCME) | 06524 | 35 |
| Forensic Scientist (OCME) | 06525 | 35 |
| Forester | 81361 | 35 |
| Fraud Investigator | 31113 | 35 |
| Fraud Investigator (DOSS) | 05148 | 35 |
| Furniture Specifications Writer | 12134 | 35 |
| General Supervisor of Building Maintenance (Construction) | 91673 | 35 |
| General Supervisor of Building Maintenance (Electrical ) | 91674 | 35 |
| General Supervisor of Building Maintenance (Mechanical) | 91675 | 35 |
| General Superintendent of Construction and Repairs | 91396 | 35 |
| Geologist | 21915 | 35 |
| Geologist Trainee | 21901 | 35 |
| Graphic Artist | 91415 | 35 |
| Head Clerk | 01568 | 35 |
| Head Dietitian | 50335 | 35 |
| Head Juvenile Counselor | 52299 | 35 |
| Head Nurse | 50935 | 40 |
| Head Nurse (Sanitation) | 06124 | 40 |
| Health Aide | 51102 | 35 |
| Health Care Program Planner/Analyst | 83051 | 35 |
| Health Facilities Planner | 22082 | 35 |
| Health Resource Coordinator | 51111 | 35 |
| Hearing Admin. Services Coordinator (PVB) | 10171 | 35 |
| Highway Transportation Specialist | 22315 | 35 |
| Highways and Sewers Inspector | 31626 | 35 |
| Home Aide | 52404 | 35 |
| Home Economist | 50510 | 35 |
| Home Economist Trainee | 50501 | 35 |
| Homemaker | 52405 | 35 |

0 0 0 0 1

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Hostler | 81901 | 40 |
| Housekeeper | 80710 | 35 |
| Housekeeping Aide [3] | 81802 | 40 |
| Houseparent | 52437 | 60 |
| Housing Development Specialist | 22507 | 35 |
| Housing Development Specialist Trainee | 22506 | 35 |
| Hull & Machinery Inspector | 33315 | 35 |
| Human Resources Aide | 56001 | 35 |
| Human Resources Specialist | 56020 | 35 |
| Human Resources Specialist (EDT) | 56021 | 35 |
| Human Resources Technician | 56006 | 35 |
| Human Resources Technician (EDT) | 56007 | 35 |
| Illustrator | 91410 | 35 |
| Information Assistant | 60805 | 35 |
| Industrial Hygienist | 31305 | 35 |
| Inspector (Boilers) | 31620 | 40 |
| Inspector (Cement Test) | 31621 | 40 |
| Inspector (Construction) | 31622 | 40 |
| Inspector (DCA) | 33995 | 35 |
| Inspector (Electrical) | 31623 | 40 |
| Inspector (Elevator) | 31624 | 40 |
| Inspector (Heating and Ventilation) | 31625 | 40 |
| Inspector (Hoists and Rigging) | 31627 | 40 |
| Inspector (Housing) | 31670 | 40 |
| Inspector (Housing Construction) | 31690 | 40 |
| Inspector (Low Pressure Boilers) | 31671 | 40 |
| Inspector (Plastering) | 31628 | 40 |
| Inspector (Plumbing) | 31629 | 40 |
| Inspector (Steel Construction) | 31630 | 40 |
| Inspector of Fire Alarm Boxes | 34315 | 40 |
| Inspector of Ports & Terminals | 33985 | 35 |
| Institutional Aide [3] | 81803 | 40 |
| Institutional Aide (DOC) | 06469 | 40 |
| Institutional Band Music Instructor | 60310 | 35 |
| Institutional Farming Instructor | 60311 | 35 |
| Institutional Garment Worker | 90112 | 35 |
| Institutional Inspector | 31415 | 35 |
| Institutional Instructor | 60309 | 35 |
| Institutional Seamstress | 90112 | 35 |
| Institutional Tailor | 90113 | 35 |
| Institutional Teacher (DJJ) | 60371 | 35 |
| Institutional Trades Instructor | 60312 | 35 |
| Institutional Trades Instructor (Carpentry) | 60314 | 35 |
| Institutional Trades Instructor (Tailoring) | 60313 | 35 |
| Interpreter, Chinese (Cantonese, Mandarin, Taiwanese) | 31017 | 35 |
| Interpreter (Spanish) | 31013 | 35 |
| Interpreter (Spanish & Italian) | 31010 | 35 |
| Investigator | 31105 | 35 |
| Investigator (CCRB) | 06157 | 35 |
| Investigator (Discipline) | 06316 | 35 |
| Investigator Trainee | 31101 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Investment Analyst | 40925 | 35 |
| Investment Analyst Trainee | 40924 | 35 |
| Junior Architect | 21206 | 35 |
| Junior Bacteriologist | 21605 | 35 |
| Junior Building Custodian | 80601 | 40 |
| Junior Chemist | 21805 | 35 |
| Junior Civil Engineer | 20206 | 35 |
| Junior Drafter | 20102 | 35 |
| Junior Electrical Engineer | 20306 | 35 |
| Junior Geologist | 21905 | 35 |
| Junior Health Facilities Planner | 22080 | 35 |
| Junior Mechanical Engineer | 20406 | 35 |
| Junior Medical Examiner (OCME) | 53865 | 35 |
| Junior Public Health Officer (District Health Administration) | 52800 | 35 |
| Junior Public Health Officer (Medical Services) | 52801 | 35 |
| Juvenile Counselor | 52295 | 35 |
| Keypunch Operator | 10907 | 35 |
| Laboratory Associate | 21512 | 35 |
| Laboratory Helper | 82107 | 35 |
| Laboratory Helper (Competitive) | 82104 | 35 |
| Laboratory Microbiologist | 21513 | 35 |
| Laboratory Technician | 21508 | 35 |
| Landmarks Preservation Specialist | 92242 | 35 |
| Landmarks Preservationist | 92237 | 35 |
| Landscape Architect | 21315 | 35 |
| Landscape Architectural Intern | 21306 | 35 |
| Latent Print Examiner | 71140 | 35 |
| Laundry Supervisor | 80860 | 40 |
| Laundry Worker | 90110 | 37.5 |
| Law Clerk | 30109 | 35 |
| Lead Abatement Worker | 31311 | 40 |
| Legal Coordinator | 30081 | 35 |
| Legal Secretarial Assistant | 10229 | 35 |
| Legal Secretary | 01665 | 35 |
| Licensed Barber (DOC) | 90116 | 35 |
| Maintenance Supervisor | 80684 | 35 |
| Management Analyst (DOP) | 06244 | 35 |
| Management Auditor | 40502 | 35 |
| Management Auditor Trainee | 40501 | 35 |
| Marine Maintenance Mechanic | 92587 | 35 |
| Market Agent | 33972 | 35 |
| Market Aide | 33971 | 35 |
| Meat Cutter | 90213 | 35 |
| Mechanical Engineer | 20415 | 35 |
| Mechanical Engineer (Air Conditioning) | 20418 | 35 |
| Mechanical Engineer (Cars) | 20416 | 35 |
| Mechanical Engineer (Salvage) | 20417 | 35 |
| Mechanical Engineering Drafter | 20405 | 35 |
| Mechanical Engineering Intern | 20403 | 35 |
| Media Services Technician | 90622 | 35 |
| Medical Clerk | 10108 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Medical Equipment Repair Technician | 90690 | 35 |
| Medical Equipment Specialist | 90691 | 35 |
| Medical Investigator | 53864 | 35 |
| Medical Records Librarian | 50811 | 35 |
| Medical Specialist | 52895 | 35 |
| Medical Subspecialist (DOH) | 06637 | 35 |
| Medicolegal Investigator (OCME) | 53299 | 40 |
| Mental Health Worker | 51262 | 35 |
| Messenger | 12005 | 35 |
| Microbiologist | 21670 | 35 |
| Microbiologist (Bacteriology) | 21671 | 35 |
| Microbiologist (Cytology) | 21672 | 35 |
| Microbiologist (Hematology) | 21673 | 35 |
| Microbiologist (Histology) | 21674 | 35 |
| Microbiologist (Immunohematology) | 21675 | 35 |
| Microbiologist (Mycology) | 21676 | 35 |
| Microbiologist (Parasitology) | 21677 | 35 |
| Microbiologist (Serology) | 21678 | 35 |
| Microbiologist (Virology) | 21679 | 35 |
| Mortgage Analyst | 40550 | 35 |
| Mortgage Tax Examiner | 30505 | 35 |
| Mortuary Technician | 52015 | 35 |
| Motion Picture Operator | 90611 | 35 |
| Motor Vehicle Operator | 91212 | 40 |
| Motor Vehicle Supervisor | 91232 | 40 |
| Multiple Dwelling Specialist (Buildings) | 22401 | 40 |
| Nurse's Aide [3] | 50901 | 40 |
| Nurse's Aide (DOC) | 06415 | 40 |
| Nurse's Aide (Handicapped Children) [3] | 50905 | 40 |
| Nurse-Midwife | 50912 | 40 |
| Nurse Practitioner (DOH) | 06611 | 40 |
| Nurse Practitioner (Sanitation) | 06068 | 40 |
| Nutrition Consultant | 50415 | 35 |
| Nutritionist | 50410 | 35 |
| Nutritionist (P/T) | 50411 | 35 |
| Nutritionist Trainee | 50405 | 35 |
| Occupational Therapist | 51210 | 35 |
| Office Aide | 10109 | 35 |
| Office Appliance Operator | 11705 | 35 |
| Office Assistant | 10115 | 35 |
| Office Associate | 10112 | 35 |
| Office Machine Aide | 11702 | 35 |
| Office Machine Associate | 11703 | 35 |
| Oil Burner Specialist | 91237 | 40 |
| Operations Assistant (C.D.) | 71488 | 35 |
| Operations Communications Specialist | 20271 | 35 |
| Orderly | 81804 | 40 |
| Painting Inspector | 32815 | 35 |
| Paralegal Aide | 30080 | 35 |
| Paralegal Aide Trainee | 30076 | 35 |
| Parking Enforcement Agent | 71612 | 40 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Parking Control Specialist | 41120 | 40 |
| Parking Control Specialist Trainee | 41117 | 40 |
| Pediatric Nurse Associate | 95440 | 35 |
| Personnel Investigator | 31107 | 35 |
| Pest Control Aide | 90500 | 35 |
| Pharmacist | 50610 | 37.5 |
| Photographer (Rule XI) | 90610 | 35 |
| Photographer and Photostat Operator | 90615 | 35 |
| Physical Therapist | 51211 | 35 |
| Physician | 53010 | 35 |
| Physician's Assistant [4] | 52700 | 37.5 |
| Physicist | 22015 | 35 |
| Physicist (Electronics) | 22016 | 35 |
| Physicist (Isotopes) | 22017 | 35 |
| Physicist (Radiation) | 22018 | 35 |
| Physicist Trainee | 22001 | 35 |
| Pipe Laying Inspector | 33415 | 35 |
| Plan Examiner (Buildings) | 22410 | 35 |
| Planner Trainee | 22107 | 35 |
| Planning & Operations Officer (C.D.) | 22113 | 35 |
| Planner: Production Control & Scheduling (EMS Motor Transport) | 83032 | 35 |
| Playground Associate | 06664 | 35 |
| Poison Information Specialist (DOH) | 06663 | 35 |
| Police Administrative Aide | 10144 | 35 |
| Police Attendant | 90202 | 40. |
| Police Communications Technician | 71012 | 35 |
| Primary Care Physician (Communicare) | 06608 | 37.5 |
| Principal Administrative Associate | 10124 | 35 |
| Principal Air Pollution Control Engineer | 20620 | 35 |
| Principal Air Pollution Inspector | 31360 | 35 |
| Principal Chemical Engineer | 20550 | 35 |
| Principal Chemist | 21835 | 35 |
| Principal Chemist (Sanitary) | 21836 | 35 |
| Principal Chemist (Toxicology) | 21837 | 35 |
| Principal Chief Dietitian | 50373 | 35 |
| Principal Children's Counselor | 51565 | 35 |
| Principal Civil Engineer | 20250 | 35 |
| Principal Civil Engineer (Water Supply) | 20260 | 35 |
| Principal Community Liaison Worker | 56095 | 35 |
| Principal Computer Operator | 13514 | 35 |
| Principal Computer Programmer | 13550 | 35 |
| Principal Construction Inspector | 32260 | 35 |
| Principal Consumer Affairs Inspector | 33994 | 35 |
| Principal Correctional Counselor | 51277 | 35 |
| Principal Custodial Supervisor | 80561 | 40 |
| Principal Electrical Engineer (Railroad Signals) | 20351 | 35 |
| Principal Electrical Engineer | 20350 | 35 |
| Principal Electrical Inspector | 32960 | 35 |
| Principal Engineer | 20620 | 35 |
| Principal Engineer | 21130 | 35 |
| Principal Fingerprint Technician | 71165 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Principal Home Economist | 50565 | 35 |
| Principal Housing Inspector | 31560 | 35 |
| Principal Illustrator | 91460 | 35 |
| Principal Institutional Inspector | 31465 | 35 |
| Principal Juvenile Counselor | 52297 | 35 |
| Principal Mechanical Engineer | 20450 | 35 |
| Principal Microbiologist | 21690 | 35 |
| Principal Mortuary Technician | 52017 | 35 |
| Principal Multiple Dwelling Specialist (Buildings) | 22402 | 40 |
| Principal Nutrition Consultant | 50416 | 35 |
| Principal Nutritionist | 50465 | 35 |
| Principal Pharmacist | 50660 | 37.5 |
| Principal Physicist | 22030 | 35 |
| Principal Police Communications Technician | 71014 | 35 |
| Principal Public Health Sanitarian | 31260 | 35 |
| Principal Research Scientist (Biological Science) | 21770 | 35 |
| Principal Retirement Benefits Examiner | 40495 | 35 |
| Principal Senior Citizen Specialist | 09223 | 35 |
| Principal Shorthand Reporter | 10420 | 35 |
| Principal Special Officer (HRA) | 70820 | 40 |
| Principal Statistician | 40625 | 35 |
| Principal Telephone Operator | 10825 | 35 |
| Principal Title Examiner | 30820 | 35 |
| Principal Veterinarian | 50765 | 35 |
| Probation Assistant | 51800 | 35 |
| Probation Officer | 51810 | 37.5 |
| Probation Officer Trainee | 51801 | 37.5 |
| Process Server | 30205 | 35 |
| Procurement Analyst | 12158 | 35 |
| Program Announcer | 60636 | 35 |
| Program Coordinator (DJJ) | 51597 | 35 |
| Program Producer | 60621 | 35 |
| Program Officer (DFTA) | 51454 | 35 |
| Program Research Analyst [1] | 60945 | 35 |
| Program Specialist (DOC) | 60948 | 35 |
| Project Coordinator | 22421 | 35 |
| Project Development Coordinator | 22525 | 35 |
| Project Development Coordinator Trainee | 22504 | 35 |
| Project Manager | 22426 | 35 |
| Project Manager Intern | 22425 | 35 |
| Project Services Specialist | 22526 | 35 |
| Psychologist | 52110 | 35 |
| Public Health Adviser (CDC) | 51191 | 35 |
| Public Health Assistant | 81805 | 35 |
| Public Health Educator | 51110 | 35 |
| Public Health Educator Trainee | 51105 | 35 |
| Public Health Epidemiologist | 51181 | 35 |
| Public Health Nurse | 51011 | 35 |
| Public Health Physician (PHA) | 52713 | 35 |
| Public Health Sanitarian | 31215 | 40 |
| Public Health Sanitarian Trainee | 31211 | 40 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Public Records Aide | 60215 | 35 |
| Public Records Officer | 60216 | 35 |
| Public Relations Assistant | 60810 | 35 |
| Puppeteer | 60414 | 35 |
| Purchase Inspector | 34115 | 35 |
| Purchase Inspector (Automotive Equipment) | 34116 | 35 |
| Purchase Inspector (Drugs & Chemicals) | 34117 | 35 |
| Purchase Inspector (Equipment) | 34118 | 35 |
| Purchase Inspector (Foods) | 34119 | 35 |
| Purchase Inspector (Fuel & Supplies) | 34120 | 35 |
| Purchase Inspector (Fuel) | 34132 | 35 |
| Purchase Inspector (Furniture) | 34121 | 35 |
| Purchase Inspector (Lumber) | 34123 | 35 |
| Purchase Inspector (Mill Steel) | 34129 | 35 |
| Purchase Inspector (Piano) | 34124 | 35 |
| Purchase Inspector (Pipes & Castings) | 34125 | 35 |
| Purchase Inspector (Printing & Stationery) | 34126 | 35 |
| Purchase Inspector (Repairs & Supplies) | 34127 | 35 |
| Purchase Inspector (School Bus Service) | 34128 | 35 |
| Purchase Inspector (Shop Steel) | 34130 | 35 |
| Purchase Inspector (Textiles) | 34131 | 35 |
| Purchasing Agent | 12121 | 35 |
| Quality Assurance Specialist | 34171 | 35 |
| Quality Assurance Specialist (Automotive Equipment) | 34172 | 35 |
| Quality Assurance Specialist (Building Repairs) | 34173 | 35 |
| Quality Assurance Specialist (Drugs & Chemicals) | 34174 | 35 |
| Quality Assurance Specialist (Equipment) | 34175 | 35 |
| Quality Assurance Specialist (Foods) | 34176 | 35 |
| Quality Assurance Specialist (Fuel) | 34177 | 35 |
| Quality Assurance Specialist (Fuel & Supplies) | 34178 | 35 |
| Quality Assurance Specialist (Furniture & Supplies) | 34179 | 35 |
| Quality Assurance Specialist (Lumber) | 34180 | 35 |
| Quality Assurance Specialist (Metals) | 34181 | 35 |
| Quality Assurance Specialist (Printing & Stationery) | 34182 | 35 |
| Quality Assurance Specialist (Pupil Transportation) | 34183 | 35 |
| Quality Assurance Specialist (Textiles) | 34184 | 35 |
| Quality Assurance Specialist Trainee | 34170 | 35 |
| Radio & Television Operator | 90411 | 35 |
| Real Estate Manager | 80110 | 35 |
| Real Estate Repairer | 81707 | 35 |
| Real Property Assistant | 80102 | 35 |
| Real Property Manager | 80112 | 35 |
| Recreation Assistant | 60407 | 35 |
| Recreation Director | 60430 | 35 |
| Recreation Director (Part-Time) | 60431 | 35 |
| Recreation Supervisor | 60440 | 35 |
| Rehabilitation Counselor | 51213 | 35 |
| Rehabilitation Specialist (HPD) | 31680 | 40 |
| Relocation Aide | 80097 | 35 |
| Repair Crew Chief (HDA) | 90573 | 35 |
| Repair Crew Worker (HDA) | 90571 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Repair Shop Manager (HDA) | 90576 | 35 |
| Reporter/Stenographer (DA) | 10212 | 35 |
| Research Assistant | 60910 | 35 |
| Research Assistant (Behavioral Sciences) | 21740 | 35 |
| Research Scientist | 21755 | 35 |
| Retirement Benefits Examiner | 40492 | 35 |
| Right of Way Negotiator | 40430 | 35 |
| Safety Officer | 31617 | 35 |
| Safety Specialist | 31310 | 35 |
| Salvage Appraiser | 12175 | 35 |
| Sanitation Compliance Agent | 71685 | 35 |
| Sanitation Enforcement Agent | 71681 | 40 |
| Satisfaction Clerk | 30405 | 35 |
| Scientist (Radiation Control) | 21516 | 35 |
| Scientist (Water Ecology) | 21538 | 35 |
| Script Writer | 60613 | 35 |
| Secretary | 10252 | 35 |
| Secretary | 10216 | 35 |
| Security Officer (Civil Defense) | 71415 | 35 |
| Senior Accountant | 40515 | 35 |
| Senior Actuary | 40715 | 35 |
| Senior Actuary (Group Chief) | 40725 | 35 |
| Senior Addiction Specialist | 56075 | 35 |
| Senior Addiction Specialist (Methadone) | 56072 | 35 |
| Senior Air Pollution Control Engineer | 20615 | 35 |
| Senior Air Pollution Inspector | 31335 | 35 |
| Senior Appraiser (Real Estate) | 40415 | 35 |
| Senior Architect | 21225 | 35 |
| Senior Architect (M R & S) | 21226 | 35 |
| Senior Area Services Coordinator | 22558 | 35 |
| Senior Attorney | 30125 | 35 |
| Senior Attorney (Taxes) | 30093 | 35 |
| Senior Audio Visual Aid Technician | 90637 | 35 |
| Senior Auditor of Accounts | 40815 | 35 |
| Senior Automotive Service Worker | 92509 | 40 |
| Senior Automotive Specialist | 20131 | 35 |
| Senior Bacteriologist | 21525 | 35 |
| Senior Bacteriologist (Serology) | 21526 | 35 |
| Senior Baker | 90236 | 35 |
| Senior Bio-Medical Equipment Technician | 21563 | 35 |
| Senior Blasting Inspector | 31835 | 35 |
| Senior Boiler Inspector | 31935 | 35 |
| Senior Building Custodian | 80635 | 40 |
| Senior Buyer | 12140 | 35 |
| Senior Buyer (Drugs) | 12142 | 35 |
| Senior Buyer (Foods) | 12143 | 35 |
| Senior Buyer (Hardware) | 12144 | 35 |
| Senior Buyer (Instructional Materials) | 12145 | 35 |
| Senior Buyer (Mechanical Equipment) | 12149 | 35 |
| Senior Buyer (Paper & Paper Products) | 12146 | 35 |
| Senior Buyer (Printing) | 12147 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Senior Buyer (School & Office Furniture) | 12148 | 35 |
| Senior Buyer ( & Approved Specialties) | 12140 | 35 |
| Senior Case - Management Nurse (Sanitation) | 05207 | 35 |
| Senior Chemical Engineer | 20525 | 35 |
| Senior Chemist | 21825 | 35 |
| Senior Chemist (Biochemistry) | 21826 | 35 |
| Senior Chemist (Clinical Chemistry) | 21830 | 35 |
| Senior Chemist (Food & Water) | 21831 | 35 |
| Senior Chemist (Microanalysis) | 21827 | 35 |
| Senior Chemist (Sanitary) | 21828 | 35 |
| Senior Chemist (Toxicology) | 21829 | 35 |
| Senior Chief Dietitian | 50372 | 35 |
| Senior Children's Counselor | 51535 | 35 |
| Senior Citizen Specialist I (DFTA) | 02735 | 35 |
| Senior Citizen Specialist II (DFTA) | 02899 | 35 |
| Senior Citizen Specialist II (JOP) | 09538 | 35 |
| Senior Civil Engineer (Approaches & Arterial Connections) | 20226 | 35 |
| Senior Civil Engineer (Building Construction) | 20232 | 35 |
| Senior Civil Engineer (Highway Traffic) | 20231 | 35 |
| Senior Civil Engineer (Railroad Valuation) | 20227 | 35 |
| Senior Civil Engineer (Sanitary) | 20228 | 35 |
| Senior Civil Engineer( Structural) | 20229 | 35 |
| Senior Civil Engineer (Water Supply) | 20230 | 35 |
| Senior Civil Engineer | 20225 | 35 |
| Senior Clerk | 10111 | 35 |
| Senior Clerk (Income Maintenance) | 10099 | 35 |
| Senior Clinician | 52835 | 35 |
| Senior Community Liaison Worker | 56094 | 35 |
| Senior Community Organization Specialist (Urban Renewal) | 22126 | 35 |
| Senior Construction Inspector | 32235 | 35 |
| Senior Consultant (Early Childhood Education) | 51636 | 35 |
| Senior Consultant (Mental Health Standards and Services) | 54810 | 35 |
| Senior Consultant (Psychiatric Nursing) | 51019 | 35 |
| Senior Consultant (Public Health Social Work) | 51638 | 35 |
| Senior Consumer Affairs Inspector | 33902 | 35 |
| Senior Cook [3] | 90235 | 40 |
| Senior Counselor (Addiction Treatment) | 51216 | 35 |
| Senior Crew Chief (Pest Control) | 90502 | 35 |
| Senior Custodial Assistant | 82016 | 40 |
| Senior Custodial Supervisor | 80535 | 40 |
| Senior Demolition Inspector | 32435 | 35 |
| Senior Dentist | 50235 | 35 |
| Senior Deputy Sheriff | 30310 | 40 |
| Senior Economist | 40915 | 35 |
| Senior Electrical Engineer | 20325 | 35 |
| Senior Electrical Engineer (RR Signals) | 20327 | 35 |
| Senior Electrical Engineer (Radio & TV) | 20329 | 35 |
| Senior Elevator Inspector | 33035 | 35 |
| Senior Engineer (Accounting) | 20725 | 35 |
| Senior Engineer (Cranes) | 20234 | 35 |
| Senior Engineer (Safety) | 20825 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Senior Engineer Assessor | 20920 | 35 |
| Senior Engineering Technician | 20114 | 35 |
| Senior Engineering Technician (Drafting | 20116 | 35 |
| Senior Environmental Control Technician | 90972 | 35 |
| Senior Estimator (Electrical) | 20126 | 35 |
| Senior Estimator (General Construction) | 20127 | 35 |
| Senior Estimator (Mechanical) | 20128 | 35 |
| Senior Fingerprint Technician | 71135 | 35 |
| Senior Fire Prevention Inspector | 31635 | 35 |
| Senior Geologist | 21925 | 35 |
| Senior Health Facilities Planner | 22083 | 35 |
| Senior Health Care Program Planner/Analyst | 83052 | 35 |
| Senior Health Resource Coordinator | 51112 | 35 |
| Senior Highway Transportation Specialist | 22325 | 35 |
| Senior Hoists & Rigging Inspector | 33235 | 35 |
| Senior Homemaker | 52407 | 35 |
| Senior Housekeeper | 80735 | 35 |
| Senior Houseparent | 52438 | 60 |
| Senior Housing Inspector | 31535 | 35 |
| Senior Hull and Machinery Inspector | 33335 | 35 |
| Senior Human Resources Specialist | 56030 | 35 |
| Senior Human Resources Specialist (EDT) | 56031 | 35 |
| Senior Human Resources Technician | 56011 | 35 |
| Senior Industrial Engineer | 20625 | 35 |
| Senior Inspector of Fire Alarm Boxes | 34335 | 40 |
| Senior Inspector of Ports & Terminals | 33986 | 35 |
| Senior Institutional Inspector | 31435 | 35 |
| Senior Institutional Trades Instructor | 60330 | 35 |
| Senior Institutional Trades Instructor (Tailoring) | 60331 | 35 |
| Senior Intergroup Relations Officer | 55015 | 35 |
| Senior Investment Analyst | 40926 | 35 |
| Senior Juvenile Counselor | 52296 | 35 |
| Senior Key Punch Operator | 10916 | 35 |
| Senior Key Punch Operator | 10917 | 35 |
| Senior Key Punch Operator | 11009 | 35 |
| Senior Laboratory Technician | 21509 | 35 |
| Senior Laboratory Technician (OCME) | 21510 | 35 |
| Senior Landscape Architect | 21325 | 35 |
| Senior Laundry Supervisor | 80861 | 40 |
| Senior Laundry Worker | 90135 | 37.5 |
| Senior Meat Cutter | 90237 | 35 |
| Senior Mechanical Engineer (Including specialties) | 20425 | 35 |
| Senior Mechanical Engineer (Including spec.) | 20426 | 35 |
| Senior Mechanical Engineer (Including spec.) | 20427 | 35 |
| Senior Mechanical Engineer (Including spec.) | 20428 | 35 |
| Senior Medical Record Librarian | 50836 | 35 |
| Senior Medical Specialist | 52896 | 35 |
| Senior Mental Health Worker | 51263 | 35 |
| Senior Meteorologist | 21950 | 35 |
| Senior Mortuary Technician | 52016 | 35 |
| Senior Motor Vehicle Supervisor | 91233 | 40 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Senior Occupational Therapist | 51235 | 35 |
| Senior Office Appliance Maintainer | 90836 | 35 |
| Senior Painting Inspector | 32835 | 35 |
| Senior Parking Enforcement Agent | 71622 | 40 |
| Senior Pharmacist | 50635 | 40 |
| Senior Photographer | 90635 | 35 |
| Senior Physical Therapist | 51236 | 35 |
| Senior Physicist | 22025 | 35 |
| Senior Physicist (Electronics) | 22026 | 35 |
| Senior Physicist (Isotopes) | 22027 | 35 |
| Senior Physicist (Radiation) | 22028 | 35 |
| Senior Physicist (Spectroscopy) | 22029 | 35 |
| Senior Pipe Laying Inspector | 33435 | 35 |
| Senior Plan Examiner (Buildings.) | 22411 | 35 |
| Senior Planner | 22125 | 35 |
| Senior Plumbing Inspector | 33635 | 35 |
| Senior Police Administrative Aide | 10147 | 35 |
| Senior Probation Officer | 51835 | 37.5 |
| Senior Program Specialist (DOC) | 60949 | 35 |
| Senior Project Coordinator | 22422 | 35 |
| Senior Project Development Coordinator | 22530 | 35 |
| Senior Project Services Specialist | 22531 | 35 |
| Senior Psychologist | 52135 | 35 |
| Senior Public Health Adviser (Communicable Disease Control) | 51192 | 35 |
| Senior Public Health Educator | 51135 | 35 |
| Senior Public Health Officer (District Health Administration) | 52804 | 35 |
| Senior Public Health Officer (Medical Services) | 52805 | 35 |
| Senior Public Health Sanitarian | 31235 | 40 |
| Senior Rehabilitation Counselor | 51215 | 35 |
| Senior Rent Examiner | 30765 | 35 |
| Senior Repair Crew Chief (HDA) | 90574 | 35 |
| Senior Right of Way Negotiator | 40431 | 35 |
| Senior Salvage Appraiser | 12176 | 35 |
| Senior Satisfaction Clerk | 30410 | 35 |
| Senior Scientist(Radiation Control) | 21526 | 35 |
| Senior Secretary | 10220 | 35 |
| Senior Service Inspector (DOT) | 33766 | 35 |
| Senior Special Officer | 70815 | 40 |
| Senior Statistician | 40615 | 35 |
| Senior Student Legal Specialist (Law Department) | 06517 | 35 |
| Senior Supervisor (Exterminators) | 90560 | 35 |
| Senior Supervisor of Mechanical Installations | 34235 | 35 |
| Senior Systems Analyst | 12648 | 35 |
| Senior Tabulator Operator | 11033 | 35 |
| Senior Taxi & Limousine Inspector | 35134 | 35 |
| Senior Title Examiner | 30810 | 35 |
| Senior Traffic Control Inspector | 31735 | 35 |
| Senior Transportation Inspector | 35135 | 35 |
| Senior Urban Designer | 22094 | 35 |
| Senior Water Use Inspector | 34635 | 35 |
| Senior Waterfront Construction Inspector | 34535 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Senior X-Ray Technician | 51335 | 35 |
| Service Inspector (DOT) | 33765 | 35 |
| Shoemaker | 90740 | 35 |
| Shop Clerk | 10132 | 35 |
| Social Worker | 52613 | 35 |
| Special Officer | 70810 | 40 |
| Special Officer (Aqueduct Patrol) | 70501 | 40 |
| Speech Pathologist (DOH) | 51252 | 35 |
| Speech and Hearing Therapist | 51212 | 35 |
| Staff Analyst [1] | 12626 | 35 |
| Staff Analyst Trainee | 12749 | 35 |
| Staff Audiologist | 51239 | 35 |
| Staff Nurse | 50910 | 40 |
| Staff Nurse (Dept. for the Aging) | 05490 | 40 |
| Staff Speech Pathologist | 51253 | 35 |
| Statistical Secretary (OMB) | 5363 | 35 |
| Statistician | 40610 | 35 |
| Stenographer | 10205 | 35 |
| Stenographic/Secretarial Associate | 10211 | 35 |
| Stenographer/Secretary | 10206 | 35 |
| Stenographic Specialist | 10217 | 35 |
| Stockman | 12210 | 35 |
| Stock Worker | 12200 | 35 |
| Student Legal Specialist (Kings D.A.) | 05310 | 35 |
| Student Legal Specialist (Law Department) | 05072 | 35 |
| Superintendent of Adult Institutions | 52279 | 35 |
| Superintendent Bridge House | 52281 | 35 |
| Superintendent of Construction and Repairs | 91375 | 35 |
| Superintendent of Laundries | 80880 | 40 |
| Supervising Accountant | 40520 | 35 |
| Supervising Air Pollution Inspector | 31355 | 35 |
| Supervising Appraiser (Real Estate) | 40420 | 35 |
| Supervising Area Services Coordinator | 22559 | 35 |
| Supervising Assessor | 40220 | 35 |
| Supervising Audiologist | 51240 | 35 |
| Supervising Auditor of Accounts | 40820 | 35 |
| Supervising Blasting Inspector | 31840 | 35 |
| Supervising Bookbinder | 92170 | 35 |
| Supervising Clerk | 10120 | 35 |
| Supervising Computer Operator | 13513 | 35 |
| Supervising Consumer Affairs Inspector | 33993 | 35 |
| Supervising Computer Service Technician | 13616 | 35 |
| Supervising Correctional Counselor | 51275 | 35 |
| Supervising Counselor (Addiction Treatment) | 51217 | 35 |
| Supervising Custodian of Children | 52298 | 35 |
| Supervising Demolition Inspector | 32455 | 35 |
| Supervising Deputy Sheriff | 30315 | 40 |
| Supervising Dockmaster | 81660 | 40 |
| Supervising Economist | 40920 | 35 |
| Supervising Emergency Medical Service Specialist | 53055 | 35 |
| Supervising Environmental Control Technician | 90973 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Supervising Fire Alarm Dispatcher | 71060 | 40 |
| Supervising Fire Prevention Inspector | 31655 | 35 |
| Supervising Health Resource Coordinator | 51113 | 35 |
| Supervising Home Economist | 50560 | 35 |
| Supervising Housekeeper | 80760 | 35 |
| Supervising Hull and Machinery Inspector | 33355 | 35 |
| Supervising Human Resources Specialist | 56040 | 35 |
| Supervising Human Resources Specialist (Auditing) | 56044 | 35 |
| Supervising Human Resources Specialist (Community Programs) | 56042 | 35 |
| Supervising Human Resources Specialist (EDT) | 56043 | 35 |
| Supervising Human Resources Specialist (Management) | 56041 | 35 |
| Supervising Institutional Inspector | 31455 | 35 |
| Supervising Investment Analyst | 40927 | 35 |
| Supervising Laundry Worker [3] | 71494 | 40 |
| Supervising Medical Records Librarian | 50837 | 35 |
| Supervising Mental Health Worker | 51264 | 35 |
| Supervising Nutritionist | 50460 | 35 |
| Supervising Parking Meter Collector | 41112 | 35 |
| Supervising Parking Meter Service Worker | 41113 | 40 |
| Supervising Pharmacist | 50650 | 37.5 |
| Supervising Police Communications Technician | 71013 | 35 |
| Supervising Probation Officer | 51860 | 37.5 |
| Supervising Public Health Adviser (CDC) | 51193 | 35 |
| Supervising Public Health Nurse | 51060 | 35 |
| Supervising Public Health Sanitarian | 31255 | 40 |
| Supervising Special Officer | 70817 | 40 |
| Supervising Speech Pathologist | 51254 | 35 |
| Supervising Taxi & Limousine Inspector | 35140 | 35 |
| Supervising Therapist | 51241 | 35 |
| Supervising Traffic Control Inspector | 31750 | 35 |
| Supervising Water Use Inspector | 34655 | 35 |
| Supervisor (Exterminators) | 90535 | 35 |
| Supervisor (Methadone Treatment Center) | 51247 | 35 |
| Supervisor (Pest Control) | 90505 | 35 |
| Supervisor I (Social Work) | 52631 | 35 |
| Supervisor II (Social Work) | 52632 | 35 |
| Supervisor III (Social Work) | 52633 | 35 |
| Supervisor I (Welfare) | 52311 | 35 |
| Supervisor II (Welfare) | 52312 | 35 |
| Supervisor III (Welfare) | 52313 | 35 |
| Supervisor of Bridge Operations | 91160 | 40 |
| Supervisor of Building Custodians | 80660 | 40 |
| Supervisor of Child Care | 52315 | 35 |
| Supervisor of Electrical Installations and Maintenance | 34205 | 35 |
| Supervisor of Ironwork | 92376 | 40 |
| Supervisor of Mechanical Installations and Maintenance | 34221 | 35 |
| Supervisor of Mechanics (Mechanical Equipment) | 92575 | 40 |
| Supervisor of Motor Transport | 91279 | 40 |
| Supervisor of Nurses [3] | 50960 | 40 |
| Supervisor of Office Machine Operations | 11704 | 35 |
| Supervisor of Radio & Television Operations | 90436 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Supervisor of School Security | 60820 | 40 |
| Supervisor of Stock Workers | 12202 | 35 |
| Supervisor of Traffic Device Maintainers | 90904 | 40 |
| Supervisor of Traffic Safety Education | 60818 | 35 |
| Supervisor of X-Ray Technician Services | 51360 | 35 |
| Supervisor of Youth Services | 51444 | 35 |
| Supervisor of Youth Services (Research) | 51446 | 35 |
| Surveyor | 21015 | 35 |
| Systems Administrator (CFB) | 06602 | 35 |
| Systems Analyst | 12647 | 35 |
| Tabulator Operator | 11032 | 35 |
| Tax Auditor | 40521 | 35 |
| Taxi & Limousine Inspector | 35116 | 35 |
| Teacher (DOC) | 00101 | 35 |
| Technical Support Aide | 13610 | 35 |
| Telecommunications Associate | 20243 | 35 |
| Telecommunications Specialist | 20245 | 35 |
| Telephone Operator | 10805 | 35 |
| Television Equipment Operator | 90311 | 35 |
| Television Lighting Technician | 90310 | 35 |
| Tests & Measurement Intern | 12700 | 35 |
| Tests & Measurement Specialist | 12704 | 35 |
| Title Examiner | 30805 | 35 |
| Traffic Control Inspector | 31715 | 35 |
| Traffic Device Maintainer | 90910 | 40 |
| Traffic Enforcement Agent | 71651 | 40 |
| Training Coordinator ( C.D. ) | 71496 | 35 |
| Training Development Specialist | 12618 | 35 |
| Training Development Specialist Trainee | 12616 | 35 |
| Transcribing Typist | 10308 | 35 |
| Transportation Inspector | 35115 | 35 |
| Typist | 10305 | 35 |
| Urban Archeologist | 92248 | 35 |
| Urban Designer | 22093 | 35 |
| Urban Park Ranger | 60421 | 35 |
| Veterinarian | 50710 | 35 |
| Washer | 90111 | 37.5 |
| Watch Person | 81010 | 40 |
| Water Meter Reader | 34600 | 35 |
| Water Plant Operator | 91010 | 40 |
| Water Use Inspector | 34615 | 35 |
| Water Use Inspector Trainee | 34601 | 35 |
| Waterfront Construction Inspector | 34515 | 35 |
| Watershed Maintainer | 91011 | 40 |
| Window Cleaner | 90749 | 40 |
| Word Processor | 10302 | 35 |
| Workers' Compensation Benefits Examiner | 40482 | 35 |
| X-Ray Technician | 51310 | 35 |
| Youth Coordinator (Youth Services) | 51402 | 35 |
| Youth Services Specialist | 51438 | 35 |

00001

## New York City Health & Hospital Corp ation Title Codes

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Accountant | 405100 | 35 |
| Activity Therapist | 004780 | 35 |
| Addiction Counselor - Level I | 000550 | 35 |
| Addiction Counselor - Level II | 000530 | 35 |
| Addiction Specialist | 560700 | 35 |
| Ambulance Technician | 001060 | 37.5 |
| Ambulatory Care Technician | 001850 | 37.5 |
| Anesthetist | 531010 | 35 |
| Architect | 212150 | 35 |
| Architectural Intern | 212050 | 35 |
| Assistant Accountant | 405050 | 35 |
| Assistant Addiction Counselor | 000540 | 35 |
| Assistant Architect | 212100 | 35 |
| Assistant Bio-Medical Equipment Technician | 215610 | 35 |
| Assistant Chemist | 218100 | 35 |
| Assistant Civil Engineer | 202100 | 35 |
| Assistant Community Liaison Worker | 560920 | 35 |
| Assistant Coordinating Manager | 003820 | 35 |
| Assistant Electrical Engineer | 203100 | 35 |
| Assistant Head Nurse | 000480 | 37.5 |
| Assistant Health Care Program Planner/Analyst | 000300 | 35 |
| Assistant Health Facilities Planner | 220810 | 35 |
| Assistant Laundry Supervisor | 808100 | 37.5 |
| Assistant Mechanical Engineer | 204100 | 35 |
| Assistant Media Services Technician | 005020 | 35 |
| Assistant Physicist | 220100 | 35 |
| Assistant Physicist (Electronics) | 220110 | 35 |
| Assistant Physicist (Isotopes) | 220120 | 35 |
| Assistant Physicist (Radiation) | 220130 | 35 |
| Assistant Planning-Scheduling Analyst | 039660 | 35 |
| Assistant Printing Press Operator | 921220 | 40 |
| Assistant Purchasing Agent | 963400 | 35 |
| Assistant Statistician | 406050 | 35 |
| Assistant Stock Handler | 122070 | 35 |
| Assistant Systems Analyst | 039270 | 35 |
| Assistant Systems Analyst (EDP) | 040010 | 35 |
| Assistant Systems Analyst (Finance) | 039310 | 35 |
| Associate Accountant | 405170 | 35 |
| Associate Bookkeeper | 405270 | 35 |
| Associate Chemist - Level I | 963010 | 35 |
| Associate Chemist - Level II | 963020 | 35 |
| Associate Chemist - Level III | 963030 | 35 |
| Associate Engineering Technician - Level I | 961710 | 35 |
| Associate Engineering Technician - Level II | 961720 | 35 |
| Associate Laboratory Microbioligist - Level I | 962910 | 35 |
| Associate Laboratory Microbioligist - Level II | 962920 | 35 |
| Associate Laboratory Microbioligist - Level III | 962930 | 35 |
| Associate Medical Record Specialist | 508360 | 35 |
| Associate Nurse Midwife - Level A | 965130 | 37.5 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Associate Nurse Midwife - Level B | 965140 | 37.5 |
| Associate Nurse Practitioner - Level I | 966410 | 37.5 |
| Associate Nurse Practitioner - Level II | 966420 | 37.5 |
| Associate Pharmacist - Level I | 985110 | 37.5 |
| Associate Pharmacist - Level II | 985120 | 37.5 |
| Associate Pharmacist - Level III | 985130 | 37.5 |
| Associate Pharmacist - Level IV | 985140 | 37.5 |
| Associate Radiographer - Level I | 966110 | 35 |
| Associate Radiographer - Level II | 966120 | 35 |
| Associate Respiratory Therapist - Level I | 980210 | 35 |
| Associate Respiratory Therapist - Level II | 980220 | 35 |
| Associate Staff Analyst [1] | 126270 | 35 |
| Associate Staff Anesthetist - Level A | 965110 | 35 |
| Associate Staff Anesthetist - Level B | 965120 | 35 |
| Associate Staff Audiologist - Level I | 965910 | 35 |
| Associate Staff Audiologist - Level II | 965920 | 35 |
| Associate Staff Speech Pathologist - Level I | 966010 | 35 |
| Associate Staff Speech Pathologist - Level II | 966020 | 35 |
| Associate Supervising Dietitian Level A | 962310 | 35 |
| Associate Supervising Dietitian Level B | 962320 | 35 |
| Associate Supervisory Radiographer - Level I | 966310 | 35 |
| Associate Supervisory Radiographer - Level II | 966320 | 35 |
| Associate Ultrasound Technologist | 005050 | 35 |
| Attending Physician (Approved Specialties) - Level I | 970210 | 37.5 |
| Attending Physician (Approved Specialties) - Level II | 970220 | 37.5 |
| Attending Physician (Approved Specialties) - Level III | 970230 | 37.5 |
| Audiology Clinician | 003800 | 35 |
| Automotive Service Worker | 925080 | 40 |
| Beautician | 001360 | 37.5 |
| Bio-Medical Equipment Technician | 215620 | 35 |
| Bio-Medical Equipment Technician Trainee | 215600 | 35 |
| Bookkeeper - Level I | 405260 | 35 |
| Bookkeeper - Level II | 405360 | 35 |
| Caseworker | 523040 | 35 |
| Cashier | 106050 | 35 |
| Central Supply Assistant | 004560 | 37.5 |
| Certified Occupational Therapy Assistant | 003430 | 35 |
| Certified Physical Therapy Assistant | 003840 | 35 |
| Certified Respiratory Therapy Technician | 003350 | 35 |
| Chemist | 218150 | 35 |
| Chief Dietician | 503700 | 35 |
| Chief Psychologist | 521700 | 35 |
| Children's Counselor | 515100 | 35 |
| City Custodial Assistant | 906440 | 40 |
| Civil Engineer | 202150 | 35 |
| Civil Engineering Intern | 202020 | 35 |
| Clerical Associate - Level Ia | 102510 | 35 |
| Clerical Associate - Level Ib | 102610 | 35 |
| Clerical Associate - Level II | 102620 | 35 |
| Clerical Associate - Level III | 102630 | 35 |
| Clerical Associate - Level IV | 102640 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Clerical Associate - Level IVa | 102650 | 35 |
| Clinical Dietetic Technician | 966610 | 35 |
| Community Assistant [2] | 560560 | 40 |
| Community Associate | 560570 | 35 |
| Community Coordinator | 560580 | 35 |
| Community Liaison Trainee | 560910 | 35 |
| Community Liaison Worker | 560930 | 35 |
| Computer Aide - Level I | 961410 | 35 |
| Computer Aide - Level II | 961420 | 35 |
| Computer Associate (Operations) - Level I | 961310 | 35 |
| Computer Associate (Operations) - Level II | 961320 | 36 |
| Computer Associate (Operations) - Level III | 961330 | 35 |
| Computer Associate (Software) - Level I | 963110 | 35 |
| Computer Associate (Software) - Level II | 963120 | 35 |
| Computer Associate (Software) - Level III | 963130 | 35 |
| Computer Associate (Technical Support) - Level I | 961210 | 35 |
| Computer Associate (Technical Support) - Level II | 961220 | 35 |
| Computer Associate (Technical Support) - Level III | 961230 | 35 |
| Computer Programmer Analyst - Level I | 961110 | 35 |
| Computer Programmer Analyst - Level II | 961120 | 35 |
| Computer Programmer Analyst Trainee | 961500 | 35 |
| Computer Specialist (Software) - Level I | 966710 | 35 |
| Computer Specialist (Software) - Level II | 966720 | 35 |
| Construction Management Assistant | 001030 | 35 |
| Construction Project Manager - Level I | 962510 | 35 |
| Construction Project Manager - Level II | 962520 | 35 |
| Construction Project Manager - Level III | 962530 | 35 |
| Consultant Public Health Nurse (Child Health) | 510150 | 35 |
| Consultant Public Health Nurse (Hospital Services) | 510170 | 35 |
| Cook | 902100 | 37.5 |
| Custodial Assistant | 820150 | 40 |
| Dental Assistant | 501010 | 35 |
| Dental Hygienist | 501020 | 35 |
| Dentist - Level A | 963910 | 35 |
| Dentist - Level B | 963920 | 35 |
| Dentist - Level I | 964410 | 35 |
| Dentist - Level II | 964420 | 35 |
| Dentist | 502100 | 35 |
| Department Librarian | 602100 | 35 |
| Department Senior Librarian | 602350 | 35 |
| Department Supervising Librarian | 602600 | 35 |
| Dietary Aide | 818010 | 37.5 |
| Dietitian - Level I | 503100 | 35 |
| Dietitian - Level II | 503350 | 35 |
| Dietitian - Level III | 962310 | 35 |
| Dietitian - Level IV | 962320 | 35 |
| Discharge Planning Assessment Specialist - Level I | 005100 | 35 |
| Discharge Planning Assessment Specialist - Level II | 005200 | 35 |
| District Supervising Public Health Nurse | 510650 | 35 |
| Electrical Engineer | 203150 | 35 |
| Electrical Engineer (Electronics) | 203160 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Electrical Engineering Intern | 203020 | 35 |
| Electrocardiograph Technician | 513120 | 35 |
| Electroencephalograph Technician | 515130 | 35 |
| Elevator Operator | 809100 | 37.5 |
| Elevator Starter | 809350 | 37.5 |
| Emergency Medical Specialist - EMT | 002220 | 37.5 |
| Emergency Medical Specialist - Paramedic | 002240 | 37.5 |
| Emergency Medical Specialist Cadet Trainee | 005030 | 37.5 |
| Engineering Technician - Level I | 961610 | 35 |
| Engineering Technician - Level II | 961620 | 35 |
| Engineering Technician Trainee | 201110 | 35 |
| Equipment Control Planner (Hospitals) | 000780 | 35 |
| Exterminator | 905100 | 35 |
| Food Service Supervisor | 902380 | 35 |
| Foreman of Gardeners | 002720 | 37.5 |
| Gardener | 002710 | 37.5 |
| Head Dietitian | 503350 | 35 |
| Head Nurse | 509350 | 37.5 |
| Health Care Program Planner/Analyst | 000310 | 35 |
| Health Facilities Planner | 220820 | 35 |
| Home Health Aide | 004860 | 37.5 |
| Hospital Care Investigator | 523420 | 35 |
| Hospital Payroll Accounts Manager | 039030 | 35 |
| Hospital Security Officer | 708300 | 37.5 |
| Housekeeper | 807100 | 35 |
| Housekeeping Aide | 818020 | 37.5 |
| Illustrator | 914100 | 35 |
| Institutional Aide | 818030 | 37.5 |
| Institutional Garment Worker | 901120 | 35 |
| Institutional Tailor | 901130 | 35 |
| Instrument Maker (Radiology) | 907220 | 35 |
| IV Technician | 005000 | 35 |
| Junior Architect | 212060 | 35 |
| Junior Bacteriologist | 216050 | 35 |
| Junior Chemist | 218050 | 35 |
| Junior Civil Engineer | 202060 | 35 |
| Junior Electrical Engineer | 203060 | 35 |
| Junior Health Facilities Planner | 220800 | 35 |
| Junior Mechanical Engineer | 204060 | 35 |
| Laboratory Assistant | 004960 | 35 |
| Laboratory Associate - Level I | 962710 | 35 |
| Laboratory Associate - Level II | 962720 | 35 |
| Laboratory Microbiologist - Level I | 962810 | 35 |
| Laboratory Microbiologist - Level II | 962820 | 35 |
| Laboratory Technician | 215080 | 35 |
| Laundry Supervisor | 808600 | 37.5 |
| Laundry Worker | 901100 | 37.5 |
| Licensed Barber | 901140 | 37.5 |
| Licensed Practical Nurse | 003150 | 37.5 |
| Maintenance and Control Planner | 039770 | 35 |
| Maintenance Control Scheduler | 039760 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Maintenance Planning and Control Supervisor | 039780 | 35 |
| Maternal and Childcare Technician | 001860 | 37.5 |
| Meat Cutter | 902130 | 35 |
| Mechanical Engineer | 204150 | 35 |
| Mechanical Engineering Intern | 204030 | 35 |
| Media Services Technician - Level I | 966910 | 35 |
| Media Services Technician - Level II | 966920 | 35 |
| Medical Equipment Repair Technician | 906900 | 35 |
| Medical Equipment Specialist | 906910 | 35 |
| Medical Record Specialist | 508110 | 35 |
| Medical Utilization Review Analyst | 001210 | 35 |
| Medical Waste Technician | 005060 | 35 |
| Medicine-Surgery Technician | 001890 | 37.5 |
| Mental Health Assistant | 001610 | 35 |
| Midwife | 509120 | 37.5 |
| Mortuary Technician | 520150 | 35 |
| Motion Picture Operator | 906110 | 35 |
| Motor Vehicle Operator | 912120 | 37.5 |
| Motor Vehicle Supervisor | 912320 | 37.5 |
| Nuclear Medicine Technologist - Level I | 964310 | 35 |
| Nuclear Medicine Technologist - Level II | 964320 | 35 |
| Nurse Practitioner | 001960 | 37.5 |
| Nurse-Midwife | 961050 | 37.5 |
| Nurse's Aide | 509010 | 37.5 |
| Nurse's Aide (Transport Escort) | 001160 | 37.5 |
| Occupational Therapist | 512100 | 35 |
| Office Aide Level I | 960010 | 35 |
| Office Aide Level II | 960020 | 35 |
| Office Aide Level III | 960030 | 35 |
| Office Associate | 960100 | 35 |
| Office Machine Aide - Level II | 960320 | 35 |
| Office Machine Associate | 960400 | 35 |
| Operating Room Technician | 001900 | 37.5 |
| Paralegal Aide - Level I | 964010 | 35 |
| Paralegal Aide - Level II | 964020 | 35 |
| Patient Care Associate | 988010 | 37.5 |
| Patient Care Technician | 986010 | 37.5 |
| Pediatric Nurse Associate | 954400 | 35 |
| Pharmacist | 506100 | 37.5 |
| Pharmacist Interne | 002410 | 37.5 |
| Pharmacy Technician | 002420 | 37.5 |
| Phlebotomist | 004950 | 35 |
| Photographer | 906100 | 35 |
| Physical Therapist | 512110 | 35 |
| Physician Assistant | 001730 | 37.5 |
| Physician Assistant - Level II (HCF) | 004730 | 37.5 |
| Physicist | 220150 | 35 |
| Physicist (Isotopes) | 220170 | 35 |
| Physicist (Radiation) | 220180 | 35 |
| Planning - Scheduling Analyst | 039670 | 35 |
| Preventive Maintenance Inspector | 000170 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Primary Care Physician (Communicare/Managed Care) | 005070 | 37.5 |
| Principal Administrative Associate - Level I | 960210 | 35 |
| Principal Administrative Associate - Level II | 960220 | 35 |
| Principal Administrative Associate - Level III | 960230 | 35 |
| Principal Chemist | 218350 | 35 |
| Principal Children's Counselor | 515650 | 35 |
| Principal Community Liaison Worker | 560950 | 35 |
| Principal Hospital Care Investigator | 523450 | 35 |
| Principal Microbiologist | 216900 | 35 |
| Principal Mortuary Technician | 520170 | 35 |
| Principal Research Scientist (Biological Science) | 217700 | 35 |
| Principal Statistician | 406250 | 35 |
| Procurement and Materials Analyst | 039440 | 35 |
| Procurement and Materials Specialist (Approved Specialties) | 039420 | 35 |
| Procurement and Materials Specialist (Bio-Med. Equip. & Supplies) | 002510 | 35 |
| Procurement and Materials Specialist (Pharmaceuticals & Supplies) | 002520 | 35 |
| Project Manager | 039710 | 35 |
| Psychiatric/Social Health Technician | 001870 | 37.5 |
| Psychologist - Level I | 521100 | 35 |
| Psychologist - Level II | 521350 | 35 |
| Psychologist - Level III | 521700 | 35 |
| Public Health Assistant | 818050 | 35 |
| Public Health Educator | 511110 | 35 |
| Public Health Nurse - Level I | 510110 | 35 |
| Public Health Nurse - Level II | 510600 | 35 |
| Public Health Nurse - Level III | 510650 | 35 |
| Purchasing Agent - Level I | 963510 | 35 |
| Purchasing Agent - Level II | 963520 | 35 |
| Purchasing Agent - Level III | 963530 | 35 |
| Quality Assurance Specialist - Level I (Automotive Equipment) | 964210 | 35 |
| Quality Assurance Specialist - Level II (Automotive Equipment) | 964220 | 35 |
| Radio Repair Technician | 004570 | 37.5 |
| Radiographer | 004890 | 35 |
| Refrigeration Service Helper | 000650 | 37.5 |
| Refrigeration Service Mechanic | 000660 | 37.5 |
| Rehabilitation Counselor | 512130 | 35 |
| Rehabilitation Technician | 001880 | 37.5 |
| Research Assistant | 609100 | 35 |
| Respiratory Care Therapist - Level I | 000790 | 37.5 |
| Respiratory Care Therapist - Level II | 000800 | 37.5 |
| Respiratory Therapist - Level I | 980110 | 35 |
| Respiratory Therapist - Level II | 980120 | 35 |
| Respiratory Therapy Aide | 980000 | 35 |
| Respiratory Therapy Technician - Level I | 980010 | 35 |
| Respiratory Therapy Technician - Level II | 980020 | 35 |
| Respiratory Therapy Technician | 003340 | 37.5 |
| Respiratory Therapy Technician Trainee | 003330 | 37.5 |
| Safety Officer | 316170 | 35 |
| Secretary - Level IIa | 102720 | 35 |
| Secretary - Level IIb | 102730 | 35 |
| Secretary - Level IIIa | 102740 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Secretary - Level IIIb | 102750 | 35 |
| Senior Accountant | 405150 | 35 |
| Senior Activity Therapist | 004790 | 35 |
| Senior Addiction Counselor - Level I | 966970 | 35 |
| Senior Addiction Counselor - Level II | 966980 | 35 |
| Senior Architect | 212250 | 35 |
| Senior Associate Accountant | 002630 | 35 |
| Senior Associate Occupational Therapist - Level I | 965810 | 35 |
| Senior Associate Occupational Therapist - Level II | 965820 | 35 |
| Senior Associate Pharmacist - Level A | 962210 | 37.5 |
| Senior Associate Pharmacist - Level B | 962220 | 37.5 |
| Senior Associate Pharmacist - Level C | 962230 | 37.5 |
| Senior Associate Pharmacist - Level D | 962240 | 37.5 |
| Senior Associate Physical Therapist - Level I | 965710 | 35 |
| Senior Associate Physical Therapist - Level II | 965720 | 35 |
| Senior Automotive Service Worker | 925090 | 40 |
| Senior Bio-Medical Equipment Technician | 215630 | 35 |
| Senior Buyer | 121400 | 35 |
| Senior Children's Counselor | 515350 | 35 |
| Senior Civil Engineer | 202250 | 35 |
| Senior Clinician Educator - Level I | 966510 | 37.5 |
| Senior Clinician Educator - Level II | 966520 | 37.5 |
| Senior Clinician Educator - Level III | 966530 | 37.5 |
| Senior Clinician Educator - Level IV | 966540 | 37.5 |
| Senior Community Liaison Worker | 560940 | 35 |
| Senior Consultant (Early Childhood Education) | 516360 | 35 |
| Senior Cook | 902350 | 37.5 |
| Senior Dentist | 502350 | 35 |
| Senior Electrical Engineer | 203250 | 35 |
| Senior Electrocardiograph Technician | 001600 | 35 |
| Senior Health Care Program Planner/Analyst - Level A | 000320 | 35 |
| Senior Health Care Program Planner/Analyst - Level B | 000330 | 35 |
| Senior Health Facilities Planner | 220830 | 35 |
| Senior Hospital Care Investigator | 523430 | 35 |
| Senior Housekeeper | 807350 | 35 |
| Senior Illustrator | 914350 | 35 |
| Senior Laundry Supervisor | 808610 | 37.5 |
| Senior Laundry Worker | 901350 | 37.5 |
| Senior Meat Cutter | 902370 | 35 |
| Senior Mechanical Engineer | 204250 | 35 |
| Senior Medical Utilization Review Analyst | 002750 | 35 |
| Senior Mortuary Technician | 520160 | 35 |
| Senior Motor Vehicle Supervisor | 912330 | 37.5 |
| Senior Pharmacist | 506350 | 40 |
| Senior Photographer | 906350 | 35 |
| Senior Physicist | 220250 | 35 |
| Senior Physicist (Electronics) | 220260 | 35 |
| Senior Physicist (Isotopes) | 220270 | 35 |
| Senior Planning - Scheduling Analyst | 039680 | 35 |
| Senior Psychologist | 521350 | 35 |
| Senior Public Health Educator | 511350 | 35 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Senior Purchase Inspector | 341350 | 35 |
| Senior Radiation Technician | 513360 | 35 |
| Senior Rehabilitation Counselor | 512150 | 35 |
| Senior Respiratory Care Therapist - Level I | 966930 | 35 |
| Senior Respiratory Care Therapist - Level II | 966940 | 35 |
| Senior Social Worker (HCF) | 004770 | 35 |
| Senior Special Officer | 708150 | 37.5 |
| Senior Statistician | 406150 | 35 |
| Senior Systems Analyst | 039290 | 35 |
| Senior Systems Analyst (EDP) | 040030 | 35 |
| Senior Systems Analyst (Finance) | 039330 | 35 |
| Service Aide | 987010 | 37.5 |
| Social Worker | 526130 | 35 |
| Special Officer | 708100 | 37.5 |
| Speech Clinician | 003790 | 35 |
| Staff Analyst - Level I [1] | 126260 | 35 |
| Staff Analyst - Level II [1] | 126460 | 35 |
| Staff Nurse | 509100 | 37.5 |
| Statistician | 406100 | 35 |
| Stenographer/Secretary | 960520 | 35 |
| Stenographic Specialist - Level I | 960710 | 35 |
| Stenographic Specialist - Level II | 960720 | 35 |
| Stenographic Specialist - Level III | 960730 | 35 |
| Stenographic/Secretarial Associate | 960600 | 35 |
| Stock Worker - Level I | 960910 | 35 |
| Stock Worker - Level II | 960920 | 35 |
| Supervising Activity Therapist | 004800 | 35 |
| Supervising Ambulance Corpsman | 002230 | 37.5 |
| Supervising Audiologist | 512400 | 35 |
| Supervising Children's Counselor | 515600 | 35 |
| Supervising Dental Assistant | 002210 | 35 |
| Supervising Emergency Medical Service Specialist Level I | 963310 | 37.5 |
| Supervising Emergency Medical Service Specialist Level II | 963320 | 37.5 |
| Supervising Hospital Care Investigator | 523440 | 35 |
| Supervising Housekeeper | 807600 | 35 |
| Supervising Laundry Worker | 001150 | 37.5 |
| Supervising Medical Record Specialist | 508370 | 35 |
| Supervising Nuclear Medicine Technologist | 004910 | 35 |
| Supervising Pharmacist | 506500 | 37.5 |
| Supervising Public Health Adviser | 511930 | 35 |
| Supervising Public Health Nurse | 510600 | 35 |
| Supervising Refrigeration Service Technician | 000670 | 37.5 |
| Supervising Speech Pathologist | 512540 | 35 |
| Supervising Therapist | 512410 | 35 |
| Supervisor I (Social Work) | 526310 | 35 |
| Supervisor II (Social Work) | 526320 | 35 |
| Supervisor III (Social Work) | 526330 | 35 |
| Supervisor of Gardeners | 002720 | 37.5 |
| Supervisor of Mechanics (Mechanical Equipment) Level I | 925750 | 40 |
| Supervisor of Mechanics (Mechanical Equipment) Level II | 925760 | 40 |
| Supervisor of Mechanics (Mechanical Equipment) Level III | 925770 | 40 |

00001

| TITLE | TITLE CODE | WORK WEEK |
|---|---|---|
| Supervisor of Mechanics (Mechanical Equipment) Level IV | 925770 | 40 |
| Supervisor of Nurses | 509600 | 37.5 |
| Supervisor of Nurses | 509600 | 37.5 |
| Supervisor of Office Machine Operations - Level I | 117010 | 35 |
| Supervisor of Office Machine Operations - Level II | 117020 | 35 |
| Supervisor of Radio Repair Operations | 907600 | 37.5 |
| Supervisor of Stock Workers - Level I | 962410 | 35 |
| Supervisor of Stock Workers - Level II | 962420 | 35 |
| Supervisor of Stock Workers - Level III | 962430 | 35 |
| Supervisor, Scheduling & Control (EDP) | 039910 | 35 |
| Systems Analyst | 039280 | 35 |
| Systems Analyst (EDP) | 040020 | 35 |
| Systems Analyst (Finance) | 039320 | 35 |
| Teacher Aide (Day Care Center) | 029330 | 35 |
| Technical Support Aide Level II | 960820 | 35 |
| Technical Support Aide Level III | 960830 | 35 |
| Telecommunications Associate - Level I | 966210 | 35 |
| Telecommunications Associate - Level II | 966220 | 35 |
| Training & Development Associate - Level A | 984710 | 35 |
| Training & Development Associate - Level B | 984720 | 35 |
| Ultrasound Technologist - Level I | 966950 | 35 |
| Ultrasound Technologist - Level II | 966960 | 35 |
| Utilization Review/Management Coordinator - Level I | 005080 | 35 |
| Utilization Review/Management Coordinator - Level II | 005090 | 35 |
| Washer | 901110 | 37.5 |
| Watch Person | 810100 | 37.5 |
| Window Washer (Health Care Facilities) | 004420 | 37.5 |

## GENERAL NOTES:

- A position for which a temporary title code has been issued pending its formal classification shall be deemed to be presumptively included in this Appendix A provided such temporary position has been certified for collective bargaining (see Article IX, Section 14).

- The listings set forth in this Appendix A represent the best understandings of the parties at the time this Agreement was drafted. However, the parties recognize that there may be inadvertent errors or omissions.

- Rule XI titles certified by the Board of Collective Bargaining subsequent to the drafting of this Agreement shall be deemed included in this Appendix A.

## TITLE SPECIFIC NOTES:

1. Applies to positions certified to the Organization of Staff Analyst pursuant to BCB Decision No. 3-88 (May 19, 1988).

2. Except 1) employees assigned to positions in shelters run by the Departments of Homeless Services or Social Services whose work week shall be 37½ hours and 2) incumbent employees who were reclassified from either Assistant Community Specialist or Office Aide (CETA) whose work week shall continue to be 35 hours.

3. Except for employees assigned to positions in the Department of Social Services whose work week shall be 37½ hours.

4. Except for incumbent employees hired prior to September 1, 1982, whose work week was 35 hours. Said incumbents shall continue to have a 35 hour work week.

00001

# APPENDIX B



## THE CITY OF NEW YORK
## OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, N.Y. 10006
WWW.CI.NYC.NY.US/HTML/OLR

**JAMES F. HANLEY**
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

November 26, 1999

Lee Saunders
Administrator
DC 37, AFSCME, AFL-CIO
125 Barclay Street
New York, N.Y. 10007

<u>Re: 1990-1992 Citywide Agreement</u>

Dear Mr. Saunders:

This to confirm our mutual understanding and agreement that the terms of the 1990-1992 Citywide Agreement and any supplemental agreements thereto have been extended to December 31, 1994.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

JAMES F. HANLEY

AGREED AND ACCEPTED
ON BEHALF OF DC 37 AFSCME, AFL-CIO

BY: _____
    LEE SAUNDERS
    Administrator

00001

## APPENDIX C



# THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, N.Y. 10006
WWW.CI.NYC.NY.US/HTML/OLR

JAMES F. HANLEY
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

Dennis Sullivan
Director of Research & Negotiations
DC 37, AFSCME, AFL-CIO
125 Barclay Street
New York, N.Y. 10007

#### Re: 1995 – 2001 Citywide Agreement

Dear Mr. Sullivan:

The following is offered by way of clarification as to the meaning and scope of certain provisions of the Citywide Agreement between the City of New York and District Council 37, AFSCME, AFL-CIO covering the period of January 1, 1995 - June 30, 2001.

1.  **Article I, Section 1:** Are Employees in Rule X titles covered by the Agreement?

    **ANSWER:** No. However they may be covered by the provisions of the Agreement if they are equated to a title that is covered by the Agreement, or to the extent that they are covered by the provisions of the applicable unit contract.

2.  **Article III, Section 1(b):** When are employees eligible to receive payment for both night shift differential and straight time (1X) overtime?

    **ANSWER:** Only employees who were receiving night shift differential during the hour that immediately preceded the straight time (1X) cash overtime are eligible. Employees whose normal tour of duty falls outside the night shift differential hours are not eligible to receive night shift differential when working hours subject to night shift differential.

3.  **Article IV, Section 3(b):** Is an employee granted a shortened schedule under Article V, Section 18 who works less than the normal work week entitled to overtime compensated in cash?

    **ANSWER:** Under certain circumstances. If such an employee is ordered to work hours in excess of the employee's shortened weekly schedule but less than the number of hours in the employee's normal work week, such employee would only be entitled to compensatory time at the rate of straight time (1x) [i.e. straight time compensatory time for work performed between 30 and 35 hours a week for 35 hour employees; between 32½ and 37½ hours a week for 37½ hour employees; and between 35 and 40 hours a week for 40 hour employees]. However, if such employee has been in pay status for all scheduled workdays in the calendar week and is ordered to perform work on a scheduled day off (i.e. a sixth day for a five day a week employee), the hours worked on such scheduled day off may be compensable in cash pursuant to Article IV as if the employee had not been granted a shortened schedule.

00001

4.  **Article IV, Section 3(d):** Can the Employer reschedule the normal work week of employees to regularly include Saturdays and/or Sundays as normal work days without violating this Section?

    **ANSWER:**     Yes.

5.  **Article IV, Section 11(b):** How is the cash payment of standby pay calculated?

    **ANSWER:**     Except as may be otherwise provided by FLSA, the cash payment for standby is always compensated at the rate of one-half (½X) of the hourly rate as determined pursuant to Article IV, Section 6.

6.  **Article V, Section 3:** May an agency head issue a blanket prohibition or limitation on the use of approved sick leave and annual leave in units of one hour?

    **ANSWER:**     No. The agency must consider each request on its merits.

7.  **Article V, Section 5:** Do these sick leave provisions apply to pregnant employees?

    **ANSWER:**     Yes. These provisions are applicable to pregnancy-connected disability under the same terms and conditions as they are applicable to any conditions requiring or permitting the use of sick leave.

8.  **Article V, Section 16(d):** May an Agency apply a fixed time based standard in determining whether to excuse lateness beyond the five minute grace period?

    **ANSWER:**     No. Each determination shall be made on a case by case basis.

9.  **Article V, Section 17:** Is the following provision in Section 2.9 of the Leave Regulations superseded by this Section?

    > For an agency whose presently existing rules (as of June 30, 1956) permit the use of sick leave credits of an employee in connection with terminal leave with pay upon retirement, the agency is authorized to grant an employee on staff prior to the effective date of these Regulations but who retires subsequent thereto, either terminal leave with pay as specified in Regulation 2.9 or terminal leave with pay calculated under such presently existing agency rules, whichever is the most liberal for the employee; provided that the sick leave balance used in the application of the agency formula does not exceed the sick leave balance to the credit of the employee at the time these Regulations go into effect (July 1, 1956).

    **ANSWER:**     No.

10. **Article V, Section 18(b):** Are all outdoor and field employees who traditionally enjoyed shortened workday schedules and who are required to return to an office location entitled to summer schedules?

    **ANSWER:**     No. Only those employees who are required to return to an office location before the end of the workday to perform duties for at least one hour are entitled to the summer schedule enjoyed by office employees at that location on such day.

11. **Article V, Section 19:** Where certain part-time employees were receiving more beneficial leave credits under the terms of a unit contract in existence prior to the effective date of this Section, may they continue to do so?

    **ANSWER:**     Yes. They may continue to receive credits which may vary from the formula established by the terms of this Section. However, upon the expiration of said pre-existing unit contracts, the employees must either elect to be covered by the terms of this Section or they may continue to receive leave credits pursuant to said pre-existing formula.

12. **Article X, Section 1:** Is the evaluatory statement referred to in this Section limited only to the formal periodic performance evaluation?

    **ANSWER:**     No. It refers to any evaluatory statement.

00001

13. **Article X, Section 1:** Are the requirements on evaluatory statements contained in this Section limited only to those statements to be placed in the permanent personnel folder in the central office?

    **ANSWER:** No. They apply to evaluatory statements to be placed in any employee personnel folder maintained in the agency.

14. **Article XIII, Section 4:** Would an employee, who at the time of separation from City service was, and thereafter continued to be covered by the State Health Insurance Program, be eligible to continue receiving the Welfare Fund contribution on his behalf?

    **ANSWER:** Yes. Such an employee shall continue to receive the Welfare Fund contribution in the employee's behalf provided said employee has five years NYCERS membership service at the time of the employee's separation and said employee remains a primary beneficiary of the State Program and is entitled to receive benefits paid for by the State through such program.

15. **Article XXI:** Does this Article intend to preclude the Union from engaging in activity to secure the enactment of the New Career Pension Plan legislation during the term of the Agreement?

    **ANSWER:** No.

The provisions of this letter shall be deemed part of the 1995-2001 Citywide Agreement as if fully set forth therein. Except as is otherwise provided herein, the contents of this letter shall be effective the date of execution of the 1995-2001 Citywide Agreement and shall be coterminous therewith.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

*James F. Hanley*

JAMES F. HANLEY

AGREED AND ACCEPTED
ON BEHALF OF DISTRICT COUNCIL 37

BY: *Dennis Sullivan*

DENNIS SULLIVAN

00001

**APPENDIX D**



# THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, N.Y. 10006
WWW.CI.NYC.NY.US/HTML/OLR

JAMES F. HANLEY
*Commissioner*
CAROLINE I. SULLIVAN
*First Deputy Commissioner*

Dennis Sullivan
Director of Research & Negotiations
DC 37, AFSCME, AFL-CIO
125 Barclay Street
New York, N.Y. 10007

<u>Re: 1995 – 2001 Citywide Agreement</u>

Dear Mr. Sullivan:

This letter is to confirm that during the negotiations for the above captioned agreement the parties agreed to continue in force the following side agreements to the 1990-1992 Citywide Agreement:

1. **Voluntary Benefits Program:**

    DC 37, or an agent designated by DC 37, shall have the exclusive right to receive contributions from employees serving in titles covered by the Citywide Agreement, subject to participating union agreements with DC 37, to be used exclusively to fund a Voluntary Benefits Program, separate and distinct from the Employer Voluntary Benefits Program, to provide such benefits as are mutually agreed upon by DC 37 and the Employer and to be administered by DC 37 or its agent. The amounts deducted for such Voluntary Benefits Program(s) shall be subject to the conditions set forth in separate supplemental agreement(s), and ,in all instances, shall not be commingled with any other funds and kept separate and apart from the general funds of DC 37 or its agent, and shall be held in trust in a special segregated account exclusively maintained for that purpose and which shall be established prior to the collection of any fees deducted for the purposes specified in such supplemental agreement(s).

2. **DECAP and Long Term Care:**

    Employees covered under the above agreement shall be eligible to participate in both the Dependent Care Assistance Program (DECAP) and the Long Term Care Program which have been established by the City of New York.

The provisions of this letter shall be deemed part of the 1995-2001 Citywide Agreement as if fully set forth therein. Except as is otherwise provided herein, the contents of this letter shall be effective the date of execution of the 1995-2001 Citywide Agreement and shall be coterminous therewith.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

*James F. Hanley*

JAMES F. HANLEY

AGREED AND ACCEPTED ON
BEHALF OF DISTRICT COUNCIL 37

BY: *Dennis Sullivan*
DENNIS SULLIVAN

00001



**APPENDIX E**

# THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, N.Y. 10006
#### WWW.CI.NYC.NY.US/HTML/OLR

JAMES F. HANLEY
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

Dennis Sullivan
Director of Research & Negotiations
DC 37, AFSCME, AFL-CIO
125 Barclay Street
New York, N.Y. 10007

<u>Re:  1995 – 2001 Citywide Agreement</u>

Dear Mr. Sullivan:

This is to confirm our mutual understanding and agreement that employees who are affected by the personnel actions set forth below shall not lose or gain seniority for the purposes of implementing the accrual rates set forth in Article V, Sections 1 and 19(b), and Article VI, Section 6 of the 1995-2001 Citywide Agreement.

1.     An employee who returns to active service from an approved leave of absence.

2.     An employee who is in pay status (whether full-time or part-time) and is permanently appointed in the same title or a new title.

3.     Employees who were laid of or terminated for economic reasons who are appointed from a preferred/recall list or referred by the PRC.

4.     A provisional employee who was terminated because of the existence of a civil service list and appointed from a civil service list within one year of such termination.

5.     A permanent employee who resigns and is reinstated or who is appointed from a civil service list within one year of such resignation.

6.     An employee who resigns and returns within 31 days.

7.     A provisional employee who resigns and returns as a provisional within 31 days.

8.     A provisional employee who is appointed directly from one provisional appointment to another.

9.     For employees whose circumstances were not anticipated by the parties, the First Deputy Commissioner of Labor Relations shall hereby be empowered to issue case-by-case interpretations.

The provisions of this letter shall be deemed part of the 1995-2001 Citywide Agreement as if fully set forth therein.  Except as is otherwise provided herein, the contents of this letter shall be effective the date of execution of the 1995-2001 Citywide Agreement and shall be coterminous therewith.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

*James F. Hanley*

JAMES F. HANLEY

**AGREED ON BEHALF OF DC 37, AFSCME, AFL-CIO**

BY: *Dennis Sullivan*

DENNIS SULLIVAN

**0 0 0 0 1**

**APPENDIX F**



**THE CITY OF NEW YORK**
## OFFICE OF LABOR RELATIONS
40 Rector Street, New York, N.Y. 10006
WWW.CI.NYC.NY.US/HTML/OLR

JAMES F. HANLEY
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

Dennis Sullivan
Director of Research & Negotiations
DC 37, AFSCME, AFL-CIO
125 Barclay Street
New York, N.Y. 10007

Re: 1995 – 2001 Citywide Agreement

Dear Mr. Sullivan:

This letter is to confirm that during the negotiations for the above captioned agreement the parties agreed to establish or continue the following joint labor/management committees to address technical questions and on-going concerns:

1.  The following committees shall be continued:

    a.  The Payroll Issues Committee (including a separate Health and Hospital Corporation subcommittee);

    b.  The Job Evaluation Procedures Issues Committee; and '

    c.  The Committee for Issues Affecting Employees with Disabilities.

2.  A temporary committee to implement a dedicated sick leave contribution plan shall be created.

3.  Issues related to the timely placement of new and returning employees on payroll; the timely payment of shift differential, overtime and holiday pay; the timely input of time and leave records on pay stubs; and the clearer reflection on payroll stubs of these and other additions-to-gross payments shall be referred   to the standing Payroll Committee

4.  A temporary Legal Committee to study and make recommendations concerning an alternative to the health and safety grievance procedures shall be established.

5.  Issues related to the protection and security of employees shall be referred to the standing Citywide Health and Safety Committee.

6.  The Workers Compensation Committee shall study and make recommendations to modify  the procedures set forth in Article V, Sections 10 and 11 of this Citywide  Agreement  within  90  days  of  commencing  said  committee.

00001

7.  The issue of the application of Article I, Section 5 of the Citywide Agreement to employees covered by the Clinicians Agreement and to employees of the Department of Health assigned to work at Board of Education facilities on a school year based schedule shall be referred to a high level labor/management committee.

8.  The issue of the exclusion of employees covered by the Clinicians Agreement from the provisions of Article III of this Citywide shall be referred to a high level labor/management committee..

9.  Issues related to the assignment of overtime in the Fire Department shall be referred to a high level labor/management committee.

10. After implementation of the Metrocard program, other issues related to transit checks shall be referred to a high level labor/management committee.

The provisions of this letter shall be deemed part of the 1995-2001 Citywide Agreement as if fully set forth therein. Except as is otherwise provided herein, the contents of this letter shall be effective the date of execution of the 1995-2001 Citywide Agreement and shall be coterminous therewith.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

JAMES F. HANLEY

AGREED AND ACCEPTED
ON BEHALF OF DISTRICT COUNCIL 37

BY: _____
DENNIS SULLIVAN

00001

**APPENDIX G**



# THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, N.Y. 10006
#### WWW.CI.NYC.NY.US/HTML/OLR

JAMES F. HANLEY
*Commissioner*
**CAROLINE I. SULLIVAN**
*First Deputy Commissioner*

Dennis Sullivan
Director of Research & Negotiations
125 Barclay Street
New York, N.Y. 10007

Re: <u>1995 – 2001 Citywide Agreement</u>

Dear Mr. Sullivan:

This is to confirm our mutual understanding and agreement that during the negotiations for the above captioned agreement the parties agreed to the implementation of the following personnel policies by both covered agencies and the New York City Health and Hospitals Corporation:

1.     Personnel Services Bulletin No. 440-8 (Guidelines on the Family and Medical Leave Act of 1993) be modified as follows to provide that effective November 26, 1999, leave will be granted to provide care for a domestic partner who has a serious health condition:

> An eligible employee is entitled to a total of 12 weeks of leave in a 12 month period. Leave may be taken upon the birth of a child to the employee, to care for such child; or upon the placement of a child with the employee for adoption or foster care, to care for such child ("FLMA Childcare Leave"). Leave may be taken to care for a child of the employee when the child has a serious health condition, as defined hereon; to care for the employee's parent or spouse or domestic partner when such person has a serious condition; and for the employee's own serious health condition.

> "Child" means a biological, adopted or foster child of the employee; a legal ward, or stepchild of the employee; or a child for whom the employee stands in loco parentis. A child must either be under 18 or incapable of self-care because of mental or physical disability. "Spouse" means a husband or wife as defined or recognized under state law for purposes of marriage in the state where the employee resides. "Parent" means the biological parent of the employee, or person who stands or stood in loco parentis for the employee when the employee was a child, as defined herein; it does not include "in-laws." "Domestic Partner" means domestic partner as defined in the New York Administrative Code Section 1-112(21).

2.     Effective November 26, 1999, employees serving permanently in a competitive; non-competitive, or labor class title in an agency covered by the Citywide Agreement and the Personnel Rules and Regulations of the City of New York ("covered position") who are appointed to another covered position in the competitive, non-competitive, or labor class that requires serving a new probationary period, shall have the right to return to their former agency and title if they do not satisfactorily complete the new probationary period. Employees serving permanently in a competitive, non-competitive, or labor class title in the Health and Hospitals Corporation that is covered by the Citywide Agreement ("HHC covered position") who are appointed to another HHC covered position in the competitive, non-competitive, or labor class that requires serving a new probationary period, shall have the right to return to their former HHC title if they do not satisfactorily complete the new probationary period.

*00001*

3.    Effective November 26, 1999, when competitive class promotional titles are consolidated with lower titles as assignment levels, any permanent competitive class employees who are serving as step-up provisionals in the affected promotional titles shall have up to twenty-four (24) months of prior provisional service credit towards the "salary lock-in" provisions set forth in the Alternative Career and Salary Pay Plan. Notwithstanding such credited service, such employees must serve at leas 12 months in the higher assignment level to gain full salary lock-in rights

The provisions of this letter shall be deemed part of the 1995-2001 Citywide Agreement as if fully set forth therein. Except as is otherwise provided herein, the contents of this letter shall be effective the date of execution of the 1995-2001 Citywide Agreement and shall be coterminous therewith.

If you concur with the contents set forth herein, please execute the signature line provided below.

Very truly yours,

JAMES F. HANLEY

AGREED AND ACCEPTED
ON BEHALF OF DISTRICT COUNCIL 37

BY: _____
DENNIS SULLIVAN

00001

**MADUEGBUNA COOPER LLP**
110 Wall Street, 11th Floor, New York, New York 10005
(212) 232 - 0155

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

PAMELA RODRIGUEZ, TIFFANY BELLE, YOLANDA
CAPERS, TONI REID, KESHA SMITH, TIFFANY
MORRIS, FELICITA GOMEZ, SANDRA SPRINGER,
CYNTHIA HILL and JENNY MARCELINO,

(On behalf of themselves and all others similarly situated),

**STIPULATION OF
SETTLEMENT**

06-Civ-3049 (BMC)

Plaintiffs,

-against-

THE CITY OF NEW YORK (Michael R. Bloomberg, As
Mayor) and THE NEW YORK CITY POLICE
DEPARTMENT (Raymond Kelly, as Police
Commissioner),

Defendants.

--------------------------------------------------------------------- X

This Stipulation of Settlement (the "Stipulation" or the "Agreement") is made and

entered into pursuant to Rule 23 of the Federal Rules of Civil Procedure and contains the terms

of a settlement (the "Settlement") by and among Pamela Rodriguez, Tiffany Belle, Yolanda

Capers, Toni Reid, Kesha Smith, Tiffany Morris, Felicita Gomez, Sandra Springer, Cynthia Hill

and Jenny Marcellino, and the members of the certified class in the above-captioned action

(collectively "Plaintiffs"), and the City of New York and the New York City Police Department.

**WHEREAS,** on June 20, 2006, the above-captioned action of Rodriguez et al. v

New York City, et al., Civil Action No. 04 06 CV 3049 (BMC)(RER), a putative class action,

was filed in the United States District Court for the Eastern District of New York (the "Action");

**WHEREAS,** the Amended Complaint in the Action (the "Complaint") alleged,

among other things, that Defendants had violated the Family and Medical Leave Act ("FMLA"),

by adopting policies within the New York City Police Department's ("NYPD") Communication Section that interfered with Plaintiffs' rights under the FMLA and retaliated against Plaintiffs for exercising their rights under the FMLA;

**WHEREAS,** by Order dated January 24, 2008 the Court certified a class consisting of "Current or former civilian employees of the NYPD, who worked or are working in the civil service titles of PCT or SPCT as of June 20, 2003, who are or were, within three years preceding the filing of the original complaint, eligible and certified for FMLA leave."

**WHEREAS,** the Parties are in agreement that many of the NYPD's policies in place regarding FMLA usage at the NYPD's Communications Section as of the date of this Stipulation are in compliance with the FMLA;

**WHEREAS,** the Parties now desire to resolve the issues raised in this litigation, without further proceedings and without admitting any fault or liability;

**WHEREAS,** Counsel for Plaintiffs and Defendants have engaged in good-faith discussions regarding the possibility of settling the Action and have reached an agreement concerning the proposed settlement of the Action as set forth below; and

**WHEREAS,** Plaintiffs' Counsel, having made a thorough investigation of the facts, believe that the proposed settlement is fair, reasonable, adequate, and in the best interests of the Class.

**NOW, THEREFORE,** without any admission or concession by Plaintiffs of any lack of merit of the Action whatsoever, and without any admission or concession of any liability or wrongdoing or lack of merit in their defenses whatsoever by Defendants,

-2-

**IT IS HEREBY STIPULATED AND AGREED**, by and among the Parties to this Stipulation, through their respective attorneys, subject to approval of the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure, that all Claims as against all Released Parties shall be compromised, settled, released, and dismissed with prejudice, upon and subject to the following terms and conditions:

### DEFINITIONS

1. For the purposes of this Stipulation, the terms listed below shall have the following definitions:

a. "PCT" means the civilian civil service title of Police Communications Technician.

b. "SPCT" means the civilian civil service title of Supervising Police Communications Technician.

c. "NYPD" means the New York City Police Department.

d. "FMLA" means the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

e. "Step Program" means an absence control monitoring program described in the NYPD's Interim Order No. 71 and New York City Police Department Administrative Guide Procedure No. 318-15.

f. "Class Members" means the members of the Class, as defined in paragraph 4.

g. "Effective Date" means the date set by the court in accordance with the approval process of this Stipulation, as defined more fully in paragraph 17.

h. "Defendants' Counsel" means the Corporation Counsel of the City of New York.

i. "Plaintiffs' Counsel" means the law firm of Lewis Brisbois Bisgaard & Smith LLP and District Council 37, AFSCME, AFL-CIO.

- 3 -

j.  "Released Parties" means any and all of the Defendants and the legal representatives, agents, heirs, successors in interest, or assigns of the Defendants.

k.  "Settled Claims" means any and all claims (i) that have been asserted in the Action by the Named Plaintiffs, Class Members, or any of them against any of the Released Parties, or (ii) that could have been asserted in any forum by the Named Plaintiffs, Class Members, or any of them against any of the Released Parties which arise out of, relate to, or are based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint, except that "Settled Claims" does not include claims to enforce the Settlement or any provision thereof.

l.  "Settlement" means the settlement contemplated by the Stipulation.

m.  "Settlement Notice" means the Notice of Proposed Settlement of Class Action and Settlement Fairness Hearing, which is sent to members of the Class substantially in the form attached hereto as Exhibit [ ].

n.  Minimal or Isolated Violation: A violation of paragraph 5 of this Stipulation and Order of Settlement shall be considered minimal or isolated if fewer than five (5) PCTs or SPCTs have been affected by Defendants' claimed violation on any single occasion and such violation occurs fewer than three (3) times within any six (6) month period. Pursuant to Paragraph 8, *infra*, plaintiffs shall timely bring to defendants' attention any claimed violations as they occur.

## SCOPE AND EFFECT OF SETTLEMENT

2.  The obligations incurred pursuant to this Stipulation shall be in full and final disposition of the Action and any and all Settled Claims as against all Released Parties and any and all Settled Defendants' Claims against any of the Named Plaintiffs, Class Members, or Plaintiffs' Counsel.

- 4 -

3. Upon the Effective Date of this Settlement, the Class Members, on behalf of (i) themselves, and (ii) their past or present legal representatives shall, with respect to each and every Settled Claim, release and forever discharge, and shall forever be enjoined from prosecuting, any Settled Claims against any of the Released Parties.

### CLASS CERTIFICATION

4. By Order dated January 24, 2008, the court certified a class defined as :

Current or former civilian employees of the NYPD, who worked or are working in the civil service titles of PCT or SPCT as of June 20, 2003, who are or were, within three years preceding the filing of the original complaint, eligible and certified for FMLA leave.

### DEFENDANTS' OBLIGATIONS

5. During the effective term of this Stipulation and Order of Settlement, except as otherwise inconsistent with law and agreements, Defendant NYPD shall:

a. Agree to continue its current practice of not "delaying" or "cancelling" intermittent FMLA leave.

b. Agree to continue its current policy of including overtime hours worked by a PCT or SPCT in its calculation of whether the individual has worked the requisite 1250 hours to be eligible for FMLA leave.

c. Agree to continue its current practice of excluding certified or approved FMLA usage as a consideration in deciding to place PCTs or SPCTs in the Step Program.

d. Agree to continue its current practice of excluding approved FMLA absences from consideration when determining a PCT's or SPCT's time-and-leave or overall rating on his or her annual performance evaluation.

e. Agree to allow PCTs and SPCTs to use intermittent FMLA leave during mandatory overtime tours.

- 5 -

f.    Agree to allow PCTs and SPCTs to take FMLA leave while the NYPD processes requests for FMLA re-certification.

g.    Agree to continue to require recertification for intermittent FMLA leave in compliance with 29 C.F.R. § 825.308.

h.    Agree to continue to comply with the FMLA, including its anti-retaliation provisions.

i.    Defendants assert that, pursuant to the Board of Collective Bargaining's ("BCB") June 18, 2007 decision in In re District Council 37, AFSCME, AFL-CIO and City of New York, and The New York City Police Department, Decision No. B-24-2007 (IP) (Docket No. BCB-2552-06), they have expunged all Reports of Violation, Command Disciplines, and other documents relating to disciplinary action taken against Plaintiffs for FMLA-related absences. Defendants also agree to expunge from Plaintiffs' personnel files any below standards or well-below standards performance evaluations issued because of FMLA-related absences brought to their attention within a one-year period of the "Effective Date," as defined herein. Any claims that Defendants have not expunged the above documents from any individual plaintiff's personnel file during the one-year period following the Effective Date will be resolved by means of the enforcement procedures outlined in paragraphs 7 through 12 of the Proposed Stipulation.

## COMPENSATORY RELIEF

6. In connection with the settlement of the above-captioned action, with the exception of the eleven named plaintiffs, defendant the City of New York shall issue payment in the amount of three hundred dollars and no cents ($300.00) to each member of the plaintiff class who executes and returns to Defendants' counsel a general release and an affidavit concerning

liens, annexed hereto as Exhibit []. Defendant City of New York shall issue payment in the amount of one thousand eight hundred dollars and no cents ($1,800.00) to each of the eleven named plaintiffs who executes and returns to Defendants' counsel a general release and an affidavit concerning liens.

## ENFORCEMENT

7. In the event of a motion by Plaintiffs for enforcement or contempt based upon any Defendants' alleged non-compliance with this Stipulation and Order of Settlement, that Defendants shall be considered to be in compliance with the provisions of this Stipulation and Order of Settlement unless Plaintiffs establish that Defendants' failures or omissions to comply with the provisions of this Stipulation and Order of Settlement were not minimal or isolated, but were sufficiently significant and widespread or recurring as to be systemic.

8. During the twenty-four (24) months following the effective date, if Plaintiffs' counsel believes that Defendants have failed to comply with Paragraphs 5 and 6 above, including all subparts, with the provisions of this Stipulation and Order of Settlement, Plaintiffs' counsel shall timely notify Defendants' counsel in writing of the nature and specifics of the alleged failure to comply, and provide copies of all documents on which he or she is relying, at least thirty (30) days before any motion is made for enforcement of this Stipulation and Order of Settlement or for contempt. Unless otherwise resolved, the parties' counsel shall meet within the thirty (30) day period following notice to Defendants' counsel in an attempt to arrive at a resolution of the alleged failure to comply.

9. If no resolution is reached within thirty (30) days from the date of notice, and the parties agree that the alleged violation of this Stipulation and Order of Settlement is minimal or isolated, and not sufficiently significant and widespread or recurring as to be systemic, the

- 7 -

parties consent to submit the dispute to a Magistrate Judge for a ruling and determination of the proper remedies to cure the alleged violation.

      10. If no resolution is reached within thirty (30) days from the date of notice, and the parties cannot agree on the nature of the violation (*i.e.* widespread or isolated), Plaintiffs may move this Court for an order enforcing the provisions of this Stipulation and Order of Settlement and/or for contempt. Plaintiffs shall bear the burden of proving the alleged noncompliance is sufficiently significant and widespread or recurring as to be systemic. Non-systemic individual and isolated violations of this Stipulation and Order of Settlement shall not form the basis for a finding that defendants have acted in contempt of this Stipulation and Order of Settlement, or as a basis for a motion for enforcement. In the event the Court determines that there is no widespread violation of this Stipulation and Order of Settlement, the dispute is subject to the provisions set forth in paragraph 9 for resolution.

      11. No motion for contempt or enforcement shall be brought to remedy those violations that the parties agree (a) have been cured, or (b) will be cured pursuant to a plan agreed upon by the parties, provided that the plan actually cures those violations. In the event that the parties agree to a plan to cure an alleged violation and Plaintiffs believe that the violation has still not been cured, Plaintiffs must provide at least thirty (30) days notice before any motion is made for enforcement of this Stipulation and Order of Settlement or for contempt.

      12. If the Court or Magistrate determines that Defendants violated this Stipulation and Order of Settlement, Defendants are responsible for paying Plaintiffs' reasonable attorneys' fees.

## JURISDICTION

      13. The provisions of this Stipulation and Order of Settlement shall not take effect unless and until the Court "so orders" this Stipulation and Order of Settlement, at which time it

- 8 -

shall become effective. Defendants' obligations under this Stipulation and Order of Settlement shall run from the Effective Date until the jurisdiction of the Court lapses.

14. As of the effective date, all remedies sought in the Complaint are limited to the provisions of this Stipulation and Order of Settlement.

15. All claims not resolved herein are dismissed with prejudice.

16. The jurisdiction of this Court shall end at the conclusion of twenty-four (24) months following the Effective Date. At the time of termination of jurisdiction, all rights and claims arising under the provisions of this Stipulation and Order of Settlement shall terminate.

## EFFECTIVE DATE OF SETTLEMENT, WAIVER OR TERMINATION

17. The "Effective Date" of the Settlement shall be the date when all the following shall have occurred:

a. Approval by the Court of the Settlement, following notice to the Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure; and

b. Entry by the Court of the Order and Final Judgment, substantially in the form set forth in Exhibit [] annexed hereto, or, in the event that the Court enters an order and final judgment in a form other than the Order and Final Judgment ("Alternative Judgment") and none of the Parties hereto elect to terminate the Settlement, the date of entry of such Alternative Judgment.

c. 30 days after final entry of judgment by the Court or issuance of a mandate from the Court of Appeals for the Second Circuit following any appeals.

18. Defendants or Plaintiffs' Counsel shall have the right to terminate the Settlement and this Stipulation by providing written notice of their election to do so to all other Parties hereto within thirty (30) days of: (i) the Court's declining to enter the Order for Notice

- 9 -

and Hearing in any material respect; (ii) the Court's refusal to approve this Stipulation or any material part of it; or (iii) the Court's declining to enter the Order and Final Judgment in any material respect; or (iv) following modification or vacatur of the Stipulation and Order after appeal.

19. Except as otherwise provided herein, in the event the Settlement is terminated, reversed, or fails to become effective for any reason, then the Parties to this Stipulation shall be deemed to have reverted to their respective positions in the Action immediately prior to the execution of this Stipulation and, except as otherwise expressly provided, the Parties shall proceed in all respects as if this Stipulation and any related orders had not been entered.

20. Defendants shall bear the costs of mailing the settlement notice to Plaintiffs.

## ATTORNEYS' FEES AND COSTS

21. Defendants agree that Plaintiffs are entitled to reasonable counsel fees as though they are prevailing parties and agree not to contest Plaintiffs' entitlement to an award of a reasonable fee under 42 U.S.C. § 1988. Within sixty (60) days of the Court so-ordering this Stipulation and Order of Settlement, Plaintiffs' Counsel may submit an application for reasonable counsel fees to the United States District Court for the Eastern District of New York, to which Defendants shall have at least 30 days to respond consistent with this paragraph and the prevailing law regarding the award of attorneys fees. Upon approval by the Court of any attorneys' fees on Plaintiffs' behalf, Defendants shall pay said attorneys' fees within ninety (90) days of the Court's Order.

- 10 -

## MISCELLANEOUS PROVISIONS

22. Nothing in this Agreement is an admission of liability by the City of New York or the NYPD. Nor shall it have precedential value with respect to any obligation of the City of New York or the NYPD. This Agreement shall not be admissible in, nor is it related to, any other litigation or settlement negotiation, except with regard to an action to enforce the terms of the Agreement. Nothing herein shall be deemed evidence of a policy or practice of the City of New York or the NYPD. Nothing in the Agreement shall be deemed evidence of any wrongful act or omission of the City of New York or the NYPD.

This Agreement contains all the terms agreed to by the parties. It can only be changed by subsequent written agreement of the parties or by order of the Court.

Dated:      New York, New York
           June ||__, 2009


LEWIS BRISBOIS BISGAARD & SMITH,
LLP
Attorneys for Plaintiffs
199 Water Street, Suite 2500
New York, New York 10038-3516
(212) 232-1356


By: _____
    MAUREEN STAMPP
    IVAN SMITH


MICHAEL A. CARDOZO
Corporation Counsel of the
  City of New York
Attorney for Defendant
100 Church Street, Room 2-123
New York, New York 10007
(212) 788-8699


By: _____
    JOSHUA R. FAY
    Assistant Corporation Counsel


- 11 -

Case 1:13-cv-06147-PKC-JO Document 1 Filed 11/06/13 Page 162 of 172 PageID #: 162
Case 1:06-cv-03049-BMC Document 77 Filed 12/11/09 Page 1 of 2 PageID #: 2398
Case 1:06-cv-03049-BMC Document 76 Filed 12/10/09 Page 1 of 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

PAMELA RODRIGUEZ, TIFFANY BELLE,
YOLANDA CAPERS, TONI REID, KESHA SMITH,
TIFFANY MORRIS, FELICITA GOMEZ, SANDRA
SPRINGER, CYNTHIA HILL and JENNY
MARCELINO (On behalf of themselves and all
others similarly situated),

Plaintiffs,

-against-

06-CV-3049 (BMC) (RER)
ECF Case

ORDER APPROVING THE
STIPULATION OF SETTLEMENT
AND DISMISSAL WITH
PREJUDICE

THE CITY OF NEW YORK (Michael R. Bloomberg,
as Mayor) and THE NEW YORK CITY POLICE
DEPARTMENT (Raymond Kelly, as Police
Commissioner),

Defendants.

-------------------------------------------------------------X

The above-referenced matter came before the Court upon the joint request of Plaintiffs and Defendants, the Court having been advised of and considered the Stipulation of Settlement entered into by and among the Plaintiffs and Defendants that resulted from voluntary arm's length negotiations, and, upon the joint application of Plaintiffs and Defendants, by their attorneys, seeking review and approval by the Court thereof, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

(1)    The Court approves and adopts as stated the terms of the Stipulation of Settlement entered into between and among the parties to this litigation. The Stipulation of Settlement reflects a fair, reasonable, and appropriate compromise deemed in the best interest of the parties thereto, and in accordance with law with respect to the claims asserted in this class action; and

Case 1:13-cv-06147-PKC-JO   Document 1   Filed 11/06/13   Page 163 of 172 PageID #: 163
Case 1:06-cv-03049-BMC   Document 77   Filed 12/11/09   Page 2 of 2 PageID #: 2399
Case 1:06-cv-03049-BMC   Document 76   Filed 12/10/09   Page 2 of 2

(2)   Consistent with the Stipulation of Settlement, all claims asserted by Plaintiffs

in this class action are hereby dismissed, with prejudice, with respect to the Class Members

to the time period up to and through the date of this Order.   Also consistent with the

Stipulation of Settlement, the Court will retain jurisdiction over the parties for the purpose of

interpretation and compliance with the Stipulation of Settlement and this agreed Order of

Dismissal with Prejudice.

So ORDERED this ___ day of _____, 2009.

s/Hon. Brian M. Cogan

Honorable Brian M. Cogan
United States District Judge

Approved for Entry:

Attorney for Plaintiffs

Attorney for Defendants

**MADUEGBUNA COOPER LLP**
110 Wall Street, 11th Floor, New York, New York 10005
(212) 232 - 0155

# EXHIBIT C

CITY OF NEW YORK, v. LOCAL 1549., 2008 WL 6626210 (2008)

2008 WL 6626210 (N.Y.Sup.) (Arbitration Award)
Supreme Court of New York.
New York County

CITY OF NEW YORK,
v.
LOCAL 1549.

Nos. 2008-402689, 402 689-08.
August 2, 2008.

Editor's Note: This document was acquired from a Court file.

**Case Type: Labor & Employment**
**Award Amount: $0**
**Attorney for Petitioner: Michael A. Cardozo**
**Award Date: 08/02/2008**
**Arbitrator: Richard C. Gwin**

### Arbitrator's Opinion and Award

Appearances:.
For District Council 37, AFSCME, AFL-CIO, Local 1549, Steven E. Sykes, Esq., Assistant General Counsel.
For the City of New York, Office of Labor Relations, And the New York City Police Department, Michelle Camille
McCarthy Esq., Assistant General Counsel.
**Arbitrator: Richard C. Gwin**

On May 5, 2006, District Council 37, AFSCME, AFL-CIO, Local 1549 ("Union") filed a request for arbitration with the New
York City Office of Collective Bargaining alleging that the New York City Police Department ("City") violated contractual
sick leave provisions and related rules and regulations by canceling sick leave for Police Communication Technicians (PCTs)
and Supervising Police Communications

Technicians (SPCTs). [J-1]

By letter dated July 25, 2006, the Undersigned was notified of his selection to hear and decide this dispute. Hearings were
held on January 16 and March 7, 2007 and February 13 and March 6,2008. Two requests to extend the briefing period were
granted. Briefs were received and the record closed on June 2, 2008. The Parties agreed to grant the arbitrator an additional
30 days to submit this award.

### RELEVANT CITYWIDE CONTRACT LANGUAGE

Article XV: Adjustment of Disputes
*Section 1.*

The term "Grievance" shall mean a dispute concerning the application or interpretation of the terms of this Agreement.

*Section 2.*

The grievance procedure shall be as follows:
Step I The employee and/or the Union shall present the grievance in writing to the person designated by the agency head for such purpose, not later than one hundred twenty (120) days after the date on which the grievance arose.

*Section 4.*

Any grievance of a general nature affecting a large group of employees and which concerns the claimed misinterpretation, inequitable application, violation or failure to comply with the provisions of this Agreement shall be filed at the option of the Union at Step III of the grievance procedure, without resort to previous steps.

Article V: Time and Leave

*Section 3.*

b. Except as provided below, employees shall be credited with one day of sick leave per month. Approved sick leave may be used as it accrues. This section shall not alter the provisions of any existing unit agreement which contains a more beneficial procedure.

*Section 5.*

a.(i) Except as provided in Section 5(a)(ii), sick leave shall be used only for personal illness of the employee. Approval of sick leave in accordance with the Leave Regulations is discretionary with the agency and proof disability must be provided by the employee, satisfactory to the agency within five (5) working days of the employee's return to work. However, the employer may request proof of disability when an employee has been on sick leave for five or more consecutive working days. Such proof satisfactory to the agency must be submitted within five working days of such request.

(ii)(3) Approval of such leave is discretionary with the agency and proof of disability must be provided the employee satisfactory to the agency within five (5) working days of the employee's return to work.

b. The provisions of Section 5(a) above notwithstanding, the agency may waive the requirement for proof of disability *unless:*

i. An employee requests sick leave for more than three (3) consecutive work days; *or*

ii. An employee uses undocumented sick leave more than five (5) times in a "sick leave period." ...

iii. An employee uses undocumented sick leave more than four (4) times in a "sick leave period."

f. It is not the intent of Sections 5(b) and 5(e) for an agency to regularly require proof of disability under normal circumstances. [J-2]

## RELEVANT LANGUAGE FROM "LEAVE REGULATIONS FOR EMPLOYEES WHO ARE UNDER THE CAREER AND SALARY PLAN"

3.2 a. sick leave maybe granted in the discretion of the agency head and proof of disability must be provided by the employee satisfactory to the agency head.
b. The provisions of paragraph a. above notwithstanding, the agency head may waive the requirement for proof of disability unless:

(1) An employee requests sick leave for more that three (3) consecutive work days; *or*

(2) An employee uses undocumented sick leave more than five (5) times in a six (6) month "sick leave period". Employees

CITY OF NEW YORK, v. LOCAL 1549., 2008 WL 6626210 (2008)

hired during a "sick leave period" shall be subject to the terms of this subsection commencing with the next complete "sick leave period"

(3) An employee uses undocumented sick leave more than four

(4) times in a "sick leave period" on a day immediately preceding or following a holiday or a scheduled day off. Employees hired during a "sick leave period" shall be subject to

the terms of this subsection commencing with the next complete "sick leave period".

[J-3]

## RELEVANT LANGUAGE FROM "POLICE ADMINISTRATIVE GUIDE 319-14CIVILIAN MEMBERS REPORTING SICK"

PROCEDURE When personal illness or injury prevents the proper performance of duty:
1. Notify commanding officer/supervisory head. two (2) hours prior to scheduled tour, if possible....

5. Request attending practitioner to complete section B of CIVILAIN SICK LEAVE REPORT when:

a. On sick leave more than three (3) consecutive work days.

b. On undocumented sick leave more than five (5) times in any sick leave period.

c. On undocumented sick leave more than four (4) times in any sick leave period.

d. All accrued leave has been used and leave without pay is now requested due to illness/injury.... [J-4, pi]

A. Civilian members covered by the citywide contract may elect to take sick leave without pay after all accrued sick leave is exhausted, while retaining their accrued annual leave balance.[Id.]

Note: Approval of sick leave is discretionary. If abuse of sick leave provisions are indicated, the commanding officer concerned may request the sick/injured member, to submit proof of such illness/injury. The commanding officer may then approve/disapprove the leave based on the documentation provided....

B. Civilian members are granted one (1)day sick leave for each month of service. Sick leave may be used as it accrues. [J-4]

## RELEVANT LANGUAGE IN DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES PUBLIC SERVICES BULLETIN 410-2 – Use of Sick Leave During Emergency Situations.

*DCAS PSB 410-2 Sick Leave During Emergency Situations (Joint Exhibit 5)*
Policy

In the case of an emergency, such as a major transportation disruption, snow emergency, or some other similar event, all employees who are assigned to activities related to the emergency, who are absent due to illness, should be required to provide satisfactory medical documentation prior to being granted sick leave. Lack of medical documentation will result in a loss of pay.

The "Leave Regulations for Employees Who are Under the Career and Salary Plan" allow agency heads to waive medical

CITY OF NEW YORK, v. LOCAL 1549., 2008 WL 6626210 (2008)

documentation relating to an employee's absence in some instances. This does not apply in emergency situations.

Procedure

As standard operating procedure, it is suggested that agencies notify all employees in writing that in emergency situations (e.g., major cleanups, snow emergencies, etc.), all employees assigned to activities relating to the emergency are required to provide medical documentation for approval of any sick leave taken. [-5]

## ISSUE PRESENTED

Whether the New York City Police Department violated the collective bargaining agreement and its rules and regulations by canceling the use of sick leave, and, if so, what shall the remedy be?

## THE FACTS

There are few disputed facts. On a handful of occasions, including but not limited to the transit strike in December 2005, the first week of January 2006, February 11 and 12, 2006, and New Years 2007, Duty Captains facing dangerously low staffing levels suspended sick leave for PCTs working in the Communications Center. (U-1 through U-5, U-7)

Deputy Inspector Vincent Guerriera, Commanding Officer of the Communications Department, explained that the Communications Center is a 24/7 operation and receives an average of 30,000 (thirty thousand ) 911 calls daily. In addition to other public safety duties, PCTs are responsible for answering and directing the 911 calls so that the appropriate police, fire or emergency resources can be dispatched. SPCTs supervise the PCTs.

Absenteeism is a serious and chronic problem at the Communication Center. PCTs accrue 12 sick days and use an average of 30 sick days annually. In 2007 approximately 30,600 tours were lost to sick leave used by the 1,018 PCTs assigned to the Command. Absenteeism due to sick leave rises on the weekends, around holidays, and during snow storms and transit interruptions. Absenteeism due to sick leave often reaches 25% on a tour.

PCTs and SPCTs cover three tours: 11:00 p.m. to 7:00 a.m., 7:00 a.m. to 3:00 p.m., and 3:00 p.m. to 11:00 p.m. The volume of 911 calls varies by time of day, day of week, and season. For example, the midnight tour (11:00 p.m. to 7:00 a.m.) is usually slowest, averaging about 5,000 calls. A winter Wednesday midnight tour, however, may receive only 3,500 calls, while a summer weekend midnight tour may receive as many as 10,000 or 11,000 calls.

There are 90 fixed PCT positions in each of three Platoons. Fixed positions are the critical positions on each tour that must be staffed. PCTs are assigned to Squads, five of which report for each tour. When a Platoon Commander observes that the next shift may not have an adequate number of PCTs to answer phones due to sick leave call-ins, the Commander first looks for volunteers to cover the shift on overtime. If this does not result in adequate coverage, an Emergency Overtime Contingency Plan identifies which squads from the previous shift would be held over. This plan (U-6) represents an agreement reached by the Union and the City to allocate overtime by rotating Squads. It applies to all tours and nearly always provides adequate coverage for staffing deficiencies. The rare occasions when it did not gave rise to this grievance.

On the occasions when application of the contingency plan did not alleviate staffing concerns, tour commanders so advised Duty Captains, who then decided to suspend sick leave. PCTs or SPCTs calling in sick were informed that sick leave had been cancelled or "delayed" and that failure to report would result in the employee being listed as AWOL. The Union has documented several instances of PCTs being marked AWOL after calling in sick (U-7), receiving Reports of Violation (U-1, U-2, U-3a-3e) and being docked a day's pay. The Reports of Violation all indicate that a PCT attempted to call in sick and that the Duty Captain had cancelled the use of sick leave. (Id.) The disciplinary action was taken without regard to whether the PCT had an accumulated sick leave balance or a record of abusing sick leave privileges. SPCTs assigned to the sick desk

were not_ instructed to advise employees calling in sick to obtain a doctor's note to verify their illnesses. SPCT Tammy_Dixon, however, routinely advised callers to do so. Dixon is also a Union Shop Steward.

Some PCTs who verified their illnesses were reimbursed for wages docked while AWOL due to sick leave suspension. Since the transit strike in December 2005, however several hundred Reports of Violation have gone unadjudicated, each potentially representing the loss of one day's pay.

Prior to December 2005, the use of sick leave had never been suspended for PCTs or SPCTs working in the Communications Center. Nor is there any record of sick leave being cancelled for any other civilian or uniformed services unit of employees. Consistent with sick leave regulations covering Police Department civilian employees, PCTs would call the sick desk to report a sickness two hours before the start of their shifts, if possible, but no later than the start of tour. (J-4) PCTs calling in would report to the SPCT at the sick desk their name, tour and social security number and would be told if a doctor's note was needed to verify the illness. A form was completed upon the employee's return to work. If the leave was approved and the employee had an accrued sick leave balance, it would be adjusted accordingly. If leave was approved but the employee had an exhausted sick leave balance, the employee would not be paid for the day.

Dennis Sullivan has worked in the Union's Research and Negotiations Department since 1977 and has been its Director since 1989. He has been involved in negotiations for the citywide contract since 1977 and has been the Union's chief spokesperson since 1989. He is familiar with the Time and Leave provisions in Article V of the citywide agreement and related NYPD rules and regulations. His testimony on the intent and application of Section 5 of Article V, was thoroughly cross-examined, and remained entirely credible and without contradiction. Sullivan testified that each agency has its own sick leave Regulations, which must be consistent with the citywide agreement. Sullivan also testified that Section 5 of Article V gives the City discretion, on a case-by-case basis, to require and review medical documentation in approving sick leave requests. It does not, however, permit a blanket cancellation of the use of sick leave. Sullivan also confirmed that, prior to the events giving rise to this grievance, the City had never suspended the use of sick leave.

## THE CITY'S POSITION

The City insists that the arbitrator should look no further than the clear and unambiguous language of Article V Section 5 of the citywide agreement, which provides: "[a]pproval of [sick] leave is discretionary with the Agency." (City's brief, p.7) The City argues that, "[i]t is a well-settled maxim of contract interpretation that if the language is clear and unambiguous, then any inquiry as to the meaning of the language is unnecessary and improper." (Id., cites omitted). The City concludes that, "any determination that redefines 'discretionary' to take away an Agency's authority to determine its staffing could superimpose an interpretation of the word that is inconsistent with the parties' intention and contrary to the accepted definition of 'discretionary'." (Id., p.10)

## THE UNION'S POSITION

The Union argues that the City violated the collective bargaining agreement and related work rules on those occasions when it cancelled or suspended the use of sick leave. By canceling sick leave, the City denied employees the right to use accrued sick leave or to elect to take sick leave without pay if their sick leave was exhausted.

The Union contends that the City's reliance on language granting discretion to approve sick leave is misplaced. That language merely conveys the discretion to require documentation of an illness under certain circumstances and the discretion to approve or disapprove the sick leave based on the medical documentation.

## DECISION

The City violated the collective bargaining agreement and related rules and regulations on those occasions when it cancelled the use of sick leave. The citywide agreement and relevant rules and regulations allow civilian police department employees

CITY OF NEW YORK, v. LOCAL 1549., 2008 WL 6626210 (2008)

to accrue sick days and to use approved sick leave against an accrued balance or, when that is exhausted, by taking the leave without pay.

Article V Section 5 (a)(i) states that "[E]xcept as provided in Section 5 (a)(ii), [concerning care of ill family members] sick leave shall be used only for personal illness of the employee. Approval of sick leave in accordance with the Leave Regulations is discretionary with the agency and proof of disability must be provided by the employee, satisfactory to the agency, within five (5) working days of the employees return to work." [J-2, p.12] Thus the agency, in this case the Police Department, has the discretion to approve a leave request based on satisfactory proof of disability.

Article V also describes circumstances under which the agency may or may not waive the requirement for proof of disability. Article V Section 5(b), for example, provides that an agency may not waive proof of disability if an employee requests more than 3 consecutive days off, has used more than 5 undocumented sick days during a six-month sick leave period, or has used more than 4 undocumented days adjacent to holidays or scheduled days off. ArticleV Section 5(e) gives the Agency discretion to waive medical documentation for employees who have worked longer than 3 years and have sufficient sick leave balances. Article V Section 5(f) provides that it is not the intent of 5(b) or 5(e), "for an agency to regularly require proof of disability under normal circumstances." [J-2, p.14]

The meaning of Article V Section 5 as it relates to an agency's exercise of discretion in approving sick leave requests is clear. The Agency retains the discretion to satisfy itself that the illness is genuine by requiring and evaluating proof of the disability. This interpretation is supported by Sullivan's testimony about the parties' many years of experience at applying the sick leave provisions in the citywide agreement.

The City argues that the plain meaning Article V Section 5 authorized the NYPD to disapprove sick leave to satisfy staffing needs: "the language ... leaves nothing open to interpretation ... [a]pproval of [sick] leave is discretionary with the agency.' Consequently, it would be improper to look any further than the plain language of the contract..." [City's brief, p.17]

The language cited by the City above is found in Section 5(a)(iiX3) and actually reads, "Approval of such leave is discretionary with the agency and proof of disability must be provided by the employee satisfactory to the agency ... " [J-2, p.12] This subsection refers to requests for using sick leave to care for ill family members. The first reference to "discretion" in Section 5 is found at 5(a)(i): "Approval of sick leave in accordance with the leave Regulations is discretionary with the agency and proof of disability must be provided by the employee, satisfactory to the agency ... [Id.] The City's argument removes the phrase, 'approval of sick leave is discretionary', from the context of both the sentence and contractual provision in which it occurs. In both Section 5(a)(i) and 5(a)(ii)(3) the "discretion to approve" appears in the same sentence with "proof of disability," which in my view contextualizes the City's use of discretion. To accept the City's argument would transform the meaning of Article V Section 5 from permitting an agency the discretion to satisfy itself that an employee's sick leave request is supported by adequate proof of disability, to forbidding an employee from making any sick leave request at all. I find no support in the citywide agreement or related rules and regulations for such an interpretation.

Relevant Leave Regulations essentially recite the language of the citywide agreement. Section 3.2(a) provides that, "sick leave may be granted in the discretion of the agency head and proof of disability must be provided by the employee satisfactory to the agency head." [J-3, p.15] Once again, the discretion to approve sick leave appears in the context of providing satisfactory proof of disability. Section 3.2(b) of the regulations reiterates the same circumstances under which proof of disability may not be waived that appear in Article V, Section 5(b).

Work rules governing the use of sick leave are found in the Administrative Guide, Procedure 319-14, which includes the following note:

> Approval of sick leave is discretionary. If abuse of sick leave provisions are indicated, the commanding officer concerned may request the sick/injured member to submit proof of such illness/injury. The commanding officer may then approve/disapprove the leave based on the documentation provided.... [J-4, p.3]

The citywide agreement and related regulations and rules all grant the NYPD the discretion to approve sick leave requests based on its satisfaction with the proof of disability submitted by its employees. There is no provision in the contract, rule or

CITY OF NEW YORK, v. LOCAL 1549., 2008 WL 6626210 (2008)

regulation, however, that authorizes an agency to deny sick or injured employees the right to request sick leave the occasions that the City suspended sick leave, it was not exercising discretion to approve or disapprove the leave. It was instead denying its employees the contractual right to request it. I conclude that the Union has met its burden of demonstrating that the City has violated the sick leave provisions of the citywide agreement and related rules and regulations and make the following award.

## AWARD

The City violated the sick leave provisions of Article V Section 5. The Grievance is sustained, with the following remedy. The New York City Police Department shall;
(1) Cease and desist from canceling sick leave;

(2) Rescind disciplinary action, including Reports of Violation, taken against bargaining unit members marked AWOL for attempting to use sick leave while it was cancelled; and

(3) Reimburse the bargaining unit members who had accrued sick leave balances and were docked pay for being AWOL on days sick leave was cancelled. Sick leave balances should be adjusted accordingly.

August 2, 2008

<<Signature>>

Richard C. Gwin

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                    Docket No.:

---------------------------------------------------------------------------

CYNTHIA HILL, GAIL WILLIAMS, DENISE INMAN, VICKIE GORDON, ROLANDO
LOPEZ, TAURA PATE, ELLEN ENNIS, and ANDREA HOLLY individually and on behalf of
a class of all others similarly situated,

                                      Plaintiff,

                      -against-


THE CITY OF NEW YORK, MICHAEL R. BLOOMBERG, as Mayor of the City of New York,
RAYMOND KELLY, as Police Commissioner, RICHARD F. NAPOLITANO, CHARLES P.
DOWD, MICHAEL V. POLITO, LJUBOMIR BELUSIC, FRANCIS KELLY, DONALD
CHURCH, DAVID LICHTENSTEIN,  LOCAL 1549, DISTRICT COUNCIL 37, AFSCME,
AFL-CIO; and JOHN and JANE DOES 1-20 (said names being fictitious, the persons intended
being those who aided and abetted the unlawful conduct of the named Defendants),

                                      Defendants.

---------------------------------------------------------------------------

                      COMPLAINT AND JURY DEMAND

---------------------------------------------------------------------------

Signature (Rule 130-1.1-a)

_____
Print name beneath   SAMUEL O. MADUEGBUNA, ESQ.


_____

                      Yours, etc.

                MADUEGBUNA COOPER LLP
                  Attorneys for Plaintiff
                 110 Wall Street, 11th Floor
                  New York, New York 10005
                    (212) 232- 0155

To: All Counsel of Record
Service of the within is hereby admitted on

_____
Attorneys for