UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

| | |
|---|---|
| CYNTHIA HILL, GAIL WILLIAMS, DENISE INMAN, VICKIE GORDON, ROLANDO LOPEZ, TAURA PATE, ELLEN ENNIS, and ANDREA HOLLY individually and on behalf of a class of all others similarly situated; | No.: 13-cv-6147(PKC)(JO) |

Plaintiffs,

-against-

**AMENDED
CLASS ACTION COMPLAINT**

THE CITY OF NEW YORK, MICHAEL R. BLOOMBERG, as Mayor of the City of New York, RAYMOND KELLY, as Police Commissioner, RICHARD F. NAPOLITANO, CHARLES P. DOWD, MICHAEL V. POLITO, LJUBOMIR BELUSIC, FRANCIS KELLY, DONALD CHURCH, DAVID LICHTENSTEIN, LOCAL 1549, DISTRICT COUNCIL 37, AFSCME, AFL-CIO; and JOHN and JANE DOES 1-20 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

**JURY TRIAL REQUESTED**

Defendants.

------------------------------------------------------X

Plaintiffs, by their attorneys, **MADUEGBUNA COOPER LLP**, complaining

of the defendants, alleges, upon information and belief, as follows:

## NATURE OF THIS ACTION

1.      Plaintiffs bring this action on behalf of themselves and those similarly

situated to secure protection of and to redress deprivation of rights, privileges and

immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981"), the New York Human Rights Law as contained in New York State Executive Law, § 296 *et seq.* ("NYHRL"), New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107 *et seq.* ("NYCHRL"), providing for injunctive relief and other relief against discrimination on the basis of race, gender, creed, national origin, and disability; the First Amendment to the United States Constitution and 42 U.S.C. § 1983, providing for redress of deprivation of rights under color of law; and 42 U.S.C. § 1988, providing for the protection of all persons in their civil rights.

2.      This is also a class action brought pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* (the "FMLA") to correct and enjoin willful employment practices, policies and procedures that have denied benefits guaranteed by the FMLA, and/or discriminated against eligible employees who sought to exercise their FMLA rights.

3.      Relief is also sought pursuant to the New York State Public Employees' Fair Employment Act of 1967, New York Civil Service Law ¶ 200 *et seq.* (the "Taylor Law") and the New York City Collective Bargaining Law ("NYCCBL"), New York City Administrative Code § 12-306(b)(1) and (3), based on violations of the duty of fair representation owed to Plaintiffs and the class they

represent.

4.     This action also seeks remedy, pursuant to the New York State Taylor Law, for breach of contract for violations of the Collective Bargaining Agreement ("CBA") (**Exhibit A** hereto) between Plaintiffs' union, Defendant LOCAL 1549, DISTRICT COUNCIL 37, AFSCME, AFL-CIO ("DC 37") and Defendant CITY OF NEW YORK ("City"), the terms of the so-ordered Settlement Agreement between Operator Plaintiffs and the City in the matter entitled Rodriguez et al. v. The City of New York, No. 1:06-cv-3049 (BMC), 2006 WL 2023949 (E.D.N.Y. June 20, 2006) (the "FMLA Class Action") (**Exhibit B** hereto – Stipulation of Settlement, and Order Approving Stipulation of Settlement, No. 06-cv-3049, Dockets # 55 and 77), and to enforce the terms of the arbitration decision dated August 2, 2008, City of New York v. Local 1549, Nos. 2008-402689, 402 689-08, 2008 WL 6626210 (N.Y. Sup. Aug. 2, 2008), rendered in favor of defendant DC 37 against the City (the "August 2008 Arbitration Decision") (**Exhibit C** hereto).

5.     This action is also brought pursuant to New York State Labor Law, § 162 *et seq.*, and other pertinent sections and provisions of New York State and New York City Law entitling employees to required meal breaks and entitling Plaintiffs to earned sick time.

6.     Plaintiffs seek appropriate class-wide injunctive and declaratory relief, monetary damages for the harm caused by the willful and discriminatory conduct of

defendants, and other appropriate legal and equitable relief as may be necessary.

## PROCEDURAL REQUIREMENTS

7.     Prior to commencement of this action, Plaintiff served a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502 (c).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 2617(a)(2).

9.     Plaintiffs' requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.    Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all State and City law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

11.    Venue is proper in the United States District Court for the Eastern District of New York because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

### Plaintiffs

12.    Plaintiffs are a class of predominantly female African-American and Hispanic individuals currently or previously employed by the City as civilians placed in the Communications Section of the Police Department of the City of New York ("NYPD" or "Police Department").

13.    Plaintiffs work in Civil Service titles of Police Communications Technician ("PCT") and Supervisor Police Communication Technician ("SPCT") (collectively "Plaintiffs or "Operators"), answering the public's emergency calls received through the City's 911 response system and dispatching police radio calls as well as handling and sharing emergency calls coming into the City's emergency response system and directing calls to other call takers within the system.

14.    While the 911 Operators are stationed within the NYPD, they are an integral part of the City's emergency call and response system, which is a cohesive group overseen and maintained as a singular unit of approximately 1,800 dispatchers and call takers by the City's Executive branch and Deputy Mayors, the Mayor's Office of Operations, the Office of Citywide Emergency Communications ("OCEC") and others, who centrally determine and oversee all major and strategic emergency communications policy and implementation for the City of New York.

15.    Plaintiffs and members of the proposed class primarily work in the City's

- 5 -

Public Safety Answering Center ("PSAC") located at 11 MetroTech in Brooklyn, which houses most of the City's 1,800 call takers and dispatchers.

16.     Of the City's approximately 1,800 emergency call takers in PSAC, nearly 1,300 are allocated by the City to the NYPD's Communication Section.

17.     1,200 PCTs and 91 SPCTs are currently employed by the City's Police Department at PSAC and also at One Police Plaza.

18.     The SPCTs, under general supervision, supervise and direct the activities of the PCTs.

19.     SPCTs do not have any role in promulgating the policies and procedures of the City's Police Department. However, SPCTs have the responsibility of enforcing these policies against PCTs and face disciplinary action if they do not. Nonetheless, SPCTs do not have the authority to cancel FMLA leave, sick time, meal breaks, or impose mandatory overtime upon PCTs.

20.     The duties and responsibilities of the PCTs and SPCTs are overseen and managed by civilian Principal Police Communication Technicians ("PPCT"), who except for defendant Francis Kelly, are mostly female and minorities.

21.     All PPCTs 1 and PPCTs 2 are under the immediate supervision and control of Defendant Francis Kelly, as well as under the general supervision of Police Department Captains, who are mostly white Caucasians, and uniformed and armed members of the City's Police Department.

## **Named Plaintiffs**

22.     Plaintiff Cynthia Hill ("Hill") is an African-American woman who lives in the City of New York, Borough of Queens.

23.     Since December 17, 1984 Hill has been employed by the City, first as a PCT and now as an SPCT.

24.     Hill currently holds the civil service title of SPCT at 11 MetroTech Center in Brooklyn, New York.

25.     At all times relevant to this lawsuit, Hill has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

26.     Plaintiff Gail Williams ("Williams") is an African-American woman who lives in the City of New York, Borough of the Bronx.

27.     Williams has been employed by the City since 1980 and with the City's Police Department since 1992.

28.     Williams currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York, having assumed that title since 1992.

29.     At all times relevant to this lawsuit, Williams has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

30.     Plaintiff Denise Inman ("Inman") is an African-American woman

who lives in the City of New York, Borough of Brooklyn.

31.    Since February 23, 2001, Inman has been employed by the City.

32.    Inman currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

33.    At all times relevant to this lawsuit, Inman has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

34.    Plaintiff Vickie Gordon ("Gordon") is an African-American woman who lives in the City of New York, Borough of Brooklyn.

35.    Since March 2000, Gordon has been employed by the City.

36.    Gordon currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

37.    At all times relevant to this lawsuit, Gordon has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

38.    Plaintiff Rolando Lopez ("Lopez") is a Hispanic male, of Puerto Rican ancestry, who lives in the City of New York, Borough of Bronx.

39.    Since September 1992, Lopez has been employed by the City.

40.    Lopez currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York, and has worked as a PCT for more than 20 years.

41.     At all times relevant to this lawsuit, Lopez has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

42.     Plaintiff Taura Pate ("Pate") is an African-American woman who lives in the City of New York, Borough of Queens.

43.     Since July 2000, Pate has been employed by the City.

44.      Pate currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

45.     At all times relevant to this lawsuit, Pate has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

46.     Plaintiff Ellen Ennis ("Ennis") is an African-American woman who lives in the City of New York, Borough of the Bronx.

47.     Since March 1984, Ennis has been employed by the City.

48.     Ennis currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

49.     At all times relevant to this lawsuit, Ennis has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

50.     Plaintiff Andrea Holly ("Holly") is an African-American woman who

lives in the City of New York, Borough of Brooklyn.

51.    Since April 1989, Holly has been employed by the City.

52.    Holly currently holds the Civil Service title of PCT at 11 MetroTech Center in Brooklyn, New York.

53.    At all times relevant to this lawsuit, Ennis has worked over 1250 hours every 12 month rolling period and is an employee under the FMLA, 29 U.S.C. § 2611(2).

## Defendants

54.    Defendant City is a municipal agency existing by virtue of the laws of the State of New York.

55.    Defendant City is an employer covered by the FMLA, 29 U.S.C. § 2611(4)(iii).

56.    Defendant Michael R. Bloomberg ("Bloomberg"), a white male, is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the City's Police Department known as the New York City Police Department ("NYPD").

57.    Defendant Bloomberg is sued in his official capacity.

58.    NYPD is an agency of the City and is therefore a public agency and a municipal employer covered by the Taylor Law.

59.    Defendant Raymond Kelly ("Commissioner Kelly"), a white male, is

- 10 -

and was, at all times relevant herein, the Commissioner of the NYPD.

60.    Commissioner Kelly is and was responsible for developing and implementing the policies, practice and/or customs of the NYPD.

61.    Commissioner Kelly is also responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the individual defendants named herein.

62.    Commissioner Kelly is sued in his official capacity.

63.    Defendant Richard F. Napolitano ("Napolitano"), a white male, is and was, at all times relevant, Inspector and Deputy Inspector in charge of the Communications Section of the NYPD.

64.    Upon information and belief, Napolitano is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within the Communication Section, including the Plaintiffs.

65.    Defendant Napolitano is sued in his official and individual capacity.

66.    Defendant Charles P. Dowd ("Dowd"), a white male, is and was, at all times relevant, a Chief in the Communications Section of the NYPD.

67.    Upon information and belief, defendant Dowd is responsible for developing and implementing personnel policies and procedures affecting the

terms and conditions of employment of employees within the Communication Section, including the Plaintiffs.

68.    Defendant Dowd is also responsible for imposing and enforcing disciplinary measures against Plaintiffs.

69.    Defendant Dowd is sued in his official and individual capacity.

70.    Defendant Michael V. Polito ("Polito"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

71.    Upon information and belief, Defendant Polito is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators.

72.    Defendant Polito is sued in his official and individual capacity.

73.    Defendant Ljubomir Belusic ("Belusic"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

74.    Upon information and belief, Defendant Belusic is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators.

75.    Defendant Belusic is sued in his official and individual capacity.

76.    Defendant Francis Kelly, a white male, is and was, at all times relevant, a PPCT and Platoon Commander in the Communications Section of the NYPD.

77.    Upon information and belief, Defendant Francis Kelly is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated operators, and fellow PPCT 1 and PPCT 2s who are mostly female and minorities.

78.    Defendant Francis Kelly is sued in his official and individual capacity.

79.    Defendant Donald Church ("Church"), a white male, is and was, at all times relevant, a Captain in the Communications Section of the NYPD.

80.    Upon information and belief, Defendant Church is responsible for developing and implementing personnel policies and imposing disciplinary measures against Plaintiffs and similarly situated Operators.

81.    Defendant Church is sued in his official and individual capacity.

82.    Defendant David Lichtenstein ("Lichtenstein"), a white male, is and was, at all times relevant, the Deputy Chief Surgeon in the Medical Division of the Police Department.

83.    Upon information and belief, Defendant Lichtenstein was responsible for conducting examinations to determine if Plaintiffs and similarly situated operators were medically fit for duty under Section 72 of the New York Civil Service Law.

84.    Defendant Lichtenstein is sued in his official and individual capacity.

85.    Defendants City, Bloomberg, Commissioner Kelly, Napolitano,

Dowd, Polito, Belusic, Francis Kelly, Church, and Lichtenstein, are collectively referred to as the municipal defendants.

86.   Defendant DC 37 is a recognized representative under the Taylor Law, has continuously been and is now an unincorporated association of employees in which they participate and which deals with employers concerning terms and conditions of employment, including, but not limited to, grievances, labor disputes, wages, rates of pay, hours and seniority.

87.   DC 37 now is, and at all times mentioned was, a labor organization representing municipal employees as recognized under the Taylor Law.

88.   DC 37 is the bargaining representative for, and has entered into a collective bargaining agreement ("CBA") with the City (**Exhibit A**) concerning the terms and conditions of employment of Plaintiffs and other employees of the Police Department of the City, which agreement was in force during the relevant period alleged herein.

89.   The CBA was entered into by defendants for the benefit of the employees of the Communications Section of the NYPD, and plaintiffs, as members of the Communications Section, are accordingly entitled to the benefit of the agreement and to enforce the provisions thereof.

## CLASS ACTION ALLEGATIONS

90.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons consisting of all minority persons working under the Civil Service titles of PCT and SPCT who currently work or have worked for the NYPD Communications Section, within three years preceding the filing of this complaint.

91.    All said persons, including named Plaintiffs, are referred to herein as the "Class." The Class members are readily ascertainable. The number and identity of the Class members are determinable from the records of Defendant City and the EEO Office of the City's Police Department. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

92.    The proposed Class is so numerous that joinder of all members is impracticable and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of the Class is unknown, upon information and belief, at least one thousand (1,000) persons would belong to the Class.

93.    Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each Class member in separate actions. All the Class members

were subjected to the municipal defendants' discriminatory conduct, employment practices and policies, breach of contract and interference with their FMLA and sick leave rights. Additionally, since the Class members are all union members, like Plaintiffs, each suffered from DC 37's breach of the duty of fair representation towards them.

94.  Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the class.

95.  Plaintiffs are represented by attorneys who are experienced and competent in civil rights and employment litigation. Plaintiffs' Counsel has the resources, expertise and experience to prosecute this action. Plaintiffs' Counsel knows of no conflicts among members of the class or between the attorneys and members of the class.

96.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. This is particularly true in a pattern or practice discrimination claim where individual class members lack the financial resources to vigorously prosecute a lawsuit against the municipal Defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions entail. Moreover, due to the invidious nature of discriminatory

employment practices, the ability to properly demonstrate a pattern or practice of disparate treatment requires a class action when brought as a private suit.

97.     Due to the nature of civil rights claims against high-ranking police officials and municipal employers, current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Class action provide class members who are not named in the complaint a degree of anonymity which allows for the vindication of their rights while eliminating or reducing these risks.

98.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

> a.     whether Defendants subjected Plaintiffs and the Rule 23 Class to a pattern or practice of disparate treatment as their employer due to their race in altering the terms and conditions of their employment;
>
> b.     whether Defendants interfered with the FMLA rights of the Plaintiffs and the Rule 23 Class in frustrating the ability to request FMLA and retaliating against those who took FMLA leave;
>
> c.     whether Defendants breached the CBA by canceling all sick leave and subjected those who attempted to use sick

- 17 -

leave to intimidation, threat of imminent harm and harassment;

d.      whether Defendants breached the CBA by declaring an on-going emergency and requiring excessive double-shifts back-to-back;

e.      whether Defendants breached the CBA by not giving mandatory overtime and double-shift orders in advance and in writing;

f.      whether Defendant DC 37 breached its duty of fair representation by not enforcing terms of the CBA, past Arbitration decisions, such as the August 2008 Arbitration Decision or the prior settlement agreement with respect to the FMLA Class Action; and,

g.      whether Defendants violated federal and state labor laws by denying Plaintiffs and the Rule 23 Class meal breaks and/or accurate compensation for mandatory work imposed during said meal breaks.

99.      This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) as well as 23(b)(1) and 23(b)(2).

## FACTS COMMON TO ALL INDIVIDUAL AND CLASS CLAIMS

100.   Plaintiffs work in a demanding high-stress environment where every call counts, and can be the difference, literally, between life and death. Plaintiffs are responsible not only to ensure that 911 emergency calls are expeditiously and appropriately dispatched to the correct source but also to dispatch all NYPD police radio calls for back-up, shots fired and other distress calls. In particular, PCTs are responsible for answering and directing the 911 calls so that the appropriate Police, Fire or emergency resources can be dispatched. As a result, both the safety of the public and the immediate safety of NYPD officers in the field rely on the Operators' skill and precision in taking and directing calls.

101.   Plaintiffs are dedicated and professional civilian employees of the Police Department who, day in and day out, serve the City of New York and its citizens in times of danger and tragedy, including during the terror attacks of September 11 and the recent Super Storm Sandy that caused widespread damage and fatalities within the City. Plaintiffs therefore sit at the crossroad of all emergency relief in the City.

102.   PCTs and SPCTs cover three (3) primary tours: 11:00 P.M. to 7:00 A.M., 7:00 A.M. to 3:00 P.M., and 3:00 P.M. to 11:00 P.M. PCTs are assigned to squads, five (5) of which report for each tour. The squads work in platoons supervised by a uniformed armed NYPD Platoon Commander, who is typically a

non-minority.

103.   A typical Operator works a 35-hour work week. Between in or about May 2013 and July 2013, the NYPD started requiring Operators to work mandatory double shifts of eight (8) hours each, three times per week. Since July 2013, the NYPD has required Operators to work two twelve (12) hour tours per week as a minimum amount of overtime with continued uncertainty as to the required length of each tour.

104.   Frequently, since May 29, 2013, and pursuant to policies instituted by the Police Department and practices instituted and enforced by Plaintiffs' non-minority supervisors, including the individual municipal defendants, Operators are relieved from duty at 2:00 A.M. after working a mandatory double-shift and expected to return for their next shift the same day at 8:00 A.M. with an average of two-hours commuting. This schedule threatens not only the health of individual Operators but all those who depend on the City's 911 emergency response system.

105.   Since May 2013, Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez, were relieved from duty at 3:00 P.M. after working a mandatory double-shift and are expected to return for their next shift the same day at 11:00 P.M with an average of two-hours commuting, or worked a similar or equivalent tour with varying start times.

106.   Since May 2013, Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez, have been required by the City and the Police Department to work

mandatory double shifts of 8 hours each three times per week. Currently these plaintiffs are required to work, at a minimum, two twelve-hour shifts each week with additional overtime and additional tours as required. On occasion, the midnight squad will work until 11:00 A.M., and be required to return to work at 7:00 P.M. the same day.

107.   Beginning in 2012, the City and NYPD, through the individual municipal defendants, have frequently and arbitrarily cancelled the use of sick leave accrued by Plaintiffs under the CBA, intimidated those Plaintiffs attempting to use sick leave, and retaliated against those of them who use or attempt to use their contractually and legally entitled FMLA or sick leave.

108.   Since May 2013, the City and NYPD, through the individual municipal defendants, have retaliated against, or threatened future retaliation against, Plaintiffs Gordon, Inman, Holly, Lopez, Hill, Pate and Ennis for using or attempting to use their contractually and legally entitled FMLA or sick leave.

109.   Since May 2013, the City and NYPD, through the individual municipal defendants, have arbitrarily cancelled the use of sick leave accrued by Plaintiffs Williams, Gordon, Inman, Hill, Pate, Ennis, Holly and Lopez.

110.   From May 2013 and continuing, the City and its Police Department has implemented formal and informal policies that interfere with Plaintiff's rights to FMLA leave, and municipal defendants by their conduct, practices and policies have

retaliated against those Operators who use FMLA leave.

111.   Since May 2013, the City and NYPD, through the individual municipal defendants, have arbitrarily imposed additional mandatory overtime on all Operators including Plaintiffs Williams, Gordon, Inman, Pate, Holly, Ennis, and Lopez.

112.   The City and its Police Department, acting through the individual municipal defendants currently maintains a policy that discourages, intimidates and retaliates against those Operators who seek reasonable accommodations under the State and Federal law, including the NYHRL, NYCHRL and the Americans with Disabilities Act ("ADA").

113.   Since May 2013, Plaintiffs who report sick or seek to exercise their FMLA rights are subjected to immediate reprisals, cancellation of sick calls, delay or denial of FMLA applications, and imposition of additional mandatory overtime on all Operators.

114.   Presently, the City and its Police Department require the Operators to clock out from their shifts and then wait to sign out before leaving. At times, the sign-out sheets are willfully held and hidden from the Operators by their supervisors who have been instructed to take the sheets to different rooms to impede Plaintiffs' and Operators' ability to sign out. This practice by Defendants and others acting in concert with them violates the rights of Plaintiffs and the Operators, and compels them to continue working without pay.

- 22 -

115.   Presently, the City and the Police Department require Operators to answer and dispatch calls during their meal breaks when call volumes spike in violation of rights under the CBA and New York State Law in that defendants and those acting in concert with them have forced and continues to force Plaintiffs and Operators to sit and work for up to 3 hours in violation of video display terminal ("VDT") health protection rights under the CBA (see **Exhibit A** at 50), citywide rules as well as state and local laws.

116.   Since May 2013, the City and its Police Department, through the individual municipal defendants, have required Plaintiffs, Williams, Gordon, Inman, Pate, Ennis, Holly and Lopez, to answer and dispatch calls during their meal breaks in violation of law.

117.   Since May 2013, the municipal defendants have therefore been willfully violating the civil rights of the Plaintiff as well as several provisions of the CBA between the City and DC 37 together with August 2008 Arbitration Decision and the settlement agreement regarding the FMLA rights of Plaintiffs approved by this Court (Hon. Brian Cogan, U.S.D.J.), on December 19, 2009 (the "December 2009 Settlement Agreement").

118.   Since July 8, 2013, Defendant DC 37 has irrationally and discriminatorily ignored the appalling working conditions of the Operators and has failed and refused to enforce the provisions of the CBA, the terms of past Arbitration decisions, and the

December 2009 Settlement Agreement while continuously promising and affirming to the Operators that they were addressing the issue with the City and NYPD.

119.    All of the above employment policies, practices and conduct of the municipal defendants, and the inaction and perfunctory efforts of DC 37 are evidence of the intentional discrimination against the predominantly minority and female Plaintiffs, for which monetary compensation and injunctive relief is sought.

**Defendants' Violation of Sick Leave Policy and CBA**

120.    The CBA between the City and DC 37 provides the Operators with an allotment of 12 paid sick leave days and 3 family sick days that they may use when they or a family member are ill.

121.    Upon information and belief, since on or around 1999, the NYPD has been arbitrarily restricting Operational floor personnel sick leave.

122.    In or around 2006, DC 37 filed a grievance against the City and NYPD before the Board of Collective Bargaining on behalf of Plaintiff Hill and Toni Reid for violating its duty to bargain by unilaterally changing its procedures for requiring documentation of certain categories of sick leave.

123.    By a decision dated December 4, 2006, the Board of Collective Bargaining, found that the City and NYPD's actions constituted a change in sick leave procedures regarding documentation required for the use of leave time for

FMLA-qualifying health conditions and that the City failed to bargain to the point of agreement with the Union before unilaterally imposing the changes, in violation of New York City Collective Bargaining Law ("NYCCBL") § 12-306(a)(1) and (4).

124.    Following the City's refusal to comply with the decision dated December 4, 2006, in or around 2007, DC 37 filed for Arbitration.

125.    By a decision dated August 2, 2008, the Board of Collective Bargaining concluded that the City violated the CBA by issuing blanket cancellation of sick leave. See **Exhibit C.**

126.    According to the decision:

> The citywide agreement and related regulations and rules all grant the NYPD the discretion to approve sick leave requests based on its satisfaction with the proof of disability submitted by its employees. There is no provision in the contract, rule or regulation, however, that authorizes an agency to deny sick or injured employees the right to request sick leave. On the occasions that the City suspended sick leave, it was not exercising discretion to approve or disapprove the leave. It was instead denying its employees the contractual right to request it. Id. at 6-7.

127.    In light of these findings, the arbitrator concluded that "the Union has met its burden of demonstrating that the City violated the sick leave provisions of the citywide agreement and related rules and regulations" and, among other things, directed that the City "[c]ease and desist from canceling sick leave." Id. at 7.

128.   Neither the City nor the Police Department appealed or otherwise challenged the August 2008 Arbitration Decision.

129.   Despite the August 2008 Arbitration Decision, since May 2013 the City and NYPD acting through the individual defendants have continued to cancel sick leave of Plaintiffs, as aforesaid.

130.   In or around May 2013, the NYPD began suspending sick leave on a regular basis for the Operators.

131.   Between May and August 2013, sick leave was consistently cancelled every Wednesday and reinstated every Monday for Operators.

132.   In particular, sick leave was cancelled from June 26, 2013 to July 4, 2013 for 10 consecutive days.

133.   From May 2013, if a PCT or SPCT attempts to use an accrued sick leave day when being sick would cause them to miss mandatory overtime, that employee is automatically marked absent without leave ("AWOL") by NYPD's Communication Section command. When the Operator returns to work an AWOL notice is given to them.

134.   Since May 2013 and continuing, an Operator who tries to use sick leave when the City and NYPD declared that it is canceled are denoted as "attempted sick" which is a status the NYPD made up specifically and only for 911 Operators.

135.   At all relevant and material times, and since May 2013, although department rules state in the NYPD Civilian Handbook that no doctor's note is required for an absence of less than 3 days, the NYPD is requiring this for operational PCTs and SPCTs.

136.   Since May 2013, Day Tour Captains at the Communications Centers have been specifically positioned at the sick desk where they intentionally challenge any Operator that wishes to use his or her sick leave.

137.   Also, since May 2013, Defendants City and NYPD, acting thorough the individual defendants, threaten to change tours and squads of Operators that take sick leave. For instance, PCTs have had their day tours changed to midnight tours because they failed or refused to complete mandatory overtime.

138.   Moreover, since May 2013, Operators who attempt to use or appeal sick day requests have had their files marked "not a team player," or comments to that effect, in evaluations.

139.   At different times between May 2013 and the present, Plaintiffs have been threatened with discipline when they requested to take sick leave.

140.   From May 2013 and continuing, the City and NYPD have released directives instructing performance evaluators to refer to Operators who use sick days as "not a team player," or comments to that effect.

### Use of Derogatory Remarks and Comments towards Operators

141.   In or around June 2013, while in the clerical area of the Communication Section, and noticing that only a few Operators were reporting for duty, Defendant Polito exclaimed, in sum and substance, in reference to the largely African-American and Hispanic Operators, "Don't they know they are hiring at Pathmark?!!"

142.   Similarly, in or around July 4, 2013, Defendant Polito stated, while in the Platoon Commander's office, at the Metro Tech Center, in sum and substance, that "you people are useless" in reference to a group of largely minority female Operators, including Plaintiff Hill, who was within earshot of his comments, and another PCT, who was removed to the hospital with high blood pressure.

### Use of Threats and Compulsion of Operators to Perform Overtime

143.   On or about July 7, 2013, Defendant Church, while armed, threatened a group of solely minority Operators that had already worked four consecutive 16-hour days at the Metro Tech communications center that if they did not work a fifth, he would take three days of vacation away from them.

144.   Additionally, on that day (July 7, 2013) Church also made intimidating remarks regarding his unquestionable authority to grant relief from duty.

145.  Church who was wearing his holstered NYPD issued weapon at the time, on July 7, 2013, also gave the Operators who had already worked four consecutive 16-hour days at the Metro Tech Communications Center five seconds to comply, and warned them that "if you don't return to your positions by the time I count to five I'm going to take three [vacation] days from each of you."

146.  Plaintiff Pate was present when Church made the threat on July 7, 2013, and was one of the Operators who had had already worked four consecutive 16-hour days.

147.  On or about July 23, 2013, NYPD, through Defendant Francis Kelly, instituted a policy whereby a list is compiled and reviewed to determine which Operators missed mandatory overtime so that those Operators will be forced to make up the missed overtime on one of their regular days off.

148.  Pursuant to this July 2013 policy, any Operator who missed mandatory "held-over" overtime due to FMLA leave was given a written order to perform mandatory overtime the very next day.

149.  At all material times, Defendant DC 37 was aware of the City and Police Department's cancelation of Plaintiffs' sick leave and violation of the August 2008 Arbitration Decision, as well as the above unlawful acts of the individual municipal defendants towards the Operators. Yet DC 37 did nothing meaningful or in good faith to protect Plaintiffs, enforce the terms of the decision,

or challenge the actions of the municipal defendants while representing to the Operators in July and August 2013 that they were addressing the issue with the City and NYPD. However, when DC 37 was asked to explain how they would address sick leave, DC 37 representatives either did not respond to inquiries or simply refused to explain whether they were advocating for the Operators.

## **Defendants Willfully Holding the Operators at Work Uncompensated**

150.  Defendants willfully prevent the Operators from leaving work after they have clocked out from their shifts resulting in unpaid wages.

151.  Since May 2013, the NYPD has been requiring the Operators to first clock out from their shifts and then wait to sign out with a supervisor before leaving work. This time spent waiting to sign out is not compensated.

152.  Operators who do not sign out face disciplinary action.

153.  At times, the sign out sheet is willfully hidden from the Operators to prevent them from leaving work in a timely manner after their shifts and after they have clocked out.

154.  Communication Division management have instructed lower level managers, SPCTs, to leave the room with the sheet and walk around in the building to evade and delay sign out.

155.  Defendant DC 37 has not grieved this issue at Step III.

## Defendants' Violation of FMLA Rights

156.   On June 26, 2006, Operators, with Plaintiff Hill, as one of the named Plaintiff, commenced the FMLA Class Action, against Defendants City, Mayor Bloomberg and Commissioner Kelly, in this Court, "to correct various willful employment practices, policies and procedures that have denied benefits guaranteed by the FMLA, and/or discriminated against eligible employees who sought to exercise their FMLA rights."

157.   On January 24, 2008, this Court (Hon. Brian Cogan, U.S.D.J.) certified the class.

158.   A Settlement Agreement was reached on June 11, 2009, and so-ordered by Judge Cogan on December 10, 2009. See **Exhibit B**.

159.   The terms of the so-ordered agreement, *inter alia*, provided that the NYPD would not cancel or delay FMLA leave for the Operators, would exclude FMLA leave as a consideration in performance reviews and follow FMLA anti-retaliation provisions. Id.

160.   In the years following the settlement agreement, Defendant City through the NYPD have implemented retaliatory measures and engaged in intimidating practices against Operators seeking to exercise their rights under the FMLA.

161.   These unlawful practices and policies are broadly imposed on all

- 31 -

Operators and members of the proposed class using and attempting to use FMLA leave.

162.   Upon information and belief, no other unit within the NYPD or the City is subject to these unlawful practices and policies.

163.   Plaintiff Ennis and other members of the class here have been the target of such retaliatory measures and intimidation including but not limited to:

(1) High Absentee Policy

164.   In or around April 2013, the Police Department through Defendant Belusic released a list of Operators with a "high absentee rate" who are no longer allowed to work voluntary overtime regardless of whether the Operators were absent due to qualified FMLA leave.

(2) 30-Minute Call Window Policy

165.   In his April 2013 communication, Defendant Belusic informed Operators that the Disciplinary Unit will only accept FMLA calls that are placed thirty (30) minutes prior to the time when the employee is requesting to leave. If the Operator calls more than thirty (30) minutes before the time, the FMLA request will be denied and the Operator will be told to call back.

166.   The policy is designed to and does frustrate an Operator's ability to request intermittent FMLA leave.

167.   On or about September 24, 2013, PCT Sonia Hicks, a member of the

proposed class, called the FMLA Compliance Unit to request intermittent FMLA leave. The Compliance Unit told her that she needed to call back at a time that was less than 30 minutes before her requested FMLA leave would start.

168.   On or about March 8, 2014, PCT Diana Sharrock, a member of the proposed class, called the FMLA Compliance Unit to request intermittent FMLA leave. The Compliance Unit in the Communication Section refused to accept the request and told her that she needed to call back at a time that was less than 30 minutes before her requested FMLA leave would start.

169.   Confused, Sharrock called back and asked if her FMLA requested had been denied at that time. The Compliance Unit informed her that the request was denied and that she must call back at time less than 30 minutes before her FMLA leave would start.

170.   On another day, PCT Joanie McKeever, a member of the proposed class, called the FMLA Compliance Unit to request intermittent FMLA leave a few hours before her leave would start. The Compliance Unit refused to approve the request and told Ms. McKeever that she was required to request the leave 30 minutes before it would start.

171.   Additionally, Plaintiff Ennis on several occasions attempted to use FMLA leave a few hours before her shift was to start. She was told by the Communications Section that she needed to call back closer to the time her shift

started.

172.   Ennis was not told that her FMLA was approved. She was told she had to call back in order to receive an approval for her requested FMLA leave.

173.   As a result of this policy, Operators with medical needs are left in limbo and unable to adequately plan for medical care, child care and other exigencies that flow from an uncertain schedule all while trying to manage serious medical conditions.

(3) Mandatory Overtime Punishment for FMLA

174.   As of July 2013, any Operator who uses qualified FMLA leave and as a result fails to perform mandatory overtime, upon return to duty is automatically required to perform mandatory overtime, even if that Operator's squad is not scheduled to work overtime. Operators who do not work the punitive, mandatory overtime face disciplinary charges.

175.   At different times between May 2013 and the fall of 2013, Plaintiff Ennis has been ordered  to perform automatic, mandatory overtime when she returned from FMLA leave even when her squad is not scheduled for overtime.

176.   Plaintiff Ennis understood this policy to be a punishment for her use of FMLA leave.

177.   At different times between May 2013 and the present, PCT Tracie Broughton, a member of the proposed class, was ordered to perform automatic,

mandatory overtime when she returned from FMLA leave even when her squad was not scheduled for overtime. On or about July 27, 2013 Ms. Broughton used FMLA leave during a period of mandatory overtime hours and was ordered to perform mandatory overtime as a punishment on return from her leave.

(4) <u>Intentional Miscalculation of FMLA Time Used</u>

178.   The NYPD intentionally miscalculates the number of intermittent FMLA hours used in order to deplete more quickly the FMLA leave hours available to individual Operators.

179.   This policy of over-billing FMLA hours frustrates and interferes with Operators' FMLA rights and damages them by requiring them to take unpaid sick leave instead of using FMLA leave.

180.   PCT Joanie McKeever, an Operator with approved FMLA leave and a member of the proposed class, has been subjected to this unlawful practice.

181.   On different dates since on or around October 2013, Ms. McKeever had requested and used approximately 2 hours of FMLA leave only to learn that 7 hours (or a full work shift) were deducted from her FMLA bank.

182.   Ms. McKeever was only able to unearth the unlawful practice because she is a time-keeper and her duties require her to review weekly time sheets.

183.   Ms. McKeever discovered the miscalculation when reviewing her own time sheets.

184.   When Ms. McKeever asked the Communication Section FMLA Compliance Unit about the difference in times, she was told that calculating how many hours are used from an Operator's FMLA bank is left to the Unit's discretion and command.

185.   Plaintiff Ennis has also been subject to this unlawful practice of intentionally depleting FMLA hours.

186.   On various occasions, Plaintiff Ennis would request and use a few hours of FMLA leave only to be told by the NYPD that an entire day of 7 hours would be deducted from her FMLA bank.

187.   Ennis was directly told that the Compliance Unit and the NYPD had discretion to assess how many hours to deduct from an Operator's FMLA time bank.

188.   When she asked about the policy, Ennis was vaguely assured that she would get the hours reimbursed. Yet, Ennis has seen no evidence that the hours afforded to her under the law were returned to her FMLA bank or what the assurance even meant.

(5) Delay of FMLA Certification

189.   The City and NYPD delay approval of FMLA certification up to and around 4 months from when an Operator files for FMLA leave.

190.   Operator Beverly S. Farnum, a member of the proposed class, filed for

FMLA recertification on or around December 17, 2013. It took until April 2014 before she was unofficially told that her FMLA application was approved by the Compliance Unit after waiting nearly 4 months for approval and a requirement to submit a second round of paper work.

191.   Operator Derona J. Samuels, a member of the proposed class, filed her FMLA renewal request on or about November 21, 2013. As of April 8, 2014, she is still waiting for a decision as to whether the FMLA Compliance Unit will approve her recertification.

192.   Ms. Farnum and Ms. Samuels were not offered provisional FMLA acceptance.

(6) Specialized FMLA Oversight Requirements

193.   In an attempt to discourage and interfere with Plaintiffs' FMLA leave requests, by a memorandum dated March 23, 2013, Defendant Napolitano directed that Operators requesting FMLA leave must call the Disciplinary Unit's new FMLA-dedicated telephone number, instead of the "Platoon Commander's Office" as required for regular sick leave requests, and consolidated the FMLA unit into the Disciplinary Unit.

194.   This unilateral change in the procedure for requesting FMLA leave by Plaintiffs allows the NYPD to keep a strict watch over FMLA leave usage by Plaintiffs. It has turned a civil right into a disciplinary issue while unlawfully

separating regular sick leave procedures from FMLA procedures.

195.   On or about July 24, 2013, the City and NYPD, through Defendant Napolitano, changed the name of the "Disciplinary Unit" to the "Compliance Unit" in an attempt to obscure their interference and retaliation with Plaintiffs' FMLA rights by making it more difficult for Operators to take FMLA leave.

196.   On or about September 30, 2013, Arnold S. Wechsler, the NYPD Deputy Commissioner of Personnel, issued a memorandum noting that an "FMLA Compliance Unit" was created that would be located at One Police Plaza to reduce FMLA abuse among the Operators.

197.   Upon information and belief, no other civilian or non-civilian NYPD unit has been forced to undergo the above FMLA policies that now exist in the Communications Section and are imposed only on the over 95% minority Operators.

### (7) FMLA Investigations

198.   The City and NYPD conduct investigations of FMLA approval and usage that are not on a good faith basis but are calculated to intimidate the Operators and interfere with their ability to seek FMLA leave.

199.   Part of the investigation involves interrogating Operators.

200.   The NYPD also directly telephones the Operator's treating physician and requests medical information that is unauthorized and beyond the scope of

permissible employer inquiries.

201.   Some Operators are forced to travel to One Police Plaza simply to have a meeting where uniformed supervisors in the NYPD interrogate them about their FMLA usage as a means of intimidation and discouragement for those with FMLA leave.

(8) Miscalculation of 1250 FMLA Qualification Hours

202.   While FMLA leave can only be issued to employees who have worked 1,250 hours, the City and NYPD have a practice of miscalculating the hours that an Operator worked by considering the wrong time period.

203.   As a result, the NYPD is able to deny FMLA leave by claiming that an Operator is not qualified because they have not worked the requisite 1,250 hours.

(9) Requiring Unnecessary Recertification of FMLA Leave

204.   As another tactic to frustrate Operators' FMLA leave, the City and NYPD employ a practice of requiring a new physician's note or confirmation of the qualifying medical condition at an excessive rate designed to deluge the Operator and the physician with a barrage of recertification requests.

205.   The tactic is designed to pressure Operators into surrendering their FMLA rights under the sheer repetitiveness and administrative fatigue of attaining the recertification from their physician and providing it to the NYPD.

206.   The proper recertification period is based on the length of time the physician determines the illness will last. The NYPD's practice ignores the physician's determination and requires excessive recertification in order to interfere with and frustrate FMLA leave.

207.   The above policies and practices are *per se* unlawful under the FMLA, and must be enjoined and entitle affected named plaintiffs and proposed class members to additional relief.

### Violation of Plaintiffs' Rights to Reasonable Accommodation

208.   Since June or July 2013, the City and NYPD has instituted a policy of automatically requiring all Operators who request a reasonable accommodation to undergo a medical examination pursuant to Section 72 of the New York Civil Service Law, where Operators are automatically declared unfit for duty by physicians employed by the Police Department, such as defendant Lichtenstein, without conducting actual examinations or properly reviewing the Operator's personnel file. They have also been threatened with unpaid leave.

209. Since in or about May 2013, Defendant City and its Police Department is responding to requests for reasonable accommodations by Plaintiffs in a racially discriminatory manner and imposing regulations unlike other NYPD of civilian units.

## The Effect of Defendants' Conduct on the Health of Operators

210.   As aforesaid, since May 2013, Operators are forced to work their regular 35-hour work week shifts plus three extra mandatory overtime double shifts each week of 8 hours. In addition, since July 2013, the NYPD now requires two twelve-hour tours per week as a minimum amount of overtime with continued uncertainty as to the required length of each tour.

211.   The mandatory non-stop double shifts imposed by the municipal defendants on Plaintiffs are causing illness and fatigue in addition to the high-stress job of being an Operator.

212.   Since May 2013, and as has been widely reported in the media, a number of Operators have collapsed from exhaustion while dispatching calls and were removed from the PSAC MetroTech Center by paramedics.

213.   On or around the weekend of September 21, 2013, Plaintiff Andrea Holly was removed from the Metro Tech call center by paramedics.

214.   The Operators are routinely prevented from taking even short meal breaks and are provided with inadequate bathroom facilities.


## Defendants' Abuse of Civil Service Law, Section 72 Examination

215.   As of May 2013, when Operators present a reasonable request from their private doctors seeking to limit the hours of overtime performed each day, the

NYPD will automatically, as part of an informal policy, send the Operators for Section 72 examination and impose blanket denials of reasonable accommodation requests.

216.   In such circumstances, the Operators are sent to an NYPD Physician, such as Defendant Lichtenstein and despite not being examined or asked sufficient questions to determine their medical condition, are declared unfit for duty pursuant to Section 72 of the Civil Service Law, and either threatened with unpaid leave or given undesirable secretarial work.

217.   The above practice by defendants is designed to deter Operators from seeking reasonable accommodation which limits the hours of overtime.

218.   Since May 2013, Defendant Lichtenstein has conducted several of these section 72 examinations wherein he does not actually examine the Operator before declaring them unfit for duty and informing them that the NYPD expects unlimited overtime performance.

219.   Since June 2013, Defendant City and NYPD is declaring Operators unfit for duty despite the fact that the City claims it is facing a staffing shortage with respect to Operators.

220.   Upon information and belief, other civilian units not manned by Plaintiffs are not targeted for and subjected to medical examinations by NYPD physicians, such as Defendant Lichtenstein.

221.   Since May 2013, Operators have been pressured by the municipal defendants to have their private doctors renounce and change their request for reasonable accommodation letter, so that the Section 72 determination will be reversed and the Operator will be reinstated to active duty.

222.   For example, prior to July 3, 2013, Plaintiff Gordon submitted a reasonable request from her doctor to limit overtime each day. In response, Plaintiff Gordon was automatically directed by Defendant Napolitano to appear for a Section 72 examination by Defendant Lichtenstein and subsequently her reasonable accommodation request was summarily denied and she was relieved of active duty as a Call taker and Radio Dispatcher.

223.   During the examination, Plaintiff Gordon was not examined or even asked any questions by defendant Lichtenstein. Yet, Defendant Lichtenstein declared Plaintiff Gordon unfit for duty under Section 72 of the Civil Service Law.

224.   As a result of the conduct, policies and practices of the municipal defendants, in or about July 2013, Plaintiff Gordon was denied reasonable accommodation in the form of a four-hour exemption, despite the fact that it was medically supported with a note by her private physician, and her request would not have posed undue hardship on the City.

225.   Similarly, prior to June 28, 2013, Plaintiff Ennis was denied reasonable accommodation in the form of a four-hour exemption, despite the fact

that it was medically supported with a note from her private physician.

226.  Also, on July 5, 2013, Plaintiff Inman was denied reasonable accommodation in circumstances similar to Plaintiff Gordon's.

227.  Since May 2013, DC 37 and their agents, including attorneys for DC 37 assigned to represent Operators during Section 72 proceedings have also pressured Operators to withdraw their physician supported reasonable accommodation requests.

228.  Subsequent to the denial of their requests for reasonable accommodation, in July 2013, Plaintiffs Gordon and Inman were pressured by Defendant DC 37 and their agents, including attorneys for DC 37, to withdraw their requests for reasonable accommodation.


**Disparate Treatment of Operators within NYPD's Disciplinary System**

229.  Upon information and belief, the City and NYPD, with the tacit support and direct involvement and participation of the individual municipal defendants, subjects the Operators to disparate treatment based on their race when applying formal and informal disciplinary proceedings and policies.

230.  NYPD disciplinary policies are often vague, unwritten and ad hoc variations of written policies that prevent Operators from knowing what the actual rules or policies are, and this practice is carried out intentionally to coerce and

manipulate the Operators from asserting their federal and state rights as well as their rights under the city-wide CBA.

231.   The City and NYPD have a long history of a pattern or practice of disparate treatment when applying disciplinary measures and punishments against African-American and Hispanic civilian and non-civilian employees of the department.

232.   Since at least 2011 and continuing, any disciplinary write up against an Operator initiated from any source outside of the Communications Section of the Police Department is automatically considered substantiated by the NYPD captains and are thus not adjudicated or defensible by the Operator.

233.   Since at least 2011 and continuing, African-American and Hispanic Operators receive a disproportionally high number of Command Disciplines ("CDs") for minor infractions which are substantiated and then used as basis to deny them seniority, and for rejecting their requests for more favorable work schedules.

234.   The high rate of CDs is so severe that, upon information and belief, a Communication Section Captain was told that there were 12,000 CDs issued to the Operators in a given time period. The captain was shocked and commented that such a number was the highest by far s/he had ever heard at the NYPD.

235.   At all relevant times, Captains in the Communications Section of the

Police Department have ordered the issuance of a Report of Violation against a targeted Operator only to then adjudicate the violations themselves.

236.   At all relevant times, Operators have been disciplined under the NYPD Patrol Guide but most Operators have never seen or read the guide.

237.   At all relevant times, NYPD will send detectives to the home of Operators to investigate alleged infractions and get signatures for disciplinary actions only a few days before the expiration of the 18-month statute of limitations for adjudication of formal disciplinary actions against Operators.

238.   The aforesaid conduct of the municipal defendants towards Plaintiffs and the Operators as regards the application of disciplinary measures and punishments was willful and was based on considerations of race and color.

239.   The above discriminatory disciplinary practices and policies are not imposed on similarly situated comparators within the NYPD such as, but not limited to, civilian police administrative aids who, as a group, upon information and belief, are not largely composed of minorities. Moreover, as a whole, non-minority civilian employees in the NYPD are not disciplined at the same excessive rate as the minority Operators who make up the proposed class.

## DC 37 Failure to Protect Operator Union Members

240.   Since July 2013, DC 37 has failed to take any meaningful action to challenge the deplorable working conditions of the Operators and the discriminatory and retaliatory treatment they face.

241.   Plaintiff has complained to no avail to the City and the Union about their deplorable working conditions and the discriminatory and retaliatory treatment they face at the hands of the municipal defendants.

242.   In or about July 2013, Plaintiffs complained to no avail to the Union about their deplorable working conditions and the discriminatory and retaliatory treatment they face at the hands of the municipal defendants.

243.   Plaintiffs' July 2013 complaints were met with unfulfilled promises by the Union of an intention to address the situation sometime in the future, which to date the Union has failed to do in a meaningful and non-perfunctory manner.

244.   Upon information and belief, the conduct of the Union with respect to Plaintiffs' complaints and requests were perfunctory, spurious, carried out in bad faith, and deliberately designed to give Plaintiffs the false impression that sincere efforts were being made by the Union to resolve and address their concerns about the terms and conditions of his employment.

245.   The conduct of the Union towards the Plaintiffs was willful and unlawful and was based on considerations of race and color.

246.   At all material times and continuing, Defendant Union has failed in its duty to fairly and zealously represent Plaintiff in that it failed take Plaintiffs' highly meritorious claims and their employers' multiple violations of the law and the terms of the CBA, the August 2008 Arbitration Decision, and the 2009 Settlement Agreement.

247.   DC 37 has also failed to grieve the uncompensated holding of the Operators after they clock out from work despite the group nature of the problem, persistent complaints from Operators about this issue, DC 37's knowledge of the issue and the CBA requirement to exhaust FLSA claims within the grievance process.

248.   The failure of the Union in its duty to fairly and zealously represent Plaintiffs is unlawful and in violation of Plaintiffs' rights under the law.

249.   The Union's failure has impaired the ability of the Plaintiffs and class members to exhaust their administrative remedies under the CBA, and prevented any meaningful relief from being provided through the grievance process.

250.   The Union's recent efforts on behalf of the Operators were solely in reaction to the filing of the original Complaint in this matter on November 6, 2013.

251.   Since the Union has not taken appropriate steps to protect Plaintiffs' rights, Plaintiffs have been compelled to retain private counsel to commence this lawsuit.

**Plaintiffs' Complaints to the Public and their Working Conditions**

252.   Since May 2013, members of the class have repeatedly and publicly complained about the effect of their deplorable working conditions for public safety in public forums such as rallies.

253.   Since May 2013, there have been several Press reports of Plaintiffs' public exposure about not only Plaintiffs' working conditions, but the effects of their forced and mandatory overtime shifts on public safety compounded by what has been described as "a bulky new 911 computer-aided dispatch system that workers say has resulted in thousands of lost calls and delays."

254.   Plaintiffs' reports to and discussions with the Press about the public safety implications of the 911 dispatch system since May 2013 were not made pursuant to their official duties as Operators.

255.   Shortly after members of the class raised awareness in public forums, and such activities were reported in news media in May 2013, the municipal defendants developed and implemented additional unlawful employment policies and practices and instituted disciplinary measures against Plaintiffs, as outlined above, which were designed to deter Plaintiffs and Class members from further speaking and complaining to the public, about their working conditions.

256.   Defendants' retaliatory conduct, as aforesaid, violated and continues

to violate Plaintiffs' First Amendment rights.

## **Pattern or Practice of Disparate Treatment**

257.   The City's and the NYPD's regular treatment of the Operators, who are over 95% minorities, is a policy and regular practice of intentional discrimination.

258.   The above practices and policies are not imposed on similarly situated dispatchers that are historically and still largely composed of non-minority employees like the Fire Department of New York's ("FDNY") dispatchers, the Department of Sanitation's ("DOS") dispatchers and Emergency Medical Services ("EMS") dispatchers.

259.   The NYPD Operators and the FDNY and EMS dispatchers provide the City with the same function: answering emergency calls, providing intake of caller information, and dispatching units to respond to the emergencies from the City's Public Safety Answering Center ("PSAC") in Brooklyn.

260.   On a daily basis, the groups have and do work in tandem to assist citizens with emergencies.

261.   The NYPD Operators and the FDNY and EMS dispatchers share the same phone calls between their units and even both remain on the same conference telephone call when a citizen has a fire emergency while transmitting information between themselves and assisting citizens together.

- 50 -

262.   Moreover, the Operators and FDNY dispatchers mostly work from the same floor of 11 MetroTech within the fully-integrated PSAC located in Brooklyn.

263.   High-ranking City officials, who control operations for the City, consider the NYPD Operators and FDNY dispatchers working on the same floor of PSAC as part of the same emergency response group, which has been the subject of speeches and press releases from Defendant Bloomberg's office throughout his tenure.

264.   Although the NYPD Operators and FDNY dispatchers share the same duties, the same phone calls and the same floor of the same building in PSAC, the City treats the two groups differently. The only notable difference is that the FDNY dispatchers are and have been historically white Caucasian males whereas the NYPD Operators are over 95% minority and predominately female.

265.   Based on their minority status, the Operators are treated far worse than their non-minority emergency calling taking colleagues in the FDNY, DOS and EMS at PSAC in terms of FMLA policies, sick leave policies, formal disciplinary treatment, reasonable accommodation requests, overtime and staffing policies, and overall work environment on account of race and ethnicity.

266.   Additionally, the above practices and policies are not imposed on similarly situated employees that are historically and still largely composed of non-minority civilian NYPD employees including, but not limited to, the Police

Administrative Aids ("PAA") who do not face the same FMLA policies, sick leave policies, formal disciplinary treatment, reasonable accommodation requests, overtime and staffing policies, and overall work environment on account of race and ethnicity.

267.   Moreover, the City's overall budget and structuring of the NYPD area of the City's call center, staffed by 95% minorities, reflects the City's discriminatory treatment and disregard for the well-being of the Operators in comparison to other similarly situated City employees carrying out similar duties at PSAC. The City's mismanagement and understaffing of the NYPD unit, at the highest levels, is one of intentional discrimination that treats the minority employees as expendable and exploitable based on their protected status, which the individual supervisors within the NYPD then implement on a daily basis in a discriminatory manner as a pattern and practice of disparate treatment as an additional level of discrimination..

## Defendants' Actions Continue and Warrant Injunctive and Other Reliefs

268.   Defendants' actions were unlawful and in violation of Plaintiff's rights under several amendments to the United States Constitution as well as Federal laws such as Section 1981, and State and local laws, such as the New York City Human Rights Law, New York State Human Rights Law and New York

Labor Law.

269.  As a proximate result of defendants' conduct towards Plaintiffs, Plaintiffs have suffered and continues to suffer monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

270.  As a further proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as, other incidental and consequential damages and expenses.

271.  The conduct of the individual defendants are outrageous and malicious; were intended to injure Plaintiff, and was carried out with reckless indifference to Plaintiffs' protected civil rights, thereby entitling him to punitive damages.

272.  Plaintiffs have no complete, plain, clear or adequate remedy at law.

273.  Defendants must be restrained from further retaliation and discrimination against Plaintiffs and directed to cease and desist from their unlawful acts against Plaintiffs.

274.  The acts of the defendants against Plaintiffs continue.

275.   Plaintiffs believe that the defendants' unlawful acts against them will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST CAUSE OF ACTION
### (Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981)

276.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

277.    Defendants subjected Plaintiffs to differential terms and conditions of employment because of their race.

278.    These differential terms and conditions of employment include, but are not limited to:

a. canceling sick leave and retaliating against and physically intimidating those who sought to use sick leave;

b. interfering with FMLA leave and retaliating against those Operators who sought to use and did use FMLA leave;

c. implementing abusive and continuous double-shift tours of duty back-to-back while maintaining dangerously low-staffing levels;

d. implementing and enforcing a blanket policy of denying ADA reasonable accommodation requests and using Section 72 fitness-for-duty examinations as retaliation for Operators who sought accommodations due to serious and on-going medical conditions;

e. applying and implementing arbitrary and harassing disciplinary measures against Operators;

f.  violating the CBA, past arbitration and settlement agreements; and

    g.  denying meal breaks and adequate rest periods.

279.   All the foregoing actions were taken by the Defendants in order to deprive Plaintiffs of employment and other contractual opportunities on account of their race.

280.   Because of the willful and deliberate actions of the Defendants, and as a proximate cause thereof, Plaintiffs have been and continues to be denied their rights to equal employment opportunity in violation of Section 1981.

281.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**(Sex, Race and Color Discrimination in Violation of NYHRL)**

282.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

283.   By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of sex, their race and color, Defendants violated the New York State Human Rights Law.

284.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Sex, Race and Color Discrimination in Violation of NYCHRL)**

285.   Plaintiffs hereby repeat and reallege each allegation in each numbered

paragraph above.

286.   By adversely affecting the terms, conditions and privileges of Plaintiffs' employment because of their sex, race and color, Defendants violated New York City Human Rights Law.

287.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (First Amendment Violation)

288.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above, including paragraphs 250-254.

289.   By developing and implementing unlawful employment policies and practices designed to deter Plaintiffs and Class members from further speaking and complaining about their working conditions to the public and in public forums, Defendants violated and continue to violate Plaintiffs' First Amendment rights.

290.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Pursuant to FMLA 29 U.S.C. § 2601, *et seq.*)

291.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

292.   As a direct and proximate result of defendants' policies, procedures

and practices alleged herein, the rights of employees are being interfered with and denied in violation of the FMLA.

293.   Defendants have (1) created policies to frustrate and make it more difficult for Operators to seek FMLA leave in violation of past settlement agreements; (2) created policies to directly retaliate against Operators who take qualified FMLA to seek treatment or care for their ill family members by requiring involuntary overtime upon their return and requiring them to report for duty on their regular days off in order to disrupt their schedules; and (3) treated those who seek FMLA leave as delinquents and scofflaws who must be disciplined and thus requiring FMLA request to be made directly to the Disciplinary Unit.

294.   Plaintiffs are entitled to declaratory judgment, declaring that the employment policies, practices and procedures adopted and implemented by defendants apply to and govern employee requests for intermittent FMLA leave as alleged herein, are unlawful and in violation of the FMLA.

295.   Unless injunctive relief is granted, Plaintiffs and class members who are otherwise eligible for FMLA rights, benefits and protections will be irreparably harmed by defendants' continued refusal to comply with their statutory obligations.

## SIXTH CAUSE OF ACTION
### (Breach of Contract pursuant to Section 200 *et seq.* of the New York State Civil Service Law, Public Employees' Fair Employment Act)

296.   Plaintiffs hereby repeat and reallege each allegation in each numbered

- 57 -

paragraph above.

297.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under the CBA by reason of the scheduling of excessive and dangerous involuntary double-shifts, canceling sick leave, violating VDT health protection rights, and failing to provide proper notice of overtime.

298.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**(New York State Labor Law Violation pursuant to § 162)**

299.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

300.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under New York Labor Law to have the required meal breaks.

**EIGHTH CAUSE OF ACTION**
**(Defendant DC 37 Breach of the Duty of Fair Representation)**

301.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

302.   Defendant DC 37 acted irrationally, discriminatorily and in bad faith

in not taking any meaningful steps to protect the rights of minority union members working as Operators and failing to enforce past arbitration decisions and settlement agreements.

303.   By failing in its duty to fairly and zealously represent Plaintiffs, DC 37 violated and continues to violate Plaintiffs' rights contrary to Section 200 *et seq.* of the New York State Civil Service Law, Public Employees' Fair Employment Act and New York City Administrative Code ¶ 12-306(b)(1) and (3).

304.   By reason of the foregoing, plaintiffs have suffered loss and damage in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Defendant DC 37 pursuant to 42 U.S.C. § 1981)

305.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

306.   Defendant DC 37 subjected Plaintiffs to differential terms and conditions of representation because of their race.

307.   All the foregoing actions were taken by the Defendants DC 37 in order to deprive Plaintiffs of their contractual opportunities under the CBA.

308.   Because of the willful and deliberate actions of the Defendants DC 37 as well as their tacit approval of the NYPD's discriminatory policies, as a proximate cause thereof, Plaintiffs have been and continue to be denied their rights to equal enforcement of contracts under the CBA in violation of Section 1981.

309.   By reason of the foregoing, plaintiffs have suffered loss and damage in an amount to be determined at trial.

## PUNITIVE DAMAGES

310.   By reason of the wanton, unrepentant, reckless and egregious conduct of the individual defendants herein-above alleged, Plaintiffs claim punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, the named Plaintiffs and other members of the class they seek to represent pray that the Court:

a) Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b) Issue an order for the following preliminary injunctive relief:

I.   Enjoining the NYPD from interfering with and retaliating against those Operators requesting FMLA leave;

II.   Enjoining the NYPD from canceling sick leave under the CBA and intimidating and retaliating against those Operators who seek and do use sick days;

III.   Enjoining the NYPD from intentionally holding Operators after they have clocked out and forcing them to remain at work uncompensated after their shifts;

IV.   Enjoining the NYPD's pattern or practice of discriminatory disciplinary measures against the Operators;

     V.    Enjoining the NYPD's pattern or practice of discriminatory and abusive scheduling of involuntary and dangerous double-shifts consecutively;

c) Impanel a jury to hear Plaintiffs' claims;

d) Issue a class-wide judgment declaring that the NYPD's pattern or practice of disparate treatment of the Operators is unlawful in that it violates § 1981 and the laws of New York State and New York City;

e) Award compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

f) Award all Plaintiffs, including the members of the Class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

g) Award all Plaintiffs, including members of the Class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

h) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.


Dated:     April 17, 2014
        New York, New York

             Respectfully Submitted,

             */s/ Samuel O. Maduegbuna*
             SAMUEL O.  MADUEGBUNA (6084)
             **MADUEGBUNA COOPER LLP**
             Attorneys for Plaintiffs
             30 Wall Street, 8th Floor
             New York, New York 10005
             (212) 232-0155


TO:  **DEFENDANTS**

THE CITY OF NEW YORK
c/o Corporation Counsel
Law Department
100 Church Street
New York, New York 10007

MICHAEL R. BLOOMBERG,
City Hall
New York, New York 10007

RAYMOND KELLY,
New York City Police Department
One Police Plaza
New York, New York 10007

RICHARD F. NAPOLITANO,
New York City Police Department
One Police Plaza
New York, New York 10007

CHARLES P. DOWD,
New York City Police Department
One Police Plaza
New York, New York 10007

MICHAEL V. POLITO,
New York City Police Department
One Police Plaza
New York, New York 10007

LJUBOMIR BELUSIC,
New York City Police Department
One Police Plaza
New York, New York 10007

FRANCIS KELLY,
New York City Police Department
One Police Plaza
New York, New York 10007

- 62 -

DONALD CHURCH,
New York City Police Department
One Police Plaza
New York, New York 10007

DAVID LICHTENSTEIN,
New York City Police Department
One Police Plaza
New York, New York 10007

LOCAL 1549, DISTRICT COUNCIL 37, AFSCME, AFL-CIO
125 Barclay Street
New York, New York 10007

## <u>DECLARATION OF SERVICE</u>

I, SAMUEL O. MADUEGBUNA, served the foregoing **PLAINTIFF'S AMENDED COMPLAINT** by causing a copy to be delivered by ELECTRONIC MAIL on April 17, 2014 to:

> ZACHARY CARTER
> Corporation Counsel of the City of New York
> Attorneys for Defendants
> New York City Law Department
> 100 Church Street, Room 2-101
> New York, New York 10007

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:     New York, New York
           April 17, 2014

                                              */s/ Samuel O. Maduegbuna*
                                              _____
                                              SAMUEL O.  MADUEGBUNA, ESQ.