UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
CYNTHIA HILL, GAIL WILLIAMS,
DENISE INMAN, VICKIE GORDON,
ROLANDO LOPEZ, TAURA PATE,
ELLEN ENNIS, and ANDREA HOLLY,
individually and on behalf  of all others
similarly situated,

                    Plaintiffs,

        − against −

THE CITY OF NEW YORK, MICHAEL
R. BLOOMBERG, as Mayor of the City of
New York, RAYMOND KELLY, as
Police Commissioner, RICHARD F.
NAPOLITANO, CHARLES P. DOWD,
MICHAEL V. POLITO, LJUBOMIR
BELUSIC, FRANCIS KELLY, DONALD
CHURCH, DAVID LICHTENSTEIN,
LOCAL 1549, DISTRICT COUNCIL 37,
AFSCME, AFL-CIO, and JOHN and
JANE Does 1−20 (said names being
fictitious, the persons intended being those
who aided and abetted the unlawful
conduct of the named Defendant),

                    Defendants.
------------------------------------------------------X

**MEMORANDUM &
ORDER**
13 CV 6147 (PKC) (JO)

PAMELA K. CHEN, United States District Judge:

     The named Plaintiffs and members of the proposed classes ("Plaintiffs") are a group of

minority individuals employed by Defendant New York City (the "City") to answer and direct

public calls to the City's 911 emergency response system.  (Dkt. 77 ("Am. Compl.") ¶ 12.)

Plaintiffs bring this action against the City; Michael Bloomberg as Mayor of the City and

Raymond Kelly as New York Police Department ("NYPD") Commissioner, both in their official

capacities[1]; and Richard F. Napolitano ("Napolitano"), Charles P. Dowd ("Dowd"), Michael V. Polito ("Polito"), Ljubomir Belusic ("Belusic"), Francis Kelly ("Kelly"), Donald Church ("Church"), and David Lichtenstein ("Lichtenstein"), all in their official and individual capacities (collectively, "City Defendants"), primarily asserting that the City Defendants discriminated against Plaintiffs on the basis of race, in violation of 42 U.S.C. § 1981 ("Section or § 1981") and § 1983 ("Section or § 1983"), and the New York State and City Human Rights Laws (respectively, "NYSHRL" and "NYCHRL").  (Am. Compl. ¶ 1.)

Plaintiffs assert the following claims against the City Defendants: (1) violation of §§ 1981 and 1983 through a pattern of discriminatory policies and practices principally relating to mandatory overtime and leave usage; (2) violation of the Family and Medical Leave Act ("FMLA") through interference with, and retaliation for, Plaintiffs' exercise of FMLA rights; (3) retaliation against Plaintiffs for protected public speech, in violation of the First Amendment; (4) violation of New York Labor Law regarding required meal breaks; and (5) breach of the City's collective bargaining agreement ("CBA") with Plaintiffs' union, Defendant Local 1459, District Council 37, AFSCME, AFL-CIO ("DC 37"), as well as arbitration and settlement agreements. (Am. Compl. ¶¶ 1–5, 267.)  Plaintiffs also assert two claims against DC 37 for violating its duty of fair representation and for discriminating against Plaintiffs on the basis of race in violation of § 1981 by acquiescing in the City's discriminatory policies.  (*Id.* ¶¶ 3, 303, 308.)

Three motions are currently pending before the Court.  The City Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6)

___

[1] Because Bloomberg and Kelly are named only in their official capacities, the current City Mayor and NYPD Commissioner, respectively, Bill De Blasio and William Bratton, are automatically substituted in this action in their official capacities pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d); *Phillip v. Schriro*, 12 CV 8349, 2014 WL 4184816, at *9 (S.D.N.Y. Aug. 22, 2014).  The Clerk of Court is requested to correct the caption on the docket.

for failure to state a cause of action.  (Dkt. 91.)  DC 37 moves to dismiss Plaintiffs' Section 1981 claim for failure to state a claim of racial discrimination.  (Dkt. 89.)[2]  Plaintiffs move for certification of two classes pursuant to FRCP 23(b)(a) and (b)(2) for liability and injunctive relief.  (Dkts. 104; 105 at 2−5.)[3]  For the reasons set forth below, Defendants' motions to dismiss are granted in part and denied in part, and Plaintiffs' motion for certification is granted.

## BACKGROUND

The following facts are taken from the Amended Complaint and exhibits, and are taken as true and construed favorably to Plaintiffs, for purposes of deciding the motions to dismiss.

## I.   **The Parties**

Plaintiffs are employed in the NYPD Communications Section as Police Communications Technicians ("PCTs") and Supervisor Police Communication Technicians ("SPCTs," collectively, "911 Operators").  (Am. Compl. ¶¶ 12−13.)[4]  Their responsibilities include answering and directing public emergency calls to the City's 911 response system so that the appropriate police, fire, or emergency resources can be dispatched.  (*Id.* ¶¶ 13, 100.)  Both SPCTs and PCTs are overseen and managed by Principal Police Communication Technicians ("PPCTs").  (*Id.* ¶ 20.)

As of the date of the Amended Complaint, the City employed 1,200 PCTs and 91 SPCTs in the NYPD Communications Section as part of the City's overall emergency call and response system, which consisted of a total of approximately 1,800 dispatchers.  (*Id.* ¶¶ 14, 17.)  Other

_____

[2] DC 37 does not move to dismiss Plaintiffs' other claim against it for a breach of the duty of fair representation.  (*See* Am. Compl. ¶¶ 301−04 (Eighth Cause of Action).)

[3] Citations to docket entries refer to internal pagination rather than those assigned by ECF.

[4] Named Plaintiffs Cynthia Hill and Andrea Holly have apparently retired since the filing of the original complaint.  (Dkt. 107 at 9 n.7.)

dispatcher units existed within the City's Fire Department ("FDNY"), Department of Sanitation ("DOS"), and Office of Emergency Medical Services ("EMS").  (*Id.* ¶¶ 258−59.)  The City stationed most of the City's dispatchers, including the 911 Operators, at the Public Safety Answering Center ("PSAC") at 11 MetroTech Brooklyn.  (*Id.* ¶¶ 15, 262−64.)  Some 911 Operators were stationed at One Police Plaza.  (*Id.* ¶ 17.)

Over 95% of 911 Operators are minorities.  (*Id.* ¶ 257.)  Seven of the eight named Plaintiffs—Cynthia Hill ("Hill"), Gail Williams ("Williams"), Denise Inman ("Inman"), Vickie Gordon ("Gordon"), Taura Pate ("Pate"), Ellen Ennis ("Ennis"), and Andrea Holly "Holly")—are African-American women.  (*Id.* ¶¶ 22, 26, 30, 34, 42, 46.)  The eighth named Plaintiff, Rolando Lopez ("Lopez"), is a Hispanic male of Puerto Rican ancestry.  (*Id.* ¶ 38.)

Plaintiffs name several individual Defendants, all of whom are white males.  (*Id.* ¶¶ 56, 59, 63, 66, 70, 73, 76, 79, 82.)  Plaintiffs are pursuing official capacity claims against the Mayor as the chief policy-making official and the NYPD Commissioner as the official responsible for developing and implementing policies of the NYPD, and for training and supervising NYPD employees.  (*Id.* ¶¶ 56−57, 60−62.)  According to the Amended Complaint, the City's Executive branch and Deputy Mayors, the Mayor's Office of Operations, and the Office of Citywide Emergency Communications "centrally determine and oversee all major and strategic emergency communications policy and implementation for the City[.]"  (*Id.* ¶ 14.)

Plaintiffs also name several individual Defendants in the NYPD Communications Section in their official and personal capacities.  At all times relevant to this action, Napolitano was the Inspector and Deputy Inspector in charge of the section, and Dowd was a section Chief.  (*Id.* ¶¶ 63, 66.)  Plaintiffs allege that Naplitano and Dowd were responsible for developing, implementing, and enforcing employment policies within the NYPD Communications Section.

4

(*Id.* ¶¶ 64, 67.)  Kelly was a PPCT and section Platoon Commander who directly supervised other PPCTs.  (*Id.* ¶¶ 20−21, 76.)  Polito, Belusic, and Church were section Captains who supervised PPCTs.  (*Id.* ¶¶ 20−21, 70, 73, 79.)  Plaintiffs allege that Dowd, Polito, Belusic, Kelly, and Church were responsible for developing and implementing personnel policies, and for imposing and enforcing disciplinary measures against 911 Operators.  (*Id.* ¶¶ 68, 71, 77, 80.)

The Amended Complaint additionally names Lichtenstein in his official and personal capacity.  At all relevant times, Lichtenstein was a Deputy Chief Surgeon in the Medical Division of the NYPD.  (*Id.* ¶ 82.)  Plaintiffs assert that Lichtenstein was responsible for conducting examinations to determine if 911 Operators who sought reasonable accommodations for disabilities were medically fit for duty under New York Civil Service Law § 72 ("§ 72").  (Am. Compl. ¶ 83.)

Defendant DC 37 is a labor organization that represents municipal employees, including 911 Operators, and serves as the bargaining representative for these employees with the City.  (*Id.* ¶¶ 86−88.)

II.     **Plaintiffs' Factual Allegations Regarding the City Defendants' Policies and Practices**

Plaintiffs recite a litany of policies and practices that the City Defendants imposed on the 911 Operators as part of the alleged pattern of racial discrimination and hostility toward the group.  These policies and practices, Plaintiffs maintain, were not imposed on the predominantly non-minority dispatcher units of the FDNY, DOS, or EMS.  (*Id.* ¶¶ 258−59, 264−65, 267.)  Plaintiffs allege that FDNY and EMS dispatchers serve the same function as 911 Operators, in that they also answer emergency calls, provide intake of caller information, and dispatch emergency response units, and that 911 Operators often work in tandem with these other dispatchers in response to emergencies, sometimes jointly handling calls.  (*Id.* ¶¶ 259−61.)

5

According to Plaintiffs, most 911 Operators and FDNY dispatchers work on the same floor of the "fully-integrated" PSAC.  (*Id.* ¶¶ 259, 262−64.)  Plaintiffs further assert that none of the challenged policies are imposed on other non-minority NYPD employees, including Police Administrative Aids ("PAA"). (*Id.* ¶¶ 239, 266.)  The following summarizes the policies that Plaintiffs allege are indicative of a discriminatory pattern and practice by the City Defendants.

### A.      Overtime, Scheduling, and Breaks

The Amended Complaint alleges that the City Defendants instituted several policies starting in May 2013 that overworked 911 Operators without regard for their health and safety. 911 Operators were required to work several double-shifts of undefined lengths, often consecutively, without meal or rest breaks.  (*Id.* ¶¶ 111, 211−14.)  Specifically, between May and July 2013, the NYPD mandated that 911 Operators work double-shifts of eight hours each, three times a week.  (*Id.* ¶ 103.)  Seven of the named Plaintiffs worked 16−hour tours three times a week in accordance with this policy.  (*Id.* ¶ 106.)  Since May 29, 2013, the NYPD has maintained a practice of relieving 911 Operators at 2:00 a.m. after a mandatory double-shift and requiring them to return for their next shift the same day at 8:00 a.m.  (*Id.* ¶ 104.)  On multiple occasions, seven of the named Plaintiffs were relieved from a double-shift only to be required to return hours later.  (*Id.* ¶ 105.)  Since July 2013, the NYPD required 911 Operators to work two 12−hour tours weekly "as a minimum amount of overtime" until relieved from duty.  (*Id.* ¶ 103.)[5]  Pursuant to these policies, seven of the named Plaintiffs were required to work a

_____

[5] It is unclear whether the double-8-hour-shift and 12-hour-overtime-shift requirements were in effect simultaneously.  The Amended Complaint  suggests that the policy mandating a minimum of three double-8-hour shifts per week went into effect first, but does not indicate whether that policy was modified, or replaced, by the later imposition of the twice weekly 12-hour-overtime-shift requirement.  (*See* Am. Compl. ¶ 103.)

minimum of two 12−hour overtime shifts each week, with additional overtime and tours as required.  (*Id.* ¶ 106.)

911 Operators who refused, or did not complete, mandatory overtime were subjected to discipline.  On or about July 7, 2013, Church threatened to dock three vacation days from a group of 911 Operators, including Pate, if they did not work a fifth consecutive 16−hour shift.  (*Id.* ¶¶ 143−46.)  PCTs assigned to work day shifts were switched to midnight shifts because they failed, or refused, to complete mandatory overtime.  (*Id.* ¶ 137.)  In addition, 911 Operators, including seven of the named Plaintiffs, were required to continue answering and dispatching calls during meal breaks.  (*Id.* ¶¶ 115−16, 214.)  Plaintiffs assert that these policies were driven by discriminatory animus toward the 911 Operators and as punishment for their use of sick and FMLA leave.  (*Id.* ¶¶ 107−08, 113.)

## B.    Sick Leave

The NYPD has a long-standing history, since around 1999, of restricting sick leave for 911 Operators.  (*Id.* ¶ 121.)  Pursuant to the CBA, 911 Operators accrued one day of sick leave each month (12 days annually), and were permitted to use three days of their sick leave balances to care for ill family members.  (*Id.* ¶ 120, *see id.* Exs. A (CBA) at 11−12, C ("Arbitration Decision") at 2, 4.)  In or around May 2006, DC 37 filed a grievance with the Board of Collective Bargaining (the "Board") against the City and NYPD on behalf of Hill and another individual for unilaterally changing procedures regarding the required documentation to use leave.  (Am. Compl. ¶ 122.)  The Board found that the City and NYPD's actions violated the duty to bargain with DC 37 before imposing sick leave policy changes.  (*Id.* ¶ 123.)  After the City failed to comply with the Board's decision by canceling sick leave for 911 Operators, DC 37 filed for arbitration.  (Am. Compl. ¶ 124; Arbitration Decision at 1.)  On August 2, 2008, the

Board found that the City had violated the CBA by cancelling sick leave, and directed the City to cease and desist.  (Am. Compl. ¶¶ 125−27; Arbitration Decision at 6−7.)

Plaintiffs allege that notwithstanding the Arbitration Decision, the City Defendants have "frequently and arbitrarily" cancelled sick leave since 2012.  (Am. Compl. ¶ 107.)  In May 2013, the City Defendants began suspending sick leave "on a regular basis" for 911 Operators.  (*Id.* ¶¶ 108−09, 129−30.)  Between May and August 2013, sick leave was "consistently cancelled" every Wednesday and reinstated the following Monday.  (*Id.* ¶ 131.)  The City Defendants also canceled sick leave for ten consecutive days from June 26, 2014 to July 4, 2013.  (*Id.* ¶ 132.)  Plaintiffs allege that DC 37 was aware of the City Defendants' recurrent cancellations of sick leave, but did not act meaningfully to protect the 911 Operators.  (*Id.* ¶¶ 149, 240−51.)

Plaintiffs also allege that the City Defendants maintained a pattern of intimidation and retaliation with respect to the 911 Operators' use and attempted use of sick leave.  (*Id.* ¶¶ 107−09.)  911 Operators who requested sick leave during a period of blanket sick leave cancellation were noted as "attempted sick."  (*Id.* ¶ 134.)  911 Operators who attempted to use, or appeal the denial of, sick leave requests were threatened with discipline and received unfavorable evaluations, including comments that the operator was "not a team player."  (*Id.* ¶¶ 138−140.)  Additionally, 911 Operators who used sick leave at a time they were scheduled to work mandatory overtime were marked absent without leave ("AWOL").  (*Id.* ¶ 133.)  City Defendants also threatened to change tours and squads of operators who took sick leave, and changed operators' day tours to midnight tours in response to sick leave use.  (*Id.* ¶ 137.)

## C.     FMLA Leave

In June 2006, a class of 911 Operators, with Hill as one of the named representatives, brought a federal action against Defendants the City, Mayor, and NYPD Commissioner to

challenge policies that interfered with the plaintiffs' FMLA rights, and retaliated against employees who sought to exercise their FMLA rights.  (*Id.* ¶¶ 156−57, Ex. B−1 (Stip. of Settlement filed in *Rodriguez v. New York City*, 04 CV 3049 ("*Rodriguez* Settlement")).)  On December 19, 2009, the district court approved the parties' settlement, pursuant to which the NYPD agreed, *inter alia*, (1) not to cancel or delay FMLA leave for 911 Operators, (2) to exclude consideration of approved FMLA absences from performance evaluations, and (3) to allow 911 Operators to use FMLA leave during mandatory overtime hours.  (Am. Compl. ¶¶ 117, 158−59, Ex. B−2; *Rodriguez* Settlement ¶ 5.)  Plaintiffs assert in this case that the City Defendants have since failed to comply with the *Rodriguez* Settlement, as well as their general obligations under the FMLA.  (Am. Compl. ¶ 160.)

Plaintiffs allege that the City Defendants have followed a punitive approach with respect to Plaintiffs' exercise of their FMLA rights, and that no other City dispatcher unit has been subject to the same FMLA policies.  (*Id.* ¶¶ 108, 110, 160−62, 197.)  On March 23, 2013, Napolitano required 911 Operators to direct all FMLA leave requests to the NYPD Disciplinary Unit's dedicated FMLA number, rather than the Platoon Commander's Office, as required for general sick leave requests.  (*Id.* ¶ 193.)  Napolitano later renamed the Disciplinary Unit the Compliance Unit.  (*Id.* ¶ 195.)  On or about September 20, 2013, a NYPD memorandum announced a new FMLA Compliance Unit at One Police Plaza to "reduce FMLA abuse" among 911 Operators.  (*Id.* ¶ 196.)

In April 2013, Belusic circulated a list of 911 Operators whose ability to work voluntary overtime was revoked due to having a "high absentee rate," regardless of whether the operator were absent due to qualified FMLA leave.  (*Id.* ¶ 164.)  Belusic also announced that the Disciplinary Unit would only accept requests for emergent FMLA leave if made within 30

minutes of the start of the shift for which the operator was requesting leave.  Leave requests made before the 30−minute window were either not accepted, with the operator being told to call back, or denied.  (*Id.* ¶ 165.)  On several occasions, Ennis attempted to request FMLA leave hours before beginning her shift and was told to call back to receive approval.  (*Id.* ¶¶ 171−72.) The Amended Complaint provides details of three other proposed class members who had similar experiences.  (*Id.* ¶¶ 167−70.)

Beginning July 27, 2013, Kelly instituted a policy to compile and review lists of 911 Operators who missed a mandatory overtime shift because of sick or FMLA leave, so that they could "make up" the missed overtime upon returning from leave.  (*Id.* ¶¶ 147−48, 174.)  These operators were given a written order to work overtime the following day regardless of whether their squad was scheduled for overtime, and regardless of whether the "make up" shift fell on the operator's regular day off.  (*Id.* ¶¶ 148, 174.)  An operator's failure to comply with this requirement resulted in disciplinary charges.  (*Id.* ¶ 174.)  On various occasions between May and the fall of 2013, Ennis was required to work a missed overtime shift immediately after she had returned from FMLA leave.  (*Id.* ¶¶ 175−76.)  The Amended Complaint also specifies another instance, on July 27, 2013, when a proposed class member was ordered to perform mandatory overtime the day she returned from FMLA leave.  (*Id.* ¶ 177.)

Plaintiffs also allege that the City Defendants intentionally miscalculated the number of FMLA hours used by 911 Operators to more quickly deplete the number of available FMLA hours, thus forcing 911 Operators to "take unpaid sick leave instead of using FMLA leave."  (*Id.* ¶¶ 178−79.)  On various occasions, Ennis requested and used a few hours of FMLA leave, but was told that a full seven-hour day was deducted from her FMLA hours.  (*Id.* ¶¶ 185−88.)  The Amended Complaint also details a similar experience of one proposed class member.  (*Id.* ¶¶

181−84.)  Additionally, Plaintiffs allege that the City Defendants had a practice of miscalculating hours worked by an Operator to qualify for FMLA leave.  (*Id.* ¶¶ 202−03.)  The City and NYPD delayed FMLA certification approval by up to four months, and required excessive and repeated medical documentation.  (*Id.* ¶¶ 189, 204−07.)  The Amended Complaint includes examples of two proposed class members who experienced such delays.  (*Id.* ¶¶ 190−92.)   Plaintiffs also claim that the City Defendants investigated FMLA use without a good faith basis, including interrogating 911 Operators and calling physicians for medical information.  (*Id.* ¶¶ 198−201.)

### D.   Reasonable Accommodation Requests

Plaintiffs allege that the City Defendants discouraged and retaliated against 911 Operators who requested to limit their hours as a reasonable accommodation under the ADA. Beginning in May 2013, 911 Operators who requested reasonable accommodations were threatened with unpaid leave, "given undesirable secretarial work," and/or were subjected to "sham" medical examinations and declared unfit for duty.  (*Id.* ¶¶ 112, 208, 216−17; Dkt. 94 at 7.)  More specifically, 911 Operators who presented a request from a private doctor seeking to limit their overtime hours were required to undergo a § 72 medical examination with physicians employed by the NYPD, including Lichtenstein.  (Am. Compl. ¶¶ 208, 218.)  No examinations were actually performed, and instead operators were automatically declared unfit for duty.  (*Id.* ¶¶ 208, 216.)   Gordon, Ennis, and Inman each were denied a reasonable accommodation pursuant to this policy and practice.  (*Id.* ¶¶ 222−27.)   911 Operators were also pressured to withdraw their requests for reasonable accommodations, in order to be reinstated to active duty. (*Id.* ¶ 221.)

E.     <u>**Sign-Out Sheets**</u>

Plaintiffs allege that the City Defendants misused its sign-out policy to keep 911 Operators at work without compensation.  After clocking out from a shift, 911 Operators were forced to wait to sign out with a supervisor.  Plaintiffs assert that supervisors were instructed to withhold sign-out sheets to impede 911 Operators' ability to leave.  (*Id.* ¶¶ 114, 151, 153−54.) The time spent waiting to sign out was not compensated, and 911 Operators who did not sign out faced disciplinary action.  (*Id.* ¶¶ 114, 150, 152.)  DC 37 did not grieve this issue.  (*Id.* ¶ 155.)

F.     <u>**Disciplinary Proceedings**</u>

According to Plaintiffs, the City Defendants subjected 911 Operators to disciplinary policies that were not imposed on non-minority groups in the NYPD, such as PAAs.  (*Id.* ¶¶ 229−39.)  Beginning in 2011, any complaint against a 911 Operator initiated by a source outside the NYPD Communications Section was automatically considered substantiated.  (*Id.* ¶ 232.) The NYPD also had a practice of permitting Communication Section captains who report violations by 911 Operators to also adjudicate those same claimed violations.  (*Id.* ¶ 235.) Minority 911 Operators received a disproportionately high number of Command Disciplines ("CDs") for minor infractions.  (*Id.* ¶¶ 233−34.)  These CDs were treated as substantiated and used as a basis to deny seniority and to reject requests for more favorable work schedules.  (*Id.* ¶ 233.)  Further, Plaintiffs allege that the NYPD disciplined 911 Operators under a NYPD Patrol Guide that was not provided to them, sent detectives to 911 Operators' homes to investigate alleged infractions, and instituted disciplinary actions shortly before the expiration of the statute of limitations.  (*Id.* ¶¶ 235−38.)

### G.   Defendant Polito's Remarks

The Amended Complaint alleges that certain remarks by Polito suggest racial animus.  In June 2013, after observing that only a few operators reported for duty, Polito commented "Don't they know they are hiring at Pathmark?"  (*Id.* ¶ 141.)  On or about July 4, 2013, Hill heard Polito remark, "you people are useless", referring to the 911 Operators.  (*Id.* ¶ 142.)

### H.   Plaintiffs' Complaints

Finally, Plaintiffs allege that the City Defendants undertook some of the above-described policies in retaliation for Plaintiffs' public complaints about their work conditions.  Since May 2013, members of the class have repeatedly and publicly complained about the effect of their working conditions on public safety in rallies and other public forums, which has resulted in several press reports.  (*Id.* ¶¶ 252−53.)  Shortly thereafter, the City Defendants "developed and implemented additional unlawful employment policies and instituted disciplinary measures" to deter class members from further speaking to the public.  (*Id.* ¶ 255.)

## *DISCUSSION*

### I.   Defendants' Motions to Dismiss

#### A.  Legal Standard

Defendants bring their motions to dismiss pursuant to FRCP 12(b)(6) for failure to state a claim.  To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In evaluating a Rule 12(b)(6) motion, a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006).  A complaint that "tenders 'naked assertion[s]' devoid

of 'further factual enhancement'" will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Twombly*, 555 U.S. at 557).  Rather, "[f]actual allegations must be enough to raise a

right to relief above the speculative level[.]"  *Twombly*, 550 U.S. at 555.  A complaint should be

dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to

plausible[.]"  *Id.* at 570.

## B.  Racial Discrimination Claims against the City and the Individual Defendants in their Official Capacities

Plaintiffs first, second, and third causes of action allege that the City Defendants

subjected the predominantly minority unit of 911 Operators to a pattern or practice of

discriminatory treatment based on race in violation of §§ 1981 and 1983, NYSHRL, and

NYCHRL.  (Am. Compl. ¶¶ 257, 267, 276−87; *see* Dkt. 94 at 7.)[6]

### 1.  Sections 1981 and 1983

Section 1981 prohibits discrimination with respect to the enjoyment of benefits,

privileges, terms, and conditions of a contractual relationship, such as employment.  42 U.S.C. §

---

[6] Plaintiffs are inconsistent on whether they are claiming discrimination on a basis other than race.  At various points in their pleading and moving papers, Plaintiffs also assert discrimination based on national origin, gender, creed, and disability.  (*See*, *e.g.*, Am. Compl. ¶¶ 1, 12, 119, 264; Dkt. 94 at 2.)  Section 1981, however, prohibits only racial or ethnic discrimination. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (§ 1981's "prohibition against racial discrimination encompasses discrimination based on ancestry or ethnic characteristics" but "does not prohibit discrimination on the basis of gender or religion, national origin, or age") (internal citations omitted); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 415 (E.D.N.Y. 2010) ("Section 1981's conception of 'race' also protects 'identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.'") (quoting *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 613 (1987)).  To the extent Plaintiffs seek to plead claims for discrimination on the basis of national origin, gender, creed, or disability against the City Defendants under New York laws, Plaintiffs' allegations fail to state a plausible claim.  The Amended Complaint contains no allegations on national origin, instead focusing on ethnicity.  Nor does it contain any allegations, such as comparator groups or remarks by defendants, to raise an inference that the challenged policies were motived by gender.  Lastly, although Plaintiffs allege that some 911 Operators requested a reasonable accommodation to limit overtime hours, they fail to allege facts regarding any Plaintiffs' disability or that Defendants perceived any plaintiff to have a disability.

1981(a); *Patterson v. Cnty. of Oneida*, *N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).  To establish a violation of § 1981, a plaintiff must show that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in § 1981.  *Dasrath v. Stony Brook Univ. Med. Ctr.*, 12 CV 1484, 2014 WL 1779475, at *5 (E.D.N.Y. Feb. 27, 2014).  Liability may not be imposed under § 1981 absent proof of purposeful discrimination.  *Gen. Bldg. Contractors Ass'n,. v. Pennsylvania*, 458 U.S. 375, 389 (1982).

Section 1983 permits an action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Here, the deprivation alleged is one of racial discrimination in violation of federal law under § 1981.  Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred," such as those conferred by § 1981.  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Hence, when the defendant sued for discrimination in violation of § 1981 is a municipality or individual sued in his official capacity, § 1983 supplies the exclusive remedy for violations of rights guaranteed under § 1981.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733−34 (1989); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011).

Because Plaintiffs have brought their § 1981 claim under § 1983, they must show that the challenged acts were performed pursuant to a municipal policy or custom in order to hold liable the City or individual Defendants in their official capacity.  *See Patterson*, 375 F.3d at 226–227 (citing *Jett*, 491 U.S. at 733–36; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978)) (internal citations omitted)).  To show a policy, custom, or practice, a plaintiff need not identify

an express rule or regulation.  *See, e.g.*, *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992).  It is sufficient to show, for example, that a discriminatory practice of municipal officials was so "persistent or widespread" as to constitute "a custom or usage with the force of law," *id.* at 870−71 (internal quotation marks omitted), or that a discriminatory practice of subordinate employees was "so manifest as to imply the constructive acquiescence of senior policy-making officials," *id.* at 871.  A policy, custom, or practice may also be inferred where "the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction."  *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotation marks omitted).  Liability of a municipal defendant or an individual sued in his official capacity under § 1981 and § 1983 cannot be premised on a theory of *respondeat superior*.  *See, e.g.*, *Jett*, 491 U.S. at 733−36.

## 2.  NYSHRL and NYCHRL

The NYSHRL makes it unlawful for an "employer" to "discharge from employment" or "discriminate against [an] individual in compensation or in terms . . . of employment" on the basis of, among other things, an individual's "age, race, creed, color, national origin, sexual orientation, military status, sex, [or] disability[.]"  N.Y. Exec. Law § 296.  NYCHRL applies a more lenient standard for proving discrimination, pursuant to which the plaintiff need "only show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty."  *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 216 (E.D.N.Y. 2014).[7]  However, the NYCHRL is not a "general civility code", and a plaintiff must

_____

[7] Section 8-107 of the NYCHRL makes it

> an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship

still show "that the conduct is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

      3.    <u>Pattern or Practice Disparate Treatment Claims</u>

      Disparate treatment claims in the context of an employment discrimination case may be shown individually or by a pattern or practice suit brought by a "group of plaintiffs, entitled to be certified as a class[.]" *United States v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013); *see Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012) (pattern or practice framework is unavailable to nonclass plaintiffs). "Pattern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals." *Robinson v. Metro–N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001); *see City of New York*, 717 F.3d at 83; *Henderson v. City of New York*, 818 F. Supp. 2d 573, 578 (E.D.N.Y. 2011). Whereas an individual claim requires intent to discriminate against one person, a pattern or practice claim requires a showing that (1) the alleged racial discrimination amounted to more than sporadic acts of discrimination, but rather the defendant's "standard operating procedure" or the "regular rather than the unusual practice," and (2) the discrimination was directed at a class of victims. *City of New York*, 717 F.3d at 83 (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 (1977)).

      4.    <u>Framework for Analyzing Discrimination Claims</u>

      Employment discrimination claims under §§ 1981 and 1983, NYSHRL, and NYCHRL are governed by the same liability standard and analytical framework as Title VII disparate

---

      status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8−107(1)(a).

treatment claims.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (§ 1981);

*Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (§ 1981); *Torres v.*

*Pisano*, 116 F.3d 625, 629 (2d Cir. 1997) (NYSHRL); *Ortega v. New York City Off–Track*

*Betting Corp.*, 97 CV 7582, 1999 WL 342353, at *3 n.2 (S.D.N.Y. May 24, 1999) (NYSHRL

and NYCHRL).[8]  Under the Title VII analytical framework, the plaintiff bears the initial burden

of presenting a *prima facie* case of a policy, pattern, or practice of intentional discrimination

against a protected group.  *City of New York*, 717 F.3d at 83; *Robinson*, 267 F.3d at 158.  A

plaintiff's initial burden in a pattern or practice case is heavier than the burden in an individual

case in that the plaintiff must make a *prima facie* showing of a "pervasive policy of intentional

discrimination" instead of only a single instance of discriminatory treatment.  *City of New York*,

717 F.3d at 84.  However, a plaintiff's burden is lighter "in that the plaintiff need not initially

show discrimination against any particular present or prospective employee."  *Id.*  Although

"instances of discrimination against particular employees are *relevant* to show a policy of

intentional discrimination, they are *not* required," and "a statistical showing of disparate impact

might suffice."  *Id. (citing Hazelwood School District v. United States*, 433 U.S. 299, 307–08

(1977)) (emphasis added).  As with individual discrimination cases, a plaintiff's initial burden in

a pattern or practice case "is only to present a prima facie case that will support a rebuttable

presumption of the ultimate fact in issue."  *Id.*

---

[8] There are, however, significant substantive legal differences between Title VII claims and claims pursuant to §§ 1981 and 1983, relating to: (1) the statute of limitations, (2) the requirement that §§ 1981 and 1983 plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) the existence of individual liability under §§ 1981 and 1983, but not under Title VII, and (4) the viability of a Title VII claim based on negligence, as opposed to the showing of intentional discrimination required for §§ 1981 and 1983 claims.  *See Patterson*, 375 F.3d at 225–227.  Additionally, unlike in the Title VII context, an individual can be subject to liability under the NYSHRL and NYCHRL, but only where the individual defendant actually participates in the conduct giving rise to the claim.  *See Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, 12 CV 2285, 2014 WL 5822628, at *18 (E.D.N.Y. Nov. 6, 2014).

Once plaintiffs make their initial showing, the burden of production shifts to the employer "to rebut the presumption of discrimination." *Texas Dep't of Comm. Aff. v. Burdine*, 450 U.S. 248, 254 (2014).  A defendant may attempt to do so by, for instance, "demonstrating that the [plaintiffs'] 'proof is either inaccurate or insignificant,'" or offering affirmative evidence demonstrating the absence of an intent to discriminate. *City of New York*, 717 F.3d at 85−87 (quoting *Teamsters*, 431 U.S. at 360); *Robinson*, 267 F.3d at 159.

If the defendant rebuts the presumption of discrimination, the trier of fact then must determine if the plaintiffs have proven "the ultimate fact" of whether the employer has "a policy of intentional discrimination." *City of New York*, 717 F.3d at 87.  Pattern or practice discrimination claims generally are proven through evidence of a concrete policy and/or statistical evidence, along with anecdotal evidence of specific instances of discrimination. *Robinson*, 267 F.3d at 158−59, *Bloomberg*, 778 F. Supp. 2d at 469; *Krish v. Connecticut Ear, Nose & Throat, Sinus & Allergy Specialists, P.C.*, 607 F. Supp. 324, 331 (D. Conn. 2009); *see Teamsters*, 431 U.S. at 337–43 (upholding finding that a pattern or practice of employment discrimination existed where plaintiffs offered statistical evidence buttressed by oral testimony of 40 specific instances of discrimination).

If a plaintiff succeeds in proving liability, the case then proceeds to a remedial phase, at which the court may fashion class-wide injunctive relief.  *Robinson*, 267 F.3d at 158−59.  In addition, at this stage, individual plaintiffs are entitled to a rebuttable presumption of discrimination in litigating a particular adverse employment decision rendered by the defendant during the class period to obtain individual relief.  *Id*. at 159; *Bloomberg*, 778 F. Supp. 2d at 468−69.

On a motion to dismiss, courts generally treat the elements of a *prima facie* case as "an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible" to survive a motion to dismiss. *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 429 (S.D.N.Y. 2014) (citing cases); *see Littlejohn v. City of New York*, 795 F.3d 297, 308 (2d Cir. 2015) (2d Cir. Aug. 3, 2015) (the standard for *prima facie* case sufficiency is not a pleading requirement, but an evidentiary standard). Thus, for the Court to deem a set of factual allegations plausible, Plaintiffs must allege facts that allow the Court, in substance, to infer the essential elements of a *prima facie* case. *See Knight v. State Univ. of New York at Stony Brook*, 2014 WL 4639100, *5 (E.D.N.Y. Sept. 16, 2014).

5.   Plaintiffs Have Sufficiently Alleged a Pattern or Practice Disparate Treatment Claim

The gravamen of Plaintiffs' racial discrimination claim is that the City Defendants, motivated by racial animus and hostility toward the predominantly minority 911 Operator work force, maintained a pattern or practice of understaffing, allocating insufficient resources to the 911 call center, and declaring fictitious staffing emergencies, to the detriment of the health and safety of 911 Operators. (*See, e.g.*, Am. Compl. ¶ 267; Dkt. 94 at 7−8.) The City Defendants contend that Plaintiffs' pattern or practice discrimination claim must be dismissed because the allegations are insufficient to raise an inference that the complained-of policies were motivated by race. (Dkt. 93 at 3−4, 6−8.) At this early stage in the litigation, the Court cannot agree.

Initially, the Court finds that Plaintiffs' allegations in the Amended Complaint provide fair notice of Plaintiffs' pattern or practice disparate treatment claim and the grounds on which it rests. *See Twombly,* 550 U.S. at 555; *Swierkiewicz,* 534 U.S. at 512; *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008). Plaintiffs allege an overarching pattern of intentional over-work, under-staffing, and punitive measures against 911 Operators, motivated by racial animus, that is

20

detrimental to their health and safety.  (Am. Compl. ¶¶ 210−14, 265−67.)  The Amended Complaint contains allegations that this discriminatory pattern is manifested by the following practices: (1) requiring 911 Operators to work consecutive double-shifts and overtime shifts, (2) cancelling sick leave and retaliating for taking sick leave, (3) interfering with, and retaliating for, the use of FMLA leave, (4) subjecting 911 Operators who seek to limit their overtime as a reasonable accommodation to sham § 72 medical examinations before declaring them unfit for duty and placing them on unpaid leave, (5) requiring 911 Operators to work during meal breaks, and (7) imposing disciplinary measures on 911 Operators that were not imposed on other NYPD employees.  (*Id.* ¶¶ 107−08, 210−14, 265−67; *see* Dkt. 94 at 7.)  Of course, not every complaint that alleges instances of discrimination necessarily states a pattern or practice claim.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982) ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action.").  Plaintiffs must plausibly allege that the discriminatory incidents were more than isolated or sporadic, but are repeated, routine, or of a generalized nature.  *Ste. Marie v. E.R. Ass'n*, 650 F.2d 395, 405 (2d Cir. 1981).  "[T]he definition of a pattern or practice is not capable of a precise mathematical formulation," although "more than two acts will ordinarily be required."  *Id.* at 406 (reviewing verdict after trial) (citations omitted).  A small number of confirmatory acts may suffice to state a plausible pattern or practice claim if a complaint contains factual allegations supporting the inference that the defendant had adopted a policy of discrimination.  *Id.*

Here, the Amended Complaint alleges facts regarding both the City Defendants' formal announcement of the challenged policies and specific instances of these policies being enforced against Plaintiffs.  For example, Plaintiffs assert that seven of the named Plaintiffs were required

to work double eight-hour shifts three times a week and a minimum of two 12-hour overtime shifts each week since around May 2013.  (Am. Compl. ¶ 106.)  Plaintiffs specifically allege that Pate was required to work five consecutive 16-hour shifts.  (*Id.* ¶ 146.)  Plaintiffs also specify time periods in which sick leave was suspended for all 911 Operators. (*Id.* ¶¶ 131−32.)  The Amended Complaint also includes allegations that Belusic announced a policy limiting the time to request FMLA leave, and that Ennis and three other putative class members were not permitted to request FMLA leave as a result of that policy.  (*Id.* ¶¶ 165, 167−72.)  Plaintiffs include specific allegations that Ennis and one other putative class member were required to perform mandatory overtime immediately upon returning from FMLA leave.  (*Id.* ¶¶ 175, 177.)  In addition, Plaintiffs allege that Gordon, Ennis, and Inman requested reasonable accommodations to limit their overtime hours, but that their requests were denied after sham § 72 medical examinations.  (*Id.* ¶¶ 22−26.)  The Court finds that, taken as a whole and viewed in the light most favorable to Plaintiffs, these allegations are sufficient to support an inference that the claimed overall discriminatory policy with respect to funding, structuring, and managing the 911 Operators was the City Defendants' "standard operating procedure".  *See E. River Hous. Corp.*, 2015 WL 872160, at *30; *Barrett*, 39 F. Supp. 3d at 430.

The City Defendants' contention that Plaintiffs fail to state a discrimination claim because they have not demonstrated an adverse employment action misapprehends the nature of Plaintiffs' pattern or practice claims.  (*See* Dkts. 92 at 12−15; 93 at 6−8.)  Because analysis of pattern or practice claims at the initial liability phase focuses on whether plaintiffs have sufficiently alleged class-wide discriminatory policies, rather than allegations of *individual* discrimination, Plaintiffs need not show an adverse action as to particular employees to survive dismissal at this stage.  *City of New York*, 717 F.3d at 84 ("instances of discrimination against

particular employees . . .  are not required").  The existence of an adverse employment action becomes relevant at the remedial stage of the litigation.  That is, if Plaintiffs succeed in showing that the City Defendants maintained a discriminatory pattern or practice, individual adverse employment decisions will be litigated at the remedial phase.  *Robinson*, 267 F.3d at 158−59; *Bloomberg*, 778 F. Supp. 2d at 468.  In that regard, the Court observes that, at a minimum, the alleged blanket cancellation of sick leave is likely to satisfy the adverse action requirement. *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 429 (E.D.N.Y. 2014) (fact that plaintiff was prevented from using his sick leave "may constitute an 'adverse employment action'"); *Krishnapillai v. Donahoe*, 09 CV 1022, 2013 WL 5423724, at *13 (E.D.N.Y. Sept. 26, 2013) ("[G]iven the significant effects of denying an employee the use of paid sick time or administrative leave during a medical absence, the court finds that this is sufficient to establish an adverse employment action."); *Delaney v. LaHood*, 07CV 471, 2009 WL 3199687 at *20–22 (E.D.N.Y. Sept. 30, 2009) (denial of sick leave may constitute an "adverse employment action").

The Court also finds that, contrary to Defendants' assertions, Plaintiffs' factual allegations are sufficient to "give plausible support to a minimal inference of discriminatory motivation" to survive a motion to dismiss.  *Littlejohn*, 795 F.3d at 312.  While a plaintiff must ultimately prove that a defendant acted with discriminatory intent, at the initial stage of the litigation, "the plaintiff does not need substantial evidence" of such discriminatory intent.  *Id.* at 311.  Plaintiffs need only "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation[.]"  *Id.* (emphasis in original); *see Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (noting that direct "smoking gun" evidence of discriminatory motive is often lacking) (internal citations omitted); *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 245 (S.D.N.Y. 2014) ("A victim of discrimination is . . . seldom able to prove his or her claim by

23

direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.").  Statistical disparities, though an important way of proving pattern or practice claims and often necessary to survive to survive summary judgment, need not be pled in the complaint to survive a motion to dismiss, "if a complaint pleads other facts that allow the court to infer a pattern of discrimination."  *Barrett*, 39 F. Supp. 3d at 430−32 (citing cases and noting that "in most cases, plaintiffs will be unable to provide reliable statistics before they have access to discovery"); *see E. River Hous. Corp.*, 2015 WL 872160, at *31 (statistical analysis was likely not possible, and "not essential" at the motion to dismiss stage).

Here, Plaintiffs plausibly raise the requisite inference of discriminatory animus based on allegations that predominantly non-minority groups, such as the FDNY, DOS and EMS dispatchers, were not subject to the same discriminatory policies as the 911 Operators, and allegations about disparaging remarks made by Polito with respect to the 911 Operators.  In the absence of direct evidence of discrimination, plaintiffs may present circumstantial evidence showing that they were treated less favorably than similarly situated colleagues outside of the plaintiffs' protected class.  *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  The proposed comparator group must be "similarly situated in all material respects" to the plaintiffs.  *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) engaged in comparable conduct.'" *Ruiz*, 609 F.3d at 493–94 (citing *Graham*, 230 F.3d at 40).  The plaintiffs' and comparator groups' circumstances must bear a "reasonably close resemblance," but need not be "identical." *Graham*, 230 F.3d at 40.  Ordinarily, whether employees are similarly situated "presents a

question of fact rather than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230.

Plaintiffs' claim is perhaps an atypical discrimination claim, in that it does not rely on a comparator group of "co-employees," *i.e.*, non-minority 911 Operators.  Plaintiffs do not allege that non-minority 911 Operators received favorable treatment compared to minority 911 Operators.   Rather, Plaintiffs allege that the City Defendants' discriminatory intent is demonstrated by their imposition of policies and practices on the 95%-minority 911 Operators unit that were not imposed on the City's predominantly non-minority dispatcher units outside the NYPD, including the FDNY and EMS dispatcher units.  (Am. Compl. ¶¶ 257−58.)  Plaintiffs contend that the FDNY and EMS dispatcher units are appropriate comparator groups for the 911 Operators because the 911 Operators and FDNY and EMS dispatchers work together and in tandem to perform the same function of answering public emergency calls and dispatching the appropriate emergency resources, sometimes conducting these calls jointly.  (*Id.* ¶¶ 259−61, 264.)  In addition, the 911 Operators and the City's other dispatcher units are part of the PSAC, and work on the same floor in the same building as the other dispatcher units.  (*Id.* ¶¶ 262−64.) According to Plaintiffs, the same "high-ranking City officials" manage, supervise, and regulate the PSAC as a single "fully-integrated" unit, and refer to the dispatchers as a common group.[9] (*Id.* ¶¶ 14−16, 262−63.)  As such, Plaintiffs allege that the FDNY and EMS dispatchers are

---

[9] Though these allegations regarding the City's overall management of the different dispatcher units as part of the "fully-integrated PSAC" are lacking in specifics and notably thin, at this stage of the litigation, they are enough to fairly suggest a plausible minimal inference of discriminatory animus. *See Brown*, 756 F.3d at 230 (rejecting argument that comparator was not similarly situated because comparator was employed by a different corporate division where plaintiff alleged that the divisions were part of a single integrated enterprise); *see also Boykin*, 521 F.3d at 215 (noting courts' hesitation to dismiss disparate treatment claims where the information relevant to whether others were more favorably treated than the plaintiffs is particularly within the defendants' knowledge and control).

subject to the same emergency call protocols and standards as 911 Operators in carrying out their duties. Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the 911 Operators and the FDNY and EMS dispatchers are plausibly alleged to be similarly situated, for purposes of Plaintiffs' pattern or practice disparate treatment claim.[10]

Plaintiffs also contend that the City Defendants' racial animus is demonstrated by two statements allegedly made by Polito, the NYPD Communications Section captain responsible for developing and implementing the section's personnel policies, with respect to the 911 Operators: first, "you people are useless," and second, "Don't they know they are hiring at Pathmark?", suggesting that the minority 911 Operators should be working in a low-wage job at a grocery store. (*Id.* ¶¶ 141−42.) A plaintiff may demonstrate an inference of discrimination by showing that an "employer criticized the plaintiff's performance in ethnically degrading terms" or "made invidious comments about others in the employee's protected group." *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013). "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

---

[10] The fact that non-minority 911 Operators were subject to the same policies as their minority 911 co-workers does not preclude an inference of discriminatory intent, since Plaintiffs' disparate treatment claim is based on the City Defendants' alleged hostility towards the 911 Operators as a *predominantly* minority group, and relies on the City's predominantly non-minority dispatcher units as comparators.

In contrast to Plaintiffs' allegations regarding the FDNY and EMS dispatcher units, Plaintiffs have not alleged facts tending to show that DOS dispatchers or NYPD PAAs were similarly situated to the 911 Operators. (*See* Am. Compl. ¶¶ 239, 258, 266.) However, because Plaintiffs' disparate treatment claim is being permitted to go forward, the Court will not limit the scope of discovery on this issue.

As the City Defendants correctly point out (Dkt. 92 at 19), "racially [ ] ambiguous, sporadic remarks" are not, without more, sufficient "evidence of race discrimination," *Big Apple Tire, Inc. v. Telesector Res. Grp., Inc.*, 476 F. Supp 2d 314, 327 (S.D.N.Y.2007), especially when "there is insufficient evidence . . . that the question was laced with racial innuendo as opposed to" a neutral, commonplace effort to identify the group being addressed, *Feather v. Intercontinental Hotels Grp.*, 563 F.Supp.2d 389, 404 (N.D.N.Y. 2008). However, phrases such as "'you people' . . . 'could just as easily be interpreted as [having] a negative racial connotation[,]" *Wooten v. Reconstruction Home, Inc.,* 02 CV 01278, 2005 WL 1502149, at *11 (N.D.N.Y. June 24, 2005), particularly when Plaintiffs "provide 'greater specificity as to the context of [such phrases'] usage,'" *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 253 (S.D.N.Y. 2014) (quoting *Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 314 (S.D.N.Y.2000)). *See also Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 53 (S.D.N.Y. 2009) (in the context of a summary judgment motion, finding that statements such as, "you people cannot do anything right", permit a reasonable jury to find discriminatory motivation); *Wooten,* 2005 WL 1502149, at *11 (concluding that use of "you people," combined with evidence of discriminatory treatment that began only after the defendant discovered that the plaintiff was African–American, could provide a partial basis for drawing an inference of discrimination).

Plaintiffs argue that Defendants Polito's additional statement, "Don't they know they are hiring at Pathmark?", provides such context. The Court agrees that this comment could be interpreted to convey the view that the minority 911 Operators don't belong in the NYPD Communications Section, and thus lends more support to the racially hostile character of Polito's other "you people" remark. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253 (2d Cir. 2014) (noting at summary judgment that a jury could find that comments regarding a "better fit"

27

or "fitting in," even when isolated, could be enough to create a reasonable question of fact for a jury with respect to discriminatory intent).  While Polito's remarks may be susceptible to a plausible innocuous interpretation, the allegation of racial animus is equally plausible.  On a Rule 12(b)(6) motion, it is not the province of the Court to dismiss the Amended Complaint on the basis of the Court's choice among plausible alternatives.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) (choosing between or among plausible interpretations of the evidence is a task for the factfinder); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 226 (2d Cir. 2014) (whether statements such as, "they don't know how to police each other", is probative of discriminatory intent is left for the jury to decide at trial).

Accordingly, the Court finds that based on their allegations regarding the FDNY and EMS comparators and Polito's statements, Plaintiffs have met their minimal burden, particularly at this stage, to allege an inference of discriminatory intent.  *See Boykin*, 521 F.3d at 215 (denying motion to dismiss where plaintiff alleged that she was African-American, described defendant's actions, and alleges that she "was treated differently from similarly situated loan applicants . . . because of her race, sex, and the location of the property in a predominantly African–American neighborhood").

Having thus concluded that Plaintiffs have plausibly alleged a violation of their federal rights under § 1981, the Court rejects the City Defendants' contention that Plaintiffs have failed to allege an underlying federal violation as required by *Monell*.  (*See* Dkts. 92 at 34; 93 at 22). Under *Monell*, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see Jett*, 491 U.S. at 702 (a plaintiff "must show that the violation of his § 1981 [rights] was caused by a custom or

policy within the meaning of *Monell* and subsequent cases").  Moreover, as discussed above, the Plaintiffs' Amended Complaint alleges sufficient facts to raise an inference that the underlying federal injury of racial discrimination is pursuant to a municipal policy or custom.  Accordingly, the Court finds that Plaintiffs have adequately alleged a deprivation of a federal right that satisfies the § 1983 *Monell* standard.

In sum, Plaintiffs have pled sufficient facts to state a plausible pattern or practice claim of racial discrimination under §§ 1981 and 1983, NYSHRL, and NYCHRL against the City and individual Defendants in their official capacity.  The motion to dismiss these aspects of Plaintiffs' Amended Complaint is accordingly denied.

### C. Racial Discrimination Claims Against the Individual Defendants in their Personal Capacities Under §§ 1981 and 1983

It is well-established that personal liability under §§ 1981 and 1983 must be predicated on the actor's personal involvement in the claimed violation and discriminatory purpose. *Patterson*, 375 F.3d at 229 ("a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action").  In *Reynolds v. Barrett*, 685 F.3d 193 (2d Cir. 2012), the Second Circuit refused to analyze a plaintiff's § 1983 Equal Protection claim against individual state defendants under the pattern or practice evidentiary framework, since holding individuals liable based on broad evidence of employer-wide discrimination would contravene the requirement of personal involvement. *Id.* at 204−05 (noting that pattern or practice framework relies on evidence of employer-wide discrimination, and is therefore "is ill-suited to the task of identifying which individual defendants engaged in purposeful discrimination").  Notably, the Court declined to decide whether the pattern or practice framework can *ever* be used in a § 1983 suit against a "policy-making supervisory defendant, although it expressed "considerable skepticism" on this issue.  *Id.* at 205 n.14.

Relying on *Reynolds*, the City Defendants seek to dismiss Plaintiffs' §§ 1981 and 1983 personal capacity claims against the individual defendants, contending that the pattern or practice framework may never be applied to analyze discrimination claims against individuals.  (Dkt. 93 at 5.)  The facts presented here, however, differ markedly from those in *Reynolds*.  Rather than relying solely on allegations of entity-level discrimination, Plaintiffs assert facts that suggest personal involvement by each of the individual defendants sued in their personal capacity.  As the City Defendants acknowledge, the Amended Complaint includes allegations about derogatory remarks made by Polito, threats of disciplinary action by Church, and correspondence or memoranda circulated by Belusic, Napolitano, and Kelly regarding the challenged policies.  (Dkt. 92 at 33; Am. Compl. ¶¶ 141−45, 147, 164−65, 193, 195, 222.)  Plaintiffs further allege that Lichtenstein conducted the sham § 72 medical examinations of 911 Operators pursuant to the City Defendants' allegedly unlawful reasonable accommodations policy.  (Am. Compl. ¶¶ 83, 222−23.)  With respect to Dowd, the NYPD Communications Section chief, Plaintiffs' allegations of the NYPD's lengthy and known violations of Plaintiff's sick and FMLA leave rights fairly suggest that Dowd was negligent in his supervision of subordinates in that unit.  *See Patterson*, 375 F.3d at 229 (personal involvement "includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring") (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)).  Plaintiffs also allege, more broadly, that Napolitano, Dowd, Kelly, Polito, Belusic, and Church were policy-making supervisors within the NYPD Communications Section, and were responsible for developing, implementing, and enforcing policies affecting the terms and conditions of Plaintiffs' employment.  (Am. Compl. ¶¶ 64, 67−68, 71, 74, 77, 80.)

In sum, these allegations provide the individual Defendants with fair notice of the basis for Plaintiffs' personal capacity claims against them.  The Court accordingly denies the City Defendants' motion to dismiss Plaintiffs' §§ 1981 and 1983 claims against the individual Defendants in their personal capacities.

### D.  Racial Discrimination Claim Against DC 37 Under § 1981

Plaintiffs' tenth cause of action alleges that DC 37 violated §1981 by subjecting Plaintiffs to differential terms and conditions of representation because of race, and by tacitly approving of the NYPD's discriminatory policies.  (Am. Compl. ¶¶ 118−19, 305−09.)  DC 37 moves to dismiss Plaintiffs' discrimination claim on the ground that the Amended Complaint lacks allegations to support an inference that DC 37's conduct was motivated by racial animus.

Employment discrimination claims against unions are analyzed differently from claims against employers, in that claims against unions are grounded in the union's duty of fair representation to its members.  *Klaper v. Cypress Hills Cemetery*, 10 CV 1811, 2012 WL 959403, at *7 (E.D.N.Y. Mar. 21, 2012).  To prevail on a disparate treatment discrimination claim against DC 37 under § 1981, Plaintiffs must establish that: 1) DC 37 breached its duty of fair representation, and 2) DC 37's actions were motivated by discriminatory animus.  *Id.*; *see Vaughn v. Am. Tel. & Tel. Co.*, 92 Fed. App'x. 21, 23 (2d Cir. 2004).  At the pleading stage, Plaintiffs' allegations must at least suggest discriminatory intent.  *Durant v. Union Local 237*, 12 CV 1166, 2013 WL 1232555, at *6 (E.D.N.Y. Mar. 4, 2013) *report and recommendation adopted*, 2013 WL 1247520 (E.D.N.Y. Mar. 26, 2013).[11]  In contrast to their allegations

---

[11]  "Unlike Title VII, . . . [disparate] impact alone is insufficient [to prove a Section 1981 claim] since purposeful discrimination must be shown."  *Scelsa v. City Univ. of N.Y.*, 806 F. Supp. 1126, 1145 (S.D.N.Y. 1992) (citing, *inter alia*, *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 390 (1982)); *see Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 225 (S.D.N.Y. 1998).  Plaintiffs thus cannot proceed against DC 37 under a disparate

pertaining to the City Defendants, Plaintiffs' allegations regarding DC 37 are devoid of any facts from which the Court can infer discrimination on the basis of race or any other protected status. There are no allegations, for instance, that DC 37 treated similarly situated groups more favorably than the 911 Operators, or that any DC 37 officials made remarks that could be viewed as reflecting discriminatory animus toward Plaintiffs.  Dismissal is thus appropriate with respect to Plaintiffs' claims that DC 37 directly discriminated against the 911 Operators.

Plaintiffs advance an alternate theory for their § 1981 discrimination claim against DC 37, based on DC 37's acquiescence to the City's known discrimination.  (Dkt. 90 at 12−16.) Courts indeed have held that "a union's tacit acquiescence [in] or ratification [of an employer's discriminatory conduct] . . . can serve as a basis for an employment discrimination claim . . . if the plaintiff sufficiently alleges that this acquiescence or ratification was 'arbitrary, discriminatory, or in bad faith'--that is, if the acquiescence or ratification establishes a breach of the union's [duty of fair representation]."  *Klaper*, 2012 WL 959403, at *11−12 (citing cases); *see Equal Employment Opportunity Comm'n v. Enter. Ass'n Steamfitters Local No. 638 of U. A.*, 542 F.2d 579, 589 (2d Cir. 1976) ("mere acquiescence in the discriminatory acts of the union would render it liable").

DC 37 maintains that because Plaintiffs are proceeding under § 1981, which requires a showing of purposeful discrimination, Plaintiffs must still plead facts suggesting that DC 37 acted with discriminatory intent to state a claim on an acquiescence theory.  This is incorrect. An acquiescence theory of liability "does *not* require a showing that [the union] was motivated by discriminatory intent."  *Klaper*, 2012 WL 959403, at *12 (emphasis added); *see Ruff v. Coba Union Corr. Officers Benefits*, 12 CV 6113, 2013 WL 5960890, at *5 (E.D.N.Y. Nov. 6, 2013);

impact theory of liability, and those claims, asserted in the tenth cause of action (Am. Compl. ¶¶ 306−08), are dismissed.  *See Reynolds*, 685 F.3d at 201−02.

*see also Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987) ("A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under . . . § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities.")  Rather, this theory stems from the principle that "[a] § 1981 violation may be established not only via presentation of evidence regarding defendant's affirmative acts, but also by evidence regarding defendant's omissions when defendant is under some duty to act."  *Scelsa*, 806 F. Supp. at 1145.[12]  In other words, the acquiescence theory permits an inference of discriminatory intent based on the union's disregard of an employer's discrimination.  *See Nweke*, 25 F. Supp. 2d at 220; *James v. Local 32B−32J, Serv. Employees Int'l Union, AFL-CIO*, 86 CV 0197, 1987 WL 33622, at *2 (S.D.N.Y. Dec. 28, 1987) (same); *United States v. City of Buffalo*, 457 F. Supp. 612, 639 (W.D.N.Y. 1978) ("Tacit union acquiescence in an employer's discriminatory practices is sufficient to render it liable.").[13]

As previously indicated, Plaintiffs have sufficiently pled its pattern or practice racial discrimination claim against the City Defendants.  Plaintiffs' Amended Complaint also pleads facts to suggest that DC 37 tacitly approved these policies by failing its duty of fair representation.  Specifically, Plaintiffs allege that DC 37 acquiesced in the City's discriminatory treatment of the 911 Operators by (1) failing to enforce the 2008 Arbitration Decision or convert it into an enforceable judgment, thus allowing the NYPD to continue cancelling sick leave for

---

[12] For instance, courts permit § 1981 liability based on a defendant's deliberate indifference to discrimination by other parties within their control.  *See DiStiso v. Cook*, 691 F.3d 226 (2d Cir. 2012).

[13] Of course, even under this alternate theory, Plaintiffs must still meet the initial burden of establishing a *prima facie* case of discrimination on the part of the City Defendants.  *See Nweke*, 25 F. Supp. 2d at 224 (dismissing acquiescence claim against union where the plaintiff failed to establish *prima facie* case of discrimination by employer).

911 Operators, (2) failing to initiate a grievance regarding the City's sign-out policy, (3) encouraging 911 Operators to withdraw reasonable accommodation requests, and (4) generally approving of the City's discriminatory policies, such as frustrating the 911 Operators' exercise of FMLA rights, and imposing discriminatory disciplinary procedures on the 911 Operators.  (Am. Compl. ¶¶ 118−19, 129, 149, 155, 227−28, 246−47, 302, 308.)  Accordingly, the Court denies DC 37's motion to dismiss Plaintiffs' § 1981 discrimination claim based on DC 37's alleged acquiescence to the City's discriminatory treatment of the 911 Operators.

### E.  FMLA Interference and Retaliation Claims Against the City Defendants

Plaintiffs' fifth cause of action asserts that the City Defendants "*per se*" or "facially" violated the FMLA through policies that interfered with the 911 Operators' exercise of their FMLA rights, and retaliated against them for using, or attempting to use, FMLA leave.  (*Id.* ¶¶ 207, 291−95; *see* Dkt. 94 at 26 (arguing that "the City imposes policies that are *per se* or facial violations of the FMLA as applied against them and the proposed class" and "that Plaintiffs are entitled to present evidence to obtain broad injunctive relief against the City's FMLA policies outside of any individual FMLA claim[]").)  Plaintiffs seek an injunction against the challenged FMLA policies.  (Am. Compl. ¶ 207.)  The City Defendants move to dismiss Plaintiffs' FMLA claims, contending that Plaintiffs have failed to state a cognizable harm or any violation of their FMLA rights.  (Dkts. 92 at 26−30; 93 at 9−12.)

The FMLA was enacted by Congress in 1993 to address "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods[.]"  29 U.S.C. § 2601(a)(4).  It grants eligible employees the right "to a total of 12 workweeks of leave during any 12–month period . . . to care for [a] spouse, or a son, daughter, or parent" who "has a serious health condition." 29 U.S.C. § 2612(a)(1)(C); *see Geromanos v.*

*Columbia Univ.*, 322 F. Supp. 2d 420, 426 (S.D.N.Y. 2004).  "The term 'eligible employee' means an employee who has been employed . . . for at least 12 months by the employer" and "for at least 1,250 hours of service . . . during the previous 12-month period."  29 U.S.C. § 2611.

FMLA leave may be taken "intermittently or on a reduced leave schedule when medically necessary."  29 U.S.C. § 2612(b)(1).  It may be provided unpaid, 29 U.S.C. § 2612(c), or "an employer may require the employee[] to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided under [the FMLA] for any part of the 12–week period of such leave," 29 U.S.C. § 2612(d)(2)(B).  At the end of FMLA leave, the employee is entitled to reinstatement to her former position or an equivalent. 29 U.S.C. § 2614(a)(2) ("The taking of [FMLA] leave . . . shall not result in the loss of any employment benefit accrued prior to" leave.).

To ensure the availability of these rights, the FMLA makes it unlawful for employers to: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA (known as "interference" claims); or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA (known as "retaliation" claims). *Id.* § 2615(a); *see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006); *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."  29 C.F.R. § 825.220(c).  Employers also are prohibited from discriminating against any employee for filing any charge or instituting any proceeding under or related to the FMLA.  *See* 29 U.S.C. § 2615(b)(1).

1. <u>FMLA Interference Claim</u>

In a FMLA interference claim, "an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act." *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2011). To state a claim for FMLA interference, a plaintiff must plead facts to show that (1) she is an eligible employee under the FMLA; (2) the defendant is an employer as defined in the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) she was denied benefits to which she was entitled under the FMLA. *See Geromanos*, 322 F. Supp. 2d at 427. The employer's intent is irrelevant to a FMLA interference claim. *Potenza*, 365 F.3d at 167. Denial of FMLA benefits is interpreted flexibly; "'[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); *see Potenza*, 365 F.3d at 168; *Sista*, 445 F.3d at 175. A plaintiff must show that "she suffered some injury by reason of the interference with her FMLA rights." *Reyes v. N.Y.C. Health & Hosps. Corp.*, 10 CV 1606, 2012 WL 3764061, at *5 (E.D.N.Y. Aug.29, 2012); *see Roberts v. Health Ass'n*, 308 F. App'x 568, 570 (2d Cir. 2009) ("Although [plaintiff] can likely show that [defendant] interfered with her FMLA rights, because there is no evidence that the violation was prejudicial, the District Court did not err in dismissing her [FMLA] claim."); *see also Gilmore v. Univ. of Rochester*, 654 F. Supp. 2d 141, 149−50 (W.D.N.Y. 2009) (dismissing FMLA claims on summary judgment where plaintiff failed to show any prejudice or injury resulting from defendant's alleged FMLA violation).

Here, each of the named Plaintiffs is alleged to be an eligible employee under the FMLA at all relevant times. (Am. Compl. ¶¶ 25, 29, 33, 37, 41, 49.) Plaintiffs assert that the City

Defendants facially interfered with their FMLA rights by (1) refusing to accept leave requests made in advance of 30 minutes prior to a shift (*id.* ¶¶ 165–173), (2) miscalculating the amount of FMLA leave hours used by the employee (*id.* ¶¶ 178–88), (3) delaying FMLA certification (*id.* ¶¶ 189–92), (4) mandating the use of a special phone number for FMLA requests (*id.* ¶¶ 193–97), and (5) miscalculating eligibility hours for FMLA leave (*id.* ¶¶ 202–03).  (*See* Dkt. 94 at 26–33.)  The Court analyzes each of these policies separately to determine whether each interferes with Plaintifs' exercise of their FMLA rights.  (*See id.* at 28 ("the Amended Complaint details nine *distinct* and unlawful policies") (emphasis added).)  Upon a consideration of Plaintiffs' pleadings, the Court finds that they sufficiently allege a plausible FMLA interference claim based on the City Defendants' 30–minute call window policy and the miscalculation of FMLA hours used by the employee.[14]

---

[14] The Court declines to adopt Plaintiffs' proposal to apply the Title VII "pattern or practice" framework to analyze its "facial" or *per se* FMLA interference claim (*see* Dkt. 94 at 28).  The pattern or practice rubric, which employs a burden-shifting scheme to assist in discerning discriminatory intent, serves no purpose here where the employer's intent is immaterial and the inquiry is simply "whether the employer in some manner impeded the employee's exercise of his or her right."  *Potenza*, 365 F.3d at 168 (explaining that Circuit courts have approved application of a burden-shifting analysis to individual "claims of retaliation—where the employer's intent is material—but not to assertions of interference—where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right").  Indeed, Plaintiffs have not identified any case law applying the pattern or practice framework in an action alleging that a defendant's policies interfere with FMLA rights, or applying the *McDonnell Douglass* burden shifting analysis to an individual interference claim.

Even if the Court were inclined to analyze Plaintiffs' FMLA interference claims under a pattern or practice framework, as described *infra*, Plaintiffs' allegations are insufficient to plead allegations of widespread acts of intentional discrimination against individuals, *i.e.*, acts that are more than isolated, accidental, or sporadic.  *See Stoler v. Inst. for Integrative Nutrition*, 13 CV 1275, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) (addressing a motion to dismiss a putative class action alleging claims for FMLA interference and retaliation, the court recited the pattern-or-practice standard but analyzing FMLA claims as to each individual).  Furthermore, analysis of each FMLA claim will be necessary for purposes of certifying a FMLA class, since an "undifferentiated mass of violations of a single statute" or "the possibility that the same law was violated in a variety of ways" would "not lead to common answers that would make class

a.      30-Minute Call Window

With respect to their 30−minute call window claim, Plaintiffs allege that in April 2013, Belusic informed 911 Operators that FMLA requests would only be accepted if made within 30 minutes prior to the shift for which the employee was requesting leave.  (Am. Compl. ¶ 165.) While the FMLA permits an employer to establish its own policies for usual and customary notice for requesting leave, 29 C.F.R. § 825.303(c), "[a]n employer cannot use its own notice policy to circumscribe an employee's rights under the FMLA," *Slaughter v. Am. Bldg. Maint. Co. of New York*, 64 F. Supp. 2d 319, 327 (S.D.N.Y. 1999).  The FMLA does not impose a specific time requirement for an employee to request FMLA leave, only requiring that "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).  As some courts have held, "[t]he specific purpose of the [FMLA] is to deal with situations . . . [in which] a worker [must] . . . balance the needs of family and work and need[s] flexibility to deal with emergency family and medical problems."  *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1217 (S.D. Cal. 1998). Hence, a policy that "does not allow for such flexibility nor recognize that in FMLA leave situations it may not be possible for an employee to call [within a specific time window] before a shift begins violates the employee's rights under the Act."  *Slaughter*, 64 F. Supp. 2d at 327 (quoting *Mora*, 16 F.Supp.2d at 1216–17); *see Bishop v. New Process Gear, Inc.*, No. 5:06-CV-0821 GTS/GHL, 2009 WL 3928679, at *6 (N.D.N.Y. Nov. 18, 2009) (invalidating portion of a settlement agreement that required one hour's notice for FMLA leave because it "failed to recognize that, in FMLA leave situations, it may not be possible for Plaintiff to call in one hour before his shift").  For these reasons, an employer "policy which requires that an employee who

litigation a productive endeavor".  *Oakley v. Verizon Commc'ns Inc.*, 09 CV 9175, 2012 WL 335657, at *14 (S.D.N.Y. Feb. 1, 2012).

will miss work call in one half an hour before his or her shift begins conflicts with the FMLA." *Mora*, 16 F.Supp.2d at 1217.

The 30−minute call window policy, as alleged, states a FMLA interference claim because it fails to provide the flexibility mandated by the FMLA with respect to determining the appropriateness of a leave request. *See* 29 C.F.R. § 825.303(a) ("When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."). Plaintiffs assert that calls to request FMLA leave made outside of the 30−minute window are categorically rejected or not accepted, and that the 911 Operators are required under all circumstances to call back within the 30−minute window. (Am. Compl. ¶ 165.) Plaintiffs allege that Ennis attempted to request FMLA leave several hours before her shift "on several occasions" but was told to call back for approval, that three non-plaintiff class members had similar experiences, and that because of the policy, 911 Operators have been unable to adequately plan for medical care, child care, and other exigencies. (*Id.* ¶¶ 167−73.) Indeed, if proven, such a policy is plainly antithetical to the FMLA's goals and its provisions, and interferes with Plaintiffs' exercise of their rights under the FMLA.

### b.   Miscalculation of FMLA Hours Used

Plaintiffs also plausibly stated a claim that Defendants interfered with their FMLA rights by deducting a full seven−hour day from available FMLA leave regardless of the number of leave hours actually used by the employee. (*Id.* ¶¶ 178−79.) On multiple occasions, Ennis requested and used a few hours of FMLA leave but was told that an entire seven−hour day was deducted from her available FMLA hours. (*Id.* ¶¶ 185−88.) Another proposed class member was also told that seven hours of leave were deducted from her FMLA hours when she had only

used two.  (*Id.* ¶¶ 180−84.)   These acts, if true, plausibly allege interference with Plaintiffs' FMLA rights.  *See Sista*, 445 F.3d at 176 (interference claim contemplates whether the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA).

c.   <u>Plaintiffs' Other FMLA Interference Allegations</u>

Plaintiffs' other allegations do not state a claim for a FMLA violation or support an inference of injury or prejudice to the named Plaintiffs.  *See Reyes*, 2012 WL 3764061, at *5 (dismissing FMLA claims where plaintiff did not demonstrate that she was prejudiced by claimed FMLA violations and "has not presented evidence of injury").  For example, Plaintiffs allege that Defendants delayed over four months to approve FMLA requests, and provides two incidents in which members of the proposed class experienced delays in approving FMLA recertification.  (Am. Compl. ¶¶ 189−92.)  This allegation pleads a technical FMLA violation, because "[w]hen an employee requests FMLA leave . . . the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."  29 C.F.R. § 825.300(b)(1).  However, because the Amended Complaint fails to allege that any of the named Plaintiffs experienced a delay, or are currently seeking certification and thus may be subject to such a delay, these Plaintiffs have failed to allege any prejudice as a result of the violation, and thus lack standing to seek the requested injunctive relief.  *See Smith*, 769 F. Supp. 2d at 468 (plaintiff did not state a claim based on a four-and-a-half-month delay to respond to request for FMLA leave when plaintiff failed to allege specific harm caused by the delay).

Similarly, Plaintiffs' claim that the City Defendants interfered with FMLA leave by miscalculating 911 Operators' eligibility hours is not supported by any allegation that a named

40

Plaintiff, or for that matter *any* member of the proposed FMLA class, was deemed ineligible for FMLA leave based on a miscalculation of the qualifying hours worked by the requesting employee. Thus, Plaintiffs fail to plausibly allege that the City Defendants maintained a policy of miscalculating FMLA qualification hours, and also fail to establish any tangible injury or prejudice to any named Plaintiff that confers standing to pursue this claim.

Plaintiffs' allegations regarding the City Defendants' use of a designated phone number for FMLA requests are similarly deficient. (Am. Compl. ¶ 193.) First, FMLA regulations specifically permit an employer to "require employees to call a designated number or a specific individual to request leave", so long as the policy allows flexibility when "unusual circumstances justify the failure to comply." 29 C.F.R. § 825.303(c). Second, Plaintiffs have not alleged any specific harm caused by the use of a designated number, or any instances in which use of the designated number interfered with a 911 Operator's ability to use FMLA leave.[15] Again, Plaintiffs have failed to state a claim or, even assuming a valid claim, to show the named Plaintiffs' injury or standing to bring such a claim.

Finally, although Plaintiffs assert that the City Defendants interfered with their FMLA rights by conducting investigations on FMLA approval and usage, "interrogating" Operators, contacting treating physicians, or requiring additional confirmation of a qualifying medical condition "at an excessive rate" (Am. Compl. ¶¶ 198−201, 204−06), Plaintiffs do not include any allegations that the named Plaintiffs or any class members were subjected to these alleged

---

[15] Even if the Amended Complaint is liberally construed to assert that the use of the designated phone line, which, at one time, was housed in the Disciplinary Unit (*see* Am. Compl. ¶¶ 193−95), together with the allegations about the City's investigatory practices, discussed *infra*, had a chilling effect on the use of FMLA leave, it lacks any allegations to support this conclusion. For example, the Amended Complaint contains no allegations that any of the named Plaintiffs were deterred or prevented from requesting FMLA leave as a result of which unit was manning the designated phone line. Thus, even on this ground, the Amended Complaint falls short of plausibly pleading that these alleged policies amounted to a FMLA violation.

practices.  Without specific examples or further detail, Plaintiffs' allegations fail to raise a non-speculative, plausible FMLA claim based on the City Defendants' alleged investigatory practices, or to establish standing to bring such a FMLA claim.

In sum, the City Defendants' motion is denied as to Plaintiffs' FMLA interference claims based on the 30−minute call window and the miscalculation of FMLA leave hours used, but granted as to the remainder of Plaintiffs' FMLA interference claims.[16]

### 2.  FMLA Retaliation

Plaintiffs also allege that the City Defendants maintain a pattern or practice of retaliating against 911 Operators for the exercise of FMLA leave rights.  In a FMLA retaliation claim, "an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  *Smith*, 769 F. Supp. 2d  at 469 (quoting *Krosmico v. JP Morgan Chase Co.*, 06 CV 1178, 2006 WL 3050869, at *2 (E.D.N.Y. Oct. 19, 2006)).  To establish a claim of FMLA retaliation, a plaintiff must show that (1) she exercised rights protected under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  *See, e.g.*, *Potenza,* 365 F.3d at 168.

Because individual retaliation claims pursuant to the FMLA are analyzed under Title VII's burden-shifting framework, *see Serby v. N.Y.C. Dep't of Educ.*, 526 F. App'x 132, 134 (2d Cir. 2013), the Court is persuaded by Plaintiffs' argument that it is also appropriate to apply the Title VII pattern or practice framework to Plaintiffs' allegations of class-wide retaliation.  *See Stoler*, 2013 WL 6068598, at *7 (discussing pattern or practice standard and finding that plaintiffs have adequately alleged a FMLA retaliation claim based on allegations of FMLA

---

[16] However, all of the alleged FMLA-violative policies may qualify as proof of an overall discriminatory pattern with regard to Plaintiffs' racial discrimination claims.

retaliation against individuals); *see also Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 432 (W.D.N.Y. 2005) (rejecting argument that pattern or practice analysis is incompatible with retaliation claims, and noting that pattern or practice retaliation claims have been certified as class actions and successfully prosecuted under Title VII) (citing cases).   Unlike in an individual retaliation case, a class asserting a pattern or practice of retaliation need not allege retaliation against a particular employee to survive a motion to dismiss. *See City of New York*, 717 F.3d at 84.  Rather, Plaintiffs must plead sufficient facts to raise an inference that the City Defendants engaged in a "pervasive policy of retaliation" against the 911 Operators. *See Eastman Kodak*, 407 F. Supp. 2d at 433.

Plaintiffs' pleadings identify two policies that connect FMLA leave usage to allegedly retaliatory consequences.  First, Plaintiffs allege that the City Defendants maintained a policy requiring 911 Operators who took FMLA leave to perform mandatory overtime immediately upon their return from FMLA leave, if the use of FMLA leave caused the 911 Operator to miss scheduled overtime.  (Am. Compl. ¶ 174.)  Second, Plaintiffs allege that in April 2013, Belusic circulated a list of  911 Operators who were not permitted to work voluntary overtime due to a "high absentee rate," regardless of whether the employee was absent due to qualified FMLA leave.  (*Id.* ¶ 164.)  Pursuant to this policy, 911 Operators who used FMLA leave were required to work overtime even when others in their squad were not scheduled to work overtime.  (*Id.*)  The Court construes these policies as discrete retaliatory acts – as opposed to parts of one unified retaliatory policy – alleged in support of two separate pattern or practice retaliation claims.

Turning first to the mandatory overtime policy, the Court finds that the Amended Complaint includes sufficient factual detail from which to infer a pattern of retaliation for the use

of FMLA leave by requiring the immediate performance of mandatory overtime.[17]   Plaintiffs

allege that Kelly instituted a policy on July 27, 2013 to compile and review lists of 911 Operators

who missed mandatory overtime shifts due to FMLA leave, for the purpose of requiring these

operators to perform the missed overtime immediately upon returning from leave, regardless of

whether their squad was scheduled for overtime, or if the shift fell on the operators' regular day

off.  (*Id.* ¶¶ 147−48, 174.)   The Amended Complaint also specifies that named Plaintiff Ennis

was required to perform automatic mandatory overtime upon returning from FMLA leave at

various times between May and the fall of 2013 (*id.* ¶ 175), and that a proposed class member

was ordered to do the same after using FMLA leave at various times after May 2013 (*id.* ¶ 177).

The City Defendants' motion to dismiss this FMLA retaliation claim is, therefore, denied.

Plaintiffs may not, however, proceed on their FMLA retaliation claim based on the

alleged "high absentee" list.  (*Id.* ¶ 164.)  Although a pervasive pattern of retaliation for FMLA

leave usage may well be inferred from the allegation that defendant Belusic circulated a list of

"high absentee" operators, who were precluded from performing voluntary overtime, that

included those who used FMLA leave, *see Ste. Marie*, 650 F.2d at 405−06 (fewer confirmatory

acts may suffice to state a plausible pattern or practice claim if a complaint alleges defendant

adopted a discriminatory policy), Plaintiffs have failed to allege that any named Plaintiff has the

requisite standing to pursue injunctive relief for this claim.   While the pattern or practice

---

[17]  The City Defendants correctly point out that the CBA requires mandatory overtime as a condition of employment, and that the "FMLA was not intended to provide employees with a greater right to . . .  benefits than they would have had" absent utilization of FMLA leave, *see Geromanos*, 322 F. Supp. 2d at 429.  In general, a schedule change or unfavorable shift schedule is a "mere inconvenience" and "not an adverse employment action", when the scheduling "does not occasion a reduction in wages or job responsibilities," *Albuja v. Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 608 (S.D.N.Y. 2012).  However, construing Plaintiffs' pleadings liberally and making all inferences in their favor, the Court is persuaded that the imposition of mandatory overtime *immediately* or otherwise close in time to the use of FMLA leave suggests a fair inference of retaliatory intent based on the exercise of FMLA rights.

framework does not require a proposed class to initially plead any individual retaliation if it can plead a pervasive retaliatory pattern, *see City of New York*, 717 F.3d at 84, Article III requires that at least one plaintiff who, at least, faces the risk of injury that is redressable by the requested injunctive relief.   *Oakley*, 2012 WL 335657, at *15 ("Article III provides that '[f]or a plaintiff to have standing to request injunctive or declaratory relief, the injury alleged must be capable of being redressed through injunctive relief at that moment.'") (quoting *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 64 (S.D.N.Y.2000)).   The Amended Complaint contains no allegations that any named Plaintiff, or any proposed class member, was placed on the "high absentee" list after taking FMLA leave, sought voluntary overtime, or was denied voluntary overtime as a result.   Accordingly, Plaintiffs' FMLA retaliation claim based on an alleged pattern or practice of placing 911 Operators who use FMLA leave on a "high absentee" list must be dismissed.[18]

### F.   First Amendment Retaliation Claim Against the City Defendants

Plaintiffs' fourth cause of action asserts that the City Defendants violated their First Amendment rights by developing and implementing policies and practices designed to deter 911 Operators from speaking about their working conditions to the public.   (Am. Compl. ¶¶ 252−56, 288−90.)   To properly plead a claim for First Amendment retaliation under 42 U.S.C. § 1983, Plaintiffs must adequately allege that: "(1) [their] speech or conduct was protected by the First Amendment; (2) the [City Defendants] took an adverse action against them; and (3) there was a causal connection between the adverse action and the protected speech."   *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).   Plaintiffs "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link."   *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003).

---

[18] Insofar as Plaintiffs assert that the "high absentee" list unlawfully interferes with Plaintiffs' FMLA rights, the claim likewise fails because Plaintiffs have not alleged any prejudice or injury resulting from the alleged interference.

"The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action," *i.e.*, that "the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.2009) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).  However, "'mere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation.'" *Agard v. N.Y.S. Dep't of Taxation & Fin.*, 10 CV 4726, 2012 WL 601474, at *7 (E.D.N.Y. Feb. 23, 2012) (quoting *Washington v. City of New York*, 05 CV 8884, 2009 WL 1585947, at *8 (S.D.N.Y. June 5, 2009)).

Plaintiffs have not adequately pleaded a causal connection between their protected activity and any adverse employment action.  They allege that "[s]ince May 2013," Plaintiffs have complained about their "working conditions" and "the effects of [] forced and mandatory overtime shifts on public safety" in rallies and other forums, generating media coverage of these issues.  (Am. Compl. ¶¶ 252−53.)  Sometime after these activities took place and were reported in media outlets, the City Defendants developed and implemented "additional unlawful employment policies and practices and instituted disciplinary measures against Plaintiffs[.]"  (*Id.* ¶ 255.)  However, Plaintiffs fail to provide details regarding Plaintiffs' alleged public statements, including when they were made.  Plaintiffs' only allegation concerning timing is that Plaintiffs engaged in the alleged protected speech "[s]ince May 2013[.]"  (*Id.* ¶¶ 252−53.)  Plaintiffs also did not specify what "additional" policies they claim Defendants instituted in retaliation for Plaintiffs' speech or the timing of these new policies.  As a result, there is no factual support

from which to infer the existence of these new allegedly retaliatory policies, or any information about the temporal proximity of these policies to any of Plaintiffs' protected activity, so as to raise an inference of causal connection.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *Davis v. Oyster–Bay E. Norwich Cent. Sch. Dist.*, 09 CV 1823, 2010 WL 3855237, at *5 (E.D.N.Y. Sept. 28, 2010) ("an inference of retaliation does not arise" "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity").  Furthermore, as Defendants correctly point out (Dkt. 92 at 25), the Amended Complaint alleges that the challenged adverse employment actions commenced prior to and including May 2013, which further undercuts Plaintiffs' claim of retaliation.  Indeed, Plaintiffs allege that the City Defendants began arbitrarily restricting sick leave in 1999, and interfering with sick and FMLA leave in 2012, and that a disproportionately high number of disciplinary measures taken against 911 Operators commenced in 2011 and continued since then.  (Am. Compl. ¶¶ 107, 121, 232−33.)  These acts all began well before Plaintiffs' claimed public advocacy.  Any continuation of the extensive period of unlawful policies pled in the Amended Complaint fails to sustain an inference of retaliatory intent.

Therefore, based on Plaintiffs' failure to sufficiently plead their First Amendment claim, the City Defendants' motion to dismiss this claim is granted.[19]

### G.  Breach of Contract Claim Against the City Defendants

Plaintiffs' sixth cause of action asserts a breach of contract claim against the City Defendants for violating the CBA by scheduling excessive involuntary double-shifts, canceling sick leave, violating health protection rights, and failing to provide proper notice of overtime.

---

[19] Having dismissed Plaintiffs' First Amendment claim on this basis, the Court need not reach the City Defendants' argument that Plaintiffs' speech was not protected.  (Dkt. 92 at 20−24.)

(*Id.* ¶¶ 296−98.)   The City Defendants contend that Plaintiffs' breach of contract claim fails because Plaintiffs did not sufficiently plead that DC 37 breached its duty of fair representation to the Plaintiffs.  (Dkt. 92 at 30−31.)[20]  The Court disagrees.

"[A] suit in which an employee alleges that an employer has breached a CBA and that a union has breached its duty of fair representation by failing to enforce the CBA is known as a 'hybrid § 301/fair representation claim.'"  *Acosta v. Potter*, 410 F. Supp. 2d 298, 308 (S.D.N.Y. 2006) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65, (1983)) (referring to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a)).  To succeed on this type of claim, "a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members."  *Bejjani v. Manhattan Sheraton Corp.*, 12 CV 6618, 2013 WL 3237845, at *8 (S.D.N.Y. June 27, 2013) (quoting *White*, 237 F.3d at 178), *aff'd* 567 F. App'x 60 (2d Cir. 2014).  "Because a union's breach of the duty of fair representation 'is a prerequisite to consideration of the merits of plaintiff's claim against' an employer for breach of a CBA, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the union has acted arbitrarily, in bad faith, or discriminatorily."  *Acosta*, 410 F.Supp.2d at 309 (citing *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990)).  By the same token, "if the employer is not liable to the employee, neither is the union."  *Id.*

A union "has a duty to represent fairly all employees subject to the collective bargaining agreement."  *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (citing *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74 (1991)).  To prove that a union breached its duty of

---

[20] The City Defendants do not challenge Plaintiffs' allegations regarding the City Defendants' violations of the CBA.  Moreover, Plaintiffs' claims regarding mandatory overtime or working during meal breaks arguably state violations of the CBA.

fair representation, a plaintiff must establish (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith", and (2) "a causal connection between the union's wrongful conduct and [the plaintiff's] injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (internal citations and marks omitted.)  A union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness" as to be irrational.  *O'Neill*, 499 U.S. at 67 (citation and quotation marks omitted).  A union's acts are discriminatory when "substantial evidence" indicates that it engaged in discrimination that was "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971).  Bad faith, which "encompasses fraud, dishonesty, and other intentionally misleading conduct," requires proof that the union acted with "an improper intent, purpose, or motive."  *Spellacy*, 156 F.3d at 126 (citations omitted).

Since DC 37 did not move to dismiss Plaintiffs' duty of fair representation claim against it, the City Defendants' contention that Plaintiffs fail to state a claim because DC 37 did not breach its duty is arguably premature.  Nevertheless, the Court finds that the Plaintiffs' allegations are sufficient to survive a motion to dismiss.  The Amended Complaint alleges that DC 37 filed a grievance in 2006 and an arbitration in 2007, and prevailed in both, resulting in the 2008 Arbitration Decision.  (Am. Compl. ¶¶ 122, 124−25.)  However, the Amended Complaint also describes DC 37's failings in enforcing the CBA and Arbitration Decision, despite knowledge of repeated violations by the City, including the City Defendants' repeated cancellations of sick leave.  (*Id.* ¶¶ 118−19, 129, 149, 240−46.)  Plaintiffs also allege that DC 37 refused to grieve issues, such as the practice of preventing 911 Operators from leaving their shift

by withholding sign-out sheets, despite repeated complaints.  (*Id.* ¶¶ 155, 247.)  In addition, the Amended Complaint also alleges that DC 37 has pressured 911 Operators, including Plaintiffs Gordon and Inman, to withdraw their requests for reasonable accommodations.  (*Id.* ¶¶ 227−28.) When considered alongside Plaintiffs' allegations of long-standing and widespread violations of the CBA, Plaintiffs have pled sufficient facts to state a plausible claim for a breach of the duty of fair representation.[21]

The Court therefore denies City Defendants' motion to dismiss Plaintiffs' breach of contract claim.

### H.  New York State Labor Law §162 Claim Against the City Defendants

The New York Labor Law requires that employees be provided with meal breaks of specified lengths based on the times and durations of their shifts.  N.Y. Lab. Law § 162. Plaintiffs' seventh cause of action alleges that the City Defendants violated New York Labor Law § 162 ("§ 162") by requiring 911 Operators to answer and dispatch calls during their meal breaks.  (Am. Compl. ¶¶ 5, 115−16, 214, 299−300.)  This claim fails as a matter law because there is no private right of action to enforce under § 162.  *Awan v. Durrani*, 14 CV 4562, 2015 WL 4000139, at *9 n.12 (E.D.N.Y. July 1, 2015); *Romero v. DHL Express, Inc.*, 12 CV 1942, 2015 WL 1315191, at *7 (S.D.N.Y. Mar. 24, 2015); *Ellis v. Common Wealth Worldwide Chaeffuered Transp. of NY, LLC*, 10 CV 1741, 2012 WL 1004848, at *10 (E.D.N.Y. Mar. 23, 2012); *Browne v. IHOP*, 05 CV 2602, 2005 WL 1889799, at *1 (E.D.N.Y. Aug. 9, 2005);

---

[21] The Court declines the City Defendants' invitation to rely upon documents submitted in connection with Plaintiffs' prior motion for a preliminary injunction, which describe additional efforts by DC 37, to adjudicate its motion to dismiss. (*See* Dkt. 92 at 31; 93 at 1.)  For purposes of a motion to dismiss, the Court must accept the facts presented in the Complaint, together with only those documents incorporated or referenced in the Complaint.  *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

*Carrube v. N.Y.C. Transit Auth.*, 738 N.Y.S.2d 67, 67 (N.Y. App. Div. 2002); *see McElroy v. New York*, 270 N.Y.S.2d 113, 115 (N.Y. Sup.Ct. 1966), *aff'd*, 287 N.Y.S.2d 352 (N.Y. App. Div. 1968).   Plaintiffs may instead "consider presenting [such a] claim to the New York Commissioner of Labor who is charged with regulating and enforcing New York's labor laws." *Browne*, 2005 WL 1889799, at *1 (citation omitted).[22]   Plaintiffs' seventh cause of action is accordingly dismissed.

## I.   Summary of Dismissed and Surviving Claims

In sum, the City Defendants' motion to dismiss the Amended Complaint in its entirety is granted in part and denied in part.

The following claims are dismissed as to the City Defendants: (1) Plaintiffs' FMLA interference claim based on certification delay, miscalculation of eligibility hours, use of a designated FMLA number, and investigation of FMLA use (fifth cause of action); (2) Plaintiffs' FMLA retaliation claim based on the "high absentee" list (fifth cause of action); (3) Plaintiffs'

---

[22]   Plaintiffs' reliance on *Maimonides Med. Ctr. v. First United Am. Life Ins. Co.*, 981 N.Y.S.2d 739, 749 (N.Y. App. Div. 2014) to support the existence of a private right to sue under § 162 is unavailing.   (*See* Dkt. 94 at 33.)   In *Maimonides*, a New York State appellate court rejected a bright line rule that courts may not infer a private right of action to enforce a statute when a "potent official enforcement mechanism" exists.   981 N.Y.S.2d at 749.   Instead, whether the existence of a private right of action may be implied depends on a careful analysis of: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme".   *Id.* at 743−44 (citations and internal quotation marks omitted)).   Plaintiffs, however, have not provided any analysis of § 162 or any other provision of the New York Labor Law to show that a private right of action to enforce meal breaks can be fairly implied in its statutory provisions or legislative history.   Additionally, after *Maimonides*, district courts in this Circuit have continued to recognize that no private right of action exists to enforce § 162.   *See Awan*, 14 CV 4562, at *16 n.12; *Romero*, 2015 WL 1315191, at *7.   *But see Nardiello v. Maureen's Kitchen, Inc.*, 14 CV 4070, 2015 WL 1223804, at *4 (E.D.N.Y. Mar. 17, 2015) (finding, without analyzing whether a private right of action could be inferred from § 162, that complaint plausibly alleged violations of the statute); *Hamilton v. Newburgh-Beacon Bus Corp.*, 14 CV 624 VB, 2014 WL 7398908, at *5 (S.D.N.Y. Dec. 4, 2014) (same); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 395 (W.D.N.Y. 2014) (same); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 44 (W.D.N.Y. 2014) (same).

First Amendment retaliation claim (fourth cause of action); and (4) Plaintiffs' New York State Labor Law claim (seventh cause of action).

The City Defendants' motion is denied with respect to: (1) Plaintiffs' racial discrimination claims under §§ 1981 and 1983 (first cause of action); (2) NYSHRL racial discrimination claim (second cause of action); (3) NYCHRL racial discrimination claim (third cause of action); (4) Plaintiffs' FMLA interference claim based on the 30−minute call window and the miscalculation of FMLA hours used (fifth cause of action); (5) Plaintiffs' FMLA retaliation claim based on mandatory overtime immediately following FMLA leave (fifth cause of action); and (6) Plaintiffs' breach of contract claim (sixth cause of action).

DC 37's motion to dismiss Plaintiffs' § 1981 racial discrimination claim is granted with respect to any claim of direct discrimination, but denied with respect to an acquiescence theory (tenth cause of action).

## II.     Plaintiffs' Motion for Class Certification

Plaintiffs seek certification under FRCP 23(a) and 23(b)(2) on liability and for an injunction of a "§ 1981 Class" and a "FMLA Class," defined as follows:

> Section 1981 Racial Discrimination Rule 23(b)(2) Class
> All minority individuals who are currently employed, or have been employed within three years preceding the filing of this action, by the City of New York as Police Communications Technicians ("PCTs") or Supervisor Police Communication Technicians ("SPCTs") in the NYPD Communications Section.
>
> FMLA Rule 23(b)(2) Class
> All minority individuals who are currently working in the civil services titles of PCT and SPCT in the NYPD Communications Section who are eligible for FMLA leave.

(Dkt. 104 at 2.)  Plaintiffs clarify that these definitions are limited to operators still employed by the City since only they will benefit from injunctive relief sought in this action.  (Dkt. 108 at 8.) Both the City Defendants and DC 37 oppose certification.

### A.  Legal Standard for Class Certification

FRCP 23 permits an action to be litigated as a class only if the party seeking certification can satisfy the four prerequisites of FRCP 23(a) and also show that at least one of the three criteria in FRCP 23(b) is met.  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *Marisol A. v. Guiliani*, 126 F.3d 372, 375–76 (2d Cir. 1997).  The moving party must demonstrate compliance with these rules by a preponderance of the evidence.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

The prerequisites of FRCP 23(a) are numerosity, commonality, typicality and adequacy of representation.  Plaintiffs must show on a preponderance of the evidence that "(1) 'the class is so numerous that joinder of all members is impracticable'; (2) 'there are questions of law and fact common to the class'; (3) 'the claims or defenses of the representative parties are typical' of those of the class; and (4) 'the representative parties will fairly and adequately protect the interests of the class.'"  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(a)).  In determining whether the moving party has established the prerequisites of FRCP 23(a), the Court conducts a rigorous analysis of the record; such analysis will frequently "entail 'overlap with the merits of the plaintiff's underlying claims.'"  *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013) (citing *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  However, FRCP 23 does not grant the Court license to engage in "free-ranging merits inquiries"; merits questions are to be considered only "to the extent that they are relevant" to the FRCP 23(a) inquiry.  *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (citing *Wal-Mart*, 131 S.Ct. at 2552, n.6.).

Upon a finding that the proposed class meets FRCP 23(a), the Court then determines whether certification is appropriate under FRCP 23(b).  *Roach*, 778 F.3d at 405.  To obtain

injunctive relief, Plaintiffs must satisfy FRCP 23(b)(2), which provides that a class action may be maintained if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or[] declaratory relief is appropriate" for the class as a whole.

The Court finds that certification under FRCP 23(a) and 23(b)(2) are appropriate, except as limited below.

## B. FRCP 23(a)

### 1. Numerosity

Numerosity requires that the proposed class have so many members so as to make joinder of all members impracticable.   FRCP 23(a)(1).   "[A] plaintiff need not present a precise calculation of the number of class members and it is permissible for the court to rely on reasonable inferences drawn from available facts[.]"   *Velez v. Majik Cleaning Service, Inc.*, 03 CV 8698, 2005 WL 106895 at *2 (S.D.N.Y. January 19, 2005); *see Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).   While there is "no magic minimum number" to establish numerosity, courts in the Second Circuit generally presume that a class consisting of 40 or more members is sufficiently numerous.   *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 383 (E.D.N.Y. 2013), *aff'd sub nom.*, *Gortat v. Capala Bros., Inc.*, 568 F. App'x 78 (2d Cir. 2014) (citations omitted).   Additionally, "the Second Circuit has relaxed the numerosity requirement where" as here "the putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2)."   *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001)

Defendants do not contest numerosity in this case, and the Court is satisfied that both classes meet this requirement.   Plaintiffs allege that the class includes approximately 1,300 African-American, Hispanic, and other minority 911 Operators.   Combined with Plaintiffs' allegations that each of the eight named plaintiffs is eligible for FMLA leave, the Court draws a

"reasonable inference" that the number of minority operators eligible for FMLA leave is also sufficiently numerous.  (Am. Comp. ¶¶ 5, 17, 257 (City employs over 1,200 911 Operators, 95% of whom are minorities); *see* Dkt. 105 at 1.)

2.  <u>Commonality</u>

To satisfy FRCP 23(a)'s commonality requirement, plaintiffs must show that the class members have "suffered the same injury" and that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution."  *Sykes v. Mel S. Harris and Assocs. LLC*, 13 2742 CV, 2015 WL 525904, at *7 (2d Cir. Feb. 10, 2015) (quoting *Wal-Mart*, 131 S. Ct. at 2551).  "What matters to class certification . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Nagareda*, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009)) (emphasis in original).  The commonality question before the Court at the class certification stage is "whether the record evidence demonstrates a likelihood that common answers will be determined via a class action approach, or conversely, whether differences among [the proposed class members] will necessarily generate individualized, rather than common, determinations as [the] litigation moves forward."  *Jacob v. Duane Reade*, 289 F.R.D. 408, 414−15 (S.D.N.Y. 2013), *on reconsideration in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 2015 WL 525697 (2d Cir. Feb. 10, 2015).  "[F]or purposes of Rule 23(a)(2) even a single common question will do."  *Wal–Mart*, 131 S.Ct. at 2556 (quotation marks and alteration omitted).

Applying these principles, the Court finds that both proposed classes satisfy commonality.  With respect to the § 1981 class, Plaintiffs' central claim is that the City Defendants "created discriminatory and unsafe working conditions" for the named Plaintiffs and

proposed class.  (*See* Dkt. 105 at 13.)  Plaintiffs provided a number of plaintiff declarations in support of their allegations that the City Defendants applied a set of practices and policies uniformly across the class as part of an *overarching* pattern of discrimination, including blanket cancellation of sick leave, mandatory double-shifts and/or overtime shifts several times a week, and automatic declarations that operators who request limited overtime as an ADA accommodation were unfit for duty.  (*See* Dkt. 106.)  Thus, common questions exist, including whether the City Defendants maintained a pervasive system of discrimination against the 911 Operators through the challenged discriminatory practices and policies, and whether the City Defendants' discriminatory intent can be inferred from statistical evidence, anecdotal evidence, or evidence that a similarly-situated group was not subjected to the same policies.  Another common question exists as to whether the City Defendants breached the CBA through its leave policies.  Since answering these questions are apt to drive the resolution of the case class-wide, the commonality requirement is met.

The City Defendants argue that Plaintiffs cannot establish commonality because they have not shown that the challenged practices are causally related to a pattern of disparate treatment based on race.  The City Defendants contend, for instance, that because the challenged policies apply to all 911 Operators, and not just minority operators, there can be no finding of discriminatory intent.  These arguments, however, go to the merits of the action and are irrelevant to the commonality inquiry, which asks whether one or more common questions exist that can be answered class-wide.  Indeed, if Defendants are correct that Plaintiffs cannot show discriminatory intent, the class racial discrimination claims will be resolved in a single stroke.

Equally unavailing is the City Defendants' argument that answering the question of whether the City retaliated against 911 Operators who filed reasonable ADA accommodation

requests requires individualized inquiries.   Plaintiffs' allegation is that once a 911 Operator submits a reasonable accommodation request to limit hours, the Operator is invariably sent to a "sham" § 72 examination with a City physician, often Defendant Lichtenstein, during which no actual examination is conducted, and after which the 911 Operator is automatically declared unfit for duty and placed on leave without pay.   Since Plaintiffs allege that this policy applies regardless of individual circumstances, no individualized inquiries, for purposes of determining liability, are required.   Rather, determining the City's liability will turn on class-wide inquiries on the existence and pervasiveness of this policy and practice.

As to the FMLA class, common questions exist as to whether the City Defendants' policy and practice of requiring all requests for unanticipated FMLA leave be made within 30 minutes of the request, or the City Defendants' practice of miscalculating the hours of FMLA hours used by 911 Operators, constituted *per se* interference with the 911 Operators' exercise of their FMLA rights.   Common questions also exist as to whether the City Defendants created a standard operating procedure that retaliated against the 911 Operators for exercising their FMLA rights by requiring them to perform overtime immediately after their FMLA leave.   Contrary to the City Defendants' contentions, resolving these questions does not involve individual inquiries. Rather, the focus of these inquiries is on the City Defendants' uniform actions and policies as applied to the class as whole.   Likewise, liability can be established by common proof across the class − *e.g.*, a showing that the City Defendants maintained a policy of denying FMLA leave requests made beyond the 30−minute window, regardless of exigent circumstances, contrary to the FMLA.

3.  Typicality

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1992)).  *Wal-Mart* recognized that in some contexts, commonality and typicality may merge because "[b]oth serve as guideposts determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  131 S. Ct. at 2551 n.5.  A named plaintiff's claims need not be identical to those of the proposed class members; so long as the named plaintiff's claims share the same essential characteristics as that of the proposed class, typicality will be satisfied, even where there are "minor variations in the fact patterns underlying individual claims."  *Glatt v. Fox Searchlight Pictures*, 293 F.R.D. 516, 537 (S.D.N.Y. 2013) (quoting *Robidoux*, 987 F.2d at 936−37).  "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (quoting *Gary Plastic Packaging Crop. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

Initially, Plaintiffs acknowledge that because named Plaintiffs Hill and Holly are retired, they do not stand to benefit from any prospective injunctive relief.  As their claims are not typical of the class, they may not be appointed as class representatives.

The remaining named Plaintiffs, however, satisfy the typicality requirement for the § 1981 and FMLA classes.  For both classes, the claims of the representatives and the class

members stem from the same course of conduct and are based on the same legal or remedial theories.  Turning first to the § 1981 class, like members of the proposed class, the named Plaintiffs are minority individuals who are employed by the City as 911 Operators in the Communications Section.  Each alleges that he or she was subject to the same overtime policies as well as restrictive leave policies based on their race.  With respect to the FMLA class, the named Plaintiffs are each eligible for FMLA and subject to the City's FMLA policies.  Ennis has specifically alleged that the City Defendants interfered with her FMLA leave by rejecting her FMLA requests made outside of the 30−minute call window.  Ennis further alleges that the City Defendants retaliated against her for using FMLA leave during an overtime shift by requiring her to work  overtime immediately upon her return from leave.  Thus, for both proposed classes, the named Plaintiffs assert the same claims and will rely on the same proof as putative class members.

The factual variations in each named Plaintiff's experiences with these policies do not destroy typicality so long as the disputed issues occupy the same degree of centrality between the named representatives and the class.  *See Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d. Cir. 1999); *Latino Officers Ass'n v. City of New York*, 209 F.R.D. 79, 88 (S.D.N.Y. 2002).  That each named Plaintiff may not yet have been affected by each alleged policy does not destroy typicality, given that the named Plaintiffs are current employees who are subject to, and seek to enjoin, the same allegedly unlawful policies.

4.  Adequacy

"Adequacy of representation is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." *Jackson*, 298 F.R.D. at 164.  Courts consider whether the class representative is prepared to fully

litigate the action and has any known conflicts with other class members.  *Shayler v. Midtown Investigations, Ltd.*, 12 CV 4685, 2013 WL 772818, at *5 (S.D.N.Y. Feb. 27, 2013).  A conflict of interest "must be fundamental" and concrete to defeat a motion for certification.  *In re Flag Telecom Holdings, Ltd Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  Defendants do not contest the adequacy of class counsel, nor does the record provide a basis to doubt the competency of counsel to represent the class.   Similarly, with respect to the adequacy of the class representatives, nothing in the record suggests an improper motive on the part of any named Plaintiff or a fundamental conflict of interest with members of the proposed class.   To the contrary, the interests of the named representatives Williams, Inman, Gordon, Lopez, Pate, and Ennis align closely with the interests of the putative class members.  Their claims arise under the same legal theories as will be relied on by the class members, the class members were harmed in the same way, and each class member seeks the same recovery.

5.   Ascertainability

"Although not expressly stated in the Rule, courts have found an implied requirement of ascertainability [in addition] to the express requirements set forth in Rule 23(a)."  *Stinson v. City of New York*, 282 F.R.D. 360, 373 (S.D.N.Y. 2012); *see In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).  "An identifiable class exists if its members can be ascertained by reference to objective criteria."  *In re Fosamax*, 248 F.R.D. 248, 395 (S.D.N.Y. 2008) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y.2002)). The standard for ascertainability "is not demanding" and "is designed only to prevent the certification of a class whose membership is truly indeterminable."  *Gortat v. Capala Bros., Inc.*, 07 CV 3629, 2010 WL 1423018, at *2, (E.D.N.Y. Apr. 9, 2010).   In class actions seeking only declaratory and injunctive relief under FRCP 23(b)(2), "general class descriptions based on the

harm allegedly suffered by plaintiffs are acceptable." *Floyd v. City of New York*, 283 F.R.D. 153, 171 (S.D.N.Y. 2012) (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 415 (S.D.N.Y. 2001)).

Here, the class members can be identified by reference to "objective criteria." *In Re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 209 F.R.D. at 337). Both purported classes consist of minority employees holding specific titles who worked in a specific NYPD section over a defined period of time. Contrary to the City Defendants' contention, a class defined as "minority individuals" is ascertainable. *See Comer v. Cisneros*, 37 F.3d 775, 779 (2d Cir. 1994) (finding that class of minority applicants for housing assistance satisfied Rule 23(a)); *D.S. ex rel. S.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 65 (E.D.N.Y. 2008) (certifying class of minority students). The Court also disagrees with the City Defendants' argument that the proposed § 1981 class is overbroad because it includes employees employed within the last three years of the filing of the complaint, *i.e.*, the applicable statute of limitations period, even though Plaintiffs' allegations primarily describe events after May 2013. As previously noted, Plaintiffs' other allegations describe a much longer history of alleged discrimination and violation of the CBA. At this early stage in the litigation, the Court exercises its discretion "to view the class broadly and reduce it in the future, if necessary." *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752, 756 (S.D.N.Y. 1988) (citing *General Tel.*, 457 U.S. at 160).

The City Defendants' objection to defining the FMLA class as those eligible for FMLA leave is also unavailing. The FMLA defines eligibility in concrete terms, *i.e.*, an individual employed for at least 12 months who worked for at least 1250 hours during the 12−month period preceding the request for FMLA leave. 29 U.S.C. § 2611(2). FMLA class membership thus

may be readily ascertained by reference to the City Defendants' personnel records. *See Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) (finding ascertainability where "[t]he class can clearly be ascertained by objective documentation, such as Defendants' employee payroll records and wage statements"); *Noble v. 93 University Pl. Corp.*, 224 F.R.D. 330, 341–42 (S.D.N.Y. 2004) ("[C]ertification is routinely granted where the proposed class definition relies in part on the consideration of the defendants' alleged liability."). Finally, the Court is not persuaded by the City Defendants' argument that the FMLA class is overbroad because it includes 911 Operators who have not requested leave, since, as discussed, Plaintiffs' FMLA interference claim applies equally to 911 Operators who have not requested leave. The implied ascertainability requirement is therefore satisfied.

In sum, the Court finds that Plaintiffs' proposed § 1981 and FMLA classes meet all of the criteria for class certification under FRCP 23(a).

## C.  FRCP 23(b)(2)

### 1.      FRCP 23(b)(2)

Given its finding that the FRCP 23(a) prerequisites are met, the Court now analyzes whether each class satisfies at least one of FRCP 23(b)'s three subsections. Plaintiffs seek certification under subsection (b)(2). Certification under FRCP 23(b)(2) is appropriate if Defendants have acted or refused to act on grounds generally applicable to a class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole. "Rule 23(b)(2) is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief." *Marisol A. v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y.1996), *aff'd*, 126 F.3d 372 (2d Cir.1997). "Class certification under Rule 23(b)(2) is particularly appropriate in civil rights litigation." *Stinson*, 282 F.R.D. at 379;

see *Loper v. N.Y.C. Police Dep't*, 135 F.R.D. 81, 83 (S.D.N.Y. 1991) ("Without class certification, their case . . . could fail on technicality. Indeed, it is in part for concerns such as these that civil rights actions are paradigmatic 23(b)(2) class suits."). In this case, Plaintiffs seek to enjoin the challenged discriminatory policies and FMLA violations, and to obtain a declaratory judgment stating that the City Defendants' pattern or practice of disparate treatment of the 911 Operators is unlawful. (Am. Compl. at 60−61.)

Certification under FRCP 23(b)(2) is appropriate in this case with respect to the claims against both the City Defendants and DC 37. With respect to their § 1981 claim against the City Defendants, Plaintiffs have made a sufficient showing, by a preponderance of the evidence, that the City Defendants acted on grounds generally applicable to the proposed class. The Amended Complaint includes repeated instances when the City Defendants issued a blanket cancellation of sick leave for 911 Operators, scheduled 911 Operators for consecutive double-shifts and/or overtime shifts, and required 911 Operators who request reasonable ADA accommodations, in the form of limited overtime hours, to undergo "sham" medical examinations. With respect to the FMLA class, Plaintiffs submitted a memorandum circulated by Kelly on July 23, 2013, announcing that because "members of squads scheduled for overtime three times a week . . . are reporting sick or FMLA to avoid overtime", all platoon commanders will conduct daily reviews of sick and FMLA lists for the previous day's tour and order overtime on the current tour for any 911 Operator "who reported sick or FMLA for their squad's ordered overtime tour on the previous day . . . even if their squad is not ordered." (Dkt. 106−2.) Plaintiffs also submitted an email from Belusic stating that the disciplinary unit will only accept emergent FMLA requests at most 30 minutes prior to the time of requested leave. (Dkt. 106−3.) Additionally, Plaintiffs submitted declarations from the named Plaintiffs and members of the proposed class attesting to

these violations, and to DC 37's repeated failure to meaningfully protect their rights.   The requested injunctive relief, insofar as it seeks to enjoin these policies and to obtain a declaratory judgment, would remedy these alleged wrongs class-wide.

With respect to the Section 1981 claims against it, DC 37 contends that Plaintiffs cannot show by a preponderance of the evidence that DC 37 acted or refused to act on generally applicable grounds because the core factual allegations underlying Plaintiffs' § 1981 claims "have been shown to be false", thereby rendering these claims moot.  (Dkt. 110 at 1.)[23]  *See Comer*, 37 F.3d at 800 (to establish mootness, a party who claims to have voluntarily ceased illegal conduct must demonstrate that there is no reasonable expectation that the conduct will occur, and that interim relief or events have completely eradicated the effects of the alleged violation).   DC 37 has submitted affidavits detailing DC 37's advocacy on behalf of the 911 Operators, including, in particular, the grievance it filed on January 31, 2014 regarding sick leave cancellations in late 2013 and early 2014.  (Dkt. 61 ¶ 51 & Ex. J; *see* Dkt. 112.)  On November 28, 2014, DC 37 and the City reached a settlement agreement in which (1) the NYPD acknowledged that it cannot deny NYPD employees the right to request sick leave, (2) agreed to reimburse any DC 37 member who was docked pay and designed as "AWOL" for attempting to use sick leave, and (3) rescind discipline imposed on DC 37 members for attempting to use sick leave.  (Dkt. 113 ¶ 5 & Ex. A.)

However, as Plaintiffs correctly counter, DC 37's recent efforts do not render Plaintiffs' claims moot since these efforts have not resulted in meaningful relief.  Plaintiffs have submitted

---

[23]DC 37 also reiterates its motion-to-dismiss argument that Plaintiffs presented no evidence of racial animus.  (Dkt. 110 at 11.)   The Court has already rejected that argument, *see supra* at 31−34, and further notes that an inquiry into the merits of that claim is inappropriate in deciding Plaintiffs' motion for class certification.  *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 280 F.R.D. 78, 83 (E.D.N.Y. 2012) ("A motion for class certification should not become a mini-trial on the merits.")

affidavits from the named Plaintiffs attesting to the facts that sick leave continued to be canceled from December 31, 2014 to January 1, 2015 and again from January 26, 2015 to January 28, 2015, and that DC 37 is aware of these ongoing cancellations by the City Defendants.  (Dkt. 109−2 ¶¶ 10−12, 15; 109−3 ¶¶ 10−12, 15.)  If true, these facts further support the Amended Complaint's claim that DC 37's alleged failure to protect the 911 Operators by, *inter alia*, not enforcing agreements with the City, are ongoing.  Plaintiffs contend that the November 2014 agreement is only the latest example of a long history of DC 37 failing to secure practical relief for Plaintiffs, and that class certification is necessary for Plaintiffs to finally obtain relief class-wide.  (Dkt. 108 at 5.)  Since this history creates a reasonable expectation that the complained-of conduct, namely DC 37's failure to protect 911 Operators, will recur, Plaintiffs' claims are not moot.  *See Comer*, 37 F.3d at 800.

Because Plaintiffs have alleged the existence of City policies and practices that pose a legitimate, non-speculative threat to Plaintiffs' rights, the Court certifies both the § 1981 and FMLA classes to seek declaratory and injunctive relief pursuant to FRCP 23(b)(2).

### 2.   Standing With Respect to Claims Against the City Defendants

Defendants present a variety of challenges to the named Plaintiffs' standing to seek injunctive relief.  "To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and "'likely' to be redressed by a favorable ruling."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).  Moreover, plaintiffs seeking injunctive relief must establish a fourth element to have standing, namely a "real and immediate threat of repeated injury" demonstrated by more than "past exposure to illegal conduct."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).  In other words, it must be "likely,

as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

As to the § 1981 Class, the Court finds that named Plaintiffs Williams, Inman, Gordon, Lopez, Pate, and Ennis, as current employees, have standing to challenge many of the policies that they claim are a part of the overall pattern or practice of racial discrimination in resourcing and structuring the 911 Operators' unit.  For instance, given the history of repeated unit-wide cancellation of sick leave alleged in the complaint, the named Plaintiffs are likely to be subject to the challenged unlawful policies again, and thus have standing to assert these claims. Plaintiffs allege that several of the named Plaintiffs were required to work consecutive mandatory double-shifts and/or overtime shifts, and that this policy is ongoing. Plaintiffs also allege that Gordon, Ennis, and Inman requested, and were denied, reasonable accommodations after being subject to a "sham" medical examination, and submit a copy of the notice declaring Gordon unfit for duty. (Dkt. 106−6.)  The fact that several named Plaintiffs were declared unfit for duty after requesting reasonable accommodations demonstrates that the potential for future harm is not speculative. Additionally, that the named Plaintiffs did not personally experience each manifestation of the City Defendants' overall course of discriminatory treatment of the 911 Operators does not, as City Defendants contend, destroy standing to seek class-wide injunctive relief in a pattern or practice case.  Rather, Plaintiffs may present evidence of the universal applicability of the City Defendants' policies and practices as proof of the overarching pattern of discriminatory conduct.

With respect to the FMLA class, the City Defendants acknowledge that Ennis has standing to pursue FMLA interference claims with respect to the 30−minute call window policy and the miscalculation of FMLA time used.  (Dkt. 114 at 12−13.)  This is sufficient for a class action lawsuit. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco*

*Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class").  As for Plaintiffs' FMLA retaliation claims, the Amended Complaint alleges that Ennis was required to perform automatic mandatory overtime upon returning from her FMLA leave at various times between May and the fall of 2013.  There is no indication on the record that the City Defendants have discontinued their announced policy of requiring 911 Operators to make up missed mandatory overtime immediately upon returning from FMLA leave.  Considering Ennis's continued employment and repeated use of FMLA leave in the past, the Court finds that Ennis has established a real and immediate threat of repeated injury to seek injunctive relief, and thus has standing with respect to this claim.

### *CONCLUSION*

In conclusion, the City Defendants' motion to dismiss is granted in part and denied in part.  The Court dismisses the following claims as to the City Defendants: (1) Plaintiffs' FMLA interference claim based on certification delay, miscalculation of eligibility hours, use of a designated FMLA number, and investigation of FMLA use (fifth cause of action); (2) Plaintiffs' FMLA retaliation claim based on the "high absentee" list (fifth cause of action);  (3) Plaintiffs' First Amendment retaliation claim (fourth cause of action); and (4) Plaintiffs' New York State Labor Law claim (seventh cause of action).

The following claims are *not* dismissed and will proceed: (1) Plaintiffs' racial discrimination claims under §§ 1981 and 1983 (first cause of action); (2) NYSHRL racial discrimination claim (second cause of action); (3) NYCHRL racial discrimination claim (third cause of action); (4) Plaintiffs' FMLA interference claim based on the 30−minute call window and the miscalculation of FMLA hours used (fifth cause of action); (5) Plaintiffs' FMLA

retaliation claim based on the requirement to perform mandatory overtime immediately upon returning from leave (fifth cause of action); and (6) Plaintiffs' breach of contract claim (sixth cause of action).

DC 37's motion to dismiss Plaintiffs' § 1981 racial discrimination claim (tenth cause of action) is granted insofar as Plaintiffs assert a direct discrimination claim, but denied on an acquiescence theory.  Since DC 37 did not move to dismiss Plaintiffs' breach of duty of fair representation claim (eighth cause of action), that claim will proceed.

Plaintiffs' motion to certify the proposed § 1981 and FMLA classes, pursuant to FRCP 23(b)(2) for liability and injunctive relief, is granted.

SO ORDERED:

    /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 28, 2015
       Brooklyn, New York